**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
JOINT DEFENSE PRIVILEGE**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

FRED E. WEIDERHOLD, JR.
  AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
  CORPORATION,

                        Petitioner,

        v.

BOMBARDIER, INC.,
ALSTOM TRANSPORTATION, INC.,
NORTHEAST CORRIDOR MAINTENANCE
  SERVICES COMPANY,

                Respondents.

---

Civil No. 1:05 MS 367
Judge Friedman

**MEMORANDUM IN SUPPORT OF RESPONSE AND
CROSS-PETITION OF BOMBARDIER INC. AND
NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY**

JONES DAY
Attorneys for Bombardier Inc. and Northeast
  Corridor Maintenance Services Company
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

WINSTON & STRAWN LLP
Attorneys for Northeast Corridor Maintenance
  Services Company
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000

Respondents Northeast Corridor Maintenance Services Company ("NeCMSC') and Bombardier Inc. ("Bombardier'), respectfully submit this memorandum in support of their Response and Cross Petition (the "Amended Petition Response") to the August 8, 2006 Amended Petition (the "Amended Petition") of Fred E. Weiderhold, Jr., the Inspector General for the National Railroad Passenger Corporation ("Amtrak").[1]  For the reasons set forth below, the Amended Petition should be denied.

## Preliminary Statement

On April 14, 2005, Amtrak's *Acela* high-speed train service was suspended after cracks were found in spokes of friction discs for passenger car brakes (the "Brake Problem").[2]  Within a few months the Federal Railroad Administration (the "FRA") gave safety approval to a new disc design, and the trains were returned to service.  In the Inspector General's own words, "Acela trains have been retrofitted with redesigned disc brake rotors that have been <u>fully</u> <u>inspected</u> or <u>certified</u> for use by the FRA."  Original Pet. Mem. at 4 n.6.  Since then, Amtrak has settled all related commercial issues with Respondents, who, in turn, have settled with the subcontractor that supplied the brakes in question.  On October 1, 2006, Respondent NeCMSC, the entity against which the Amended Petition is principally directed, transferred to Amtrak all of its operating responsibilities and related files.  Thus, all legitimate safety and commercial issues arising out of the Brake Problem have been resolved or are moot.  Amended Pet. Resp. ¶ 1.

---

[1]     The Inspector General's Original Petition and supporting memorandum, filed on September 22, 2005 (DKT. 1), will be cited respectively as the "Original Petition" or "Original Pet." and "Original Pet. Mem.". The Amended Petition and its supporting memorandum will be cited herein respectively as "Amended Pet." and "Amended Pet. Mem."  Respondents' brief in response to the Original Petition which was served, but not filed, will be denominated "Original Petition Response" or "Original Pet. Resp."  The Amended Petition Response is abbreviated "Amended Pet. Resp."  The entire Original Petition Response and all supporting declarations and exhibits, which have been filed simultaneously herewith, are incorporated herein by reference.  Unless otherwise indicated, all emphasis herein is our own.

[2]     There are multiple brake systems on Acela trainsets.  Only the passenger or "trailer" car friction brakes were implicated by the Brake Problem.

Eighteen months after the Brake Problem first arose, Petitioner, armed with a roving commission and accountable to no one, continues an obsessive pursuit of this matter. The Inspector General's investigation has long since become abusive. At a cost of over $1.5 million, Respondents have produced in excess of 1.3 million pages of records, participated in scores of written and oral exchanges with Petitioner's staff, subjected a number of their employees and consultants to lengthy interviews and submitted a variety of memoranda, written reports, analyses, exhibits and affidavits. Respondents have time and again attempted to resolve issues raised by the Inspector General's staff, only to be confronted with still more unreasonable demands, from which no appeal was permitted to either the Inspector General himself or anyone else. Amended Pet. Resp. ¶ 2.

The problem appears at heart to be a political one. As is described in more detail in the accompanying Amended Petition Response, the Inspector General has made this investigation the centerpiece of his Office and, with great public fanfare, has committed himself to a series of spectacular, but, in the end, baseless investigative theories. For example, in May 2005, during Congressional hearings, the Inspector General garnered national headlines by announcing that the Brake Problem had not been discovered earlier because NeCMSC's inspection procedures had been "lost in translation" between the subcontractors' and Respondents' manuals. The conclusion proved to be baseless and nothing more was ever heard of that theory. Amended Pet. Resp. ¶¶ 3-4.

On September 22, 2005, Petitioner filed the Original Petition, claiming on the public record that Respondents (a) may have precipitated a near calamity by suppressing prior knowledge that the brakes were likely to fail, and (b) subsequently obstructed the investigation by, among other things, withholding "highly pertinent" evidence of such advance "notice."

After Respondents affirmatively proved, through affidavits and by reference to the very records relied on in the Original Petition, that <u>each</u> and <u>every</u> one of these allegations was utterly false, Petitioner abandoned his prior "notice" claims and secured what turned out to be a nine-month stay of these proceedings. Amended Pet. Resp. ¶¶ 5-6.

