UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.
  AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
  CORPORATION,

                Petitioner,

      v.

BOMBARDIER, INC.,
ALSTOM TRANSPORTATION, INC.,
NORTHEAST CORRIDOR MAINTENANCE
  SERVICES COMPANY,

             Respondents.

Civil No. 1:05 MS 367

Judge Friedman

## RESPONSE AND CROSS-PETITION OF BOMBARDIER INC.
## AND NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY

JONES DAY
Attorneys for Bombardier Inc. and Northeast
  Corridor Maintenance Services Company
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

WINSTON & STRAWN LLP
Attorneys for Northeast Corridor Maintenance
  Services Company
1700 K Street, N.W.
Washington, D.C.  20006-3817

(202) 282-5000

## TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................. 1

II.   Proceedings to Date ...................................................................................... 5

III.  Factual Background ...................................................................................... 7

    A.    The Parties ............................................................................................ 7

    B.    The Brake Problem ............................................................................... 9

    C.    The Investigation (Phase I) ................................................................ 10

    D.    The Original Petition and Response .................................................... 18

    E.    The Investigation (Phase II) ............................................................... 21

        (1)    Petitioner's Abandonment of the Misconduct Claims ........................... 21

        (2)    The Parties' Agreement on Electronic Search Terms .......................... 23

        (3)    The Parties' Disagreement Regarding "Native Format" Files ............... 24

        (4)    Petitioner's Investigation of The Memorial Day Incident ..................... 29

IV.   Petitioner's Demands .................................................................................. 32

    A.    Claims Against NeCMSC ................................................................... 32

        (1)    The Memorial Day Incident Issue ......................................................... 32

            (a)    The Allegations .............................................................. 32

            (b)    NeCMSC's Good Faith Response to the Incident ...................... 33

            (c)    Accuracy of the Pillsbury Winthrop Report ............................... 37

            (d)    NeCMSC's Re-Use of the Server Hard Drives........................... 41

            (e)    No Significant Records Were Lost .......................................... 42

            (f)    Request for a "Detailed, Documented Report" ........................... 46

        (2)    The "Incomplete Production" Issue ....................................................... 48

            (a)    The Kroll Subpoena ........................................................ 48

            (b)    The Back-Up Tapes ........................................................ 50

                 (i)    There Was No "Incomplete" Tape Production ...............52

                (ii)    Search of Memorial Day Tapes Would Be Futile...........52

                (iii)    There Are No 2005 Tapes................................................53

                (iv)    NeCMSC Agreed to Submit Tapes
                     to Petitioner's Expert .................................................. 54

    B.    Claims Against Both Respondents........................................................ 55

## TABLE OF CONTENTS
(continued)

**Page**

(1)   The "Non-Existent" Records Issue ........................................................ 55

(2)   The "Native Format" Issue ................................................................. 56

(3)   The "Certificate of Compliance" Issue ................................................ 62

V.   Respondents' Cross-Petition for Compliance Costs ....................................... 65

VI.  Conclusion .................................................................................................... 67

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.
    AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
    CORPORATION,

                              Petitioner,

        v.

BOMBARDIER, INC.,
ALSTOM TRANSPORTATION, INC.,
NORTHEAST CORRIDOR MAINTENANCE
    SERVICES COMPANY,

                              Respondents.

Civil No. 1:05 MS 367
Judge Friedman

**RESPONSE AND CROSS-PETITION OF BOMBARDIER INC.
AND NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY**

Respondents Northeast Corridor Maintenance Services Company ("NeCMSC') and

Bombardier Inc. ("Bombardier'), as their Response and Cross Petition to the August 8, 2006

Amended Petition (the "Amended Petition") of Fred E. Weiderhold, Jr., the Inspector General

for the National Railroad Passenger Corporation ("Amtrak"), do hereby allege through their

counsel, Jones Day and Winston & Strawn LLP ("Winston & Strawn"), as follows:[1]

                I.        **Introduction**

        1.        On April 14, 2005, a year and a half ago, Amtrak's *Acela* high-speed train service

was suspended after cracks were found in spokes of friction discs for passenger car brakes (the

---

[1]        The Inspector General's Original Petition and supporting memorandum, filed on September 22, 2005 (DKT. 1), will be cited respectively as the "Original Petition" or "Original Pet." and "Original Pet. Mem.". The Amended Petition and its supporting memorandum will be cited herein respectively as "Amended Pet." and "Amended Pet. Mem." Respondents' brief in response to the Original Petition which was served, but not filed, will be denominated "Original Petition Response" or "Original Pet. Resp." The entire Original Petition Response and all supporting declarations and exhibits, which have been filed simultaneously herewith, are incorporated herein by reference. Declarations, affidavits and exhibits in support of the Original Petition Response and this Response will be cited respectively as "[name] Dec.", "[name] Aff.", and "Resp. Ex. __". To the extent not expressly admitted herein, each and every allegation in the Amended Petition is denied. Unless otherwise indicated, all emphasis herein is our own.

"Brake Problem").[2]  The incident generated extensive publicity and, of course, Congressional hearings.  Within a few months, however, the Federal Railroad Administration (the "FRA") gave safety approval to a new disc design, and the trains were returned to service.  In the Inspector General's own words, "Acela trains have been retrofitted with re-designed disc brake rotors that have been <u>fully</u> <u>inspected</u> or <u>certified</u> for use by the FRA."  Original Pet. Mem. at 4 n.6 (emphasis added).  Since then, Amtrak has settled all related commercial issues with Respondents, who, in turn, have settled with Knorr Brake Corporation ("Knorr"), the subcontractor that supplied the brakes in question.  After hearings on May 11, 2005, Congress has long since ceased to express interest in the subject.  On October 1, 2006, Respondent NeCMSC, the entity against which the Amended Petition is principally directed, transferred to Amtrak all of its operating responsibilities and related files.  Thus, all legitimate safety, commercial, and legislative issues arising out of the Brake Problem have been resolved or are moot.

       2.       Nevertheless, armed with a roving commission and accountable to no one, Petitioner continues his obsessive pursuit of this matter.  The Inspector General's directionless investigation has long since become abusive.  Over the course of eighteen months, at a cost of over $1.5 million, Respondents have produced in excess of 1.3 million pages of records, participated in scores of written and oral exchanges with Petitioner's staff, subjected a number of their employees and consultants to lengthy interviews and submitted a variety of memoranda, written reports, analyses, exhibits and affidavits.  Respondents have time and again attempted to resolve issues raised by the Inspector General's staff, only to be confronted, when a final

---

      [2]      There are multiple brake systems on Acela trainsets.  Only the passenger or "trailer" car friction brakes were implicated by the Brake Problem.

settlement seemed tantalizingly close, with still more unreasonable demands, from which no appeal was permitted to either the Inspector General himself or anyone else.

3.  The problem appears at heart to be a political one.  The Inspector General has made this investigation the centerpiece of his Office and, often with great public fanfare, has committed himself to a series of spectacular, but, in the end, baseless investigative theories.

4.  In early May 2005, at the very outset of the investigation, Petitioner's investigator implied to a third party that Respondents' previous multi-million dollar settlement with Amtrak had been fraudulently induced because Respondents may have known about, but did not disclose, the Brake Problem.[3]  Douglas Dec. ¶ 17.  Later that month in the Congressional hearings, the Inspector General garnered national headlines by announcing that the Brake Problem had not been discovered earlier because NeCMSC's inspection procedures had been "lost in translation" between the subcontractors' and Respondents' manuals.  The conclusion proved to be baseless (the referenced manuals did not require any inspection of the brake spoke component involved in the Brake Problem), and nothing more was ever heard of that theory.

5.  On September 22, 2005, Petitioner filed the Original Petition, claiming on the public record that Respondents (a) may have precipitated a near calamity by suppressing prior knowledge that the brakes were likely to fail, and (b) subsequently obstructed the investigation by, among other things, withholding "highly pertinent" evidence of such advance "notice." Original Pet. Mem. at 7, 11, 17, 21-22.  In their October 20, 2005 response (the "Original

---

[3]      As Respondents pointed out to Petitioner's staff at the time, this theory made no sense.  Because the brake discs at issue in this case were supplied by Knorr, the brake subcontractor, Respondents were protected by a warranty.  That protection, however, was to expire shortly after April 14, 2005.  Thus, if Respondents had had any prior knowledge of the Brake Problem, they would have had every incentive to have raised it immediately and organized an orderly retrofit of the trains.

Petition Response"),[4] Respondents affirmatively proved, through affidavits and by reference to the very records relied on in the Original Petition, that each and every one of these allegations was utterly false. Original Pet. Resp. at 3-24. Rather than publicly embarrass the Inspector General, however, the Original Petition Response was not filed with the Court.

6.      As is evidenced by the Amended Petition's failure even to mention them, the Inspector General has long since abandoned each of the Original Petition's prior "notice" and obstruction claims. Like Petitioner's prior headline-grabbing "lost-in-translation" theory, these baseless allegations have simply disappeared into the aether, without any mention, much less retraction or apology.

7.      Respondents' first informed the Inspector General that his "notice" theory was "demonstrably false" on September 30, 2005. Resp. Ex. 56. Petitioner received a draft of Respondents' brief rebutting his theory on October 14, 2005. On October 20, 2005, Respondents delivered their final brief, twelve supporting declarations and sixty-eight exhibits. On October 25, 2005, the Inspector General sought a stay of this case on the ground that Respondents' Original Petition Response may have resolved at least some of the issues raised in the Original Petition. DKT. 3.

8.      Nevertheless, on October 31, 2005, at a result of either bureaucratic bungling or worse, Petitioner issued his Semiannual Report to Congress, making the investigation, this lawsuit, and Respondents' "possible prior knowledge of the dangerous condition" the centerpiece of his Office's efforts for the next year. Resp. Ex. 73, at 5.

---

[4]      Respondents called their response a "Memorandum in Support of Request for Hearing." The Original Petition Response and its supporting declarations appear in a separately bound volume accompanying this pleading. Respondents' Exhibits 1-68 are those submitted in support of the Original Petition Response.

9.     The Inspector General's Report to Congress thus committed his Office to this lawsuit and to a theory Petitioner knew he could not sustain.  Therefore, rather than dismiss the Original Petition without prejudice, as Respondents had repeatedly urged (e.g., Original Resp. Mem. at 36), the Inspector General filed request after request for a stay of this case until, at long last, this Court ordered him to proceed with, or dismiss, his claims.

10.     In the meantime, Petitioner's staff had been working long and hard to develop a new theory to justify the resources and political capital invested in the investigation.  In particular, after having completely ignored the issue for the prior six months, the investigation was redirected to NeCMSC's loss of e-mail server data on May 30, 2005 (the "Memorial Day Incident" or the "Incident").  This is now the source of such allegations as:  the Incident  was "neither unanticipated nor surprising" (Amended Pet. ¶ 24); counsel's reports on the subject were "materially inaccurate" and "curious[]" (Id. ¶¶ 28-29); and a "significant documentary loss resulted from a relatively modest overheating of the computer facility."  Id. ¶ 29.  Yet as demonstrated below, this latest misconduct charge has no more basis than any of its predecessors.

11.     The Inspector General has a legitimate investigatory role, but this Court has the ultimate responsibility to ensure that Petitioner's powers are exercised within reasonable bounds.  Because those limits have been violated here, this Court must now intervene.

## II.     Proceedings to Date

12.     The Original Petition, together with its supporting memo, exhibits and affidavits, was filed on September 22, 2005.  DKT. 1.  No order to show cause was ever issued in connection with the Original Petition and, accordingly, Respondents did not respond.

13.     Instead, on October 14 and 20, 2005, Respondents (and Alstom Transportation, Inc. ("Alstom")) served, but did not file, their Original Petition Response, supported by 12 declarations and 68 exhibits.  On October 25, 2005, recognizing that most of the Original Petition's Allegations were false, the Inspector General sought a 45-day stay of proceedings. DKT. 2-3.  The Court granted the stay on November 1, 2005.  On December 9, 2005, again on his own motion, Petitioner sought another 45-day stay of proceedings.  DKT. 4-5.  This request was granted on December 16, 2005.  On January 30, 2006, the Inspector General unilaterally sought a third stay of this case.  DKT. 6.  The Court issued the requested stay on March 6, 2006.

14.     On March 24, 2006, Petitioner filed a "Status Report."  DKT. 7.  In contrast to the Inspector General's prior three filings, the Status Report was now critical of Respondents' efforts to satisfy his demands.  On June 27, 2006, the Court ordered that Petitioner show cause by July 18, 2006, "why this case should not be dismissed for failure to prosecute."  DKT. 8.  On July 18, 2006, Petitioner responded by promising that by August 8, 2006, he would "file an [sic] either amended Petition to enforce the subpoena . . . or a request to dismiss the action."  DKT. 9. The Inspector General reported on his "largely successful effort . . . to obtain Respondents' belated but non-compelled compliance with the subpoenas" (at 2) and that "Respondents have made very significant – but not fully compliant – production of paper and electronic documents subject to the filing of the [Original] Petition" (at 3).  On July 26, 2006, this Court ordered that Petitioner file an amended petition by August 8, 2006 or request dismissal of the Petition.

15.     On August 8,  2006, the Inspector General submitted a hastily drafted Amended Petition and supporting memorandum.  DKT. 10.  "Point II" of Petitioner's memorandum consisted of a heading regarding his "Native Format" claims, but no argument.  Instead, the memorandum stated that "[c]ounsel for Petitioner could not combine this [Native Format]

portion of the brief with the filing, and requests leave to supplement this portion of the memorandum."[5]  Amended Pet. Mem. at 8.  On August 11, 2006, the Inspector General filed an "Insert to Memorandum in Support of Amended Petition" (the "Insert") containing his 'Native Format" argument and a proposed Order to Show Cause.  According to the Insert, "[w]hen counsel for Petitioner was concluding the [Amended Petition] Memorandum . . . on August 8, the materials for Argument II could not be located." [6]

16.    Petitioner's two excuses for not submitting a "Notice Format" argument – namely that his office "could not combine" the claim with his brief or "could not . . . locate[]" those "materials" – seem inconsistent.

