### June 8, 2005 Meeting

15. On June 7, 2005, I called Mr. Carriere and Mr. Sadoff to request a meeting with OIG. On June 8, 2005, Edward Flanders of my firm and I traveled to Washington, D.C. to join Timothy Broas, Esq., counsel to Alstom, at a meeting at the OIG's offices with Mr. Carriere, Mr. Sadoff and Special Agent Jackson-Dixon. Mr. Carriere left the meeting prior to its completion.

16. Among other points, the parties discussed Bombardier's letter of that date, which was hand delivered to OIG at this meeting. Resp. Ex. 13. In connection with that letter, I stated that because OIG was investigating Amtrak as well as Respondents and, in any event, had to remain independent and objective, the Inspector General could not become involved in the contractual dispute between Amtrak and Respondents. In response to a question from Mr. Sadoff, I stated that the Inspector General Act limited OIG investigative disclosures, whether within or without Amtrak, in the first instance, to the Chairman of Amtrak's Board of Directors.

17. I also noted that at the very outset of the investigation an OIG investigator had asked a third-party witness whether Respondents knew of the broken spokes problem at the time they executed the March 16, 2004 Settlement Agreement of the prior litigation between Amtrak and Respondents. I said that this question suggested that OIG was looking for a way to help Amtrak reopen that settlement. I stated that the Inspector General should not take sides in Amtrak's commercial dispute with Respondents and should simply take the investigation wherever the facts lead him.

18. At one point in the meeting, I again suggested that the parties try to agree to search terms for use in reviewing the large volume of potentially responsive electronic data. Mr. Carriere or Mr. Sadoff responded by asking Respondents to prepare a list of those search terms

7

for OIG review. Respondents provided that list on June 20, 2005. Resp. Ex. 15 at 4 n.1. Despite several reminders from Respondents (Resp. Ex. 28 at 2; Resp. Ex. 29 at 5; Resp. Ex. 32 at 2), OIG did not respond to this request until July 6, 2005. Resp. Ex. 35. At that time, the Inspector General's Office demanded that an additional 20 search terms be added to Respondents' list. Resp. Ex. 35.

19. This declaration does not provide a complete summary of all statements made during the June 8, 2005 meeting. Respondents' correspondence, for example, accurately describes other statements made during that discussion.

**Costs of Subpoena Compliance**

20. Upon information and belief, on June 2, 2005, the Inspector General's staff agreed to a suggestion by Alstom's representatives that Respondents' production be limited to passenger car brake systems. Broas Dec. ¶ 3. OIG, however, subsequently denied that it had entered into this agreement and demanded that Respondents produce records relating to all four Acela brake systems, three of which were not implicated by the broken spoke problem discovered on April 14, 2005. *See* Resp. Ex. 29 at 3; Resp. Ex. 37 at 1, 3. Other than this one, subsequently disavowed, agreement, the Inspector General's staff did not propose or agree to a single limitation on or clarification to any of the seven subpoenas it has directed to Respondents. Resp. Ex. 24 at 2.

21. As a result of the broad scope and vague wording of the subpoenas, the Inspector General's demands for a structured and expedited production and his staff's inability to discuss, much less agree to, reasonable limits on and clarifications to the subpoenas, the document production in this investigation has been extremely time-consuming.

8

a.  In addition to the 20 lay-of-the-land interviews, my firm conducted more than 40 additional interviews. To date, Pillsbury Winthrop has assisted in the production of almost a million pages of documents.

b.  Moreover, Pillsbury Winthrop has undertaken, where the manner in which records are kept or the relatively manageable volume of records otherwise makes it feasible, to eliminate non-responsive documents from the production. For instance, Pillsbury Winthrop attorneys spent 30 hours reviewing Bombardier's 8 boxes of modification notices to remove non-brake-related material. This resulted in the production of only 43 documents from the 8 boxes. As another example, Pillsbury Winthrop attorneys and staff spent 70 hours eliminating non-responsive materials from NeCMSC's electronically maintained DIRs.

c.  As of August 31, 2005, this firm has spent over 3,200 hours on matters related to the cracked spoke problem. I estimate that more than half of these hours were directly related to the review and production of documents in response to the subpoenas. Bombardier has been billed well in excess of $600,000 for Pillsbury Winthrop time and disbursements directly related to production of these documents.

