8.    In an effort to make the results more manageable, I supervised a very basic "Phase II" search. The Phase II search utilized the Phase I search terms, but restricted the results to those documents that also contained terms indicating a relation to the Acela project (i.e. to exclude, for example, documents relating to "failures" on other projects). While Phase II did carve the Phase I results in half, the resultant review set of 21 to 27 million review pages is still too large to manage.

9.    When confronted with search results of such volume, it is standard practice to work with the requesting party, aided by data sampling, in order to target the searches better to yield manageable results. Parties typically agree to specific searches, search terms, and particular data sets to be searched, among other techniques. As I understand it, Petitioner has refused thus far to work with Bombardier and NECMSC to accomplish this, instead insisting on the Phase I search, which, for reasons stated above, is unreasonable. Therefore, notwithstanding Petitioner's refusal to participate, Respondents have attempted alternate means of locating relevant emails and other electronic evidence as described in the Declaration of Philip Le B. Douglas.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 18, 2005.

Christopher Hansen

Hebert

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRED E. WEIDERHOLD, JR.,<br>AS INSPECTOR GENERAL,<br>NATIONAL RAILROAD PASSENGER<br>CORPORATION | : | |
| | : | |
| | : | |
| | : | |
| Petitioner | : | Misc. Civil No. 1:05-mc-00367-PLF |
| | : | |
| v. | : | **DECLARATION OF** |
| | : | **PIERRE HEBERT** |
| BOMBARDIER, INC. | : | |
| | : | |
| ALSTOM TRANSPORTATION, INC. | : | |
| | : | |
| NORTHEAST CORRIDOR MAINTENANCE<br>SERVICES COMPANY | : | |
| | : | |
| Respondents. | : | |
| | : | |

I, PIERRE HEBERT, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am the General Manager of Northeast Corridor Maintenance Services Company ("NeCMSC"). I make this declaration in support of Alstom Transportation, Inc.'s ("Alstom"), Bombardier, Inc.'s and NeCMSC's (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak"). Unless otherwise noted, this declaration is based on personal knowledge or the results of an inquiry made to responsible employees who are answerable to me.

2.    I understand that the Amtrak Office of the Inspector General ("OIG") has raised certain questions about the organization of the daily inspection reports at NeCMSC. In response, I had an inquiry performed into the organization of the daily and other periodic inspection

reports ("DIRs") prepared by NeCMSC in the course of its inspection and maintenance of Acela trains. The results of my inquiry are as follows:

    a.    DIRs prepared prior to April 1, 2003 have been maintained, in their original paper form, at an off-site storage facility and are organized in their original manner. I understand that at the time of their preparation, these pre-April 2003 records were not, and are not now, consistently organized by trainset and then in chronological order.

    b.    As of April 1, 2003, NeCMSC has employed a Document Control Coordinator whose primary responsibility is to ensure that the daily inspection reports are properly filed on a going-forward basis.

    c.    Since April 1, 2003, DIRs have been scanned and posted onto NeCMSC servers shortly after each was prepared. The original paper version of these DIRs were then filed in 20 file cabinet drawers – one for each trainset – at NeCMSC's Ivy City facility. Within each drawer, a Trainset's DIRs were organized chronologically. In order to make room for new DIRs, the 20 files drawers have been periodically emptied and their contents sent for storage to an off-site facility.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 19, 2005 in Washington, District of Columbia.

_____

Pierre Hebert

2

Labbe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRED E. WEIDERHOLD, JR.,<br>    AS INSPECTOR GENERAL,<br>    NATIONAL RAILROAD PASSENGER<br>    CORPORATION | : | |
|         Petitioner | : | Misc. Civil No. 1:05-mc-00367-PLF |
|         v. | : | **DECLARATION OF**<br>**SYLVAIN LABBÉ** |
| BOMBARDIER, INC. | : | |
| ALSTOM TRANSPORTATION, INC. | : | |
| NORTHEAST CORRIDOR MAINTENANCE<br>    SERVICES COMPANY | : | |
|         Respondents. | : | |

I, SYLVAIN LABBÉ, pursuant to 28 U.S.C. § 1746, declare that:

1.     I am a Senior Mechanical Designer at Northeast Corridor Maintenance Services Company ("NeCMSC"), and am also an employee of Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation, Inc.'s ("Alstom"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

2.     I am a train brake specialist and a member of NeCMSC's reliability team. I have been responsible for designing interfaces to, trouble-shooting, testing and commissioning the brake system of trainsets for different transportation authorities, including the Acela trainsets.

