11.    To the best of my knowledge and recollection, none of the Supplier Reliability

Reports prior to April 14, 2005 ever concerned or referred to spoke cracks.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  This declaration was executed on October 18, 2005 in St-Bruno,

Québec, Canada.

_____
Pierre Miclette

4

Morin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,
    AS INSPECTOR GENERAL,
    NATIONAL RAILROAD PASSENGER
    CORPORATION

           Petitioner

           v.

BOMBARDIER, INC.

ALSTOM TRANSPORTATION, INC.

NORTHEAST CORRIDOR MAINTENANCE
    SERVICES COMPANY

           Respondents.

Misc. Civil No. 1:05-mc-00367-PLF

**DECLARATION OF
LINDA MORIN**

I, LINDA MORIN, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am a secretary at Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation, Inc.'s ("Alstom's"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") Response to the Petition ("Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak"). Unless otherwise noted, this declaration is based on personal knowledge.

2.    Supply Management maintains a file of correspondence between Knorr Brake Corporation ("Knorr") and Bombardier.

3.    On October 18, 2005, I searched the Knorr correspondence file and the Contract Tracking System ("CTS") database for BO/KB-1606. I was not able to find it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 19, 2005 in Washington, District of Columbia.

_Linda Morin_
Linda Morin

Oakes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRED E. WEIDERHOLD, JR.,<br>    AS INSPECTOR GENERAL,<br>    NATIONAL RAILROAD PASSENGER<br>    CORPORATION | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | Misc. Civil No. 1:05-mc-00367-PLF |
| Petitioner | : | |
| | : | **DECLARATION OF** |
| v. | : | **DENIS OAKES** |
| | : | |
| BOMBARDIER, INC. | : | |
| | : | |
| ALSTOM TRANSPORTATION, INC. | : | |
| | : | |
| NORTHEAST CORRIDOR MAINTENANCE<br>    SERVICES COMPANY | : | |
| | : | |
| Respondents. | : | |
| | : | |

I, DENIS OAKES, pursuant to 28 U.S.C. § 1746, declare that:

1.      I am a Project Engineer at Bombardier Transportation, a group of Bombardier Inc.,

the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make

this declaration in support of Alstom Transportation's ("Alstom"), Bombardier's and Northeast

Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents")

Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General,

National Railroad Passenger Corporation ("Amtrak").

2.      I am a train systems and integration engineer, who has developed an expertise in the

brake system. I have been responsible for selecting, creating interfaces for, and testing the brake

system of many different vehicles, including the Acela trainsets.

3.     I have been employed by Bombardier since May 1982.  From 1996 through October 2000, I was a Project Engineer on the Acela project.  From November 2000 through December 2002, I was primarily working on a different project, but remained in close contact with my temporary replacement on the Acela project and continued to be kept informed on major issues relating to the Acela brakes.  In January 2003, I formally resumed my role on the Acela project and continued my work in connection therewith through the end of January 2005.  (Although my own involvement ended at that time, Acela brake issues continued to be reported to and handled by Pierre Miclette and Sylvain Labbé.)  In April 2005, after the Acela service was suspended due to the broken spoke problem, I again resumed my role on the Acela project.  I am therefore familiar with the facts and circumstances surrounding the events described in this declaration.  Unless otherwise noted, this declaration is based on personal knowledge.

**Bombardier's Lack of Notice**

4.     Because of my role on the Acela project, I am routinely notified, through both formal and informal channels, of any problems with the brakes (other than one-time problems such as those caused by improper handling, for instance if a brake component is inadvertently dropped on the shop floor at NeCMSC).  For instance, I am one of the core group of Bombardier employees responsible for making sure that Knorr addresses out-of-limit cracks on the friction surface of the brake discs.  Accordingly, I would have been notified of any issues relating to broken spokes.

5.     Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes ("Spoke Issues") on the Acela trains.

6.    After April 14, 2005, I reviewed my files to see if I had ever received any documents that might have put me on notice of any Spoke Issues. I found no such documents.

7.    I am unaware of any documents that might have put Bombardier on notice of any Spoke Issues prior to April 14, 2004.

**Brake Discs and Spoke Cracks**

8.    The diagram below (a copy of which, I understand, appears in Exhibit 10 of Mr. Weiderhold's Petition) shows an axle-mounted friction brake disc. On the Acela trainsets, this type of brake disc is found only on the trailer car friction brakes. The other brakes on the Acela trainsets (*i.e.*, the electric brakes, which use electricity rather than friction, and the power car friction brakes, which are wheel-mounted rather than axle-mounted) do not have spokes.



1 -  Friction ring
2 -  Connection Spokes
3 -  Hub

9.    Cracks in the "friction ring" (also known as the "friction surface" or the "friction plate") are due to the temperature gradient resulting from the heating, generated by the contact between the brake pads and the friction ring, and the cooling of the ring. They are not

considered to be a problem, unless their size exceeds the limits set by the brake manufacturer. (By contrast, the manufacturer has not set any specific size limits for spoke cracks.)

