UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

FRED E. WEIDERHOLD, JR.
  AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
  CORPORATION,

                    Petitioner,

         v.

BOMBARDIER, INC.,
ALSTOM TRANSPORTATION, INC.,
NORTHEAST CORRIDOR MAINTENANCE
  SERVICES COMPANY,

                    Respondents.

Civil No. 1:05 MS 367
Judge Friedman

---

## RESPONDENTS' MEMORANDUM AND DECLARATIONS
## IN SUPPORT OF ORIGINAL PETITION RESPONSE

JONES DAY
Attorneys for Bombardier Inc. and Northeast
  Corridor Maintenance Services Company
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

WINSTON & STRAWN LLP
Attorneys for Alstom Transportation, Inc. and
Northeast Corridor Maintenance
  Services Company
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000

MEMORANDUM

**Confidential Settlement
and Investigative Communication
Disclosure Restricted to
Head of Designated Federal Entity
Pursuant to 5 U.S.C. App. 3 § 8G(d)**

**BEFORE FRED E. WEIDERHOLD, JR.
INSPECTOR GENERAL, NATIONAL
RAILROAD PASSENGER CORPORATION**

---

|  |  |  |
|---|---|---|
| **IN RE AMTRAK OIG SUBPOENAS TO ALSTOM, BOMBARDIER AND NECMSC** | : : : : : : | Subpoena Nos. 05-05 <br> 05-07 <br> 05-09 <br> 05-17 <br> 05-18 <br> 05-20 |

---

## RESPONDENTS' MEMORANDUM IN
## SUPPORT OF REQUEST FOR A HEARING

PILLSBURY WINTHROP SHAW PITTMAN LLP
Attorneys for Bombardier Inc. and Northeast
 Corridor Maintenance Services Company
1540 Broadway
New York, New York 10036-4039
(212) 858-1000

WINSTON & STRAWN LLP
Attorneys for Alstom Transportation, Inc. and
 Northeast Corridor Maintenance Services Company
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000

October 20, 2005

*Received a document
on 10/20/2005*

## <u>Table of Contents</u>

Page

**Preliminary Statement** ..........................................................................................1

**ARGUMENT** ........................................................................................................3

**I.   THE PETITION'S NUMEROUS FALSE STATEMENTS
MUST BE WITHDRAWN** ............................................................................3

    A.  Knowledge of Spoke Cracks...........................................................................4

    B.  Failure to Produce "Suppliers Reliability Report".........................................8

    C.  Failure to Produce Brake Correspondence Log...............................................9

    D.  Failure to Produce Recent Inspection Records..............................................11

    E.  "Disorganized" Older Inspection Records.....................................................11

    F.  "Refusal" to Produce Any Emails or Electronic Documents .........................14

    G.  Improperly Scanned Documents.....................................................................16

    H.  "Inflated" and Non-Responsive Production ..................................................17

    I.  Refusal to Produce Documents As Kept by Respondents..............................21

    J.  "Willingness" to Narrow Production ............................................................22

**II.  THE PETITION'S MOOT AND SETTLEMENT-READY
CLAIMS SHOULD BE WITHDRAWN** .......................................................24

    A.  Production of Responsive Records Will Be Completed Shortly .....................25

    B.  No "Notice" Documents are Known to Exist ...............................................26

    C.  An Index to Subpoena Requests Has Been Provided......................................28

    D.  Reasonable Assistance Will Be Provided......................................................29

**III. RESPONDENTS' COUNTERCLAIMS SHOULD BE GRANTED** .................29

    A.  Brake Discs Should Be Released for Root Cause Analysis ...........................30

    B.  The Inspector General Must Reimburse Respondents' Costs .........................30

C.  Mr. Weiderhold's Demands for Additional Electronic Searches
    Should be Withdrawn .................................................................................... 31

D.  The Inspector General Should Recuse Himself ........................................... 33

**CONCLUSION** ................................................................................................ 36

issues before Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak") and/or David M. Laney, Esq., as Mr. Weiderhold's supervisor.

