- were <u>originally</u> filed, organized and stored by NeCMSC separately for each of the 20 Acela train sets, and within each train set, by date." *Id.* at 17.

- "These documents lack any apparent organization notwithstanding that, apparently, the documents were <u>originally</u> maintained in a separate drawer for each Acela train set, and then organized in each drawer by date." *Id.* at 23.

- "Respondents' claims test the limits of credulity – not to mention FRA requirements – with their implicit claim that their production of more than 600,000 pages of disorganized pre-April 2003 daily and periodic inspection and maintenance records for Acela trains is their most usable and organized collection of these important records." *Id.* at 23-24.

- "[T]he NeCMSC train inspection reports lack any apparent organization notwithstanding that the documents were <u>originally</u> organized." *Id.* at 26.

2.   ***Reasons Correction Required***

Respondents' documents were produced by two national law firms with extensive litigation experience and reputations for competence and integrity. Any allegation that these firms did anything so childish and unethical as deliberately "disorganizing" their clients' files should be made only after thorough investigation.[14] Prior to filing his Petition, however, the Inspector General <u>never</u> raised this issue with Respondents. Douglas Dec. ¶ 27(e). But no such inquiry was necessary in this instance: Mr. Weiderhold's claim that Respondents rearranged DIRs "that were originally organized" (Pet. Mem. at 26) is contradicted <u>by his own affiant</u>. John MacMichael of the Inspector General's staff swears that as of "the Spring 2003", NeCMSC's DIR recordkeeping had "severe deficiencies". Pet. Ex. 22 ¶ 4. According to Mr. MacMichael, by "late Spring 2004", NeCMSC had corrected these deficiencies and was maintaining DIRs "in

---

[14] It would be strange indeed for Respondents to have deliberately "disorganized" their DIR files. On May 18, 2005, Marc-André Raymond of Bombardier informed Mr. Weiderhold's staff that NeCMSC was then filing its DIRs by trainset and in date order. Douglas Dec. ¶ 8.

12

file cabinets" organized "by trainsets, and within each trainset folder by date order." *Id.* ¶ 5.[15] Mr. Weiderhold, therefore, should not be surprised that Respondents' production of DIR files from the period prior to the Spring of 2003 was "disorganized".

It was only after Mr. MacMichael's 2003 inspection that NeCMSC hired a "Document Control Coordinator" to file subsequent DIRs "by trainset and within each trainset folder, by date order". Hebert Dec. ¶ 2b; *see* Pet. Mem. at 12 n.21. As we have seen, these more recent and "organized" DIRs were produced to the Inspector General in July 2005. Resp. Exs. 30, 32, 43, 68. For unknown reasons, however, George Binns, the affiant who purports to substantiate the Inspector General's claim that during production, Respondents "disorganized" the DIR files, limited his review to "the period prior to March 2003" (Pet. Ex. 21 ¶ 5(a)), which, of course, is precisely the time when NeCMSC did not maintain "organized" DIR files. Hebert Dec. ¶ 2a.[16] Thus, contrary to Mr. Weiderhold's repeated claim, Respondents have produced all their DIR files as they were maintained in the ordinary course of their businesses.

Finally, even though only the pre-April 2003 DIRs – amounting to 225,000 pages of documents – were allegedly "disorganized" (*see* Pet. Mem. at 17, 20), Mr. Weiderhold repeatedly suggests that Respondents' <u>entire</u> production was deliberately disorganized:

- "[H]ighly pertinent documents [are] . . . not reasonably locatable among thousands of pages of frequently disorganized documents." Pet. Mem. at 5.

---

[15] At the time of Mr. MacMichael's 2004 inspection, the last several months' worth of DIRs were filed in twenty file drawers, one for each Trainset, a practice which continues today. When these drawers reach their full capacity, they are transferred into boxes and shipped to off-site storage. Hebert Dec. ¶ 2c. Mr. MacMichael could not reasonably have concluded that these twenty drawers contained <u>all</u> the hundreds of thousands of DIR pages generated since the inception of Acela service in 2000.