After seeking the stay of this case the Inspector General issued his October 31, 2005 <u>Semiannual Report to Congress</u>, which inexplicably made this investigation, this lawsuit, and his already discredited claim regarding Respondents' "possible <u>prior knowledge</u> of the <u>dangerous</u> condition," the cornerstone of his Office's efforts for the next year. Amended Pet. Resp. ¶¶ 7-9. For whatever reason the Inspector General's Report to Congress thus committed his Office to this lawsuit and to a theory Petitioner knew he could not sustain.

As a result, during the nine months that the stay remained in effect, Petitioner's staff worked long and hard to develop new misconduct theories to justify the resources and political capital invested in the investigation. In particular, after having completely ignored the issue for the prior six months, the investigation was redirected to NeCMSC's loss of e-mail server data on May 30, 2005 (the "Memorial Day Incident" or the "Incident"). This is now the source of such allegations as: the Incident was "neither unanticipated nor surprising" (Amended Pet. ¶ 24); counsel's reports on the subject were "materially inaccurate" and "curious" (*id.* ¶ 28); and a "significant documentary loss resulted from a relatively modest overheating of the computer facility". *Id.* ¶ 29. As Petitioners' Amended Response demonstrates, this latest misconduct charge has no more basis than any of its predecessors. Amended Pet. Resp. ¶¶ 88-132.

To make matters worse, the Inspector General's Staff was unable to place any reasonable limits on the extremely broad and often unintelligible subpoenas served on Respondents. These

are described at paragraphs 28-32 of the Amended Petition Response.  Throughout the period in which Respondents' were producing most of their records, the Inspector General's staff refused even to construe, much less limit, the subpoenas' demands.  *E.g.*, Amended Pet. Resp. ¶¶ 34-43. As a result, at enormous cost, from June – September 2005, Respondents produced more than a million pages of records.  Finally, in 2006, as the Amended Petition acknowledges (¶20), the Inspector General's staff finally agreed to limit their electronic document demands.  Even these more limited searches were a cost of an additional several hundred thousand dollars and produced three hundred thousand more pages of largely irrelevant records.

The Inspector General, of course, has a legitimate investigatory role.  But this Court has the ultimate responsibility to insure that Petitioners' powers are exercised within reasonable bounds.  This judicial oversight is particularly critical here because, as the District of Columbia Court of Appeals has held, "[s]ince its inception, the statutes governing Amtrak have indicated that the railroad is … <u>not</u> … a department, agency or instrumentality of the federal government." <u>Totten v. Bombardier Corp.,</u> 286 F.3d, 542, 544 (D.C. Cir. 2002).  This means that Respondents have no recourse to administrative due process and that the Court is not bound by the deference owed to a co-equal branch of the Government.

Where, as here, Respondents' have no administrative recourse and an investigation has grossly exceeded all reasonable bounds, this Court should not hesitate to exercise its authority under well-settled precedents to place reasonable limits on the scope of Respondents' compliance obligations.  The Court also has the discretion to award costs to Respondents in light of the excessiveness of the investigation, and it should do so in this case.  At the very least, the Court should condition any further compliance obligations on the part of Respondents upon reimbursement by Petitioner for these additional new costs.

The facts are set out in the Amended Petition Response.  Factual references in this brief cross-reference the relevant portions of that Response.

## **Proceedings to Date**

The Original Petition, together with its supporting memo, exhibits and affidavits, was filed on September 22, 2005.  DKT. 1. No order to show cause was ever issued in connection with the Original Petition and, accordingly, Respondents did not respond.  Instead, on October 14 and 20, 2005, Respondents (and Alstom Transportation, Inc. ("Alstom")) served, but did not file, their Original Petition Response, supported by 12 declarations and 68 exhibits.  On October 25, 2005, recognizing that most of the Original Petition's Allegations were false, the Inspector General sought a 45-day stay of proceedings.  DKT. 2-3.  The Court granted the stay on November 1, 2005.  On December 9, 2005, again on his own motion, Petitioner sought another 45-day stay of proceedings.  DKT. 4-5.  This request was granted on December 16, 2005.  On January 30, 2006, the Inspector General unilaterally sought a third stay of this case.  DKT. 6. The Court issued the requested stay on March 6, 2006.

On March 24, 2006, Petitioner filed a "Status Report".  DKT. 7.  In contrast to the Inspector General's prior three filings, the Status Report was now critical of Respondents efforts to satisfy his demands.  On June 27, 2006, the Court ordered that Petitioner show cause by July 18, 2006 "why this case should not be dismissed for failure to prosecute".  DKT. 8.  On July 18, 2006, Petitioner responded by promising that by August 8, 2006, he would "file an [sic] either amended petition to enforce the subpoena … or a request to dismiss the action".  DKT. 9.  The Inspector General reported on his "largely successful" effort … to obtain Respondents' belated but non-compelled compliance with the subpoenas" (p.2) and that "Respondents have made very

- 6 -

significant – but not fully compliant – production of paper and electronic documents subject to the filing of the [Original] Petition" (p. 3). On July 26, 2006, this Court ordered that Petitioner file an amended petition by August 8, 2006 or request dismissal of the Petition.