17.    The Inspector General's belatedly-filed proposed Order to Show Cause also raises questions.  As filed on August 11, 2006 and served on Respondents, the proposed order did not contain a document preservation requirement.  The August 22, 2006 Order issued by the Court, however, requires that "respondents shall maintain and preserve any documents that are or may be responsive to the above-described subpoena [sic]."[7]  Although Petitioner served Respondents with his proposed order on August 11, 2006, neither NeCMSC nor Bombardier received notice of any sort that the Inspector General would subsequently seek a document preservation order for all records that "may be responsive" to a certain unspecified subpoena.  This was particularly significant since, as Petitioner should have been aware, NeCMSC was obligated to transfer most of its records to Amtrak on October 1, 2006.  As a result, Respondents had to file their Emergency Motion for Hearing to Modify *Ex Parte* Order.  DKT. 13.

---

[5]       No such motion was ever filed or granted.

[6]       The Insert's only references to "materials", as such, were a few reported decisions (Insert at 2-3, 5-6); Instructions 5&7 to the subpoenas (presumably at standard OIG form) (*id.* at 3-4); and FRCP 34 (*id.* at 4 & 6). It is unclear how any of these materials, in truth, could not have been "located".

[7]       There are actually four subpoenas at issue in this case.

### III.    Factual Background

**A.    The Parties**

18.    For fiscal year 2004, the Inspector General had a budget of $12.5 million and a staff of 88 lawyers, investigators, engineers and information technology specialists.  Resp. Ex. 66 at 4.  Although armed with broad subpoena power (5 U.S.C. Appendix § 3(a)), Petitioner is not part of any government agency.  As the District of Columbia has held, "[s]ince its inception, the statutes governing Amtrak have indicated that the railroad is . . . <u>not</u> . . . a department, agency or instrumentality of the federal government."  <u>Totten v. Bombardier Corp.</u>, 286 F.3d 542, 544 (D.C. Cir. 2002).  While the Inspector General is under the "general supervision" of the Chairman of Amtrak's Board of Directors, even the Chairman may not ". . . prohibit the Inspector General from initiating, carrying out or completing any . . . investigation or from issuing any subpoena."  *Id.*  Neither Petitioner nor Amtrak have promulgated any administrative procedures affording a subpoena recipient <u>any</u> substantive or procedural rights.

19.    Respondent NeCMSC is a Delaware corporation owned equally by Respondent Bombardier and Alstom.  NeCMSC actions require the unanimous concurrence of its owners.  From 2000, when the Acela first went into revenue service, until October 1, 2006, NeCMSC provided inspection, maintenance and cleaning services for the trains.  Pursuant to the relevant contract (the "Maintenance Contract"), this work was conducted by unionized Amtrak employees acting under the supervision of NeCMSC managers.  On October 1, 2006, NeCMSC's maintenance obligations ended. NeCMSC will be dissolved shortly and most of its records have been now transferred to Amtrak's possession, custody and control.  Pursuant to the Inspector General Act, 5 U.S.C. Appendix § 6(a), Petitioner has full and unrestricted access to all Amtrak records, including NeCMSC's recently transferred files.

20.     Respondent Bombardier is a Canadian corporation based in Montreal.  It is the world's largest railway equipment manufacturer.  Alstom is a New York corporation and a subsidiary of Alstom Transport S.A., another leading rail services corporation, headquartered in France.  In 1996, after several years of design work, Bombardier and Alstom were awarded the contract to manufacture the *Acela*, the first high-speed train in North America.  As noted above, the passenger car friction brakes at issue in this case were supplied by Knorr.  Knorr sub-subcontracted the brake design to WABCO, which in turn sub-sub-subcontracted the work to what is now known as Faiveley Transport.  ORX, an NeCMSC contractor, was responsible for installing and removing the friction brake discs on *Acela* axles.

21.     Beginning in 2000, a total of 20 *Acela* trainsets, consisting of two power cars (at each end of the train) and six passenger cars, were delivered to Amtrak.

**B.     The Brake Problem**

22.     On April 14, 2005, an FRA inspector discovered a cracked spoke on the axle-mounted disc of a friction brake on an *Acela* passenger car.  This prompted an inspection of other brake discs, many of which were found to have similar spoke cracks.  As a result, the entire *Acela* fleet was grounded.

23.     More than 1400 friction brake discs are mounted on the axles of each passenger car so that brake pads can be applied to slow or stop a train.  Passenger car friction brakes are one of four brake systems on the *Acela* trainsets.  None of the other three systems had disc spokes or were otherwise implicated by the Brake Problem.  Oakes Dec. ¶ 8.

24.     After April 14, 2005, the FRA, Amtrak, Respondents and Knorr immediately began intensive analysis and testing to determine the cause of, and a redesign for, the Brake Problem.  Within a few months, after a thorough FRA safety review, Respondents obtained FRA

approval for a redesign that strengthened the friction brake spoke discs, had over 1400 new discs manufactured and installed and returned the *Acela* to service. Neither the FRA nor Amtrak required any modification to any other part of any *Acela* system. Since the return of Acela service in July 2005, there have been no problems with the *Acela* friction brake discs.

25.    Once the trains were returned to service, Amtrak and Respondents began negotiations regarding all commercial issues related to the Brake Problem. By August 2006, all these issues were settled. In the meantime, all related issues between the Bombardier-Alstom consortium and Knorr, its brake subcontractor, had also been settled.

**C.    The Investigation (Phase I)**

26.    Shortly after the Brake Problem was discovered, Petitioner's staff descended on NeCMSC's maintenance facilities and offices (the "Ivy City Facility") in Amtrak's Ivy City rail yard in the District of Columbia. Without the benefit of a subpoena, the Inspector General demanded, and was given, a variety of original records and ex parte interviews of NeCMSC employees. Resp. Ex. 29 at 2.

27.    Bombardier and NeCMSC were each served with substantially similar subpoenas on May 4 and May 10, 2005, respectively (the "First Subpoenas"). Resp. Exs. 2 & 4. NeCMSC and Bombardier received a second set of similar subpoenas respectively on June 24 and 28, 2005 (the "Second Subpoenas"). Resp. Exs. 6 & 7.

28.    On May 11, 2005, the Inspector General testified before Congress regarding the Brake Problem. During his May 11, 2005 testimony, Petitioner acknowledged that Respondents "have been cooperating fully". Resp. Ex. 67 at 26.

29.    The First Subpoenas were drafted by an Inspector General investigator, and issued

without any review by legal counsel.  As the following examples demonstrate, these subpoenas

are extremely broad, often vague and, in places, unintelligible:

| **Request No. 4** | **Comment** |
|---|---|
| "All engineering reports regarding the Acela Brake System . . ."  (Amended Pet. Ex. 2, Attach. at 4). | Despite repeated requests, the Inspector General has never defined the term "engineering reports". Depending on its meaning, an "engineering report" could encompass records prepared as far back as the mid-1990's when Bombardier first began "engineering" work on the brake design.  In June 2005, the Inspector General disavowed his prior agreement to limit all subpoena requests to the passenger car brake system implicated by the Brake Problem.[8]  Compare Broas Dec. ¶ 2 with Resp. Ex. 25 at 2. |
| **Request No. 5** | **Comment** |
| "All . . . documents regarding service or repair information related to the Acela brakes or systems or equipment directly connected to the brakes." | This request has no time limits and thus could encompass records from the mid-1990's to present.  The Inspector General disavowed his prior agreement to limit requests to the passenger car friction brakes and, despite repeated requests, has never defined, much less limited, the terms "service or repair information" and 'systems . . . directly connected to the brakes", the latter of which could include a variety of irrelevant systems. |
| **Request No. 6** | **Comment** |
| "All . . . documents providing service or repair information relating to the Acela trains" | This request, which has no time limits, is not limited to brakes and indeed seems to encompass every aspect of NeCMSC's service and repair business. |
| **Request No. 7** | **Comment** |
| "All documents which describe, discuss or relate to identification of quality control pertaining to braking discrepancies, malfunctions and/or defects for the Acela | This request is unintelligible.  The Inspector General's staff has itself been unable to construe this request. |

---

[8]    On May 10, 2006, after Respondents had completed their production, Petitioner's staff stated orally that Respondents were not required to produce records relating to locomotive brakes.

brakes or components of the brakes."

| **Request No. 8** | **Comment** |
|---|---|
| "All documents . . . between NeCMSC representatives and any other entity . . . regarding cracks, malfunctions . . . pertaining to the Acela brakes, their assembly and/or wheelsets." | This request has no time limit. The Inspector General disavowed his prior agreement to limit his requests to the passenger car friction brakes and has declined to limit the term "malfunction". |

| **Request No. 10** | **Comment** |
|---|---|
| "All documents which . . . relate to Quality Assurance reports of cracks <u>and</u> statements pertaining to the Acela brakes." | This request is unintelligible. Because the subpoenas require "and" to be construed in the disjunctive (<u>E.g.</u>, Definition "M"), Respondents do not know how to define the phrase "statements pertaining to Acela brakes". The Inspector General's staff itself has been unable to explain what is meant by that phrase. Because it has no time limits and is not limited to the passenger car friction brakes, this request could apply to any "statements pertaining to [any] Acela brakes" as far back as 1994. |

| **Request No. 11** | **Comment** |
|---|---|
| "All documents . . . which describe, discuss or delineate the process or methodology of manufacturing the Acela brakes or any of its [sic] parts." | As previously noted, the Inspector General's staff disavowed its prior agreement to limit requests to the passenger car friction brakes. The Inspector General has declined to discuss, much less limit, this request, which literally read could require assembly line manufacturing records for all 20 Acela trainsets. |

Resp. Exs. 2 & 4.

30.     Although limited to a single request, the Second Subpoenas were equally opaque:

| **Request No. 1** | **Comment** |
|---|---|
| "All documents . . . regarding cracks or malfunctions, pertaining to the Acela brakes." | This request has no time limits and, literally read, would apply to every insignificant "malfunction" of the multiple Acela brake systems since 2000. The Inspector General, however, has instructed Respondents to construe this request as encompassing any document constituting pre-April 14, 2005 "notice" to a knowledgeable person of a significant problem with passenger car friction brakes. Respondents have submitted affidavits that no records constituting notice of the Brake Problem have been located or are believed |

to exist.

Resp. Exs. 6 & 7.

31.     The Second Subpoenas were accompanied by a new, but in the context of
Petitioner's vague demands, equally unclear instruction:  "There may be some overlap between
this Subpoena and [the First Subpoenas] . . . To the extent there is duplication . . . please respond
to this subpoena."  E.g., Resp. Ex. 6, Instruction 7.

32.     Insofar as electronic records are concerned, the Inspector General's subpoenas
demanded that Respondents:

> "[P]roduce all computer disks or tapes <u>which are relevant to the</u>
> <u>document requests below</u>.  In addition, copy <u>all hard drive</u>
> <u>materials</u> onto a disk or tape and produce those copies.  For each
> disk or tape provided, provide an explanation on how to access the
> materials.  Finally, produce a [paper] copy of all documents
> contained on or within the disks or tapes."

See, e.g., Resp. Ex. 2 at Attach. A, at 2 (emphasis added).
Taken literally, this request would seem to encompass the entire database in which any single
"responsive" record is found, even if the balance of that database is non-responsive.  Indeed, at
times during the investigation, the Inspector General demanded full access to all of Respondent's
databases.

33.     Because Bombardier is a large multi-national corporation, the electronic search
and document review demanded by these subpoenas would have taken years to complete at a
cost of millions of dollars.  NeCMSC's electronic search would also have been onerous.

34.     Confronted with these vague and potentially overwhelming demands,
Respondents retained counsel.  Alstom engaged Timothy M. Broas of Winston & Strawn to
represent Alstom and Alstom's interests in NeCMSC.  Bombardier retained Philip Le B.
Douglas, who was then a member of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury

Winthrop") to represent Bombardier and its interests in NeCMSC. When in early June 2006 Mr. Douglas became a partner in Jones Day's New York office, Bombardier retained that firm.

35.     On May 18, 2005, at Respondents' request, Pillsbury Winthrop and Bombardier representatives met at Petitioner's Washington, D.C. offices with Colin C. Carriere, Counsel to the Inspector General, David Z. Sadoff, Associate Counsel to the Inspector General and Special Agent Renee Jackson-Dixon. In an attempt to narrow the subpoenas' requests, Pillsbury Winthrop agreed that it would inventory the universe of potentially responsive NeCMSC and Bombardier records and provide the Inspector General with preliminary surveys of each Respondent's possibly responsive files (the "Document Production Overviews"). The "purpose of this exercise was to provide Petitioner's office with information that would help it discuss with Respondents which files were truly needed and the order in which they should be produced." Respondents asked that, after the Inspector General's staff received the Document Production Overview, "the parties meet again to discuss ways to clarify and narrow the subpoenas." Douglas Dec. ¶ 5; see Resp. Ex. 13.

36.     From the outset of the May 18 meeting, Messrs. Carriere and Sadoff insisted that Respondents promptly search "all potentially responsive files for any document indicating that Bombardier and NeCMSC might have been on 'notice' of any *Acela* brake problem." Douglas Dec. ¶ 6 (emphasis in original). In subsequent correspondence, the Inspector General's staff repeated their demand that Respondents search for and segregate " 'notice records,' i.e. those documents and records which discuss or pertain to any information or notice to [any] deficiencies or [any] problems with [any] Acela brakes." *Id*.; Resp. Exs. 9 & 14. During the meeting, however, Respondents clearly stated that Petitioner's request was, for a variety of reasons, impractical and unacceptable. Douglas Dec. ¶ 7. Nevertheless, on June 1, 2005, the

Inspector General's office wrote to Bombardier claiming that Bombardier had agreed to segregate and produce "notice" records.  Resp. Ex. 11.

37.    During the May 18 meeting, Respondents asked Petitioner's staff to identify any search terms they wanted Respondents to use in searching their voluminous electronic files.  Douglas Dec. ¶ 10.  This request was repeated in subsequent meetings and correspondence.  *Id*. ¶ 18; Resp. Exs. 15, 28, 29 & 32.  Nevertheless, the Inspector General's Office did not provide any proposed search terms until July 6, 2005, at which time his staff added 20 search requests to those previously proposed by Respondents.  Douglas Dec. ¶ 18.  A search using those terms would have taken years to complete at a cost of millions of dollars.  Hansen Dec. ¶ 8; Douglas Dec. ¶ 22.