22.  I understand that the electronic search terms proposed by the OIG, as further limited to the Acela project alone, would result between 21 and 27 million pages of additional electronic documents to review. Hansen Dec. ¶ 8. If 27 million pages were reviewed by 40 attorneys for

9

10 hours a day, 5 days a week, 52 weeks a year, allowing just 30 seconds per page, I estimate that the review would take at least 2 years at a cost to the client of at least $67 million.

23. I estimate that the exercise demanded by the Inspector General – of "cross-referenc[ing] or index[ing] each of the documents produced" – so far, nearly one million pages, would cost Respondents an additional several millions of dollars.

**Organization of Production**

24. Most of the records produced by NeCMSC and Bombardier were described in the cover letter accompanying each production. *See, e.g.*, Resp. Exs. 16, 19-21, 27, 30-33, 38, 40, 41, 44, 48, 53-55, 61, 63-65; *cf.* Resp. Exs. 29, 27, 46 (describing productions).

25. Pillsbury Winthrop attorneys and staff undertook to produce the records they collected from NeCMSC and Bombardier in substantially the same order as the records were maintained by Respondents. With regard to the production of DIRs prepared prior to April 1, 2003 (*i.e.*, before the DIRs were routinely scanned and posted on the NeCMSC servers), we requested that NeCMSC retrieve all boxes containing DIRs prior to April 1, 2003 from an off-site storage facility. We then produced these boxes in substantially the same order as they were delivered to us.

**Inspector General's Refusal to Produce Documents**

26. At page 10 of his Memorandum in Support of the Petition, the Inspector General refers to various written communications between sub-subcontractors regarding their discovery of cracked spokes on Acela brake discs. Even though Mr. Weiderhold attached one of those documents, a March 16, 2005 memorandum, as Exhibit 11 to the Petition, he failed to attach a second related document, apparently dated March 18, 2005. On October 6, 2005, the Inspector

General's staff declined to produce the missing document. Resp. Ex. 59. His office has not responded to my October 11, 2005 request for "a principled reason" for not doing so. Resp. Ex. 60. I believe, therefore, that the suppressed document contains information that is inconsistent with the allegations in the Inspector General's Petition.

**Filing of the Petition**

27. Prior to filing the Petition, the Inspector General did not provide advance notice or an opportunity to be heard regarding the following issues, among others, raised in the Petition:

    (a) Respondents' alleged knowledge of cracks in the spokes of discs for trailer car friction brakes prior to April 14, 2005;

    (b) Respondents' alleged failure to produce a "Suppliers Reliability Report";

    (c) Respondents' alleged failure to produce a brake correspondence log;

    (d) Respondents' alleged failure to produce post-March 2003 periodic inspection records;

    (e) Respondents' alleged production of "disorganized" records;

    (f) Respondents' alleged refusal to produce e-mails;

    (g) Respondents' production of allegedly improperly scanned documents; and

    (h) Respondents' allegedly "inflated" and non-responsive production of inspection reports and other records.

28. David M. Laney, Esq., Mr. Weiderhold's supervisor, has not responded to Respondents' October 5, 2005 request that he review the hearing denial and conduct a hearing.

29. I estimate that Respondents' attorneys' fees in responding to the Petition will exceed $100,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 20, 2005 in New York, New York.