3.    I have been employed by Bombardier since May 1980, and have been with NeCMSC since May 2002. I have been involved with the Acela project from its inception. I am therefore familiar with the facts and circumstances surrounding the events described in this declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Bombardier's and NeCMSC's Lack of Notice**

4.    Because of my dual role as NeCMSC's lead brake specialist and the sole Bombardier brake specialist to have been continuously involved in the Acela project, I am routinely notified, through both formal and informal channels, of any problems with the brakes (other than one-time problems such as those caused by improper handling). Accordingly, I would have been notified of any issues relating to broken spokes.

5.    Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes ("Spoke Issues") on the Acela trains.

6.    After April 14, 2005, I reviewed my files to see if I had ever received any documents that might have put me on notice of any Spoke Issues. I found no such documents.

7.    I am unaware of any documents that might have put NeCMSC or Bombardier on notice of any Spoke Issues prior to April 14, 2005.

**Where Broken Spokes Might Be Identified**

8.    All periodic NeCMSC inspections are conducted by Amtrak employees. These Amtrak employees are required to inspect the Acela trainsets thoroughly, including the brake discs, every day while the trainset is in service and at other regular intervals. (For convenience, I will refer to the various kinds of reports generated from routine inspection and maintenance as "Daily Inspection Reports" or "DIRs".) Any Amtrak employee who identifies a problem with

the trainsets (including, for instance, any problems with the brake discs), is required to note those problems on certain forms as part of their DIR for that trainset.

9.    If a problem on a DIR requires corrective action, a Corrective Work Order ("CWO") is generated.

10.    Accordingly, if a cracked spoke had ever been identified by an Amtrak employee at NeCMSC, it would first be noted in writing on a DIR and CWO.

11.    In November 2004, I searched the CWO titles in the SPEAR 2000 database for the word "CRACK" in order to provide information for a memorandum regarding cracked brake discs, which I understand is attached as Exhibit 12 to Mr. Weiderhold's Petition. I reviewed the search results; none of them involved a cracked or broken spoke.

12.    I am unaware of any DIR or CWO prior to April 14, 2005 noting any cracked spokes.

**Communications With Subcontractors Regarding Brakes**

13.    Although all formal communication between NeCMSC or Bombardier and Knorr Brake Corporation ("Knorr") goes through Bombardier's Supply Management department in St-Bruno, Canada, I am the primary contact for informal communications with Knorr. In early 2005, I was frequently on the telephone with Ted Lin, Ph.D., Lead Analytical Engineer of Knorr to discuss various brake-related issues (none of which related to brake spokes).

14.    Shortly before April 14, 2005, Dr. Lin called me to ask if Knorr and one of its subcontractors could visit NeCMSC's Ivy City facility. He stated that Knorr's subcontractor wanted to check the wear rate of its brake disc friction plates. Dr. Lin made no reference to brake disc spokes. In fact, our conversation did not appear unusual to me at the time. This

particular visit never took place, however, because on April 14, 2005, the Federal Railroad

Administration discovered cracks on the spokes of the Acela trailer car friction brakes, and took

the trains out of service.

15.     I do not ordinarily communicate directly with ORX or Knorr's subcontractors or

sub-subcontractors, including Faiveley Transport, Wabco, Wabtec, and Sab Wabco.

16.     Prior to April 14, 2005, neither ORX nor Dr. Lin nor anyone else at Knorr nor

Knorr's various subcontractors ever informed me of any cracked or broken spokes on the Acela

trailer car brake discs.

**March 16, 2005 Faiveley Memorandum**

17.     Prior to September 22, 2005, I had never seen the "Confidential!" March 16, 2005

Faiveley Transport memorandum, which I understand is attached as Exhibit 11 to Mr.