10.    Thermal cracks on the friction surface are known and expected by the Amtrak employees inspecting and maintaining the Acela cars under the supervision of NeCMSC. In fact, prior to April 2005, when Amtrak personnel maintaining the Acela referred to a "cracked disc," it was understood that they were referring to cracks in the friction surface. By contrast, if there were a crack in any <u>other</u> part of the brake disc, such as the spoke, the hub, or the cooling fins, the crack would have been described by reference to that part of the disc (*e.g.*, a "spoke crack" or "crack in the hub" or a "cracked fin").

**Communications With Knorr Regarding Cracked Brake Discs**

11.    I drafted the document 041-ISL-2420, dated November 15, 2004 (the "Cracked Brake Discs Memorandum"), which I understand is attached as Exhibit 12 to Mr. Weiderhold's Petition.

12.    None of the cracks that I identified or referred to in the Cracked Brake Discs memorandum or its attachment, "Cracked Disc List Rev_02", involved cracks on the spokes. They were all reported to me as cracks on the friction surface.

13.    This is apparent from a reading of most of the individual line items of Cracked Disc List Rev_02. It is clear on the face of the document, without even looking up the applicable Failure Analysis Reports or Corrective Work Orders, that at least 36 of the 46 cracks <u>cannot possibly</u> be spoke cracks:

    a.    Many entries refer to whether or not the dimensions of the crack are within permissible limits. Because there are permissible limits for surface

cracks, but not for spoke cracks, there is no reason to mention the size of a spoke crack; all such cracks are impermissible.

      b.      The <u>power car</u> brake discs (*e.g.,* items where the "Equipment Code" starts with the number "2", or items referencing "bolt holes" or the "bolt countersink") do not have spokes.

      c.      The terms "heat crack" and "thermal crack" describe cracks in the friction surface, not spoke cracks.

      d.      Similarly, the terms "incipient crack" and "penetrating crack" are defined and used in the maintenance and inspection manuals to refer to cracks in the friction surface.

14.      In my experience, it is unlikely that engineers or maintenance personnel on the Acela project would describe a spoke crack as appearing on the "side"; "left side"; "inner side"; "1/4" from edge"; "on edge"; "surface"; or "on surface" without <u>specifically</u> stating that the crack is related to the spoke. Ordinarily, they would likely describe the location of a spoke crack as on the "spoke surface" or the "spoke web". By contrast, they would utilize words such as "surface" (without additional qualifiers) to describe the friction surface.

15.      Bombardier has repeatedly expressed its concern to Knorr Brake Corporation ("Knorr") about out-of-limit friction surface cracks through both formal and informal channels. Knorr addressed some, but not all of the issues raised in the Cracked Brake Discs Memorandum, by providing Failure Analysis Reports. None of Knorr's communications in response to the Cracked Brake Discs Memorandum ever made any mention of cracked or broken spokes.

**Communications With Faiveley, ORX, Wabco, Wabtec, and Sab Wabco**

    16.    I do not ordinarily communicate directly with Respondents' subcontractors, including Knorr and ORX, or with any of Knorr's subcontractors or sub-subcontractors, including Faiveley Transport, Wabco, Wabtec, and Sab Wabco.

    17.    Prior to April 14, 2005, I did not have any communications with ORX, Knorr, Faiveley Transport, Wabco, Wabtec, or Sab Wabco with respect to cracked spokes on the Acela project.

    18.    Prior to September 22, 2005, I had never seen the "Confidential!" March 16, 2005 Faiveley Transport memorandum, which I understand is attached as Exhibit 11 to Mr. Weiderhold's Petition (the "Faiveley Memorandum").

    19.    I was entirely unaware of the substance of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

    20.    I am not aware of anyone else at Bombardier who had knowledge of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October __, 2005 at St-Bruno, Québec, Canada.

Denis Oakes

Wochelle

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR., AS INSPECTOR GENERAL, NATIONAL RAILROAD PASSENGER CORPORATION )))))) | |
| Petitioner ) | Misc. Civil No. |
| v. ) | |
| BOMBARDIER, INC. ) | **AFFIDAVIT OF CHUCK WOCHELE** |
| ALSTOM TRANSPORTATION, INC. ) | |
| NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY )) | |
| Respondents. ) | |

CHUCK WOCHELE, being first duly sworn, deposes and says:

1.    I am over the age of 18 and believe in the obligation of an oath.

2.    I am Vice President of Business Development/Amtrak Customer Director for Alstom Transportation, Inc. ("Alstom"). I have served with Alstom since January, 1997, and as Alstom's Customer Director for Amtrak since October, 2003.

3.    As Alstom's Customer Director for Amtrak, I am responsible for all customer relations matters with Amtrak, and am its primary customer contact. All program managers related to Amtrak report to me. These program managers work with the Acela project on a day-

to-day basis, and keep a running log of any reports or quality issues. As a result, I would be

aware of such issues should they arise.

    4.    Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes

("Spoke Issues") on the Acela trains.

    5.    This concludes my affidavit.

Chuck Wochele

Subscribed and sworn to before me this
12th day of October, 2005

Notary Public
My Commission Expires:

ELIZABETH R. T. HALLO
Notary Public, State of New York
No. 01HA6130553
Qualified in New York County
Commission Expires July 18, 2009