On September 24 and September 27, 2005, respectively, Winston & Strawn and Pillsbury Winthrop received a copy of the Petition filed on September 22, by the Inspector General in the United States District Court for the District of Columbia.[3] *Weiderhold v. Bombardier, Inc. et al.*, Civ. No. 1:05-mc-00367-PLF (D.D.C.). The Petition contains grave allegations that Respondents may have suppressed safety-related information and are obstructing the Inspector General's investigation. Prior to filing the Petition, however, Mr. Weiderhold had not provided Respondents with any notice of, much less an opportunity to be heard regarding, the Petition's most serious allegations.[4] Douglas Dec. ¶ 27. If prior to filing suit the Inspector General had provided Respondents with an opportunity to be heard, he would have learned that his Petition consists of claims that are demonstrably false, are moot, are irrelevant or can and should be resolved on a consensual basis.

Accordingly, on September 30, 2005, Respondents requested a hearing before Mr. Weiderhold so that, consistent with due process and his obligations to the Court, he could provide Respondents with an opportunity to challenge the issues raised in the Petition. Resp. Ex. 56. On October 4, 2005, however, the Inspector General's staff denied that request. The staff stated, however, that they, not the Inspector General, would meet with Respondents provided they first received "a detailed description, in writing, of 1) the topics to be discussed at any meeting, 2) the support – with Bates-number references – for each claim by your clients that any Petition allegation is 'demonstrably false', and, 3) each offer by your clients to resolve their

---

[3] None of the Respondents have been served in this action, and Mr. Weiderhold has declined counsel's offer to accept service in return for an agreed-upon briefing schedule. Resp. Exs. 56 & 57.

[4] On May 18, 2005, Respondents asked the Inspector General's staff for an opportunity to address any investigative conclusions. Douglas Dec. ¶ 11.

obligations under the subpoenas 'on a consensual basis' together with a proposed timetable for such compliance". Resp. Ex. 57. On October 5, while reserving all rights, Respondents agreed to produce the requested written submission, provided that Mr. Weiderhold responded in kind. Resp. Ex. 58. Respondents also asked David M. Laney, Esq., Mr. Weiderhold's supervisor, to review the hearing denial and conduct a hearing. *Id.* Mr. Laney has not responded to this request. Douglas Dec. ¶ 28.

For the reasons set forth below, the Petition should be withdrawn because it contains allegations that are false, moot, irrelevant or should be settled.

## ARGUMENT

### I.

### THE PETITION'S NUMEROUS FALSE STATEMENTS MUST BE WITHDRAWN

The Petition suggests that Respondents have engaged in misconduct of the most serious kind. Inspector General contends, for example, that evidence "at least suggest[s]" that Respondents endangered the public safety by not acting despite advance notice of the disc spoke cracks and are now withholding "highly pertinent" information from his investigation. Pet. Mem. at 11, 21. If Mr. Weiderhold had provided Respondents with a prior opportunity to be heard, he would have learned that all of the Petition's most serious allegations are false, and none have the good faith basis in fact or law required by due process and Rule 11(b) of the Federal Rules of Civil Procedure ("FRCP"). We suggest, therefore, that unless promptly withdrawn, these prejudicial allegations are sanctionable.

Respondents list below Mr. Weiderhold's false statements followed by a demonstration of why they are incorrect.

3

A.    **Knowledge of Spoke Cracks**

1.    *Erroneous Statements*

- "Petitioner has obtained from other subpoenaed entities documents that at least suggest Bombardier, in the Fall of 2004, had knowledge of and concern about cracked disc brake rotors." Pet. Mem. at 11.

- "Petitioner has not been able to locate the[se] Bombardier documents . . . during its review of Bombardier's disorganized production." *Id.*

- "Petitioner has not located among the Bombardier/NeCMSC production documents Bombardier created and previously provided vendors and subcontractors when problems with the disc brake rotors first occurred. These highly pertinent[5], but apparently not produced and certainly not identified documents include the 'Cracked Disc' spreadsheet that reports incidents of cracking, repairs and/or replacement of disc brake rotors, and related testing ('Failure Analysis Reports')." *Id.* at 21.