[16] Even though the Inspector General has yet to review NeCMSC's post-March 2003 DIRs, Respondents undertook to do so. Respondents discovered that in the course of our extensive effort to exclude non-responsive (*i.e.*, non-brake related) files from these DIRs, the original file structure/path name organization of the electronically maintained DIRs was somewhat disrupted. On October 12, 2005, Respondents re-produced these documents in their original order. Resp. Ex. 61.

13

- "Petitioner [has been] presented with more than 600,000 document pages to review that apparently lack even their original or existing organization". *Id.* at 22.

- "Respondents' production of more than 600,000 document pages....lacks organization". *Id.* at 38.

- Respondents' production of "more than 600,000 document pages ... is disorganized." Pet. ¶ 19.

This, of course, is untrue. There is no evidence in the Inspector General's brief that, other than the pre-April 2003 DIRs, any documents were "disorganized".

F.  **"Refusal" to Produce Any Emails or Electronic Documents**

    *1.*  *Erroneous Statements*

- "Respondents have refused to produce <u>any</u> e-mails or electronic documents." Pet. Mem. at 5.

- "Particularly because Respondents have failed to produce subpoenaed e-mail, Petitioner has been unable to review probably the least censored and most contemporaneous evidence of Respondents' pre-April 15, 2005 'notice' or 'knowledge' of cracks on Acela disc brake rotors." *Id.* at 10.

- "Respondents have refused to produce any e-mail and similar electronic documents." *Id.* at 15.

- "Respondents have failed to produce responsive e-mails, data bases, or other electronic documents and files maintained on their servers or in computers of their identified employees who were involved in the design, procurement, inspection or maintenance of brake disc rotors." *Id.* at 17.

- "No electronic records or e-mail were provided." Pet. ¶ 18.

- "Respondents have failed to produce e-mails, spreadsheets and other electronic documents." Pet. ¶ 21.

    *2.*  *Reasons Correction Required*

If the Inspector General's staff had exercised a modicum of care in reviewing the production to date, or at least had inquired of Respondents, they would have learned that these statements are also false. Even though Respondents' document production is still ongoing,

14

<u>hundreds of thousands</u> of pages of electronic documents and e-mails had been produced at the time the Petition was filed. Among these are: (i) 314,862 pages of inspection reports retrieved from the NeCMSC servers;[17] (ii) at least 700 pages of e-mails from the Knorr correspondence file;[18] and (iii) dozens of e-mail printouts from the individual paper files of Denis Oakes, one of Bombardier's brake specialists.[19] Since then, the review of Sylvain Labbé's paper and electronic files has been completed; his paper documents (including email printouts)[20] and the first batches of electronic documents have been produced.[21] The rest will follow on a rolling basis as processing is completed. Once Respondents complete their document production by the end of November 2005, Mr. Weiderhold will have also received all responsive e-mails and electronic documents maintained by Bombardier's other brake specialist, Denis Oakes. In the ordinary course of Bombardier's business, Messrs. Oakes and Labbé would receive all e-mails and other electronic documents concerning significant brake problems. Oakes Dec. ¶ 4; Labbé Dec. ¶ 4. Mr. Weiderhold's utterly false claim that he has not received "<u>any</u> e-mails or electronic documents" must therefore be withdrawn.

---

[17] Prod. Nos. NEC0227487-NEC0542348 (subsequently produced a second time as NEC0602714-NEC0917575).

[18] Prod. Nos. NEC0062367-NEC0063071 (BO/KB correspondence between June 20, 2003 and May 4, 2005).

[19] E.g., Prod. Nos.: BBD0105015; BBD0105038; BBD0105144; BBD0105168; BBD0105171; BBD0105179; BBD0105189; BBD0105202; BBD0105287; BBD0105291; BBD0105362; BBD0105364; BBD0105412; BBD0105418; BBD0105421; BBD0105445; BBD0105447; BBD0105456; BBD0105458; BBD0105461; BBD0105466; BBD0105481; BBD0105483; BBD0105485; BBD0105488; BBD0105492; BBD0105497; BBD0105499; BBD0105501; BBD0105502; BBD0105504; BBD0105506; BBD0105508; BBD0105509; BBD0105512; BBD0105516; BBD0105519; BBD0105524; BBD0105525; BBD0105527; BBD0105690; BBD0105937; BBD0105939; BBD0105151; BBD0106221; BBD0106222; BBD0106261; BBD0106264; BBD0106267; BBD0106299; BBD0106313; BBD0106347; BBD0106370; BBD0106380; BBD0106406; BBD0106410; BBD0106435; BBD0106450; BBD0106588; BBD0106839; BBD0106966; BBD0107007.