On August 8, 2006, the Inspector General submitted a hastily drafted Amended Petition and supporting a memorandum. DKT. 10. "Point II" of Petitioner's memorandum consisted of a heading regarding his "Native Format" claims, but no argument. Instead, the memorandum stated that "[c]ounsel for Petitioner "could not combine this [Native Format] portion of the brief with the filing, and requests leave to supplement this portion of the memorandum." Amended pet. Mem. At 8. On August 11, 2006, the Inspector General filed an "Insert to Memorandum in Support of Amended petition" (the "Insert") containing his 'Native Format' argument and a proposed Order to Show Cause. According to the Insert, "[w]hen counsel for Petitioner was concluding the [Amended Petition] Memorandum … on August 8, the materials for Argument II could not be located." Petitioner's two excuses for not submitting a "Notice Format" argument – namely that Mr. Sadoff either "could not combine" the claim with his brief or "could not … locate[]" those "materials" – seem inconsistent.

The Inspector General's belatedly-filed proposed Order to Show Cause also raises questions. As filed on August 11, 2006 and served on Respondents, the proposed order did not contain a document preservation requirement. The August 22, 2006 Order issued by the Court, however, requires that "respondents shall maintain and preserve any documents that are or may be responsive to the above-described subpoena [sic]." Although Petitioner served Respondents with his proposed order on August 11, 2006, neither NeCMSC nor Bombardier received notice of any sort that the Inspector General would subsequently seek a document preservation order for all records that "may be responsive" to a certain unspecified subpoena. This was particularly

significant since, as Petitioner was aware, NeCMSC was obligated to transfer most of its records

to Amtrak on October 1, 2006.  As a result, Respondents had to  file their Emergency Motion for

Hearing to Modify *Ex Parte* Order.  DKT. 13.


**ARGUMENT**

I.    **General Legal Deficiencies Of The Petition Precluding Judicial Enforcement.**

Contrary to Petitioner's suggestion, Amended Pet. Mem. at 2-4, this Court does not sit as

a ministerial rubber stamp in administrative subpoena enforcement proceedings.  The D.C.

Circuit has emphasized that "[e]nforcement of administrative subpoenas has long been

committed, not to administrative tribunals themselves, but instead to the courts."  *SEC v. Arthur

Young & Co.*, 584 F.2d 1018, 1032 (D.C. Cir. 1978).  Therefore, "judicial authority to temper

enforcement with fairness stems inexorably from congressional entrustment of subpoena

enforcement to the judiciary."  *Id.* at 1033; *see also, e.g.*, *Dow Chem. Co. v. Allen*, 672 F.2d

1262, 1266 (7th Cir. 1982) ("Leaving enforcement to the courts indicates that Congress intended

that judges should not merely rubber-stamp the subpoenas that come before them.").  As the

Supreme Court cautioned long ago, the judicial enforcement function in this area is "neither

minor nor ministerial."  *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 217 n.57 (1946).

The overarching standard for the judicial enforcement of an administrative subpoena is

one of reasonableness.  *See, e.g.*, *Dow Chem. Co.*, 672 F.2d at 1267.  "[T]he courts will plainly

refuse to enforce an administrative subpoena which is not within the bounds of reasonableness."

*FCC v. Cohn*, 154 F. Supp. 899, 908 (S.D.N.Y. 1957).

Thus, petitioner errs in his assumption that enforcement can be justified simply by meeting some minimal threshold of relevance and falling short of some broad outer boundary of burden, in isolation from one another.  To the contrary, courts have emphasized that these are both but aspects of the more fundamental requirement of reasonableness, and must be balanced together to ensure that the subpoena is reasonable in the aggregate.  *See, e.g.*, *Dow Chem. Co.*, 672 F.2d at 1269 (noting that "the degree of burden is an aspect of reasonableness").  For example, in *In re Administrative Subpoena*, 253 F.3d 256 (6th Cir. 2001), the court of appeals emphasized that "this court must *weigh* against the relevance of the requested material the burden that would be placed on [the subpoena recipient] in producing it."  *Id.* at 268 (emphasis added).  Similarly, the Seventh Circuit in *Dow Chemical Co.* noted that "there is no set rule for determining whether a particular burden is excessive"; that "reference must be made to the facts of the individual case"; and that "[t]he assessment of what is unreasonable or unnecessary, by definition, depends to a large extent on the reasons or needs underlying the request."  672 F.2d at 1269.  Thus, "resolution of the issue of reasonableness requires juxtaposition of the need and probative value against burden of compliance."  *Id.* at 1270.  The fact that requested materials may be relevant is not enough, for example, where that relevance is merely marginal and coupled with a significant burden; under such circumstances, the standard for judicial enforcement is not satisfied.  *See id.*

Petitioner also ignores that the touchstone of reasonableness is absent, and an administrative subpoena cannot properly be enforced, where the subpoenas or the underlying investigation has crossed the line of harassment.  The D.C. Circuit has expressed "a natural concern over potential abuse" stemming from situations where "an administrative subpoena could be overzealous."  *Arthur Young & Co.*, 584 F.2d at 1027.  Thus, "if a subpoena is issued

for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process." *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-67 (3d Cir. 1986); *see also, e.g.*, *In re Admin. Subpoena*, 253 F.3d at 271-72.  In assessing whether an investigation has strayed over that line, circumstantial factors such as "the length of the investigation" and "the number of subpoenas previously issued" may be considered.  *See id.* at 269.