38.    Shortly after the May 18, 2005 meeting, in order to prepare the Document Production Overviews, Pillsbury Winthrop lawyers and paralegals traveled to Montreal, Quebec and Washington, D.C. and conducted at least 20 interviews.  Douglas Dec. ¶ 13.  This resulted in two Bombardier and NeCMSC Document Production Overviews delivered to the Inspector General respectively on May 31, 2005 and June 7, 2005.  Resp. Exs. 10 & 12.  Beginning on June 8, 2005, Respondents repeatedly asked the Inspector General's staff to review the Overviews and discuss ways of narrowing and clarifying the subpoenas.  Resp. Exs. 13 at 6 and 23 at 2.  These requests were ignored for the next four months.  Douglas Dec. ¶ 14; Compare Resp. Exs. 10, 12 & 13 with Resp. Exs. 11, 14 & 15.  To this day, the only use to which the Inspector General has put the two Document Production Overviews, which Respondents prepared at significant cost and effort, has been to manufacture claims that one was inaccurate.  See, e.g., Amended Pet. ¶ 28.

39.      On June 2, 2005, again at Respondents' request, Winston & Strawn and Alstom met with Mr. Sadoff and other members of Petitioner's staff at the Inspector General's Washington, D.C. office.  During that meeting, the Inspector General's staff agreed "to limit the scope of the subpoenas to the friction brakes on the trailer [passenger] cars.  This agreement made sense because the other three brake systems on the Acela trainsets do not contain discs with spokes."  Broas Dec. ¶ 3.  On June 27, 2005, however, the Inspector General's Office, to Respondents' surprise and chagrin, claimed that it had "never agreed" to limit the Subpoenas to passenger car friction brakes.  Resp. Ex. 22 at 2.

40.      On June 8, 2005, once more at Respondents' request, Respondents met with Mr. Sadoff and other members of Petitioner's staff at the Inspector General's Washington, D.C. office.  Pillsbury Winthrop reported to the Inspector General's representatives regarding a loss of email server data on NeCMSC's email servers in connection with a server shutdown due to the overheating of the Ivy City Facility while it was closed for Memorial Day, May 30, 2005.  Respondents also described the conclusions of Kroll On-Track, Inc. ("Kroll") and eMag Solutions, Inc. ("eMag"), expert consultants Pillsbury Winthrop had retained to examine email server drives and back-up tapes involved in the Incident.  Pillsbury Winthrop agreed to prepare a written report regarding its investigation of the Incident (the "Memorial Day Report" or "Report").  Aside from a few perfunctory questions, the Inspector General's staff betrayed little interest in the Incident.  Indeed, after the Inspector General's receipt of the Memorial Day Report on June 28, 2005, none of his representatives mentioned the topic again until November 30, 2005.  Douglas Dec. ¶¶ 15-19; see Resp. Ex. 26.

41.      Rather than the Memorial Day Incident, most of the June 8, 2005 meeting was again devoted to the Inspector General's strongly worded demands that Respondents search for,

isolate and produce all records evidencing any pre-April 14, 2005 "notice' of a problem with any one of the *Acela*'s four brake systems.  Douglas Dec. ¶¶ 15-19.

42.    In addition to these meetings, the parties exchanged no fewer than 47 letters in the period May 10 until September 22, 2005, when Petitioner, without any warning, filed the Original Petition in this case.  Among other things, Respondents' letters provided reasoned objections to the Subpoenas' requests (Resp. Exs. 15 & 18) and unsuccessfully pleaded for an opportunity to discuss ways to clarify and narrow the subpoenas' demands for paper and electronic records.  (Compare Resp. Exs. 10, 12 & 13 with Resp. Exs. 11, 14 & 15).  Nevertheless, the Inspector General's staff declined to narrow a single request in any of the Subpoenas.

43.    On July 11, 2006, faced with Petitioner's staff's (a) erroneous claim that Respondents had agreed to undertake a "notice" production, (b) disavowal of their agreement to limit the Subpoenas to brake discs of the type involved in the Brake Problem, (c) refusal to limit any of the Subpoenas' vague and broad requests, and (d) failure to place reasonable limits on the required electronic searches, Respondents asked for an audience with Mr. Weiderhold himself.  Resp. Ex. 37 at 2.  This request was repeated on a number of subsequent occasions.  Resp. Ex. 56; Original Pet. Resp. at 1-2.  Petitioner's staff ignored or rejected each of these requests.  E.g., Resp. Ex. 57.  To this day, Mr. Weiderhold has never personally entertained Respondents' objections to the Subpoenas.[9]

44.    In the absence of any agreement to limit the Subpoenas' scope and faced with the Inspector General's insistent demands for prompt production, Respondents proceeded to search for and produce files that were reasonably likely to contain any pre-April 14, 2005 "notice" to

---

[9]    Respondents have also asked for a hearing before David M. Laney, Esq., Mr. Weiderhold 's nominal supervisor.  Pet. Ex. 58.  This request was also ignored.  Douglas Dec. ¶ 28; see Resp. Ex. 59.

Respondents of the Brake Problem.  Pillsbury Winthrop's document production efforts alone included interviews of more than sixty witnesses.  Douglas Dec. ¶ 21(a).  The resulting productions were accompanied by letters describing the records in question and, where appropriate, how the searches were conducted and the standards used to determine "responsiveness".

45.    Respondents first produced the relevant contracts (Resp. Exs. 16, 19, 30), NeCMSC's Daily Inspection Records ("DIRs") (Resp. Exs. 21 and 32) and NeCMSC's Corrective Work Orders ("CWOs") (Resp. Ex. 30).  DIRs are written reports regarding NeCMSC's daily inspections of each of the 20 *Acela* trainsets.  CWOs identify each defect discovered during those inspections that required corrective action.  These records would have identified any significant brake problem experienced by the *Acela* trains since the inception of service in 2000 and all repairs of those problems.

46.    Thereafter, Respondents produced other potentially relevant files, including NeCMSC's Purchasing Department records (Resp. Ex. 40) and the individual files of key NeCMSC officers and engineers.  Also produced were brake-related technical manuals (Resp. Exs. 31, 33 and 38), Purchasing Department materials, the correspondence files for Knorr (the Bombardier subcontractor that supplied the friction brake discs) (Resp. Ex. 44) and ORX (the NeCMSC contractor that installed and removed the brake discs) (Resp. Ex. 54), Bombadier's Quality Assurance records (Resp. Ex. 48), design modification notices, records kept by key employees, including Sylvan Labbé and Denis Oakes (Bombardier's and NeCMSC's principal brake experts) (Resp. Exs. 54 and 55), and Customer Service Department files (Resp. Ex. 55).  By September 2005, Respondents had produced more than a million pages of records.

**D.**     **The Original Petition and Response**

47.     On September 22, 2005, without any prior notice, the Inspector General filed the Original Petition in this action.  That pleading placed on the public record serious allegations of misconduct by Respondents.  Among other things, the Inspector General claimed that "Petitioner has obtained from other subpoenaed entities documents that <u>at</u> <u>least</u> suggest Bombardier, in the Fall of 2004, had knowledge of and concern about cracked disc brake rotors."  Original Pet. Mem. at 11 (emphasis added).  According to the Inspector General, Bombardier's failure to act on or even disclose this problem "threatened catastrophic failure" of an *Acela* high-speed train. *Id.* at 7.  The Original Petition went on to allege that Respondents obstructed Petitioner's investigation by "delay, incompleteness, and non-compliance with their production responsibilities under the Subpoenas."  *Id.* at 17.  In particular, Respondents were accused of:

(a)     not producing "highly pertinent"[10] records suggesting that Respondents had advance "notice" of the Brake Problem (Original Pet. Mem. at 11 & 21-22, 22 n.28, 23);

(b)     deliberately "disorganizing" their document production (*id.* at 5-6, 11, 17-18, 21 n.27, 23-24);

(c)     "refus[ing] to produce <u>any</u> emails or electronic documents" (*id.* at 5; *see id.* at 10, 15, 17; Original Pet. ¶¶ 18, 21);

(d)     disaggregating electronic documents into their individual pages (Original Pet. ¶ 20); and

(e)     "inflat[ing] their production with [non-responsive] records."  (Original Pet. Mem. at 5; *see id.* at 5-6, 20, 23; Original Pet. ¶ 19).

---

[10]     A "pertinent" document is one as "having a clear decisive relevance to the matter at hand; highly significant."  Webster's New Collegiate Dictionary at 856 (1973).  A "highly pertinent" document, then, is one of the utmost significance to the investigation.

48.     None of these six categories of allegations had <u>ever</u> previously been raised with Respondents.  Douglas Dec. ¶ 27.  Each, moreover, was completely false.  On October 14 and 20, 2005, therefore, Respondents provided the Inspector General's Office with respectively preliminary and final drafts of their Original Petition Response.  The Original Petition Response was supported by twelve declarations and sixty-eight exhibits.  Rather than publicly embarrass the Inspector General, Respondents, after serving Petitioner, did not file the Original Petition Response with the Court.

49.     By reference to the Inspector General's own declarations and exhibits and specifically identified records already produced to his staff,[11] the Original Petition Response demonstrated that Respondents had:

(a)     not received advance notice of the Brake Problem (Original Pet. Resp. at 4-8); and had not "withheld" of the "highly pertinent" records identified in the Original Petition (*id.* at 5, 8-11);

(b)     not "disorganized" its files (*id.* at 11-14);

(c)     produced several hundred thousand pages of supposedly withheld emails and electronic documents (*id.* at 14-15);

(d)     properly scanned documents and produced them in a readily usable form (*id.* at 22-23); and

(e)     not "inflated" their document production.  *Id.* at 17-20 & 24.

50.     In addition, in order to address Petitioner's seeming obsession regarding Respondents' supposed prior "notice" of the Brake Problem, Bombardier, Alstom and NeCMSC submitted five declarations from the witnesses, including Bombardier's and NeCMSC's chief

---

[11]     The Original Petition was filed before Respondents had completed their document production.

brake specialists, most likely to have been informed of any serious brake problem.  The Amended Petition agrees that these witnesses were "key personnel".  Amended Pet. ¶ 18.  These five declarants testified that (a) each would have been informed of any issues relating to defective, cracked or broken friction brake disc spokes and (b) none knew of any such problem prior to the FRA's discovery of the Brake Problem on April 14, 2005.  Behety Aff. ¶¶ 3-4, Labbé Dec. ¶¶ 4, 5, 7; Miclette Dec. ¶¶ 6, 11; Oakes Dec. ¶¶ 4, 5, 16-20; and Wochele Aff. ¶¶ 3-4.

51.    In addition, a number of Respondents' witnesses testified that they had searched their own files and other files in which a record of a Brake Problem would likely be kept, including correspondence files for Knorr (the brake supplier), the DIR and CWO databases, the Failure Analysis Reports ("FAR") database, and the Failure Reporting Analysis and Corrective Action System ("FRACAP").  Each testified that their searches had not found any document constituting pre-April 14, 2005 "notice' of a Brake Problem.  DeMarco Dec. ¶ 4; Labbé Dec. ¶¶ 6, 7, 8-12; Miclette Dec. ¶ 7; and Oakes Dec. ¶¶ 6, 7.

**E.    The Investigation (Phase II)**

52.    The second phase of the investigation extended from October 25, 2005 when Petitioner filed his first application for a stay of this case until the filing of the Amended Petition on August 8, 2006.  During this nine-month period, Respondents, at a cost of many hundreds of thousands of dollars in legal and consultant fees, produced an additional 300,000 pages of records, subjected witnesses to lengthy interviews and engaged in innumerable meetings and telephone conferences, all in a futile effort to resolve the Inspector General's ever mutating demands.  Only some of these efforts are described below.

**(1)    Petitioner's Abandonment of the Misconduct Claims**

53.    From the outset of Phase II of the investigation, it was clear that Petitioner realized that his Original Petition was almost entirely wrong.  On October 25, 2005, the Inspector

General, on his own initiative, filed a Request for Temporary Stay of Proceeding (the "First Stay Request") stating, with reference to the Original Petition Response, that "the requested stay will, at the very least, narrow and focus issues that may require eventual presentation to this Court." DKT. 3 (emphasis added).  This, of course, understated the errors that infected the Original Petition.  None of that pleading's "notice" and suppression of evidence claims was mentioned ever again.

54.     Nevertheless, on October 31, 2005, Petitioner issued his Semiannual Report to Congress making the investigation the centerpiece of his efforts for the next year and committing his Office to precisely the "prior knowledge of the dangerous condition" theory (Resp. Ex. 73 at Cover Letter & 5) that Respondents had just discredited.

55.     In a November 10, 2005 letter to Respondents, Mr. Sadoff acknowledged, without apology or explanation, that the Original Petition Response "demonstrates that portions of the above-referenced Petition require supplementation and revision."  Resp. Ex. 74 at 1. Mr. Sadoff's letter then submitted five single-spaced pages of questions regarding Respondents' document production.  None of these made any mention of the Original Petition's claims that Respondents had advance "notice" of the Brake Problem and suppressed records evidencing such notice.  It was clear, therefore, that the Original Petition Response had satisfactorily refuted each of those claims.[12]  As was the case with all of the Inspector General's prior communications

---

[12]     The only Original Petition issue mentioned in the November 10 letter was Mr. Sadoff's complaint that the Inspector General had received "multiple copies of the [sic] identical documents and non-responsive documents."  Resp. Ex. 47 at 4.  As Respondents explained on November 18, 2005, however, the Inspector General's refusal since the beginning of the investigation to narrow or clarify a single one of the First Subpoenas' requests made it impossible to determine what he meant by "responsive" and that, in any event, "to comb through one million pages of potentially responsive records in order to, as you now suggest . . . 'exclude multiple copies of the same documents' would exponentially increase the duration and expense of document production."  Resp. Ex. 76 at 8.  This explanation evidently satisfied Mr. Sadoff because the issue has not resurfaced in the Amended Petition.

since his receipt of the Memorial Day Report on June 28, 2005, Mr. Sadoff's letter also made no mention of the Memorial Day Incident.