_____
Philip Le B. Douglas

Drury

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR., AS )
INSPECTOR GENERAL, NATIONAL )
RAILROAD PASSENGER )
CORPORATION, ) Misc. Civil No. 1:05-mc-00367-PLF
)
Petitioner, )
)
v. ) DECLARATION OF DALE DRURY
)
BOMBARDIER, INC., )
)
ALSTOM TRANSPORTATION, INC., and )
)
NORTHEAST CORRIDOR )
MAINTENANCE SERVICES COMPANY, )
)
Respondents. )

I, DALE DRURY, declare as follows:

1. I am a Vice President of Alpha Systems ("Alpha"), a data and document management company founded in 1975. Alpha is now considered one of the preeminent providers of litigation support services in the country. In my capacity as Vice President of Alpha, I am in charge of litigation support services and have over fifteen years of litigation technology experience. Alpha has been engaged by Northeast Corridor Maintenance Services Company ("NeCMSC") to scan hard copies of documents located at NeCMSC's Ivy City facility ("Ivy City") and then to produce the resultant images to the Amtrak Office of Inspector General. I make this declaration in support of Alstom Transportation's ("Alstom"), Bombardier Inc.'s ("Bombardier") and NeCMSC's (collectively "Respondents") Response to the Petition (the

"Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

2. I understand that Petitioner suggests that the images of the documents on the production disks have been deliberately presented in a disorganized fashion, that review of the documents is unwieldy because an "individual document folder" has been created for each document page imaged, and that document boundaries in the production are somehow unclear. None of these contentions are correct, and, in my opinion, evince a complete unfamiliarity on the part of Petitioner with image based productions and the standard litigation document management applications used to review them. As I will demonstrate below, Alpha's production of NeCMSC records wholly complies with litigation support industry standards.

3. Over the course of my career, I have overseen hundreds of image-based productions, including dozens to government agencies, such as the Department of Justice, the Federal Trade Commission, and the Securities and Exchange Commission. In my experience, the most prevalent form of image-based document production is via single-page TIFF images generated by scanning paper documents (with each single page of paper translating into one single-page TIFF image), accompanied by a text file stating which single-page TIFF images collectively constitute an original document. With this raw data, standard litigation document management applications used by receiving parties then can easily generate user-friendly review sets of documents comprised of said images. As such, single-page TIFF image based productions are the litigation support industry standard form of production.

4. Alpha's production to Petitioner followed the same method described above. Specifically, over the course of scanning and producing documents to Petitioner, where single-page TIFF images were used, a text file showing document constitution (in the format "Begin

NEC Number","End NEC Number") was included in the root directory of each production disk, as is customary. NeCMSC documents were scanned by Alpha in the same order they were organized at the time we retrieved them from NeCMSC's Ivy City facility. Alpha reproduced the resultant images in the same order in which they were scanned, while keeping a record of the original document boundaries for inclusion in text files with each production. In short, the production of NeCMSC documents was handled no differently than any of the other image-based productions my office has supervised.

5. In my experience, parties interested in managing large document productions – as is often the case in large litigations or investigations – use single-page TIFF format for the images generated because they are easier to work with than multi-page images. For example, multiple documents may be clipped or fastened together in the ordinary course of business at any typical office (i.e. as a secretary might maintain a correspondence file). Single-page TIFF reproduction of those files, once scanned, enables a reviewing party to identify and work with the constituent documents of those files more easily (either via coding or other organization techniques) while still retaining a record of the overall document boundaries. Thus, single-page TIFF images allow flexible boundaries so that a reviewer is not forced to work with unwieldy collections of documents that happened to be clipped together for one reason or another.

3

6. For the foregoing reasons, single-page TIFF is the most prevalent image-based production form in the litigation support industry. That is why we used it in the engagement for NeCMSC. Any receiving entity equipped with a standard litigation document management application should have been able to readily and efficiently work with the productions from Ivy City. Petitioner's apparent difficulties stem from inexperience, not actions by my office.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October /_, 2005