Weiderhold's Petition (the "Faiveley Memorandum").

18.     I was entirely unaware of the substance of the Faiveley Memorandum before Mr.

Weiderhold filed his Petition.

19.    I am not aware of anyone else at Bombardier or NeCMSC who had knowledge of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on October *19*, 2005 in Washington, District of Columbia.

Sylvain Labbé

Miclette

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,
   AS INSPECTOR GENERAL,
   NATIONAL RAILROAD PASSENGER
   CORPORATION

          Petitioner

            v.

BOMBARDIER, INC.

ALSTOM TRANSPORTATION, INC.

NORTHEAST CORRIDOR MAINTENANCE
   SERVICES COMPANY

          Respondents.

Misc. Civil No. 1:05-mc-00367-PLF

**DECLARATION OF
PIERRE MICLETTE**

    I, PIERRE MICLETTE, pursuant to 28 U.S.C. § 1746, declare that:

    1.    I am an engineer with the Reliability, Availability, Maintainability, and Safety ("RAMS") group of Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation's ("Alstom"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

    2.    I have been employed by Bombardier since 1996, and have been involved with the Acela project since that time. I am therefore familiar with the facts and circumstances

*PM*
October 18, 2005

surrounding the events described in this declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Respondents' Problem Reporting Process**

3.      When a problem with the Acela trainsets is found during inspections at NeCMSC, it is first described in the appropriate inspection report (*e.g.*, on a daily or 90-day inspection report), and if corrective action is required, a Corrective Work Order ("CWO") is issued. Each CWO is reviewed at NeCMSC by NeCMSC, Alstom and Bombardier customer service, and by Amtrak field representatives to determine whether the problem should be considered as a reliability failure or not. In addition to the CWO review, any brake problem which is safety related, appears to be recurrent, or has caused service failures is reported by NeCMSC on a Failure Analysis Report ("FAR") for the Bombardier RAMS group attention.

4.      The Bombardier RAMS group extracts information about reliability failures (*i.e.*, CWOs) from the SPEAR 2000 database (Amtrak has read-only access), and then transfers that information into the Bombardier Failure Reporting, Analysis, and Corrective Action System ("FRACAS") reliability database. I then review and analyze the relevant information. Then, this information is reported to the Consortium, NeCMSC, and Supplier organizations.

5.      When we receive a request from NeCMSC for a FAR, my group alerts the appropriate engineering personnel responsible for whichever system is implicated by the problem. The problem is reviewed by the appropriate engineering personnel and a decision is taken whether to proceed with a further request for a formal FAR. Ultimately, the problem will be analyzed (by Alstom, Bombardier or the appropriate supplier), and an answer to the requested FAR will be issued when the analysis is completed.

*PM*
*October 18, 2005*

6.    I would have been informed if there had been any reports of cracked or broken spokes in the trailer car friction brake discs by either the FRACAS database information or directly by NeCMSC which would have initiated an FAR on a cracked or broken disc spoke. Prior to April 14, 2005, I had never been notified of any problems with the spokes.

7.    After April 14, 2005, I checked the FRACAS and FAR databases for any spoke-related problems. There were none in the database prior to April 14, 2005. I am unaware of any information that might have put Bombardier on notice of any problems with the spokes prior to April 14, 2005.

**Supplier Reliability Reports**

8.    Bombardier issues Supplier Reliability Reports to its vendors, which summarize performance issues for that particular vendor, on an as-needed basis. These reports are addressed to Supply Management and are then transmitted to Knorr as part of the formal project correspondence.

9.    I have routinely been involved in preparing such Supplier Reliability Reports for the brake systems on the Acela trainsets.

10.   I drafted the document 041-FMS-0714, dated September 23, 2003, which I understand was attached as Exhibit 26 to a Petition recently filed by Amtrak's Inspector General. This Supplier Reliability Report does not show any spoke cracks, and there was nothing about this report that would alert a knowledgeable technical person that there might be cracks in the spokes.

3

*PM*
October 18, 2005