2.    *Reasons Correction Required*

Despite Respondents' request at the very outset of this investigation that they be afforded a prior opportunity to be heard, Mr. Weiderhold irresponsibly placed these claims on the public record without any prior notice. Douglas Dec. ¶¶ 11, 27. These irrelevant and inflammatory accusations find no support in any of Petitioner's affidavits or exhibits and are false in almost every material respect:

- The Petition identifies only a single purportedly "missing" Bombardier document, not multiple "documents";

- Respondents in fact produced that document;

- Rather than being "hidden" in a "disorganized" production, the Bombardier document is to be found precisely where it should be:  in the chronologically organized Knorr correspondence file; and

---

[5]  A "pertinent" document is one as "having a clear decisive relevance to the matter at hand; highly significant." Webster's New Collegiate Dictionary at 856 (1973). A "highly pertinent" document, then, is one of the utmost significance to the investigation. As Respondents demonstrate below, the Bombardier document in question is utterly irrelevant to the investigation.

- Neither the sub-subcontractor (Pet. Ex. 11) nor the Bombardier (Pet. Ex. 12) document provide any evidence that Bombardier knew of broken spokes.

This abuse of power is substantiated below.

### a.    The Bombardier Document was Produced

Although the Inspector General claims that Bombardier "documents" are missing, this allegation concerns Petitioner's Exhibit 12, a single e-mail from Bombardier to Knorr Brake Corporation ("Knorr"), Respondents' brake subcontractor. On July 28, 2005, Bombardier produced that e-mail (Prod. Nos. BBD0062407-2414) under cover of a letter describing the enclosed materials as "Project correspondence." Resp. Ex. 44.[6] The enclosed Knorr correspondence file was not "disorganized", but rather was produced as kept by Bombardier: in reverse chronological order consistent with Exhibit 12's sequential Project reference number of "041-BO/KB-2191".[7] Exhibit 12, in short, is located precisely where one would expect to find it, within the Knorr correspondence file in a folder marked "041-BO/KB-2154 [to] 041-BO/KB-2215". Prod. No. BBD0062366.[8]

### b.    The Bombardier Document Does Not Concern Cracked Spokes

Equally unfounded is Mr. Weiderhold's claim that Petitioner's Exhibits 11 and 12 "at least suggest" that Bombardier "knew of and was concerned about" the cracked disc spokes at issue in this investigation. Exhibit 12 is a November 16, 2004 Bombardier e-mail enclosing a "Cracked Disc List" prepared by Denis Oakes, a Bombardier brake specialist. Mr. Oakes asked

---

[6] As will be demonstrated later in this memorandum, this is but one of hundreds of thousands of pages of e-mails and electronic documents that Respondents have produced to date. There are more to come. Thus, it is completely untrue that "Respondents have refused to produce any e-mails." Pet. Mem. at 5.

[7] Letters from Bombardier to Knorr are given sequential numbers starting with BO/KB-001, while letters from Knorr to Bombardier are given sequential numbers starting with KB/BO-001. The "041" prefix refers to the Acela project.

[8] Mr. Weiderhold did not inform the Court that Respondents are still at work on their respective document productions. This has given the Court the erroneous impression that Respondents had completed their production and were refusing to produce any more records. This omission should also be corrected promptly.

Knorr to provide failure analysis reports for various "cracked discs." Exhibit 11 is a March 16, 2005 "Confidentiall" memorandum prepared by Faiveley Transport ("Faiveley") reporting on some of the results of the failure analysis requested by Mr. Oakes. Faiveley is a subcontractor of WABCO, which in turn is a subcontractor of Knorr.