[20] Prod. Nos. BBD0147676-BBD0161621.

[21] Prod. Nos. BBD0166941-BBD0206884 (emails from Microsoft Outlook application); Prod. Nos. BBD0206885-BBD0234748 (Acela brake-related electronic documents other than emails).

15

G.  **Improperly Scanned Documents**

  1.  *Erroneous Statements*

- Mr. Weiderhold's investigation has been delayed because "[m]any document pages [produced by Respondents] have been scanned/copied as an individual document folder. In instances where a document is more than one page, it required that I open and close each page separately throughout multiple document folders to review the document in its entirety." Pet. Ex. 8 ¶ 11(a).

- "Nearly all of the documents that I reviewed that were on the CDs had each page scanned or copied into a separate document folder. Where a scanned document had multiple pages, there were an equal number of folders and it was necessary, in reviewing a multi-page document, to open each folder separately". Pet. Ex. 21 ¶ 5(b).

- "It was frequently unclear from the documents imaged the number of pages in the original document, whether the document contained an attachment and, if so, . . . the page length of the attachments." *Id.* ¶ 5(c).

- "Respondents ... have created a separate folder for each page image of a document." Pet. ¶ 20.

  2.  *Reasons Correction Required*

These allegations make it clear that the Inspector General, despite his staff of 88 and $12.5 million budget (Resp. Ex. 66 at 4), does not have, or at least is not using, <u>any</u> of the commonly available document management applications.[22] If Mr. Weiderhold had inquired of Respondents or, indeed, anyone with knowledge of electronic document production, he would have learned that Respondents employed a standard method of electronic production that when fed into any of a number of commercially available document review programs, would have permitted all documents to be opened and reviewed seamlessly.

Respondents have submitted the declarations of Dale M. Drury, Vice President of Alpha Systems, the document management vendor retained by NeCMSC to scan and produce its files

---

[22] In 2004, Mr. Weiderhold's Office of Investigations "hired outside consultants on an as-needed basis for a total of $160,500." Resp. Ex. 66 at 4.

16

and Christopher Hansen, Pillsbury Winthrop's Director of Litigation Support. Alpha Systems is one of the leading document production services in the United States. Mr. Hansen has years of experience in electronic document production. They have produced electronic documents to numerous federal agencies in precisely the same format as they did here. Messrs. Drury and Hansen testify that if the Inspector General's staff had used any of a number of available document management applications, such as JFS Litigators' Notebook or Concordance EX, each "document" rather than its individual pages, would have been clearly identified and there would have been no need to "open or close each page separately". This function would occur automatically once the images and the accompanying text files were loaded into the document management system. Drury Dec. ¶¶ 2-6; Hansen Dec. ¶ 3.

### H. "Inflated" and Non-Responsive Production

#### 1. *Erroneous Statements*

- Respondents' production is "frequently lacking any apparent responsiveness to the Subpoenas." Pet. Mem. at 5.

- "Respondents have inflated their production with more than 225,000 document pages of . . . NeCMSC inspection and maintenance records . . . that do not appear to be responsive." Pet. Mem. at 5-6.

- Respondents have produced documents "without, apparently, performing any review for responsiveness." *Id.* at 20.

- Respondents have "bloat[ed] their production with . . . records of daily and periodic train inspections, from 2000 until April 2003." *Id.* at 23.

- "Respondents' production of "more than 600,000 document pages ... contain[s] non-responsive documents." Pet. ¶ 19.

- "[N]either Bombardier nor Alstom has produced responsive documents." Pet. Mem. at 16.

- "Respondents have .. refus[ed] to make any responsive production under Subpoenas 05-17 or 05-18." *Id.* at 16-17 n.19.