There is no basis for granting the amended petition for enforcement under the foregoing legal standards.  The Response demonstrates at length the unreasonable and excessive nature of the investigation, which has already imposed extraordinary costs and burdens upon Respondents, already totaling over $1,500,000 in costs and fees.  *See* Response § III.  In light of the facts shown throughout the Response, the diminishing marginal relevance of additional productions has long since been outweighed by this enormous burden.  Indeed, the investigation has been marked by public accusations of serious potential wrongdoing against Respondents, followed by reluctant, tacit acknowledgements that these charges were false by dropping them silently, without either express acknowledgement or apology.  *See, e.g.*, Response § III(D).  This is the very definition of a harassing investigation, further demonstrating that additional enforcement is unwarranted.  Finally, the assumption of Acela train maintenance by Amtrak from NeCMSC several days ago, and the pending dissolution of NeCMSC, *see* Response § I, demonstrate that the petition has marginal, if any, continuing practical significance, and this reinforces the conclusion that the petition should be denied.

Yet another reason why the amended petition is not properly susceptible to judicial enforcement is that, unlike the original petition it replaces, the amended petition is accompanied by no supporting affidavits at all.  As such, there is no evidence sufficient to create any *prima facie* case for enforcement, thus precluding any need for a rebuttal by Respondents.  In order to

have an administrative subpoena enforced, courts recognize that "[t]he agency seeking enforcement *must first file* a complaint . . . *and an affidavit of the agent who issued the subpoena* verifying*" the allegations of the subpoena." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 128 (3d Cir. 1981) (en banc) (emphasis added). The amended petition has no such affidavits, and this omission is even more striking when contrasted with the original petition, which *was* accompanied by affidavits. By itself, this evidentiary deficiency precludes enforcement.

Both because the standard for enforcement of administrative subpoenas is not satisfied here and because Petitioner has failed to satisfy the evidentiary requirements of supporting affidavits, his enforcement petition should be denied. Even apart from the inadequate legal basis for enforcing the petition in its entirety, however, the specific categories of relief sought by Petitioner are additionally fraught with legal errors unique to those specific requests. Even if (contrary to fact) it had been the case that the subpoenas were properly subject to judicial enforcement as a general matter, most of Petitioner's requests would still be legally improper, and inappropriate for judicial enforcement. Respondents discuss each of the specific elements of the relief requested in the petition in turn.

## II.    **Production of An Additional Memorial Day Incident Report Is Not Necessary.**

As set out more fully in the Amended Petition Response, an air conditioning failure at a NeCMSC facility on May 30, 2005 resulted in the loss of some data from computers at that facility. The facts surrounding this event (which the parties call the "Memorial Day incident") and its aftermath, and the existing report regarding that incident, are set out in section IV(A)(1) of the Amended Petition Response, paragraphs 88-132. As shown in the Response, the relief requested by Petitioner is entirely pointless. As shown in the Response, the existing Memorial

Day Report thoroughly documents the facts underlying all of these incidents. *See* Response § IV(A)(1)(c), ¶¶ 101-10. Any new report on this incident would say nothing different, and would add no additional information. Nonetheless, Petitioner asks that the Court require Respondent NeCMSC to produce another report describing the Memorial Day incident and its efforts and procedures in responding to it. The Amended Petition Response addresses Petitioner's factual errors with regard to the Memorial Day incident. This memorandum merely addresses the legal deficiencies in Petitioner's request for an additional report.

In the first place, Petitioner has conceded that he lacks the power to compel such a testimonial report. In his testimony before the Congress regarding this matter, Petitioner expressly stated that "[w]e only have duces tecum subpoena authority, we do not have testimonial subpoena authority," and urged the Congress to consider "granting the IG community that in all matters relating to safety and security." Testimony of Fred E. Weiderhold, Jr., Hearing Before Subcomm. on Railroads of House Comm. on Transp. & Infrastructure, at 26 (June 9, 2005). Nor does 5 U.S.C. App. 3 § 6(a)(5), cited in passing in Respondent's brief, alter the validity of that admission. That section *permits* Petitioner to take oaths and affidavits, but by its terms does not authorize Petitioner to *compel* the production of testimonial reports. Petitioner's request in this regard thus exceeds the scope of his statutory authority. In any event, even apart from the scope of Petitioner's statutory authority, the subpoenas do not call for the production of any such report; therefore, the request is deficient because it is not properly included within the subpoenas that are the subject of this enforcement action.