56.     On November 30, 2005, the parties met in the Inspector General's Washington, D.C. office and, in the words of his December 9, 2005 Second Stay Application, had "a lengthy and productive exchange of information and proposals." (DKT. 5). The November 30 meeting addressed upwards of 20 points and issues. None of these involved the "notice" and obstruction claims alleged in the Original Petition. Two concerned Pillsbury Winthrop's Memorial Day Report. This was the Inspector General's first mention of anything having to do with the Memorial Day Incident since his staff received Pillsbury Winthrop's Report on June 28, 2005.

57.     Although during the eight months following the November 30, 2005 meeting, Mr. Sadoff raised, and Respondents addressed, innumerable questions regarding a wide variety of issues large and small, Phase II of the investigation proceeded along three principal lines: (a) Respondents' successful attempt to limit the Inspector General's demand for additional electronic record searches; (b) Respondents' unsuccessful effort to instruct Petitioner's staff in the use of accepted electronic document management systems; and (c) Mr. Sadoff's new-found preoccupation with the Memorial Day Incident. The parties' dealings in these areas are summarized below.

### (2)    The Parties' Agreement on Electronic Search Terms

58.     With regard to the electronic search issue, Respondents worked with Mr. Sadoff and Jeff Black, the Inspector General's technology specialist, to develop an agreed electronic search protocol that would be acceptable to Mr. Sadoff without producing an excessively large number of irrelevant records. Respondents had first requested such a dialogue as far back as May 18, 2005. Douglas Dec. ¶ 10.

59.     After testing a variety of search term iterations on the hard drive of a senior, knowledgeable employee, Mr. Sadoff finally agreed to a search and production protocol that was limited to documents constituting pre-Brake Problem "notice" of problems regarding passenger car brakes.

60.     Respondents then devoted a great deal of effort to reaching an agreement with Mr. Sadoff regarding the additional employees whose personal hard drives and centrally maintained "user" electronic files would be searched.  Due to Mr. Sadoff's concerns that informal "notice" communications might have taken place between employees who were not knowledgeable about brake issues, Respondents were required – at additional cost – to search the files of many who in the ordinary course of their duties would not have been informed of, much less understood, the implications of a cracked spoke on a friction brake disc.  Over the course of an extensive correspondence and numerous telephone conferences, Respondents provided Mr. Sadoff with Alstom, Bombardier and NeCMSC organizational charts and thoroughly described the roles of the many employees identified on those charts.  Respondents then provided a 172-page analysis of potentially responsive electronic files (Resp. Ex. 91), and a 51-page analysis of the personal hard-drive and user- drive files of specified managerial employees (Resp. Ex. 93).

61.     At long last, Mr. Sadoff agreed to limit the search to the electronic files of dozens additional employees.  After these files were reviewed for privilege and responsiveness, electronic copies of those records were produced to the Inspector General's staff.  In total, after reviewing a much larger universe of electronic records, Respondents produced an additional 300,000 pages of records.

62.    This production, which did not involve the search of <u>any</u> Bombardier, Alstom or NeCMSC back-up tapes, seemed satisfactory to Mr. Sadoff.  As the Amended Petition recites, "Counsel's efforts [after the Original Petition was stayed] resolved important issues – most notably, the scope of the search for responsive electronic documents."  Amended Pet. ¶ 20.

**(3)    The Parties' Disagreement Regarding "Native Format" Files**

63.    During Phase II of the investigation, the parties also devoted considerable time to Mr. Sadoff's demand for files in their "native format."  At first, Mr. Sadoff's claim was that the Subpoenas entitled the Inspector General to free and unrestricted access to all of Respondents' databases.  In his November 10, 2005 letter, Mr. Sadoff asserted that because "Respondents have not produced [electronic] documents in their native format, they have not complied with the terms of the subpoenas."  Resp. Ex. 74 at 3.  By "native format", Mr. Sadoff meant not just records in their original electronic form but the relational databases  in which they were maintained.

64.    In their November 18, 2005 letter, Resp. Ex. 76, Respondents attempted to resolve this demand with a variety of proposals.  <u>First</u>, Respondents pointed out that "Amtrak (and thus presumably its Inspector General) <u>already had full access</u> to each and every of the NeCMSC databases listed in your [November 10] letter" (*Id.* at 5) namely, the Technical Service Bulletins, Service Bulletins from Knorr, Inspection Records, SPEAR and the Contract Tracking System ("CTS") databases.[13]  <u>Second</u>, Bombardier noted that Mr. Sadoff's demands for unrestricted access to all of Bombardier's databases was more problematic because some contained non-responsive, privileged and otherwise highly confidential information regarding a

---

[13] On December 14, 2005, Respondents agreed to provide Petitioner's staff with remote access to NeCMSC's maintenance ("SPEAR") database.  This was primarily for the convenience of the Inspector General's investigators, as doing so would allow them greater privacy in their search.

large number of projects, most of which had nothing to do with Acela or Amtrak (*Id*. at 7-9). Nevertheless, Bombardier offered to permit the Inspector General's staff to observe electronic searches using agreed protocols of the Bombardier databases mentioned in Mr. Sadoff's letter (*Id*. at 11).  Finally, in response to Mr. Sadoff's claim that his staff was having difficulty working with these particular files, Respondents also agreed to, and subsequently did, provide  Excel spreadsheets in a more user-friendly text searchable format.  Resp. Ex. 80.

65.    With regard to the NeCMSC databases, however, Petitioner's staff seemed unable to search these systems properly.  After several telephone conferences failed to resolve the problem, NeCMSC arranged a training session for the Inspector General's investigators.  It is not clear, however, whether, after receiving their training, the Inspector General's investigators actually conducted any searches of the NeCMSC databases.  Neither did Mr. Sadoff ever pursue Bombardier's offer to conduct supervised searches of its databases.

66.    Instead, the Inspector General changed his demand from one seeking access to existing databases into a requirement that Respondents deliver to Petitioner a "duplicate" of all existing databases cleansed of "non-responsive" and privileged data.  After repeated explanations by Respondents demonstrating that this was an impossible request, Mr. Sadoff's "native format" demand evolved into its third iteration:  namely, that (a) the individual electronic records produced by Respondents be produced as complete documents rather than page-by-page TIFF files, (b) they be text searchable, and (c) each document be accompanied by its "metadata" (the background information regarding a document's creation and revision).

67.    From the outset of the investigation, Respondents had produced all their paper and electronic records in single-page TIFF format, with "image load" files, defining document boundaries.  As confirmed by Respondents' document management experts, this generally

recognized document production method was compatible with any widely used document management system.  Hansen Dec. ¶ 3; Drury Dec. ¶ 3.  For example, single-page TIFF documents and load files, when properly loaded into a standard document management database, will be properly organized into their respective documents.

68.    In a February 21, 2006 telephone conference, Respondents attempted to address Mr. Sadoff's claims that his Office's document management software could not integrate the individual pages of Respondents' production into their respective documents, as well as his complaints that past productions had not been searchable.  Bombardier proposed a production of both TIFF and text-searchable PDF images as a compromise.  To this, Mr. Sadoff replied incorrectly that the Inspector General's position had originally and consistently been that electronic documents be produced only in their native formats.

69.    Respondents replied that they had numerous reservations about providing native documents including that:  (a) native files can be altered by the recipient; (b) native files cannot be redacted without altering them, and in some circumstances, the mere production of a native format document can result in an alteration of the original; (c) native documents cannot be "Bates-stamped," frustrating efforts to keep track of and/or verify documents; and (d) running a text-search within a native database document can lead to unpredictable results.

70.    Mr. Sadoff claimed that these concerns were "illusory", that Respondents past TIFF productions  were "valueless" and that Bates numbering is not necessary to keep track of, or authenticate, documents.  Mr. Sadoff insisted that Respondents provide all electronic documents in "native" format and stated that he was "becoming suspicious about some of this" as it "seems needlessly complex".

71.    Respondents then secured Mr. Sadoff's agreement to a February 27, 2006 telephone conference between the parties' technical experts to address Mr. Sadoff's concerns. The purpose of this call was to discuss technical, and not legal, issues. At the outset of the call, however, Mr. Sadoff suddenly refused to let Respondents' technical personnel speak with Respondents' document management specialists. Respondents' experts then tried to convince Mr. Sadoff that their only purpose was to determine the technical capabilities of the Inspector General's document management software in order to develop a compromise electronic production format.

72.    Mr. Sadoff flatly rejected these overtures, stating that native files would be the only ones he would accept, because he wanted a format that was text-searchable and that had the original "date stamps" and "metadata" attached.

73.    At this point, Respondents' experts suggested that Respondents might produce both text-searchable PDF images as well as TIFF images *and* the extracted metadata. Even though this proposal addressed both concerns expressed by Mr. Sadoff, he rejected this proposal out of hand.

74.    When Respondent then asked whether Petitioner in fact had access to software that could search native documents (since different document formats require different applications to use them), Mr. Sadoff replied that he <u>hoped so</u>, but if not, he would get such capability.

75.    Faced with Mr. Sadoff's inability to engage in a reasoned dialogue on this subject, Respondents, at additional expense, began to produce documents in both single-page TIFF (with load files) and text-searchable PDF images. In addition, metadata was provided in either Excel spreadsheets – or for the Alstom's NeCMSC employees, in a delimited text file – for loading into

the database of the Inspector General's choosing.  Finally, Respondents repeatedly offered the assistance of their technical experts, should Mr. Sadoff and staff require such assistance with the loading or use of the files provided.

76.    Mr. Sadoff, however, claimed that Jeff Black was unable to perform these functions with the electronic records supplied by Respondents.  Respondents, therefore, again offered to have their experts work with Mr. Black to resolve the Inspector General's software difficulties.  At first, however, Mr. Sadoff inexplicably underlined refused to identify the document management application being used by his office.  Mr. Sadoff finally identified the Inspector General's system as "Zyindex," a little known program.  Respondents then suggested that the Inspector General license (for a few thousand dollars) either Concordance or JFS Litigators Notebook and offered to train Petitioner's staff in their use.  Mr. Sadoff, though, failed to follow through on Respondents' invitation to provide a demonstration using their own document management software on one of the CDs produced by Respondents. [14]

77.    Despite the failure of Petitioner's staff to avail itself of Respondent's technical assistance, Respondents continued to work with Petitioner to address the Inspector General's concerns.  On March 30, 2006, Respondents Bombardier and NeCMSC provided the Inspector General with an electronic production of Excel spreadsheets in their native format, in order to resolve any difficulties the Inspector General may have experienced accessing other forms of that particular type of document.

**(4)    Petitioner's Investigation of The Memorial Day Incident**

---

[14]    At 11 a.m. on a summer Friday in 2006, Mr. Sadoff asked for a demonstration that same afternoon. Resp. Ex. 138.  Unfortunately, the Jones Day litigation technology specialist was unavailable because she was leaving for vacation.

78.     The third thread of Phase II of the investigation was the Inspector General's exhaustive investigation of the Memorial Day Incident.  After raising the issue for the first time on November 30, 2005, Mr. Sadoff asked to interview Pillsbury Winthrop's litigation consultants, Kroll and eMag, regarding their examinations, respectively, of the server drives and back-up tapes involved in the Memorial Day Incident.  Pillsbury Winthrop voluntarily made its consultants available for interviews.

79.     On January 19, 2006, three members of the Inspector General's staff – Mr. Sadoff, David Burrell and Jeff Black – conducted, a 1.25 hour interview of Christine Mennes, a representative of Kroll, regarding her company's attempts to recover data from the email server drives involved in the Memorial Day Incident.  During the interview, Ms. Mennes confirmed that Kroll had concluded that because a data recovery program had been erroneously used on the email servers, no usable data was recoverable.

80.     On January 24, 2006, David Sadoff, Jeff Black, Cam Huntsinger and David Burrell spent two hours interviewing Jeremy Edwards, the NeCMSC information technology specialist involved in the Memorial Day Incident.  Even though Mr. Edwards was no longer employed by NeCMSC and not under subpoena, NeCMSC used its good offices to arrange the interview.  Mr. Edwards' statements were also consistent with Pillsbury Winthrop's Memorial Day Report.  Mr. Edwards, for example, confirmed Pillsbury Winthrop's conclusion that, at the time of the Incident, NeCMSC's server back-up tapes were overwritten on a weekly basis. When questioned by Mr. Sadoff regarding a statement in NeCMSC's Document Production Overview that tapes were rotated so that each was overwritten only monthly, Mr. Edwards explained (as the Amended Petition acknowledges) that although this was indeed NeCMSC's general policy, during the Memorial Day weekend "NeCMSC had no more than the required

sixteen tapes available" for its weekly backup of the server drives. Amended Pet. ¶ 27.

Accordingly, at the time of the Incident, NeCMSC, lacking any extra tapes, could not comply

with the monthly rotation policy and had, instead, to overwrite all of its tapes each week..

81.     On January 25, 2006, Messrs. Sadoff, Burrell, Black and Huntsinger interviewed

Anna Shelton of eMag regarding that firm's attempts to recover email data from the Eight

Unused Tapes. Ms. Shelton confirmed the Memorial Day Report's statement that no emails

were recoverable from the eight Memorial Day Incident tapes eMag had examined.

82.     On February 2, 2006, Messrs. Sadoff, Huntsinger, Black and Burrell of the

Inspector General's office conducted another hour-long interview of three more Kroll

representatives, Ludwig Chin, Kip Komack and Hubert King. Kroll was not under subpoena at

the time, and Pillsbury Winthrop produced these consultants voluntarily. Among other things,

the three Kroll employees confirmed, once again, that no email data was recoverable from the

Memorial Day server drives.

83.     The Inspector General's office next requested all of Kroll's internal working

papers regarding their review of the damaged servers. At Respondents' direction, Kroll

voluntarily provided the Inspector General with 30 pages of emails generated by Kroll during the

course of their efforts to recover data from the NeCMSC server drives.

84.     On February 14, 2006 Respondents voluntarily provided Mr. Sadoff with access

to the NeCMSC server room and permitted him again to interview Mr. Edwards. Amended Pet.

¶ 20. At that time, Mr. Edwards informed Mr. Sadoff that in either October or November 2005,

he had put back into service the email drives that in early June 2005, Kroll had found contained

no recoverable data.

85.     On February 14, 2006, Mr. Sadoff also interviewed Frank Christello, a NeCMSC employee involved in the Incident.  On February 23, 2006, Respondents also voluntarily provided the Inspector General with several NeCMSC emails discussing the Memorial Day Incident.