*[signature]*
Dale Drury

Hansen

Case 1:05-mc-00367-PLF    Document 22-5    Filed 10/06/2006    Page 12 of 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR., AS INSPECTOR GENERAL, NATIONAL RAILROAD PASSENGER CORPORATION<br><br>    Petitioner<br><br>v.<br><br>BOMBARDIER, INC.<br><br>ALSTOM TRANSPORTATION, INC.<br><br>NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY<br><br>    Respondents. | Misc. Civil No. 1:05-mc-00367-PLF<br><br>**DECLARATION OF CHRISTOPHER HANSEN** |

I, CHRISTOPHER HANSEN, declare as follows:

1. I am Pillsbury Winthrop Shaw Pittman LLP's firm-wide Director of Litigation Support, and have twenty years of litigation technology experience. I submit this declaration in support of Alstom Transportation's ("Alstom"), Bombardier, Inc.'s ("Bombardier") and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak"). In particular, I am responding to certain allegations that I understand Petitioner has made pertaining to the format of document productions made by Bombardier and NeCMSC.

2.   Prior to joining Pillsbury, I served as Senior Consultant with Alpha Systems (a litigation support vendor), and was Manager of Litigation Support at Debevoise & Plimpton from 1998 to 2002. I have published articles on litigation technology in the New York Law Journal and Metropolitan Corporate Counsel, and am a past member of the ABA Litigation Support Software Evaluation Working Group. In the course of my career, both in law firms and at litigation support vendors, I have overseen dozens of image-based productions.

3.   I understand that Petitioner has suggested that Bombardier and NeCMSC improperly produced "many document pages ... scanned/copied as an individual document folder" requiring the reviewer to "open and close each page separately throughout multiple document folders to review the document in its entirety." *See* Petition Ex. 8, ¶ 11(a). In response, I concur completely with the statements of Dale Drury of Alpha Systems in paragraphs 2 though 6 of his declaration dated October 18, 2005. In my experience, Respondents' manner of production, namely single-page TIFF images accompanied by a text file reflecting which image ranges together constitute individual documents, is the standard format in which parties make and receive image-based productions, which are then easily reviewable via standard electronic document management applications. Indeed, several of the document productions I have supervised have been made to government agencies, such as the Department of Justice, the Federal Trade Commission, and the Securities and Exchange Commission, all of which have deemed single-page TIFF images to be acceptable. The fact that Petitioner's staff opened each single-page TIFF image separately indicates that the Amtrak Office of Inspector General, unlike the other above-mentioned federal offices, has not employed any of the standard electronic document management applications typically used to handle such productions.

4. I understand that Petitioner has asserted that it is unreasonable for Bombardier and NECMSC to insist on using agreed targeted searches and search terms to identify potentially responsive documents amongst the significant volume of electronic data maintained by both entities (comprised principally of hard drives of relevant personnel's computers, e-mails on servers, and shared drives and databases on computer networks).

5. In order to evaluate the burdens involved in reviewing the data by a variety of formulations, I supervised the application to the Bombardier and NeCMSC electronic data sets of varying combinations of search terms and techniques. Application to the electronic data of all of the search terms Bombardier and NECMSC suggested, together with the search terms that Petitioner suggested, yielded so many "hits" that the data set to review would approximate 41 to 58 million review pages ("Phase I").

6. In my 20 years of experience, the largest electronic data set that was ever reviewed under my supervision amounted to approximately 12 million review pages, and it is my judgment that a review for responsiveness and privilege of the significantly larger Phase I data set would be an extremely expensive, and ultimately wasteful, endeavor. Indeed, assuming a minimal cursory review time of 30 seconds per data page, the Phase I review time would project out to an absurd approximate range of 342,000 to 483,000 hours review time.

7. In my opinion, based on my own data sampling, Petitioner's insistence on the use of vague search terms like "break," "fail," "failure," "annulment," "non-compliant," and "inadmissible," among others, without regard to their frequency and proximity to other more precise search terms contained in the relevant data -- namely terms related to the brakes systems at issue on the Acela project -- yields a data set that will contain disproportionate volumes of non-responsive information unrelated to the Acela brakes systems, the Acela project, or both.

3

300192606v3