Exhibits 11 and 12 both demonstrate that Mr. Oakes' inquiry was prompted by thermal cracks on the discs' friction plate surface. As the Inspector General and his experienced staff should know, friction plate cracks are completely unrelated to the spoke crack problem that caused the suspension of Acela service. As Mr. Weiderhold testified during his May 11, 2005 appearance before Congress, there is indeed "normal wear and tear on the friction surfaces". Resp. Ex. 67. Thus, friction plate surface cracks have long been known and expected by Amtrak maintenance personnel working on the Acela cars. Oakes Dec. ¶ 10. In fact, prior to April 14, 2005, Amtrak maintenance personnel used the term "cracked disc" to refer to friction surface cracks, rather than cracks anywhere else on the disc (*e.g.*, in the spokes). *Id.* The Knorr maintenance manuals – about which the Inspector General spoke at length during his Congressional testimony (Resp. Ex. 67 at 18-19, 126) – make it clear that friction surface cracks need not even be repaired so long as they remain within specified tolerances. The record contains similar Bombardier documents asking Knorr to examine friction surface cracks, none of which the Inspector General alleges to be suspicious or to implicate the spokes in any way.

Exhibit 12, on its face, is concerned with friction plate cracks:

- The Cracked Disc List makes no reference to any spoke cracks. Oakes Dec. ¶¶ 10, 14.

- Many of the entries on Exhibit 12 concern whether the cracks are within acceptable limits, a concept that applies to surface cracks – but not spoke cracks. *Id.* ¶ 13(a).

- Other Exhibit 12 cracked discs were from the power cars (the "Equipment Code" for the power cars always starts with a "2"), which do not have spokes. *Id.* at ¶ 13(b).

- Still other entries are described as "heat cracks" or "thermal cracks," *i.e.*, cracks generated by the friction of brake pads on the plate surface. *Id.* at ¶ 13(c). The brake pads do not rub against the spokes, hence these cannot be spoke cracks.

- The terms "incipient crack" and "penetrating cracks" are defined and used in the Acela maintenance and inspection manuals to refer only to cracks in the friction surface. *Id.* at ¶ 13(d).

For all these reasons, the Inspector General could easily have determined that nothing in Exhibit 12 refers to cracks in the spokes.

The fact that, insofar as Bombardier was concerned, the "Cracked Disc List" concerned friction plates, rather than spokes, is clear from the first three sentences of Petitioner's Exhibit 11, the March 16, 2005 memorandum discussing Faiveley's discovery of broken spokes:

"In the past the operator [the Consortium] raised some concerns about the crack development in the friction surface. Therefore [Knorr] was asked [by Bombardier] to examine and assess the crack development in the friction surface . . . The examination has shown that crack development in the friction surface was in permissible limits." (Pet. Ex. 11) (emphasis supplied).

It was only during Faiveley's independent "[f]urther examinations . . . to determine the general conditions of the disc" that it happened to discover the broken spokes. Pet. Ex. 12.[9]

There is no evidence that Faiveley (which, as WABCO's subcontractor, would report only to WABCO, which in turn would report only to Knorr), or anyone else, ever informed

---

[9] Mr. Weiderhold's memorandum states that on March 18, 2005, two days after the Faiveley memorandum, "four more disc brake rotors had been found to have cracked spokes" and that "these cracks were the subject of written communications between the vendors' [*i.e.*, sub-contractors'] personnel, and they made plans to travel to Washington, D.C. in April to inspect disc brake rotors on Acela trains at the NeCMSC facility, without informing Amtrak of the purpose of the visit." Pet. Mem. at 10. Even though the sub-subcontractors' March 16 memorandum was included in the Petition, their related March 18 "written communications" were not. Nor are these allegations supported by an affidavit. Mr. Weiderhold has refused to produce this document and has not responded to Respondents' request for a "principled" explanation of why the March 16, but not the March 18, document was produced. This suggests that the March 18 memorandum is inconsistent with the Inspector General's theory that Respondents were informed about the spoke cracks. Douglas Dec. ¶ 26.