17

### 2.    *Reasons Correction Required*

This claim was not disclosed to Respondents prior to the litigation (Douglas Dec. ¶ 27(h)), and even now, Mr. Weiderhold's 41-page brief and three supporting affidavits fail to identify a single "non-responsive" document. Thus, Respondents to this day have no clear idea what the Inspector General considers to be responsive or non-responsive. We have seen, for example, that Mr. Weiderhold finds "highly pertinent", and therefore presumably responsive, such innocuous documents as the March 2000 "open items list" (Pet. Ex. 27) and a September 2003 "Suppliers Reliability Report" (Pet. Ex. 26), neither of which have anything to do with his investigation. Pet. Mem. at 21-22 & n.28.

Mr. Weiderhold's staff, moreover, has been inconsistent regarding what should be produced. As we have seen, OIG staff agreed early on that Respondents could limit their production to the trailer car brakes. Broas Dec. ¶ 3.[23] On June 28, 2005, however, Mr. Weiderhold demanded that Respondents provide documents relating to all four Acela brake systems. Resp. Ex. 25.

The Inspector General, moreover, has never clarified any of his vague and extremely overbroad document requests. As a result, the subpoenas appear to call for every conceivable Acela-related document. By way of example only, Request No. 6 is not limited to brakes and thus would require the production of every service- or repair-related document: "All ... documents regarding service or repair information related to the Acela trains" (*E.g.*, Pet. Ex. 1). Nor are other requests limited even to brake problems generally. Request No. 4, for example, requires the production of "[a]ll engineering reports regarding the Acela brake system".

---

[23] There are three other brake systems on the Acela, none of which are implicated by the disc spoke cracks discovered on April 14, 2005. Oakes Dec. ¶ 8.

18

Mr. Weiderhold also suggests that NeCMSC inspection and maintenance records are not important to his investigation and Respondents supplied these documents merely to "inflate" their production. Pet. Mem. at 5-6. This claim is self-evidently absurd and directly contradicted by the Inspector General's own Petition. Obviously, any NeCMSC discovery of a broken spoke would in the first instance be noted in its inspection records. Labbé Dec. ¶¶ 8-10. And the absence of any such reference in NeCMSC records would be all but conclusive proof that the Amtrak employees who inspect Acela brakes did not inform NeCMSC of any broken disc spokes. This is why the Inspector General, in the same breath used to accuse Respondents of "inflating" their production with these documents, describes DIRs as "important records". Pet. Mem. at 23-24. Indeed, one of Mr. Weiderhold's affiants goes even further and swears that DIRs are "essential":

> "The DIRs are essential in that they are used to document compliance with federal railroad safety standards . . . Additionally, the DIRs are necessary to verify completion of required inspections and maintenance procedures that would be part of any post-accident investigation. . . . "

Pet. Ex. 22 ¶ 4.

Mr. Weiderhold's staff, moreover, has known from the outset that Respondents' initial production would include NeCMSC's DIRs and Corrective Work Orders ("CWOs"). Douglas Dec. ¶ 8; *see also* Resp. Ex. 21 (describing the accompanying first NeCMSC production); Resp. Ex. 29 at 2 (describing the NeCMSC productions to date and the next anticipated production). In order to satisfy the Inspector General's demands that "notice" documents, such as DIRs and CWOs, be produced on a highly expedited basis, Respondents informed his staff on June 28, 2005 that they would be soon producing these records without reviewing each of their hundreds of thousands of pages to determine whether any disclosed a broken spoke. Nevertheless, Respondents were never asked to forego or even delay this production. Douglas Dec. ¶ 9.

19

Mr. Weiderhold, however, now complains that Respondents have not isolated DIRs and CWOs involving spoke cracks. Pet. Mem. 23-24. As the accompanying declarations of Respondents' reliability and brake specialists and key engineering and customer service managers demonstrate, though, any spoke cracks discovered during NeCMSC inspection and maintenance of the Trainsets would have been brought to their attention. Behety Aff. ¶ 3; Labbé Dec. ¶ 4; Miclette Dec. ¶ 6; Oakes Dec. ¶ 4; Wochele Aff. ¶ 3. Nevertheless, Messrs. Behety, Labbé, Miclette, Oakes and Wochele all swear that prior to April 14, 2005, they were not informed of any such problem. We can only imagine the OIG staff's reaction if Respondents had declined to produce any DIRs or CWOs on the ground that none were known to involve cracked spokes.