Even apart from these fatal deficiencies, the request for another report regarding the Memorial Day incident fails the ordinary standard for the enforcement of an administrative subpoena in any event. Petitioner does not contend that he has been unable to get access to any

information or evidence within Respondents' possession that would bear on any of these issues. Thus, the purported need for another duplicative report is not premised on the need to develop any additional underlying evidence. To the contrary, Petitioner's staff has exhaustively investigated this incident, as shown in the Response to the Amended Petition, *see* Amended Pet. Response § IV(A)(1)(b), ¶¶ 91-100, and Petitioner has all of the available facts. No further reports by Respondents will do anything to elucidate the situation. For example, regarding the one alleged discrepancy Petitioner identifies, regarding the frequency of back-up transfers, *see* Response § IV(A)(1)(c), ¶ 106, as immaterial as this issue is in light of the fact that the Memorial Day incident occurred on a week that was also the end of the month, a new report reiterating the true facts about that procedure would in no way prevent Petitioner from continuing to claim, wrongly, that there is some mystery here, any more than the existing Memorial Day Report has stopped him from doing so.

It is precisely in situations such as this where courts routinely decline to enforce administrative subpoenas. The Supreme Court has noted that administrative subpoenas are properly enforced only as to information that "was not already in the [agency's] possession." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 739 (1984). Numerous courts, including this one, have noted that judicial enforcement of an administrative subpoena is unwarranted where the agency already has the information in question. *See, e.g.*, *In re Admin. Subpoena*, 253 F.3d at 263 (noting requirement "that the information sought is not already within the Commissioner's possession" (internal quotation marks omitted)); *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (same); *Resolution Trust Corp. v. Am. Cas. Co.*, 787 F. Supp. 5, 7 (D.D.C. 1992) (same).

This prohibition squarely applies here. As noted above, Petitioner does not even allege that he lacks any information or evidence within the possession of Respondents regarding the subject matter of the report he requests. Nor can he — his staff has investigated the matter exhaustively, and Respondents have already supplied the very information that Petitioner redundantly requests. The Court should therefore deny this request in the amended petition, which is directed only to NeCMSC.

### III.    The Incomplete Production Issue — Review and Production of Additional Back-Up Tapes Is Unnecessary.

Petitioner contends that Respondents' production is incomplete, and requests the Court to order NeCMSC to "review NeCMSC back up tapes for documents responsive to the Subpoenas and produc[e] the responsive documents."[3] Pet. 18. In the Response, Respondents document the facts regarding the Kroll subpoena and the back-up tapes, and demonstrate that there was no incomplete production, that search of the Memorial Day tapes would be futile, and that NeCMSC has already agreed to submit the sixteen Memorial Day tapes to Petitioner's expert. *See* Response § IV(A)(2), at paragraphs 133-51. In view of these facts, Petitioner's request for a further review of backup tapes beyond what Respondents have already done and agreed to do would be unnecessary, pointless, and wasteful.

Courts have recognized that, "in the hierarchy of accessibility, it is clear that electronic data stored on media such as the backup tapes involved here is near the bottom." *United States v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3111972, at *4 (N.D. Ill. Oct. 21, 2005). Indeed, backup tapes are ordinarily categorized as "inaccessible," *Zubulake v. UBS Warburg*

---

[3] Petitioner also requests a privilege log for records subpoena from Kroll. Petitioner has never before requested such a privilege log, NeCMSC is willing to provide the requested privilege log. *See* Response § IV(A)(2)(a).

*LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003), warranting judicial concern about the burdens associated with indiscriminate requests involving such materials.  Therefore, as a general matter, "[t]here is certainly no controlling authority for the proposition that restoring all backup tapes is necessary in every case."  *McPeek v. Ashcroft*, 202 F.R.D. 31, 33 (D.D.C. 2001).

Enforcement of Petitioner's unreasonable and burdensome request is clearly unwarranted in light of these facts.  This case is strongly analogous to *Cognex Corp. v. Electro Scientific Industries, Inc.*, No. Civ. A. 01CV10287RCL, 2002 WL 32309413 (D. Mass. July 2, 2002).  In that case, a party in civil litigation sought to compel a search of electronic backup tapes after a reasonable search of active files had already been completed.  The Court concluded that in that case (unlike here), it was "virtually inconceivable that [the backup tapes] d[id] not contain additional relevant material which would be appropriate for production."  *Id.* at *2.  Nonetheless, despite the clear relevance of the information at issue, "[t]he fact that the back-up tapes [we]re believed to contain relevant documents d[id] not end the inquiry."  *Id.* at *3.  Rather, the Court noted that in light of the existing searches, "the burden and expense of the proposed discovery outweigh[ed] its likely benefit," and it denied the request *despite the fact that the requesting party had offered to pay for the search itself*.  The Court found that "Cognex's willingness to pay for the search of ESI's back-up tapes makes the question of whether ESI should be required to search these tapes a close call."  *Id.* at *4.  Nonetheless, applying a standard of reasonableness — which is the same standard governing the enforcement of administrative subpoenas, *see supra* Part I — the Court held that "[a]t some point, the adversary system needs to say 'enough is enough' and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable."  *Id.* at *5 (emphasis in original); *see also, e.g.*, *Concord Boat Corp. v. Brunswick*

*Corp.*, No. LR-C-95-781, 1996 WL 33347247, at *2 (E.D. Ark. Dec. 23, 1996) (rejecting requested exhaustive search of backup tapes over five year period as "extremely burdensome").