86.     On June 2, 2006, without notice to either NeCMSC or Pillsbury Winthrop, the Inspector General subpoenaed Kroll seeking all records relating to its retention by Pillsbury Winthrop to review the Memorial Day Incident servers.  On July 10, 2006, Kroll produced 275 of their internal emails.

### IV.     Petitioner's Demands

87.     The Amended Petition raises five claims.  Two are directed to NeCMSC alone: (a) alleged material inaccuracies and other offenses committed in connection with the Memorial Day Incident (Amended Pet. ¶¶ 24-32); and (b) the "incomplete production" of back-up tapes and a Kroll privilege log.  *Id.*¶¶ 33-37.  Three seek from both Respondents (a) descriptions of "non-existent" records (*id.* ¶ 38) ; (b) electronic documents in their "native format" (*id.* ¶¶ 21-23); and (c) certificates of compliance.  *Id.* ¶ 39.  In the paragraphs that follow, we will first address the two allegations directed to NeCMSC alone, and then the three claims directed at both NeCMSC and Bombardier.

### A.     Claims Against NeCMSC

#### (1)     The Memorial Day Incident Issue

##### (a)     The Allegations

88.     Having trumpeted to Congress the Original Petition's discredited claim regarding Respondents' "prior knowledge of the dangerous" Brake Problem (Resp. Ex. 73 at 5), the Inspector General needed another headline-grabbing theory with which to sustain this lawsuit. Thus, even though the Original Petition did not make the slightest reference to the events of

Memorial Day 2005, that Incident became the focus of Phase II of the Investigation.  See Amended Pet. ¶ 20.

89.    As we have seen, from December 2005-July 2006, Mr. Sadoff and his team undertook a microscopic examination of the Memorial Day Incident.  The Inspector General now claims his office discovered that (a) the Incident was neither "surprising" nor "unanticipated" (Amended Pet. ¶ 24); (b) outside counsel's report regarding the Incident was "curious" and "materially inaccurate" (*id.* ¶ 28); (c) a "significant documentary loss" resulted from an again "curious[]" and "relatively modest overheating of the computer facility" (*id.* ¶ 29); and (d) Respondents "repeatedly" failed to implement procedures to preserve the records lost in the Incident.  *Id.* ¶ 31.  Based on this supposed misconduct, Petitioner asks that NeCMSC be required to "file a detailed, documented report" regarding the Memorial Day Incident.  *Id.* ¶ 32.

90.    As will be discussed below, the Inspector-General's allegations are again false: There was no misconduct in connection with the Memorial Day Incident, there were no errors in Respondents' report on the Incident and there was no loss of "significant" electronic documents. Having thoroughly investigated this Incident, moreover, the Inspector General does not really need another report.  This demand for relief is simply a pretext for Petitioner's latest blockbuster claim.

### (b)    NeCMSC's Good Faith Response to the Incident

91.    On May 10, 2005, the day before his scheduled testimony before Congress regarding the Brake Problem, the Inspector General issued Subpoena 05-09 to NeCMSC.  (Resp. Ex. 4.)  As Petitioner concedes, NeCMSC timely informed Jeremy Edwards, its "network administrator", that the subpoena "required the production of electronic documents, including email."  Amended Pet. ¶ 31.  As a precaution, Mr. Edwards was asked to make back-up tapes of

33

all data on NeCMSC's sixteen server hard drives.  As previously noted, however, NeCMSC had

only sixteen tapes available, the minimum necessary to conduct the required weekly server

backup.  *Id.* ¶ 27.  Accordingly, Mr. Edwards had ordered but, at the time of the Memorial Day

Incident, was still awaiting delivery of, the extra tapes necessary to make the copies requested by

counsel.

92.    NeCMSC's sixteen server hard drives operated several different servers.  One,

equipped with two hard drives, was devoted to NeCMSC's Microsoft Exchange email network.

Each server's hard drives were backed up onto magnetic tapes each weekend.

93.    The principal *Acela* maintenance facility is a large building enclosing train bays,

work areas and associated offices at Amtrak's Ivy City yard.  Prior to the April 14, 2005

suspension of service, that facility had been open on a 24-hour a day, seven-day a week basis.

However, because the entire *Acela* fleet had been grounded by the Brake Problem, NeCMSC and

Amtrak agreed that the Ivy City Facility could be closed on Memorial Day, May 30, 2005.  It

was this unanticipated and unique occurrence that triggered the sequence of events that resulted

in a loss of NeCMSC's server email data.  Amended Pet., Ex. 3 at 2.

94.    As a result of the Ivy City Facility's one-time Memorial Day closure, most of the

building's doors were closed, with three high-speed trains parked inside.  As procedures

required, *Acela* trainsets were parked with their electronics and heating, ventilation and air

conditioning ("HVAC") systems in a "powered-up" mode.  One of the trains was positioned

directly under the HVAC unit for the room occupied by NeCMSC's computer servers.  Amended

Pet., Ex. 3 at 2.

95.    On Memorial Day morning, the outside temperature rose to 80º F.  The metal-

roofed facility began to overheat from the combination of external heat and that generated by the

three powered-up trains inside.  When the heat exceeded the capacity of the server room's cooling systems, the HVAC machinery automatically shut down.  The server room then rapidly overheated and, by 10:30 a.m., server drives began to shut down automatically.  Amended Pet., Ex. 3 at 3.

96.     The Amended Petition suggests that there was something untoward about the Incident by claiming that (a) the email server failed due to "a relatively modest overheating of the computer facility" (Amended Pet. ¶ 29); (b) the Memorial Day Incident was "neither unanticipated nor surprising" (*id.* ¶ 24); and (c) it was "curious[]" that "neither built-in redundancies of the email servers nor the automated tape back-up system could protect two years of NeCMSC email."  *Id.* ¶ 29.  These statements are incorrect.  <u>First</u>, temperatures in the server room reached 140-150 degrees, which was more than twice the specified 69 degree operating temperature.  The room was so hot that the HVAC unit "could not be reset because it was <u>too hot to touch</u>."  Amended Pet., Ex. 3 at 3.  It was not until late that afternoon, when the server room had cooled to a mere 111 degrees, that NeCMSC was able to restart the HVAC system.  *Id.* <u>Second</u>, the incident was indeed the "surprising" result of the first closure of the Ivy City Facility in NeCMSC's five year history.  <u>Third</u>, the servers' "built in redundancies" and "automatic" systems in fact operated properly.  When the server room's air conditioning system became overheated, it shut down automatically, and when the server themselves became too hot, they shut down as well.  Alarms were properly issued.  The automatic shut down of the servers preserved all of NeCMSC's essential train maintenance data.

97.     Alerted by various alarms, Jeremy Edwards, NeCMSC's information technology specialist, attempted to place the servers back in operation.  He quickly restored to service all of

NeCMSC's most important servers, including the SPEAR system.[15]  No data had been lost from any of these servers.  However, when Mr. Edwards examined the email server's two drives, red lights indicated that these may have been damaged.  After Mr. Edwards attempted to restart these drives, one indicated by a green light that it was now working properly.  Because the other still had a red indicator, Mr. Edwards replaced that drive with a substitute.  This caused the email server's automatic "Chkdsk" program to try to "repair" both drives.  This destroyed any data on the email drive in operation at the time of the Incident.

98.     At the time of the Incident, the server drives were in the midst of NeCMSC's regular weekend back-up procedure.  Prior to the server shut down, eight of the sixteen tapes containing the prior week's backed-up data had just been overwritten with data from eight of the server drives (the "Eight Overwritten Tapes").  Because neither of the two email server drives had yet been backed up, Mr. Edwards concluded that none of the Eight Overwritten Tapes contained the lost email server files.  This left open the possibility that the eight tapes which had not been overwritten that weekend (the "Eight Unused Tapes") might contain email server data from the prior week's back-up procedure.  Kroll On Track, Inc., a leading data recovery specialist, came to the Ivy City facility to secure the two damaged email drives and the Eight Unused Tapes.

99.     After Kroll advised that it did not have the expertise to recover data from the Eight Unused Tapes, Pillsbury Winthrop retained eMag Solutions, Inc., a specialist in this area, to determine whether any contained server email data from the backup that had occurred a week before Memorial Day.  eMag subsequently determined that none of the Eight Unused Tapes contained data from NeCMSC's email drives.

---

[15]     One of these systems was NeCMSC's "user" or "u" server.  This contained the files, including email files, of individual NeCMSC employees.  These email records were not damaged during the Incident.

100.    In conclusion, then, the loss of data from NeCMSC's email server was not the product of some dark NeCMSC conspiracy.  It was rather the result of a hot day, the first complete building shutdown in NeCMSC's five-year history and perhaps human error.  After the Incident, NeCMSC took prompt and reasonable actions, including retaining the services of two leading data recovery experts.  Nevertheless, when, during the course of Mr. Edwards interview, a Pillsbury Winthrop lawyer expressed her belief that despite his error, Mr. Edwards had acted in good faith, Mr. Sadoff replied ominously, that "this is not about Jeremy Edwards."  There is, however, nothing about this Incident to justify Petitioner's months of investigation and now this litigation.

### (c)    Accuracy of the Pillsbury Winthrop Report

101.    On June 7, 2005, after Kroll and eMag reported that no email files were recoverable from either NeCMSC's drives or the Eight Unused Tapes, Pillsbury Winthrop contacted Mr. Sadoff to schedule a meeting.  On June 8, 2005, NeCMSC met with Mr. Sadoff and other staff members at Petitioner's Washington, D.C. office.  Pillsbury Winthrop presented an oral report regarding the Memorial Day Incident and Kroll's and eMag's unsuccessful efforts to recover the email data.  Aside from a few perfunctory questions, the Inspector General's staff betrayed little interest in the subject.  There was no request, for example, that Respondents take any further action with regard to either the servers or back-up tapes involved in the Memorial Day Incident.  Instead, the bulk of the meeting was devoted to Petitioner's continuing insistence that Respondents locate, isolate and produce records showing that they had advance "notice" of the April 14, 2005 Brake Problem.

102.    During the June 8 meeting, NeCMSC agreed to provide a written report summarizing the Memorial Day Incident.  The Memorial Day Report, prepared by Edward

Flanders, a Pillsbury Winthrop partner and Laura Smith, an associate, was submitted to the Inspector General on June 28, 2005.

103.    The Amended Petition claims that "OIG interest in investigating and analyzing the circumstances of the May 30 [, 2005] server failure, . . . arose and rapidly developed on and after June 8."  Amended Pet. ¶ 29.  As we have seen, this allegation is false.  After the Inspector General received the Memorial Day Report on June 28, 2005, his office did not mention the subject again until November 30, 2005.  Indeed, even the September 22, 2005 Original Petition, which is otherwise replete with false accusations of Respondent misconduct, contains <u>no mention</u> of the Memorial Day Incident.

104.    The Amended Petition's critique of the Pillsbury Winthrop's investigation of the Memorial Day Incident is based on a supposed inconsistency between the Memorial Day Report's statement that at the time of the Incident, NeCMSC's server back-up tapes were overwritten once a week (Amended Pet. Ex. 3 at 5) and that of an entirely unrelated document, the Document Production Overview, reporting more generally that NeCMSC overwrote its tapes monthly.  Amended Pet. Ex. 2 at 3.  By implying that both documents were related to the Memorial Day Incident and by stating that one had to be "materially inaccurate," the Amended Petition suggests that Pillsbury Winthrop's disclosures regarding the Memorial Day Incident were unreliable.  Amended Pet. ¶ 28.  This assertion is false.

105.    <u>First</u>, contrary to the Amended Petition's unexplained claim of "materiality", the issue of whether NeCMSC's tapes were overwritten weekly or monthly is of <u>no</u> importance to the investigation.  The Memorial Day Incident occurred at the end of <u>both the week and the month</u>.  Accordingly, regardless of whether NeCMSC's overwriting practice was weekly or monthly, there is no doubt that the tapes were in fact being overwritten over that weekend.

106.    <u>Second</u>, it was improper for the Inspector General to state that the Memorial Day

Report's conclusion that tapes were overwritten weekly might be "materially inaccurate".

Mr. Sadoff, the Amended Petition's author, has repeatedly expressed his own conviction that at

the time of the Incident, NeCMSC's back-up tapes were being overwritten weekly, which is

precisely what Pillsbury Winthrop reported in the Memorial Day Report.

107.    During Phase II of the investigation, however, Mr. Sadoff was frequently

confused regarding this Memorial Day Report conclusion.  On several occasions, he expressed

the mistaken belief that the Report had concluded that the tapes were being overwritten monthly.

The last such occasion occurred on July 13, 2006, only a few weeks before Mr. Sadoff filed the

Amended Petition.  At that time, Mr. Sadoff opined that Memorial Day Report was "unreliable"

because (a) Pillsbury Winthrop had not interviewed Jeremy Edwards, the NeCMSC information

technology specialist involved in the Incident, and (b) the Report erroneously claimed that

NeCMSC's back-up tapes were backed up monthly.  On July 17, 2006, after Respondents quoted

the Memorial Day Report to him, Mr. Sadoff finally acknowledged that Pillsbury Winthrop had

in fact interviewed Mr. Edwards and that the Report correctly stated that "the backup  tapes from

the prior week are reformatted and are used again, overwriting the previous week's backup

tapes."  Amended Pet., Ex. 3 at 4.  Mr. Sadoff also said that he "understood" Respondents'

request that he tell his superiors that his prior claims concerning the Memorial Day Report's

"unreliability" had been in error.

108.    During the July 17 conversation, Mr. Sadoff justified his error regarding the

Memorial Day Report by claiming that he had confused it with NeCMSC's Document

Production Overview, which does state that NeCMSC's tapes were overwritten monthly.  <u>See</u>

Amended Pet., Ex. 2.  In response, NeCMSC's counsel reminded Mr. Sadoff that, although dated

June 7, 2005, this document had nothing whatsoever to do with, and in fact <u>had</u> <u>been</u> <u>prepared</u> <u>before</u>, the Memorial Day Incident.[16] On its face, the Document Production Overview reveals that its purpose was to provide the Inspector General's Office with a general "lay-of-the-land" regarding potentially responsive documents so that the parties could discuss ways to refine and narrow the subpoenas' document requests.[17] Amended Pet., Ex. 2 at 1. Mr. Sadoff agreed, therefore, that any error in the Document Production Overview regarding the frequency with which NeCMSC overwrote its back-up tapes was even less significant than if it had appeared in a report regarding the Memorial Day Incident.