Respondents of this discovery.[10] To the contrary, the Faiveley memorandum, which is dated less than a month before the April 14, 2005 suspension of Acela service, was itself marked "CONFIDENTIAL!" and on its face indicates that it was circulated only between Faiveley and WABCO. Pet. Ex. 11. None of Faiveley's "proposal[s] for short term actions" involve disclosure to Respondents.[11] In recent correspondence, moreover, the Inspector General's staff has conceded that "none of the Respondents, apparently were not [sic] parties to these [sub-subcontractor] communications". Resp. Ex. 59. It is not clear, therefore, why Mr. Weiderhold asserted – based on documents that on their face were circulated to neither Amtrak nor Respondents – that apparently "Amtrak was not informed", but Bombardier was. Pet. Mem. at 10-11.

Certainly, Mr. Weiderhold had no legitimate basis to represent to the Court that his Exhibits 11 and 12, along with the March 18, 2005 document he has refused to disclose, somehow "at least suggest Bombardier . . . had knowledge of and concern" about broken spokes. *Id.* Nor could he properly claim that Exhibit 12 was either not produced or deliberately hidden in a "disorganized" production. Respondents therefore ask that these incendiary and false allegations be retracted.

**B.     Failure to Produce "Suppliers Reliability Report"**

*1.     Erroneous Statements*

- Mr. Weiderhold's "review of Respondents' production" has not located copies of "[a]nother apparently pertinent document . . . the monthly

---

[10] Knorr responded to the Oakes memorandum (Pet. Ex. 12) with Failure Analysis Reports ("FARs") 14065, 14068, 14069, 15698, 15700, 15756, 15669, 15670 and 15699 regarding cracked monobloc discs. None of these responses concern cracked spokes.

[11] In order to put this issue to rest, we have included the declaration of Denis Oakes, the author of the Exhibit 12 request that prompted the sub-subcontractor inquiry discussed in Weiderhold Exhibit 11. Mr. Oakes confirms that (i) his memorandum (Pet. Ex. 12) concerned friction plate, not spoke, cracks and (ii) the discovery of cracked spokes referenced in Weiderhold Exhibit 11 was never communicated to Bombardier. Oakes Dec. ¶¶ 11-20; *see also* Labbé Dec. ¶ 11, 17-19.

'Suppliers Reliability Report' evidently maintained by Bombardier's 'Reliability, Availability, Maintainability, and Safety Group' ('RAMS') and that lists, by supplier, the 'relevant failures' of supplied parts (such as disc brake rotors), related Failure Analysis Reports, and other data." Pet. Mem. at 21.

- "A [subcontractor's] copy of the report for September 2003 is appended as Exhibit 26." *Id.* at 21 n.27.

- "Bombardier has not produced the documents, as they apparently exist – in a searchable, electronic format." *Id.*

### 2. *Reasons Correction Required*

If prior to accusing them of withholding another "highly pertinent, and readily identifiable" document (Pet. Mem. at 5), Mr. Weiderhold had adequately reviewed the production, or at least inquired of Respondents, he would have learned that his Exhibit 26 was in fact produced on July 28, 2005 within the Knorr correspondence file. Prod. Nos. BBD0062901-20. Many other Supplier Reliability Reports were produced at the same time.[12] Rather than being "highly pertinent", neither Petitioner's Exhibit 26 nor any of the other Supplier Reliability Reports has anything whatsoever to do with spoke cracks. Miclette Dec. ¶ 10.

### C.  Failure to Produce Brake Correspondence Log

#### 1. *Erroneous Statements*

- Among other "highly pertinent" missing documents, "Petitioner has not located . . . a correspondence log concerning open (and closed) issues related to the braking system." Pet. Mem. at 21-22.

- "[Knorr's copy of a] cover letter and the first three pages of a March 2000 list . . . of 'Braking System' correspondence relating to the Acela trains between Bombardier and Knorr Brake Corporation, are included as Exhibit 27." *Id.* at 22 n.28.

---

[12] *See, e.g.*, Prod. Nos. BBD0060771-81, BBD0061281-93, BBD0061141-56, BBD0062901-20, BBD0062860-76, BBD0062693-703, BBD0062646-663, BBD0062608-24, BBD0062560-78, BBD0062534-52, BBD0062510-26, BBD0062445-63, BBD0062387-402.