In any event, the production of DIRs and CWOs was necessary to help prove the negative, namely, that those in a position to know had no prior warning of the cracked spokes problem discovered on April 14, 2005. Thus, given the breadth of the Subpoenas and the OIG's refusal to narrow them <u>in any way</u>, Respondents believe that their production is, in fact, responsive.

Contrary to Mr. Weiderhold's brief, Respondents have in fact performed a good faith and extensive review for responsiveness:

- Respondents have limited the production of relevant contracts to those concerning Knorr and ORX. Resp. Ex. 68;

- Respondents have reviewed NeCMSC's electronically maintained DIRs and by means of electronic searches have eliminated an estimated 35,000 pages of DIRs that do not relate to trailer car friction brakes. Resp. Ex. 61; Broas Dec. ¶¶ 8-9. This effort alone involved approximately 340 hours of professional time. Broas Dec. ¶ 8; Douglas Dec. ¶ 21;

- Similarly, detailed reviews were undertaken for specific categories of paper documents, such as NeCMSC's CWOs and Bombardier's modification notices.

Broas Dec. ¶¶ 5-7; Douglas Dec. ¶ 21;

- Respondents to date have produced only those files reasonably likely to contain documents involving brake problems, such as DIRs, CWOs, Knorr and ORX correspondence, Oakes' and Labbé's paper and electronic files, and the like. Douglas Dec. ¶ 8; Resp. Ex. 68;

- Respondents have inquired of their own reliability and brake specialists, as well as key engineering and customer service managers, who would be among the first to learn of any significant brake problem, whether any knew of cracked friction brake spokes prior to April 14, 2005. None of them knew of this problem prior to that time or could identify any documents showing that anyone else knew. Behety Aff. ¶¶ 3-4; Labbé Dec. ¶¶ 5-7, 11-19; Miclette Dec. ¶¶ 6-7; Oakes Dec. ¶¶ 5-7, 11-20; Wochele Aff. ¶¶ 3-4; and

- Respondents have produced Messrs. Oakes and Labbé's paper files. Resp. Exs. 54, 55. They have also reviewed, and have begun to produce, Mr. Labbé's electronic files. Resp. Exs. 63, 65. The apparent absence of any cracked spoke materials from those files tends to prove that Respondents did not have advance notice of this problem.

## I. Refusal to Produce Documents As Kept by Respondents

### 1. *Erroneous Statement*

- "Respondents have refused either to organize their production according to the requests . . . or to produce . . . records . . . as they were originally maintained and organized." Pet. Mem. at 6.

- "Respondents have not produced documents for inspection either 'as they have been kept in the usual course of business,' or organized the documents produced to correspond to the Subpoenas' specifications to which they are responsive." *Id.* at 18.

- "Respondents produced random copies of documents that are not consistent with Respondent's [*sic*] record-keeping systems." Pet. ¶ 18.

21

### 2. *Reasons Correction Required*

All of Respondents' files have been produced as "originally maintained and organized". Douglas Dec. ¶ 25; Broas Dec. ¶ 4.[24]

## J. "Willingness" to Narrow Production

### 1. *Erroneous Statements*

- Petitioner "expressed willingness to narrow . . . Respondents' search, review and retrieval obligations . . . to [the] most pertinent [documents]." Pet. Mem. at 13.

- Petitioner "expressed willingness . . . to defer or limit full retrieval, review and production of all documents responsive to the Subpoenas . . . in return for prompt, initial production of the most pertinent documents." *Id.* at 13.

- "To advance these goals, OIG counsel met with respondents' counsel three times, and has exchanged numerous letters." *Id.* at 14.