Petitioner's request for an expensive, sweeping search of voluminous backup materials plainly fails the test of reasonableness for the same reason. Petitioner has not made, because he cannot make, any showing that this broad-brush exercise is reasonable under the circumstances, weighing the enormous costs against the minimal expected benefits. And his intransigence in clarifying even the most basic contours of this request further undermines any claim that it would be appropriate to exercise the Court's enforcement power with respect to this class of materials. Under *Cognex Corp.*, enforcement would be inappropriate even if Petitioner had offered to pay for Respondents' compliance with the request. In the absence of such compensation, enforcement is all the more clearly unwarranted.

Even in those situations where courts have concluded that backup tape search requests are properly enforced, they have noted that in light of the unusual burden associated with such requests, cost-shifting to the requesting party is especially appropriate. *See, e.g.*, *Medtronic Sofamor Danek, Inc. v. Michelson*, 229 F.R.D. 550, 558 (W.D. Tenn. 2003); *McPeek*, 202 F.R.D. at 33-34 (D.D.C. 2001) (holding that cost-shifting in the backup tapes context should be determined by balancing the expected value of the search against its cost). As shown more fully below in Part VI, such cost-shifting is appropriate in cases like this involving administrative subpoenas, and to the extent that enforcement could be justified at all, such cost shifting would be particularly appropriate here in light of the extraordinary circumstances of this investigation.

IV.    **Production of "Native Format" Documents**

Petitioner requests that Respondents be compelled to "produce all responsive electronic documents in their original or 'native' format." Pet. 18. Respondents address the facts of the "native format" issue in the Amended Petition Response, at section IV(B)(2), paragraphs 156-65. While the Amended Petition Response demonstrates that Respondents have already supplied the metadata that is the focus of Petitioner's argument, and that Petitioner's other arguments are factually erroneous, this memorandum shows that, even putting aside the factual incoherence and unreasonableness of Petitioner's request, which alone suffices to deny the petition with respect to this request, Petitioner fails to make the requisite legal showing to support it, even with respect to the extensive metadata Respondents have already provided Petitioner.

In the first place, Petitioner has failed adequately to preserve this native format request. Petitioner did not make any request for native format productions in his original petition, but raised the issue for the first time in November 2005, and presents it to the Court for the first time now in the amended petition. Yet, Petitioner failed to include this section of his brief submitted on the due date provided by Court order, August 8, 2006. Rather, without obtaining leave of the Court, Petitioner merely filed a belated "insert" to that brief several days later, stating without elaboration that he "could not combine this portion of the brief with the filing" on the deadline, Mem. in Supp. of Pet. at 8, or that "the materials for [this issue] could not be located and the argument included in" the original brief, Insert at 1. These explanations are inconsistent and make no sense by their terms — the "insert" has nothing but legal argument, and has no factual "materials" that would require being "located." Nor does any reason appear why Petitioner could have had any difficulty "combin[ing]" the insert in his original brief, apart from his simple failure to have prepared it on time. This unexcused failure to submit Petitioner's full brief within

the prescribed time limits arguably precludes enforcement of the petition as a whole; but at the very least it precludes enforcement with respect to the untimely submitted portion. *See, e.g.*, *Cobell v. Norton*, 213 F.R.D. 42, 42 (D.D.C. 2003) (striking unexcused, untimely filed brief).

In any event, Petitioner's request for native-format document productions also fails on the merits. First, the scope of the subpoenas does not extend to incorporate any request for metadata or the "native" format of electronic documents. Petitioner represents to the Court "[t]hat the Subpoenas require Respondents to produce responsive electronic documents in their 'original' or 'native' format on Respondents' computer systems," placing quotation marks around the word "native." Insert at 3. Petitioner repeats this supposed quotation on the next of the insert: "Again, the responsive electronic documents exist on Respondents['] systems in their 'native' formats, not as TIFF or PDF images." *Id.* at 4. In fact, these quotations are simply fabricated; the word "native" does not occur anywhere in the subpoenas. *See, e.g.*, Mem. in Supp. of Pet. Exh. 1. To the contrary, the actual subpoenas expressly disclaim Petitioner's native-format request. The subpoenas contain express directions regarding materials present on computer hard disk drives. Far from requesting that such databases be reproduced in a specialized native format, maintaining all invisible metadata, the subpoenas expressly instruct Respondents simply to "copy all hard drive materials onto a disk or tape and provide these copies." *Id.* Attachment A, at 2, ¶ 1. Respondents have undisputedly made the requested copies as instructed with respect to the materials at issue; Plaintiff's new demand for supplemental production of all databases in a fully integrated mirror form is plainly outside the scope of the subpoenas. Petitioner does not even attempt to explain how his current claim that metadata falls within the scope of the subpoenas can be reconciled with instruction 1 of the subpoena; rather, Petitioner simply ignores that directly controlling language.