109. Most importantly, Mr. Sadoff knows that the Document Production Overview's reference to monthly tape overwriting was not "materially inaccurate". As the Amended Petition acknowledges, Jeremy Edwards told Mr. Sadoff that, at the time of the Incident, NeCMSC's tapes were being overwritten on a weekly basis because "in May 2005, NeCMSC had no more than the required [minimum of] sixteen tapes available for backing up" its sixteen server drives. Amended Pet. ¶ 27. As Mr. Edwards informed Mr. Sadoff, when sufficient extra tapes were available, it was indeed NeCMSC's policy to rotate the tapes during the weekly back-up process so that none was overwritten more than once a month.

---

[16] Mr. Sadoff has known from the outset of the investigation that the Document Production Overview was based on interviews conducted "[s]hortly after . . . May 18, 2005", i.e., before the Incident. Douglas Dec. ¶ 13. The June 7, 2005 cover letter accompanying the Document Production Overview informed Mr. Sadoff that delivery to the Inspector General's staff had been delayed by the need for "review and approval by counsel to Alstom." Resp. Ex. 12.

[17] The Original Petition Memorandum, which Mr. Sadoff authored, described the Document Production Overview as follows: "To aid the on-site review and prioritization of documents, Petitioner requested and Respondents' [sic] subsequently provided, descriptions of their potentially responsive records . . . Bombardier and NeCMSC provided summaries of their responsive paper and electronic documents – referred to in the meetings and correspondence as 'lay-of-the-land documents.'" Original Pet. Mem. at 14 & n.15.

110.    For all these reasons, this Court should reject the Inspector General's suggestion that there was something improper about Pillsbury Winthrop's report to his office regarding the Memorial Day Incident.

### (d)    NeCMSC's Re-Use of the Server Hard Drives

111.    The Amended Petition next complains that in October or November 2005, Mr. Edwards re-used the email server drives that months earlier Kroll had determined <u>did not contain any recoverable email data</u>.  Amended Pet. ¶ 30.  The Inspector General speculates that "[t]his action almost certainly overwrote and obliterated <u>any</u> clues contained on the hard drives to the May 30 failure or <u>any</u> documents that <u>may have been</u> retrievable, at least in part, from the drives."  *Id.* (emphasis added).

112.    There was nothing improper about NeCMSC's use of the Memorial Day server drives in the ordinary course of its business.  <u>First</u>, given Petitioner's previous indifference to the Incident and Kroll's determination that none contained recoverable data, Mr. Edwards had no reason not to place these $1,000 devices back into use.  As noted above, at no time between June 28, 2005, when the Inspector General received the Memorial Day Report reporting on Kroll's conclusion, until November 30, 2005, did his staff express the slightest interest in the Incident, much less indicate that it might want to search the drives for "clues".  Even the September 22, 2005 Original Petition did not even mention the Memorial Day Incident.  It is not surprising, therefore, that when the need arose, these unreadable drives were subsequently put to use.

113.    <u>Second</u>, Petitioner has disclosed no basis for his speculation that unspecified "clues" may have been retrievable from the drives.  Amended Pet. ¶ 30.  During two lengthy interviews by Mr. Sadoff and several other members of the Inspector General's staff, Kroll, an

acknowledged expert in this area, repeatedly confirmed that any original data had been irretrievably lost when Mr. Edwards mistakenly caused the "Chkdsk" program to overwrite the email server drives.

114.    Third, neither of the two NeCMSC Subpoenas, one of which was served three weeks after the Memorial Day Incident, contain any request for evidence regarding "clues . . . to the May 30 failure".  Amended Pet. ¶ 30.  Instead, the Subpoenas' requests are limited to affirmative evidence regarding brake problems.  As Kroll has already determined, no such information is retrievable from the NeCMSC email server drives.

115.    For all these reasons, there was no misconduct in connection with NeCMSC's re-use of the Memorial Day Incident server drives.

### (e)    No Significant Records Were Lost

116.    Petitioner also claims that a "significant documentary loss" resulted from the Memorial Day Incident.  Amended Pet. ¶ 29, see id. ¶ 32.  Despite this seemingly categorical statement, the Inspector General has not provided any supporting facts or, indeed, even a general description of how any of the email server data lost on Memorial Day 2005 might have been relevant, much less "significant," to his investigation.[18]

117.    Although files located on NeCMSC's email server drives were indeed lost, there is no reason to believe that any were of importance to this investigation or, even if a significant email had been located on a server drive, it is not to be found elsewhere on either a sender's or recipient's personal computer or user drive.

---

[18]        Perhaps this is why in the Amended Petition elsewhere alleges only that "potentially responsive" electronic documents were lost in the Memorial Day Incident.  Amended Pet. ¶ 31 (emphasis added).

118.    In this regard, Respondents are fortunate that one of the few productive results of Phase II of the investigation was Mr. Sadoff's agreement to narrow considerably the scope of electronic searches.  As the Amended Petition concedes:

> "Petitioner and Respondent [sic] had numerous and frequent telephone conferences in their effort [sic] negotiate unresolved subpoena compliance issues . . . <u>Counsel's [sic] efforts resolved important issues – most notably the scope of the search for responsive electronic documents</u>."

Amended Pet. ¶ 20 (emphasis added).  For the reasons described below, this agreement makes it highly unlikely that <u>any</u> "responsive" emails were lost as a result of the Memorial Day Incident.

119.    After weeks of negotiations and the testing of various electronic search terms, Petitioner's staff finally accepted the showing made in Respondents' Original Petition Response that wide-ranging searches of servers and back-up tapes would involve prohibitive delay and expense.  Original Pet. Resp. at 31-32.  As a result, the Inspector General agreed to limit Respondents' electronic search obligations to (a) to the electronic files of certain specified employees, and (b) to records within those files constituting advance "notice" of a friction brake disc problem.

120.    Accordingly, for Petitioner to establish that the Memorial Day Incident deprived him of "responsive" emails, he would have to make at least some showing that (a) the email server drives were likely to have contained pre-April 14, 2005 records disclosing a friction brake problem and (b) that information is not to be found elsewhere in Respondents' or a third-party's files.  As will be demonstrated below, there is simply no realistic possibility that this occurred.

121.    Over the course of this investigation, Respondents have searched for and produced responsive paper and electronic records from those files in which "notice" of the Brake Problem would likely be found.  Among other things, Respondents searched the paper and

electronic files of those employees with principal responsibility for significant brake problems. These employees included: Chuck Wochele (Alstom), Norbert Behety (NeCMSC), Sylvain Labbé (Bombardier and NeCMSC), Pierre Miclette (Bombardier) and Denis Oakes (Bombardier). Even the Amended Petition concedes that these employees are "key" witnesses. Amended Pet. ¶ 18. None of these "key" witnesses lost any responsive data in the Memorial Day Incident.

122.    Each of these witnesses, moreover, voluntarily submitted sworn statements to the Inspector General testifying that he (a) would have been notified of any issues relating to the Brake Problem, and (b) was not aware of any such issues prior to April 14, 2005. Denis Oakes and Sylvain Labbé were Respondents' principal brake experts. In addition to testifying that they personally had never received advance notice of the Brake Problem, they each swore that they were not aware of any documents constituting such notice. Because none of the people who would have been informed of the Brake Problem lost any data or have any records of a significant brake problem, there is no reason to believe that any such evidence ever existed, much less was lost, in connection with the Memorial Day Incident.

123.    In addition to documents and affidavits from the "key" Brake Problem witnesses, Respondents produced:

(a)    All passenger car friction brake-related "Daily Inspection Reports" ("DIR") for each of the twenty *Acela* trainsets for the years 2000-2005. These inspections, which were conducted by Amtrak (not NeCMSC) employees, would have identified any brake problem discovered in the course of daily inspections. No DIR was lost in connection with the Memorial Day Incident;

(b)      All passenger car friction brake-related Corrective Work Orders ("CWOs") since the inception of Acela service in 2000.  CWOs are prepared in connection with any known problems requiring a repair and thus would contain any reference to a brake problem. No CWO data was lost as a result of the Memorial Day Incident;

(c)      Records from Bombardier's Reliability, Maintenance and Safety (RAMS) Group.  Any serious brake problem would have been identified to the RAMS Group.  No RAMS records were lost as a result of the Memorial Day Incident;

(d)      Bombardier's file of 1996-2005 correspondence with Knorr, the subcontractor that supplied the friction brake disc at issue in this investigation.  Any serious brake problem would have been the subject of communications between Knorr and Bombardier. The Memorial Day Incident did not cause the loss of any data from the Knorr file;

(e)      NeCMSC's file of 2000-2005 correspondence with ORX, the NeCMSC contractor responsible for brake disc repairs.  No information from the ORX file was lost as a result of the Memorial Day Incident; and

(f)      Bombardier's Failure Reporting, Analysis and Corrective Action System ("FRACAS"), Failure Analysis Report ("FAR") and SPEAR maintenance databases.  These databases would contain any reports of series brake problems.  Neither were affected by the Memorial Day Incident.[19]

124.    Finally, at the insistence of the Inspector General's staff, NeCMSC searched the individual electronic files of dozens of other employees.  These were selected by Mr. Sadoff

---

[19]      At the very outset of the investigation, the Inspector General subpoenaed the relevant paper and electronic files of Respondents' principal brake contractors, Knorr and ORX.  Accordingly, Petitioner  has complete access to those witnesses' copies of any disc-related paper or email files exchanged with Respondents.  Thus, even if email sent to or received from those specialists had been lost due to the Memorial Day Incident, Petitioner would possess the copy subpoenaed from these witnesses.  Unlike claims to this effect made in connection with the Original Petition (Original Pet. Mem. at 11, 21-23), the Amended Petition has not identified a single Knorr or ORX email that is missing from NeCMSC's production.

after a detailed review of, and discussions regarding, Bombardier's, Alstom's and NeCMSC's organizational charts and Respondents' specifically prepared analyses of available employee electronic files. These searches resulted in the production of approximately 300,000 pages of records.

125. Insofar as Respondents are aware, these searches and the resulting productions have not produced any evidence that anyone in a position to know was informed of any significant brake problem prior to April 14, 2005. Certainly, the Amended Petition contains no such suggestion. Given the false claims to this effect in the Original Petition (Original Pet. Mem. at 11 & 21), this Court can be certain that if the Inspector General had found any such evidence among the 1.3 million pages of records already produced to him, he surely would have resuscitated (and re-publicized) the "notice" theory he abandoned after October 2005.

126. For these reasons, Petitioner has failed to make any showing that relevant email data was lost as a result of the Memorial Day Incident.

### (f)     Request for a "Detailed, Documented Report"

127. The Inspector General claims that NeCMSC's supposed Memorial Day offenses entitle him to "a detailed documented report" describing (a) NeCMSC's efforts at the time of the Memorial Day Incident to preserve "responsive" electronic documents, (b) its efforts to retrieve responsive emails and other electronic documents, (c) any information known to NeCMSC about the existence of responsive electronic documents, and (d) the "difficulty and cost such retrieving those [sic] documents." Amended Pet. ¶ 32.

128. For the following reasons, this vaguely worded request is both unnecessary and abusive: First, because Respondents' prior reports to Petitioner have been ignored except when

needed to fabricate misconduct claims, still another is likely to serve no purpose but generate still more controversy and litigation.

129. <u>Second</u>, as noted above, the Inspector General has been unable to demonstrate any deficiency in the Pillsbury Winthrop Report already provided to him. Indeed, as recently as a few weeks prior to filing the Amended Petition, Mr. Sadoff conceded that his prior criticisms of the Memorial Day Report had been in error.

130. <u>Third</u>, the Inspector General has already had complete access to, and has thoroughly investigated, the Memorial Day Incident:

(a) Petitioner's staff received a detailed oral report on June 8, 2005. At that time, the Inspector General questioned Edward Flanders, the Pillsbury Winthrop partner responsible for Respondents' investigation of the Memorial Day Incident. On repeated occasions thereafter, Petitioner's staff questioned Laura Smith, another Pillsbury Winthrop lawyer, regarding the Memorial Day Report;

(b) On June 28, 2005, the Inspector General's office received the written Memorial Day Report. As noted above, that Report was accurate in all material respects;

(c) Petitioner's staff has toured, and been briefed regarding, the Ivy City Facility server room and other facilities, inspected NeCMSC's collection of damaged and out-of-date back-up tapes and received emails sent by NeCMSC employees in connection with the Incident;

(d) The Inspector General's office has interviewed (i) Jeremy Edwards, the NeCMSC information technology specialist involved in the Memorial Day Incident; (ii) Maria DeMarco, NeCMSC's current information technology specialist; and (iii) Frank Christello, an NeCMSC manager involved in the Memorial Day Incident recovery effort;

(e)    On two separate occasions over the course of more than three hours, Petitioner's staff interviewed four different Kroll employees regarding their efforts to recover email data from the servers damaged during the Incident.  See Amended Pet. ¶ 34.  In addition, the Inspector General received a voluntary production of Kroll documents and subsequently a subpoenaed production of 275 Kroll records.  See id.; and

(f)    The Inspector General's office interviewed an eMag representative regarding the company's efforts to find email data on the Eight Unused Tapes involved in the Memorial Day Incident.

131.    Finally, the Subpoenas at issue in this proceeding do not seek any report.

132.    Indeed, prior to the Amended Petition, the Inspector General had never before asked for the report that he has now made a centerpiece of this case.  In truth, it is not NeCMSC's report with which Petitioner is dissatisfied, it is the underlying facts, none of which will be changed by another report.

### (2)    The "Incomplete Production" Issue

133.    Because Respondents' $1.5 million production of over 1.3 million pages of records is supposedly "incomplete" (Amended Pet. at 14), the Inspector General seeks an order directing NeCMSC to (a) provide a privilege log for records subpoenaed from Kroll and (b) search up to 76 NeCMSC server back-up tapes for two categories of "responsive documents". Amended Pet. ¶ 37.  Although NeCMSC is willing to provide the requested privilege log, this Court, for the reasons set forth below, should reject Petitioner's unnecessary and garbled request for a back-up tape search.