2.     *Reasons Correction Required*

Although the Inspector General, for once, correctly alleges that Respondents did not produce a particular document (Petitioner's Ex. 27), a simple inquiry to Respondents would have revealed that, for good reason, Exhibit 27 does not appear in Bombardier's files and, in any event, has no relevance to this investigation.

Petitioner's Exhibit 27 is a March 27, 2000 letter from Bombardier to Knorr enclosing an "open letters list" and requesting Knorr "feedback" regarding these open items. From the "identifier" numbers on the list, however, it is apparent that Exhibit 27 attached the wrong list. The "KB/BO" designation for each letter indicates that the list consists of open letters from Knorr to Bombardier. Obviously, in asking Knorr for feedback, Bombardier intended to include a list of Bombardier's, rather than Knorr's, open letters. Evidently, Knorr immediately brought this error to Bombardier's attention. On March 29, 2000, the day after Knorr received Exhibit 27, Bombardier sent Knorr a new letter with an attached list of open Bombardier, rather than Knorr, requests for information. Prod. Nos. BBD0059536-81. As a consequence, Knorr marked Exhibit 27 with the notation "Log closed. Ref. KB-2066."

Bombardier's March 29, 2000 letter, with the correct open items list, was produced as part of the Knorr correspondence file on July 28, 2005. Exhibit 27, the March 27, 2000 letter with the incorrect open items list, was not produced because it does not appear in Bombardier's Knorr correspondence file. Morin Dec. ¶ 3. Because the erroneous March 27 letter was almost immediately replaced by the March 29, 2000 letter, the former Exhibit 27 was presumably never included in the Knorr file.

Rather than "highly pertinent", there is nothing at all in Exhibit 27 – which was prepared nine months before the Acela began revenue service and refers to open items as far back as 1999 – that suggests that it had anything to do with broken spokes. Respondents' production

includes many other Knorr "open items" lists,[13] none of which are described by the Inspector General as "pertinent", much less "highly pertinent".

    Mr. Weiderhold's allegations regarding Exhibit 27 should therefore be withdrawn as baseless.

**D.    Failure to Produce Recent Inspection Records**

    *1.    Erroneous Statement*

- Respondents have "fail[ed] to provide more recent [*i.e.*, post March 2003]" daily and periodic inspection reports ("DIRs"). Pet. Mem. at 23.

    *2.    Reasons Correction Required*

    Mr. Weiderhold's staff never previously informed Respondents that OIG had been unable to locate the post-March 2003 DIRs. If they had inquired, Respondents would have informed them that in July 2005, NeCMSC produced all DIRs for the period April 2003 – May 2005. Prod. Nos. NEC0227487-0542348. These were delivered under cover of letters describing the production as containing "Daily Inspection Records" or "Inspection Records". Resp. Exs. 30, 32, 43. It is difficult to understand how the Inspector General's staff could have overlooked these 315,000 pages of Respondents' production.

**E.    "Disorganized" Older Inspection Records**

    *1.    Erroneous Statements*

- "Respondents have inflated their production with more than 225,000 document pages of disorganized NeCMSC inspection and maintenance records." Pet. Mem. at 5.

- "Respondents' production . . . of the daily inspection reports lacks any meaningful organization, notwithstanding that, apparently, the reports

---

[13] *E.g.*, Prod. Nos. BBD0050093, BBD0050222, BBD0050342, BBD0050506, BBD0050556, BBD0050639, BBD0050831, BBD0050916, BBD0051207, BBD0051461, BBD0051510, BBD0051603 ("Engineering Open Items list"); BBD0050251 ("Open Letter Status"); BBD0061109, BBD0061126, BBD0061132, BBD0061165, BBD0061177, BBD0061193, BBD0061203, BBD0061259, BBD0061265, BBD0061294 ("Outstanding F.A.Rs"); BBD083039, BBD083569, BBD083615, BBD084625, BBD084719, BBD084753 ("Open Item List").