### 2. *Reasons Correction Required*

Mr. Weiderhold's staff has never made a single proposal either to narrow, clarify or lessen the burden of document production. Contrary to the Petition, Mr. Weiderhold's demand that Respondents first comb their files for and segregate "notice" records prior to production of all other subpoenaed records cannot fairly be described as "an expressed willingness to narrow . . . Respondents' search, review and retrieval obligations." Pet. Mem. at 13.

Nor did the Inspector General's staff meet with Respondents as part of an OIG effort to "simplify and expedite production." Pet. Mem. at 13. Each of those meetings was at Respondents' request and was part of their completely unsuccessful effort to get OIG to modify

---

[24] As we have previously noted, Respondents' effort to eliminate electronic files that did not relate to the brakes at issue in this investigation resulted in certain post-March 2003 inspection reports and corrective work orders being produced slightly out-of-order. On October 12, 2005, we corrected this error. Because the Inspector General has yet to review these files, the error did not hinder the investigation. Pet. Ex. 21 ¶ 5(a); Resp. Ex. 61.

22

or clarify even one of the subpoenas' demands.[25] Douglas Dec. ¶¶ 3, 5-7, 14-15, 18, 20-21. Indeed, when specifically asked by Respondents to identify even a single Inspector General offer to clarify a subpoena or ease production (Resp. Ex. 37 at 3), Mr. Weiderhold's staff failed to respond. *Compare* Resp. Ex. 37 at 3, Resp. Ex. 39 *with* Resp. Ex. 42 at 2.

For their part, Respondents have accommodated Mr. Weiderhold's request for aid in expediting his investigation. *First*, counsel agreed to accept service of the subpoenas on behalf of Respondents located abroad. Douglas Dec. ¶ 3.

*Second*, unlike other subpoena recipients, NeCMSC and Bombardier, after interviewing employees and surveying files both in the United States and Canada, provided detailed preliminary surveys of their files. Resp. Exs. 10, 12. These surveys were performed at the request of the Inspector General's staff to "aid in defining the proper scope of the subpoenas." (*Id.*) Even though these surveys were submitted at the very outset of his investigation, Mr. Weiderhold's staff never responded to Respondents' repeated requests that the parties use the surveys in order to clarify the subpoenas and reduce the burden of production. *Compare* Resp. Exs. 10, 12 & 13 *with* Resp. Exs. 11, 14 & 15. Indeed, Respondents' first indication that Mr. Weiderhold's staff had even read the surveys was the Petition itself. Pet. Mem. at 14.

*Third*, Respondents complied with the Inspector General's extremely broad request for expedited production of "1) contract documents that set out the rights and responsibilities of Respondents and their vendors and sub-contractors; and 2) ''notice records' – those documents and records which discuss or pertain to any information or notice with respect to deficiencies or problems with the Acela brakes.'" Pet. Mem. at 14-15, citing Pet. Ex. 15 at 2-3. On June 20,

---

[25] Although Mr. Weiderhold's staff agreed on June 2, 2005, to limit the subpoenas to trailer car brakes (there are a total of four brake systems on the Acela trainsets), the staff subsequently attempted to renege on this agreement. Broas Dec. ¶ 3; Resp. Ex. 25 at 2.

23

2005, NeCMSC, for example, agreed,

> "[i]n accordance with your request to review certain categories of documents on a priority basis . . . [to] produce the following categories of documents:
>
> 1. Contracts (Request No. 1)
> 2. Daily Maintenance Records
> 3. Corrective Work Orders".

Resp. Ex. 15 at 7.

*Fourth*, as we have seen, Respondents made a significant effort, involving approximately 340 hours of professional time, not to produce electronic files that were unrelated to the trailer car friction brakes at issue in this investigation. Broas Dec. ¶ 8; Douglas Dec. ¶ 21. The Inspector General's request, by the way, did not purport to require the production only of documents putting Respondents on notice of spoke cracks, it asked for any documents that "pertain to any information or notice with respect to deficiencies or problems with the Acela brakes." *E.g.*, Resp. Ex. 11; Resp. Ex. 14 at 2-3.