Even apart from Petitioner's failure to request metadata in his subpoenas, as would have been necessary to justify judicial enforcement in a subpoena enforcement action, he could not justify such a request as a matter of law under these circumstances, even if he had properly requested it.  While Petitioner cites a few isolated decisions where courts have allowed discovery of metadata (none of which involved administrative subpoenas), Petitioner ignores the more general point that "emerging standards of electronic discovery appear to articulate a general presumption *against* the production of metadata, but provide a clear caveat when the producing party is aware or should be reasonably aware that particular metadata is relevant to the dispute." *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 652 (D. Kan. 2005) (emphasis added). Thus, courts routinely authorize electronic document productions in substantially the form Respondents submitted, in TIFF or PDF form, with metadata, if supplied at all, produced in an accompanying form.  *See, e.g.*, *In re Priceline.com Inc Secs. Litig.*, 233 F.R.D. 88, 90-91 (D. Conn. 2005).

*Williams* surveyed the existing case law in this area and, finding it inadequate to "provide[] sufficient guidance on the production of metadata," 230 F.R.D. at 650, considered the practical considerations surrounding discovery of such information, and finding a working paper by the Sedona Conference, *The Sedona Principles for Electronic Document Production*, to be particularly helpful.  *See id.*  The Court observed that a comment in that document "caution[ed] that data hidden and never revealed to the user in the ordinary course of business should not be presumptively treated as a part of the 'document,'" *id.* at 651 (quoting *The Sedona Principles*), and noted that another "comment state[d] that '[a]lthough there are exceptions to every rule, especially in an evolving area of the law, there should be a modest legal presumption in most cases that the producing party need not take special efforts to preserve or produce metadata.'"

*Id.* The court praised this approach, observing that "[t]he comment balances [the] potential benefits against the 'reality that most of the metadata has no evidentiary value, and any time (and money) spent reviewing it is a waste of resources,'" and that, "unless the producing party is aware or should be reasonably aware that particular metadata is relevant, the producing party should have the option of producing all, some, or none of the metadata." *Id.* (quoting *The Sedona Principles*). The court thus held that where a "party timely objects to production of metadata," there is no presumption in favor of discovery of such information. *Id.* at 652. While the presumption against discovery did not apply in *Williams* itself because the court had specifically put the producing party on notice that it should produce metadata, the court recognized that "emerging standards of electronic discovery appear to articulate a general presumption against the production of metadata" in the absence of specific knowledge of relevance. *Id.* at 645.

In this case, Petitioner does not even allege that Respondents should have been aware of special relevance of any metadata in any documents. Therefore, the *Williams* presumption applies with full force, and there is no basis to enforce any demand for metadata, or to require elaborate re-distribution of documents according to their native format, particularly given the burdensome, excessive, and needlessly prolonged character of the investigation as a whole and Petitioner's belated raising of the issue.

## V.     **The Request For A Certificate of Compliance Is Unnecessary.**

Petitioner requests that the Court order Respondents to issue a certificate of compliance, stating that Respondents have fully complied with the subpoenas. Respondents address this issue in the Response, at section IV(B)(3), ¶¶ 166-72, and there show that a certification of compliance is impossible with respect to the subpoenas as a whole, because the subpoenas are extremely

vague and has been construed by Petitioner's staff contrary to its actual meaning.  Respondents

further showed that the scope of Respondents' obligations with respect to the subpoenas is the

very issue before the Court.  Petitioner's request thus begs the question.  Because the scope of

Respondents' required compliance regarding the four remaining issues are before the Court, the

Court's rulings will resolve those issues.

**VI.     The Court Should Grant Respondents' Counterclaim for Costs Upon Petitioner.**

As shown in the Response at section V, ¶¶ 173-74, and in the Response to the original

petition, Petitioner has conducted this investigation in an inconsistent and fundamentally

unreasonable manner, and has forced Respondents to incur extraordinary expenses — more than

$1,500,000 — in costs and fees.  Because of this unusual confluence of circumstances, the Court

should exercise its discretion to grant Respondents' counterclaim for costs against Petitioner.