### (a)    The Kroll Subpoena

134.    On June 2, 2006, thirteen months after learning of the Memorial Day Incident, the Inspector General subpoenaed all Kroll records relating to that Incident.  Amended Pet. ¶ 35.  As

the Amended Petition demonstrates, prior to issuing the subpoena, the Inspector General's Office

knew that Kroll had been retained by Pillsbury Winthrop and that Pillsbury Winthrop had in the

past asserted attorney-client and work product privilege claims regarding Kroll communications

with Pillsbury Winthrop.[20]  Nevertheless, Mr. Sadoff caused the subpoena to be served on Kroll

without any notice to NeCMSC or its lawyers.

135.    Fortunately, prior to production, Kroll informed NeCMSC's new counsel, Jones

Day, of the subpoena.  Jones Day then identified to Kroll those of the subpoenaed records that

referenced communications between Kroll and NeCMSC's lawyers.  On July 14, 2006, when it

produced the subpoenaed records, Kroll told the Inspector General that at Jones Day's request, it

had withheld privileged records and invited Mr. Sadoff to address any privilege questions to

Jones Day.  Amended Pet., Ex. 5.

136.    Once again, however, Mr. Sadoff did not communicate with NeCMSC and its

counsel.  Instead, Mr. Sadoff called Kroll on August 2, 2006 to ask for the number and "type" of

documents Kroll had withheld.  Amended Pet., Ex. 6.  Strangely, Mr. Sadoff told Kroll he was

"not requesting a privilege log and index."  *Id.*  The Inspector General's Office did not

subsequently contact Jones Day on this subject.

137.    Nevertheless, the Inspector General suggests that NeCMSC is somehow at fault

for not providing a privilege log:  "[t]he request by counsel for NeCMSC and Kroll's response

suggests that NeCMSC controls the production and assertion of privilege for the documents" and

---

[20]        The Amended Petition states that, prior to the subpoena, "Kroll personnel stated . . . that
NeCMSC's counsel retained them to perform [data recovery services] following May 30, 2005 and that their
communications with NeCMSC and/or its counsel were by email . . . Through counsel for NeCMSC, Kroll
subsequently provided more than 30 pages of responsive email documents.  NeCMSC's counsel redacted portions of
two documents and described the reduction on its 'Privilege Log' dated May 12, 2006."  Amended Pet. ¶ 34 & Ex. 4
(emphasis added).

complains that "[t]o date, NeCMSC's counsel has not submitted a privilege log for the 99

documents withheld."  Amended Pet. ¶ 36.

138.    NeCMSC, of course, did not "control" Kroll's production of non-privileged

records; it simply requested, in the absence of any sensitivity by the Inspector General's staff to

NeCMSC's privilege rights, that Kroll withhold records disclosing communications between

Pillsbury Winthrop and the consultants retained by that firm.  Nor, is there anything untoward in

the fact that NeCMSC has not provided a privilege log.  Prior to serving the Amended Petition,

Petitioner <u>never</u> asked NeCMSC for a privilege log.  In any event, Exhibit 6 to the Amended

Petition states that as late as August 2, 2006, Mr. Sadoff told Kroll that he "was <u>not</u> requesting a

privilege log or index."  (emphasis added).  NeCMSC must inquire, therefore, why is this issue

being raised for the first time as part of a claim that NeCMSC's production has been

"incomplete"?

139.    That being said, so long as it is understood that its conduct with regard to the

Kroll subpoena was proper, NeCMSC has no objection to providing the requested privilege log.

### (b)    The Back-Up Tapes

140.    Petitioner alleges that NeCMSC's document production is also "[i]ncomplete"

because Respondent has not searched (a) the Eight Overwritten Tapes, which are noted above,

the back-up tapes in use during the Memorial Day Incident that were overwritten with data from

the non-email servers, and (b) the thirteen other tapes "with back-up dates from September 2002

through December 2003 that contain emails" (the "2003 Tapes").  Amended Pet. ¶ 33.

Strangely, the relief sought in the Amended Petition has little to do with these two supposedly

incomplete productions.

141.    The Amended Petition, which is somewhat garbled on this issue[21], seems to ask this Court to require NeCMSC to review (a) all sixteen of the Memorial Day back-up tapes (and not simply the "withheld" Eight Overwritten Tapes) (*id.* ¶ 37(c)) and (b) not the supposedly withheld 2003 Tapes, but rather those "backed up during the [sic] any part of the period June 1, 2004 through June 30, 2005" ("2005 Tapes").  *Id.* ¶ 37(d).  After these productions, the Inspector General would require NeCMSC to deliver the sixteen Memorial Day tapes and any 2005 Tapes "to Petitioner's forensic computing consultant solely for it to determine whether responsive documents can be retrieved from any of the tapes."  *Id.* ¶ 37(c) & (d).  For the reasons set forth below, these requests make no sense.

(i)    There Was No "Incomplete" Tape Production

142.    We turn first to the Amended Petition's allegation that NeCMSC's production was "incomplete" because it did not include a review of either (a) the Eight Overwritten Tapes from the Memorial Day Incident or (b) any 2005 Tapes.  The Inspector General, whether by means of the agreed electronic search protocol or otherwise, has never before requested a search of the Eight Overwritten Tapes.  This is because on Memorial Day 2005, the tapes were

----

[21]    Paragraph 37(a) of the Amended Petition asks that NeCMSC be directed to review "all back-up tapes for responsive electronic documents and emails."  The fact that the Amended Petition places this all-inclusive demand immediately before its unrelated request for a Kroll privilege log (¶ 37(b)), and then in Paragraphs 37(c) and (d) reverts back to the tape issue with more limited requests, suggests that the first request for all NeCMSC tapes was erroneously included in this hastily drafted document.

Assuming, however, that Petitioner is indeed demanding a search of all 76 tapes for all "responsive" data, such a search, which is likely to involve hundreds of data gigabytes, would be lengthy, expensive and futile.  Of these tapes:

(a) Sixteen are the Memorial Day Incident tapes, none of which seem to contain any email data;

(b) four contain only post-Memorial Day Incident data and thus are not called for under the pre-April 14, 2005 electronic search protocol agreed to by the Inspector General;

(c) an additional twenty-six were determined by eMag not to contain email or to be blank; and

(d) another seventeen have external markings (all of which were examined by the Inspector General's staff) indicating that none contained emails.

The remaining thirteen tapes are the 2003 Tapes.  These are not encompassed by the Amended Petition's request that NeCMSC review tapes backed from "June 1, 2004 through June 30, 2005."  Amended Pet. ¶ 37(d).

overwritten with data from NeCMSC's non-email servers.  Because only email server data was lost, searching those tapes now would be useless.  Accordingly, NeCMSC's production was not incomplete in this regard.

143.    With regard to NeCMSC's supposed failure to search the 2003 Tapes, there was again no request for such a search until July 26, 2006, only 18 days before the Amended Petition was filed.  That oral request, moreover, was based on Mr. Sadoff's mistaken understanding of the facts.[22]  This explains why, despite the Inspector General's claim that Respondents' production was "incomplete" in this regard, the Amended Petition no longer seeks a search of the 2003 Tapes.

(ii)    Search of the Memorial Day Tapes Would be Futile

144.    Inexplicably, the Amended Petition seeks a search of all sixteen Memorial Day tapes, even though NeCMSC's production was supposedly "incomplete" only with regard to the Eight Overwritten Tapes.  Thus, Petitioner has not even alleged a basis for seeking a review of the other Eight Unused Tapes.

145.    More importantly, any search of the Memorial Day tapes would likely be futile. Insofar as the Eight Overwritten Tapes are concerned, we have seen that these were used immediately before the Memorial Day Incident to back up non-email servers, none of which lost any data in the Incident.  Thus, no responsive emails are likely to be found on these tapes and

---

[22]    On July 26, 2006, the parties were negotiating regarding an agreement to permit the Inspector General's consultant to analyze back-up tapes.  During those discussions, Colin Carriere, Counsel to the Inspector General seemed to be under the impression that NeCMSC had been remiss in not searching for these records before. He therefore demanded that NeCMSC search the 2003 Tapes.  When NeCMSC reminded Messrs. Carriere and Sadoff that NeCMSC had never been asked to conduct such a search, Mr. Sadoff stated, with absolute and unequivocal conviction, that the Inspector General's staff had been led to believe that these tapes had been searched. This statement was false.  Mr. Sadoff had previously been informed in writing that the 2003 Tapes had not been searched.  See Resp. Exs. 124, 128 & 145.  In an August 22, 2006 telephone conversation, Mr. Sadoff subsequently acknowledged that after the July 26, 2006 telephone conference, he had reviewed the parties' correspondence and determined that indeed he had previously been informed that NeCMSC had not searched the 2003 Tapes.

any other search would be redundant. To the extent that any non-email server data was "responsive" under the agreed electronic search protocol, it was produced.

146.    The remaining Memorial Day tapes sought by the Amended Petition – the Eight Unused Tapes – were not overwritten during the Memorial Day Incident.[23]  These tapes, therefore, contain data from the backup that occurred the week before the Memorial Day Incident.  As we have seen, Pillsbury Winthrop's technical consultant, eMag, has examined all of these tapes and has determined that none contain any files from NeCMSC's email server.  Accordingly, it would be futile to search these tapes as well.  None of the data contained on the Eight Unused Tapes was lost in the Incident, and any called for by the electronic search protocols agreed to by the Inspector General would have been searched on, and produced from, files obtained from the servers themselves.

(iii)     <u>There Are No 2005 Tapes</u>

147.    The other back-up tape category sought by the Amended Petition consists of any 2005 Tapes.  Amended Pet. ¶ 37(d).  This request, which was made for the first time in the Amended Petition, is particularly mystifying.  As the Inspector General knows, NeCMSC  has not located any 2005 Tapes.  There is thus nothing for NeCMSC to review.

(iv)     <u>NeCMSC Agreed to Submit Tapes to Petitioner's Expert</u>

148.    As we have seen, the Amended Petition asks that the sixteen Memorial Day tapes and any containing 2005 Tapes be submitted to an expert solely for the purpose of determining

---

[23]     Although the Amended Petition seeks "all responsive" records on the sixteen Memorial Day tapes (Amended Pet. ¶ 37(a)), the Inspector General's staff had previously been interested only in the issue of whether any back-up tapes might contain email server files.  This is because only the email servers lost data during the Memorial Day Incident.

whether any contain email files. Amended Pet. ¶¶ 37 (c) and (d).[24] Because there are no known 2005 Tapes, there are, of course, none to submit to Petitioner's expert.

149.    With regard to the Inspector General's request that his consultant examine the Memorial Day tapes, NeCMSC agreed to such a review in early February 2006. As Mr. Sadoff recognized at the time, however, the parties had to agree to certain safeguards so that, in the course of any such review, neither the Inspector General nor his consultant would have access to any privileged or non-responsive data on those sixteen back-up tapes. The parties also agreed that the Inspector General would pay his own consultant's fees. On February 9, 2006, therefore, NeCMSC's counsel submitted to Mr. Sadoff a draft agreement to that effect. On February 14, 2005, after receiving oral comments from Mr. Sadoff, NeCMSC submitted a second draft of the agreement that, in the opinion of NeCMSC's counsel, resolved all issues raised by Mr. Sadoff.

150.    Respondents heard nothing more on the subject from the Inspector General for five months. On July 10, 2006, Mr. Sadoff submitted a substantially changed version of the draft sent to him on February 14, 2006. NeCMSC submitted its proposed revisions to the Sadoff draft on July 25, 2006. After considering further oral comments from Mr. Sadoff and his supervisor, Colin Carriere, Respondents submitted still another draft on July 27, 2006. Petitioner NeCMSC did not provide any comments on this draft, which, in any event, has been superseded by the Amended Petition's request for narrower relief.[25]

---

[24]    Literally, the Amended Petition asks that NeCMSC be ordered "to determine whether responsive documents can be retrieved from any of the tapes." *Id.* This seems to be another example of poor draftsmanship on the Inspector General's part. Prior to filing the Amended Petition, Petitioner's requests were limited to requests that its expert search the tapes simply to determine whether any contain "Microsoft Exchange email data." In any event, it would be manifestly improper for the Inspector General's expert, actually to read any email record prior to NeCMSC's determination that it was both responsive and not privileged.

[25]    Among other things, the July 10 Sadoff draft would have increased the consultant's review to all 76 NeCMSC back-up tapes. Thankfully, the Amended Petition seems to have reduced that demand to the sixteen in use on Memorial Day 2005.

151.    Now that the Inspector General has finally returned to a position approximating the relatively discrete review agreed to by the parties in February 2006, NeCMSC is agreeable to submit the sixteen Memorial Day Incident tapes to a qualified "forensic computing consultant," provided that Petitioner (a) bear all costs associated with such an exercise and (b) protect NeCMSC's attorney-client privilege by executing an agreement substantially in the form agreed to by the parties in February 2006.

**B.    Claims Against Both Respondents**

**(1)    The "Non-Existent" Records Issue**

152.    The Inspector General next asks that NeCMSC <u>and</u> Bombardier be ordered to comply with Instruction 9 to the Subpoenas, which asks for "information about responsive documents that no longer exist."  Amended Pet. ¶ 38.  This may be the oddest of Petitioner's requests.  Indeed, as applied to the Subpoena's impossibly vague requests and Respondents' millions of potentially responsive documents, Instruction No. 9 is manifestly absurd:

> 9.    If there was a document responsive to this subpoena but it no longer exists, state the circumstances which it was destroyed or ceased to exist and provide the following information:
>
> i.    identify each person who determined or authorized that each such document would be removed, discarded, or destroyed;
>
> ii.    identify each person who authorized the removal, discarding, or destruction of each such document;
>
> iii.    identify each person who removed, discarded, or destroyed each such document;
>
> iv.    the substance and content of each such document;
>
> v.    the date on and location at which such document was removed, discarded, or destroyed; and
>
> vi.    the reason for the removal, discarding, or destruction.

Amended Pet., Ex. 1.

153.    Although compliance with Instruction 9 was in the context of this case impossible, NeCMSC and Bombardier, in good faith, informed Petitioner of any known incident involving the loss of possibly responsive records.  As we have seen, NeCMSC has provided Petitioner's staff with all information they requested regarding the Memorial Day Incident.  Nothing more should be required in this regard.