It was at this point that Mr. Weiderhold's office reneged on its prior agreement to limit the subpoenas to the trailer car friction brakes at issue in the investigation, insisted that all further communications occur in writing and declined Respondents' request for a meeting with Mr. Weiderhold. Douglas Dec. ¶ 20; Resp. Ex. 25.

II.

### THE PETITION'S MOOT AND SETTLEMENT-READY CLAIMS SHOULD BE WITHDRAWN

Respondents believe that a number of other issues raised in the Petition have been mooted or should be settled. These are described below.

A.  **Production of Responsive Records Will Be Completed Shortly**

Although Mr. Weiderhold neglected to inform the Court of this fact, his Petition was filed while Respondents were still reviewing and producing documents.[26] Since the Petition was filed, Respondents have continued to produce a variety of records. On September 30, 2005, for example, Bombardier produced additional records maintained by Bombardier's brake engineering department, customer service department, and reliability, availability and maintenance group.[27] On October 12, 2005, Respondents produced a second copy of the electronic DIRs. On October 13, 2005, Respondents provided additional emails retrieved from databases maintained by Mr. Labbé, one of Bombardier's and NeCMSC's brake specialists.[28] On October 18, Respondents produced additional files maintained by Mr. Labbé and by the NeCMSC purchasing department.[29]

Respondents are presently reviewing additional documents from the files of Respondents' brake specialists. These remaining files are likely to be produced prior to December 1, 2005. At that time, Respondents will have completed their production of all files that, in the ordinary course of Respondents' business, would contain any "notice" to Respondents of a significant brake problem:

- NeCMSC DIRs (2000-2005)        (produced June 24 and July 1, 5, and 22, 2005);

- NeCMSC Corrective Work Orders (2000-2005)    (produced July 1 and August 17, 2005);

---

[26] Ironically, Mr. Weiderhold admits that his staff has only "reviewed in part" Respondents' production. Pet. Mem. at 5; see also id. at 22 n.28 (alluding to "Petitioner's continuing review").

[27] Prod. Nos. BBD0147676-BBD0161621 (paper files maintained by Mr. Labbé); Prod. Nos. BBD0161622-BBD0161690 (customer service documents); Prod. Nos. BBD0161691-BBD0166940 (RAMS group documents).

[28] Prod. Nos. BBD0166941-BBD0206884 (emails from Mr. Labbé's Microsoft Outlook application).

[29] Prod. Nos. BBD0206885-BBD0234748; Prod. Nos. NEC0917576-NEC0917599.

25

| | |
|---|---|
| • Knorr Correspondence (1996-2005) | (produced July 28, 2005); |
| • ORX Correspondence (2000-2005) | (produced September 2, 2005); |
| • Oakes Files and Database (1992-2005) | (papers produced September 2, 2005; electronic documents to be produced); |
| • Labbé Files and Database (1996-2005) | (produced September 30 and October 13 2005; additional electronic documents to be produced); |
| • RAM Group Files | (produced September 30, 2005).[30] |

At that time, the Inspector General should be in a position to confirm for himself whether he has received a document production that is reasonably tailored to his investigative purposes. Until that occurs, further litigation would be premature.

**B.   No "Notice" Documents are Known to Exist**

In contrast to his pre-Petition demands (*e.g.*, Resp. Exs. 11, 14, 22, 25), which would have required that Respondents review every page of this huge production, Mr. Weiderhold now seems to ask that, "based on Respondents' superior knowledge, ability to interview knowledgeable personnel, and use of document organization systems," they identify documents providing notice of a problem with spokes on Acela brakes. Pet. Mem. at 20-21. Without waiver of their previously stated objections in this regard, Respondents are willing to disclose the results of a review they have been conducting along lines similar to those now demanded in the Inspector General's brief.[31] At considerable expense, Respondents have interviewed

---

[30] Mr. Weiderhold's requests for contracts and manuals were complied with by July 1, 2005 and August 17, 2005, respectively.

[31] Respondents continue to decline Mr. Weiderhold's prior request that they search every one of the almost 1,000,000 pages produced in response to the subpoenas and segregate any document providing <u>any</u> "notice" of each and every brake-related "deficiency" or "problem". *See* Pet. Ex. 15 at 2-3.

26