It is well established in this circuit and elsewhere that, where appropriate, district courts

have the power to require that an administrative agency pay for the costs of complying with an

administrative subpoena.  *See, e.g.*, *Arthur Young & Co.*, 584 F.2d at 1033; *FTC v. Winters Nat'l

Bank & Trust Co.*, 509 F. Supp. 1228, 1234 (S.D. Ohio 1981) (noting that "allocation of cost of

compliance is within the discretion of the Court").  In *Arthur Young & Co.*, the D.C. Circuit

observed that, "in formulating protective conditions for administrative subpoenas, courts may

resort analogously to techniques conventional to judicial subpoenas, and thus in safeguarding

against undue financial outlays may appropriately insist upon a reasonable measure of

reimbursement."  584 F.2d at 1033 (footnote omitted).

This power is an inherent element of the federal courts' oversight role in the

administrative subpoena enforcement regime.  As the Third Circuit has observed, "from the very

fact that enforcement of [an administrative subpoena is] entrusted to the judiciary," it may be inferred that "th[e] court has the power to fashion appropriate rules as to the fairness of the enforcement order," including requiring the agency to pay the costs of compliance.  *United States v. Friedman*, 532 F.2d 928, 937 (3d Cir. 1976).

The determination whether costs are appropriate turns on a case-specific analysis of the facts at hand.  *See Arthur Young & Co.*, 584 F.2d at 1033 (holding that costs are appropriate "when the financial burden of compliance exceeds that which the party ought reasonably be made to shoulder.  And what is reasonable will depend as over the legal spectrum it ultimately does upon the circumstances of each case." (footnote omitted)).  Such an "individualized determination" is appropriate to determine whether, as a matter of equity, the cost of compliance should be shifted to the agency.  *Friedman*, 532 F.2d at 938.  Thus, "[w]hile the district court has the power to require the government ultimately to pay the costs of compliance, it is a matter of discretion."  *FTC v. Rockefeller*, 591 F.2d 182, 191 (2d Cir. 1979) (citations omitted).

The court may consider a variety of factors, including the existence of a large volume of documents produced and the passage of a significant length of time during the investigation.  *See, e.g.*, *United States v. Tivian Labs., Inc.*, 589 F.2d 49, 55 (1st Cir. 1978).  Costs are also appropriate where, as here, the investigation has become harassing.  *See, e.g.*, *SEC v. OKC Corp.*, 474 F. Supp. 1031, 1037 (N.D. Tex. 1979) (holding that "under certain circumstances a court may impose costs on the government, or may otherwise set the terms of compliance so as to ensure that an enforcement order does not become a means of oppression or harassment").

The standards for cost shifting under Rule 45 of the Federal Rules of Civil Procedure are also relevant to the analysis, even though that rule does not actually apply to administrative

subpoenas.  *See Friedman*, 532 F.2d at 937 ("Even if not literally applicable, Rule 45(b), Fed. R. Civ. P., serves as significant precedent disclosing a broad congressional judgment with respect to fairness in subpoena enforcement proceedings.").  Under the current Rule 45(c)(2)(B), costs are properly shouldered by the requesting party so long as they impose a "significant expense" on the other party.

Under the foregoing standards, an award of costs is plainly appropriate.  Respondents' multi-million dollar compliance expenses are unquestionably "significant" for purposes of Rule 45.  *See, e.g.*, *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (having "no trouble concluding" that compliance costs of $199,537.08 were "significant" for purposes of Rule 45).  More generally, Petitioner's investigation has degenerated into precisely the sort of over-expansive and harassing proceeding that justifies an award of costs even apart from Rule 45.  *See, e.g.*, *OKC Corp.*, 474 F. Supp. at 1037.  At a minimum, the costs in this case exceed that which Respondents reasonably should expect to bear under the circumstances, which by itself justifies an award of costs.  *See, e.g.*, *Arthur Young & Co.*, 504 F.2d at 1033 (holding that costs may be awarded "when the financial burden of compliance exceeds that which the party ought reasonably be made to shoulder").

Therefore, the Court should grant Respondents' counterclaim, and order that Petitioner reimburse Respondents for the costs of complying with the subpoenas.  At a minimum, the Court should condition any future enforcement upon reimbursement of Respondents' costs and expenses.

## CONCLUSION

Accordingly, Respondents respectfully request that both the Original Petition and Amended Petition be dismissed with prejudice and that Respondents' Cross-Petition for its reasonable costs in connection with the Subpoenas be granted.

Dated:  October 6, 2006

Respectfully submitted,

| | |
|---|---|
| JONES DAY | WINSTON & STRAWN LLP |
| By: _____Philip Le B. Douglas  /s_ <br> Philip Le B. Douglas (# 311944) <br> Attorneys for Bombardier Inc. and <br>   Northeast Corridor Maintenance <br>   Services Company <br> 222 East 41st Street <br> New York, New York 10017-6702 <br> (212) 326-3939 | By:  _____Timothy M. Broas  /s <br> Timothy M. Broas (# 391145) <br> Attorneys for Northeast Corridor Maintenance <br>   Services Company <br> 1700 K Street, N.W. <br> Washington, D.C. 20036-3817 <br> (202) 282-5000 |

Of counsel:                                                Of counsel:

Michael S. Fried, Esq.                          Franklin R. Parker, Esq.