154.    As for Bombardier, there is no allegation that, after the Subpoenas were served, it lost any potentially responsive records.[26]  To the contrary, Bombardier has carefully preserved its paper and electronic files.  Bombardier, moreover, has already disclosed any known pre-subpoena loss of potentially responsive records.  For example, during the investigation, Bombardier informed Petitioner's staff that on May 6, 2004, the laptop belonging to Sylvan Labbé, Bombardier's and NeCMSC's brake specialist, had been stolen.  Mr. Sadoff made several inquiries regarding the laptop theft, all of which were answered by Bombardier.  On May 9, 2006, for example, Bombardier provided the results of a requested "analysis of Sylvan Labbe's emails and 'loose' documents before and after the laptop theft."  Resp. Ex. 120 at 1.

155.    In conclusion, then, both NeCMSC and Bombardier have already provided the Inspector General with notice of, and information regarding, any significant loss of potentially responsive files.

### (2)    The "Native Format" Issue

156.    The Petitioner makes two claims regarding this issue:  First, that from his Original Petition onward, Petitioner has insisted that Respondents produce documents in their "native"

---

[26]    The Inspector General argues that a detailed inventory of lost records "is particularly important" in light of the Memorial Day Incident.  Amended Pet. ¶ 38.  As is evident from Petitioner's decision not to require an "Instruction 9" report from Alstom, this argument is relevant only to NeCMSC and does not justify imposing such an onerous requirement on Bombardier.

formats, "unless an alternative production format provides comparable authenticity, content and usability" and; second, that Respondents have failed to comply with this demand.  These statements are not accurate for the following reasons: (a) Petitioner never specifically requested "native" documents until after the first phase of production was complete and almost two months after the Original Petition was filed; (b) Respondents made numerous efforts to supply the Inspector General with electronic documents that met Petitioner's ever-changing criteria, ultimately providing certain native documents for Petitioner's review; and (c) Despite efforts by Respondents to meet Petitioner's demands or to forge a workable compromise, the Inspector General has categorically refused to consider any "comparable", "alternative" productions that are not in native format.  see Amended Pet. ¶ 21.

157.    The Amended Petition states that the Inspector General has sought the production of documents in their "native" format from his Original Petition forward. *Id.* This statement is untrue.  The original petition stated merely that "Respondents have failed to produce e-mails, spreadsheets and other electronic documents that exist and are in a searchable format."  Original Pet. ¶ 21.  Likewise, the Memorandum in Support of the Original Petition only comments that documents had not been provided "in a searchable electronic format". Original Pet. Mem. at 21 n.27.  Similarly, neither the first nor second subpoenas issued to NeCMSC and Bombardier specifically request "native" documents or that electronic documents provided be text-searchable.

158.    Contrary to the claims made by the Inspector General in the Amended Petition, the first demand for documents in "native" format came not from the subpoenas, and not from the Original Petition.  Petitioner's first demand for this information came within a November 10, 2005 fax from Mr. Sadoff, which stated that Respondents had not produced documents in their "native, searchable format" and that "[t]o the extent Respondents have not produced the

documents in their native format, they have not complied with the terms of the Subpoenas." Resp. Ex. 74 at 3.

159.    Over the following months, Respondents and the Inspector General's staff entered into several rounds of negotiations to resolve any open issues related to the subpoenas. Regarding electronic documents, the issues of most pressing immediate importance were defining the electronic search terms and determining which employees should have their electronic files searched and reviewed.  On February 21, 2006, once the electronic search terms and relevant employees to search had been substantially resolved,  Bombardier informed Mr. Sadoff that the upcoming productions would be made in TIFF and text-searchable PDF formats. To this, Mr. Sadoff angrily replied that he had always insisted that native documents be produced, and chided Respondents for not raising this issue sooner; even though he himself had not chosen to address it since November 10, 2005.

160.    Despite Respondents' stated objections to a production of documents in native format, Respondents continued to engage Petitioner on the issue.  In response to Petitioner's stated troubles opening and reviewing TIFF images, Respondents repeatedly offered the assistance of their technical experts.  Petitioner's staff did not avail themselves of these opportunities.  In response to Mr. Sadoff's request for searchable documents and "metadata" – the core reasons expressed for his insistence on native files – Respondents produced documents in text-searchable PDF format, and provided metadata for each document as well.  Again, Respondents extended the services of their technical experts, if needed.

161.    Not only was the Inspector General  not open to Respondents' attempts to accommodate his demands, he appeared unwilling, or unable, to seriously consider the sufficiency of the alternative formats that had been provided.  For example, Petitioner's technical

expert Jeff Black had repeated difficulty understanding how the provided metadata was to be accessed. On one occasion, he noted that the metadata that had been provided to him was difficult to read because it was in a text file. Respondents promptly clarified to Mr. Black, however, that the metadata provided was intended not to be read "as is" but to be loaded into a database, in which case it would be linked to the image files of its respective documents, and thereby fully searchable both by the full-text of each document and its metadata fields.

162. Finally, in a further attempt to accommodate the Inspector General, Respondents Bombardier and NeCMSC agreed to provide responsive Excel spreadsheets to Petitioner in their native format, in an effort to alleviate any difficulties specifically related to the review of those document types in other forms.

163. Despite the Inspector General's claims, Respondents have made reasonable and significant efforts (at their own, ever-increasing, expense) to accommodate the Inspector General's ever-changing electronic production demands. While the subpoenas did not specify that any "native" documents, "searchable" documents, metadata or technical assistance be provided, Respondents have attempted at every opportunity to accommodate the Inspector General's needs, without betraying their own substantial and legitimate concerns regarding the production of native documents.

164. Respondent NeCMSC remains willing to provide spreadsheets in a user-friendly format (whether native or otherwise), should it be necessary to do so. Respondents have even offered to consider, within the context of resolving any open issues, and on a case-by-case basis, the production of other non-database documents in their native formats, should the Inspector General demonstrate that such production is necessary in a specific instance.

165.    Respondents have made these efforts, despite their continuing disagreement with the Inspector General's assertions that the provision of native documents is in accordance with settled legal doctrine on the subject.  Nevertheless, the Inspector General remains closed to these efforts and unmoved in his insistence on native documents, despite the numerous attempts Respondents have made to accommodate his stated concerns.  At this point, it is apparent that the Inspector General will not be satisfied until Respondents provide unrestricted access to all electronic documents in their native formats, regardless of the usability, searchability, authenticity or convenience of presented alternatives.  Furthermore, given Petitioner's history in this matter, it is uncertain that even then, the Inspector General would consider such a production sufficient.

(3)    **The "Certificate of Compliance" Issue**

166.    The Amended Petition seeks an order directing <u>both</u> Respondents to certify that "they have produced all responsive, non-privileged documents and have otherwise fully complied with the terms of the subpoenas."  Amended Pet. at 18.  For the reasons set forth more fully below, Petitioner's steadfast refusal to define his poorly drafted document requests rendered a certificate impossible in the past and his resumption of litigation has obviated the need for any in the future.

167.    Prior to the resumption of litigation, Respondents had always been willing to certify that their productions have been as represented to the Inspector General.  Indeed, when it appeared that a consensual resolution of Petitioner's demands was in the offing, Respondents drafted and re-drafted certificates to this effect.  None of these, however, have been satisfactory to the Inspector General's Office because, at the end of the day, Petitioner insists that

Respondents certify that they have "fully and completely" complied with the Subpoenas. Amended Pet. ¶ 39.  This request should be denied.

168.    The Amended Petition provides no guidance whatsoever regarding what, after all these months, hundreds of communications and 1.3 million pages of produced records, the Inspector General means by full compliance with his Subpoenas.  Nor are Respondents able to assist the Court on this issue.  All we can say is that the Amended Petition does seem to be demanding literal compliance with the Subpoenas and, indeed, the Inspector General's staff has frequently taken this position.  As noted above, however, the Subpoenas themselves are poorly drafted.  Some demands are simply unintelligible:  "All documents which . . . relate to identification of quality control pertaining to braking discrepancies . . . for the Acela brakes". Resp Ex. 4, Request No. 7.  Others call for hundreds of thousands of irrelevant records: "[a]ll . . . documents providing service or repair information related to the Acela trains".  Resp. Ex. 4, Request No. 6.  As we have seen, however, while records were being produced, the Inspector General refused to construe or limit <u>any</u> of the requests in the First Subpoenas.[27]

169.    Although Petitioner's staff has construed the Second Subpoenas' sole request, this interpretation is completely at variance with its actual language.  This suggests that, to the extent he has any, the Inspector General's undisclosed interpretations of the First Subpoenas may be similarly divorced from their actual language.  By their terms, the Second Subpoenas served on NeCMSC and Bombardier seek "[a]ll documents . . . regarding . . .malfunctions . . . pertaining to the Acela brakes."  Resp. Ex. 6.  Petitioner construes this request to require that (a) " 'notice'

---

[27]    As noted above, on June 2, 2005, the Inspector General's Office orally agreed to limit all of the Subpoenas' requests to the passenger car friction brakes.  Broas Dec. ¶ 3.  In a June 28, 2005 letter, however, Petitioner's staff denied making this agreement.  Resp. Ex. 28 at 2.  A year later, during a May 10, 2006 meeting, <u>after</u> Respondents had completed their 1.3 million page document production, Mr. Sadoff told Respondents that the Inspector General was now agreeable to excluding locomotive brakes.  Given the history of this investigation, however, Respondents could not confidently assume that this is the Inspector General's <u>current</u> position.

records, i.e. those documents and 'records' which discuss and pertain to [pre-April 14, 2005]

notice with respect to deficiencies or problems with the Acela brakes", and (b) these documents

"be reasonably segregated and not produced or identified among a host of other records."  Resp.

Ex. 9;[28] see Original Pet. Mem. at 16 & n.19.  For these reasons, Respondents have no idea what

Petitioner considers to be "full and complete" compliance with these unintelligible Subpoenas.

170.    In the face of often unintelligible and overbroad subpoena demands for paper

records and the Inspector General's refusal even to discuss their meaning, Respondents,

consistent with their written objections, proceeded to produce those files in which any prior

"notice" of the April 14, 2005 Brake Problem might reasonably be found.  In cover letters,

document production indexes, affidavits, briefs and oral conversations, Respondents accurately

described to Mr. Sadoff how the searches had been conducted and what was being produced.

One thing is certain, the Inspector General's staff has known from the outset that there would be

no literal compliance with the Subpoenas, and prior to the Amended Petition, Petitioner had long

since abandoned any demand for such compliance.

171.    Insofar as the electronic records are concerned, the Amended Petition's demand

for "full" Subpoena compliance is inconsistent with Petitioner's admission earlier in that same

pleading that "the scope of the search for responsive electronic documents" has been limited by

means of a negotiated agreement.  Amended Pet. ¶ 20.  That negotiated search – which was

limited to pre-April 14, 2005 records, used a specifically defined search protocol and was

restricted to the personal electronic files of specified employees – is much narrower than that

---

28        Originally, the Inspector General's Office claimed that this request for "notice documents" was
encompassed by Request Nos. 7-8 of the First Subpoenas.  See, Original Pet. Mem. at 25-26; Resp. Ex. 14 at 2-3 &
n.3.  Realizing that neither Request could be construed to call for the production of segregated "notice" records, the
Inspector General issued the Second Subpoenas.  Cf. Resp. Ex. 23 at 3.  As we have seen, however, although
intended to constitute a demand for "notice records", the Second Subpoenas actually do no such thing.

required by the Subpoenas' literal terms.  Obviously, therefore, Respondents cannot possibly be required to certify to literal compliance with the Subpoenas' requests for electronic records.

172.    Fortunately, there is a way out of this confused morass.  Now that the Amended Petition has replaced the Original Petition's discredited allegations, there appear to be only four issues standing between Respondents and a determination by this Court that they are in full compliance with the Inspector General's demands:

(a)    Is NeCMSC required to draft another Memorial Day Report?;

(b)    Is NeCMSC required to search the Memorial Day tapes and any 2005 Tapes?[29];

(c)    Have Respondents adequately described their "non-existent" files?; and

(d)    Are Respondents required to produce electronic files in their "native format"?

Once those four issues have been decided, the Court can determine for itself whether Respondents are in full compliance with any resulting order, and this long, agonizing experience can limp to a merciful end.

## V.    Respondents' Cross-Petition for Compliance Costs

173.    In support of their Cross-Claim for the costs they reasonably incurred in connection with the Subpoenas, Respondents hereby incorporate by reference (a) their Original Petition Response and (b) Paragraphs 1-174 of this Response to the Amended Petition.

174.    For the reasons already indicated, the Inspector General's investigation has imposed disproportionate costs on Respondents, which costs now exceed $1.5 million, and, in

---

[29]    As noted above, Respondents have (a) long since agreed to let a qualified expert, retained by the Inspector General at his own expense, review the Memorial Day tapes to determine whether any contain email server files; and (b) now that they have been informed of Petitioner's desire to obtain a Kroll privilege log, are willing to prepare that log.  These two issues are therefore moot.

any event, the investigation has been marked by oppressive, unreasonable and unnecessary requests for information and by demonstrably reckless and false statements to this Court. Although either ground would entitle Respondents to recover the costs imposed upon them by this investigation, the combination of these two circumstances renders an order for cost reimbursement even more compelling.

## VI.    Conclusion

Accordingly, Respondents respectfully request that both the Original Petition and Amended Petition be dismissed with prejudice and that Respondents' Cross-Petition for its reasonable costs in connection with the Subpoenas be granted.

Dated:  October 6, 2006

Respectfully submitted,

| JONES DAY | WINSTON & STRAWN LLP |
|---|---|
| By: _____Philip Le B. Douglas  /s_____<br>Philip Le B. Douglas (# 311944)<br>Attorneys for Bombardier Inc. and<br>  Northeast Corridor Maintenance<br>  Services Company<br>222 East 41st Street<br>New York, New York 10017-6702<br>(212) 326-3939 | By: _____Timothy M. Broas_____/s<br>Timothy M. Broas (# 391145)<br>Attorneys for Northeast Corridor Maintenance<br>Services Company<br>1700 K Street, N.W.<br>Washington, D.C. 20036-3817<br>(202) 282-5000 |

Of counsel:                                           Of counsel:
Michael S. Fried, Esq.                          Franklin R. Parker, Esq.