knowledgeable employees and are reviewing at length files and databases that, in the ordinary course of their businesses, would contain notice of significant brake problems. Among other witnesses, Respondents have interviewed Pierre Miclette, an engineer with Bombardier's Reliability, Availability, Maintainability, and Safety ("RAMS") group; Denis Oakes, Project Engineer for Bombardier; Sylvain Labbé, Senior Mechanical Designer for NeCMSC (also an employee of Bombardier); Norbert Behety, Engineering Manager for NeCMSC (also an employee of Alstom); and Chuck Wochele, Vice President of Business Development/Amtrak Customer Director for Alstom. They have searched Bombardier's Failure Reporting, Analysis, and Corrective Action System ("FRACAS"), Failure Analysis Report ("FAR") and SPEAR 2000 databases, the Knorr and ORX correspondence files and the electronic and paper files maintained by the above-referenced witnesses. As previously noted, documents from Mr. Oakes' files remain to be reviewed. These five witnesses are the persons with front-line responsibility for any significant brake problems and the results to date of these interviews and reviews are summarized in their declarations.

Prior to April 14, 2005, none of these witnesses knew of any broken or cracked spokes on Acela brake discs. Behety Aff. ¶ 4; Labbé Dec. ¶¶ 5-7, 11-19; Miclette Dec. ¶¶ 6, 11; Oakes Dec. ¶¶ 5-7, 11-20; Wochele Aff. ¶ 4. Nor have Respondents thus far been able to find any documents in the above-described files revealing a broken spoke problem.

This sworn evidence, reached after considerable investigation, should moot Mr. Weiderhold's demand for "notice documents". Indeed, once the Inspector General receives all the relevant DIRs, CWOs, FARs and the Knorr, ORX, Labbé and Oakes files (this will occur prior to December 1, 2005), he can determine independently that Respondents did not have "notice" of any serious problem with the Acela trailer car friction brakes. For these reasons, the

27

Inspector General should withdraw as moot, or at least premature, his allegations that Respondents have not produced "notice" documents.

C. **An Index to Subpoena Requests Has Been Provided**

As we have noted above, Respondents' productions have been accompanied by letters generally describing the materials being produced. For example, NeCMSC's July 1, 2005 production was accompanied by a cover letter describing the enclosed records as "Corrective Work Orders, contract documents and Daily Inspection Records". Resp. Ex. 30. On July 11, 2005, moreover, we informed you that all of the 520,000 documents produced by NeCMSC as of that date contain the two categories of records for which OIG has sought expedited production: "(1) contract documents and (2) 'notice records' – those documents or records which discuss or pertain to any information or notice with respect to deficiency [*sic*] or problems with the Acela brakes." Resp. Ex. 37 (quoting 6/16/05 Carriere letter at 2-3).

Because the Inspector General's staff nevertheless continues to ask Respondents to identify the subpoena requests applicable to these documents, Respondents are now willing to acquiesce in Mr. Weiderhold's previous request that they "[s]pecifically identify the subpoena portions to which each document <u>or generic category of documents</u> is responsive." Resp. Ex. 22 at 3; Resp. Ex. 24 at 2. Accordingly, Respondents' Exhibit 68 identifies the date of production, the production numbers, type of document and applicable subpoena requests for all categories of documents produced thus far in the investigation.[32]

The Inspector General's brief goes beyond the requests described above and demands that Respondents "cross-reference or index <u>each of the documents</u> produced to the numbered Subpoena request to which it is responsive." Pet. Mem. at 24. So far, such an exercise would

---

[32] Respondents reserve, and do not waive, their previous objections to these requests as vague, overbroad and overlapping. Resp. Exs. 15 & 18; Resp. Ex. 68 n.1.

28

require the close analysis of a million pages of documents. This would cost Respondents millions of dollars. Douglas Dec. ¶ 23.

The end result, moreover, would be of no practical use to Mr. Weiderhold's investigation. For example, Respondents' "indexing" of Pet. Ex. 12 would reveal that the document is responsive to Requests 4, 5, 6, 7, 8, 10 and 12, and according to the Weiderhold brief (pp. 11, 21), also to his vague request for "notice" documents. This would not distinguish this supposed "highly pertinent" document from tens of thousands of others. Indeed, as Respondents' Exhibit 68 demonstrates, the subpoenas requests are so vague and broad that almost any document is responsive to multiple requests. Clearly, then, the hugely expensive indexing exercise demanded by the Inspector General would, in the end, be utterly useless.

**D.**  **Reasonable Assistance Will Be Provided**

In the event the Petition is promptly withdrawn, Respondents, as part of a settlement of the issues raised in that pleading, are willing to provide the following assistance to the investigation:

- If the Inspector General continues to have difficulty locating a particular document or has reasonable questions regarding Respondents' production, Respondents will in good faith provide reasonable assistance to his staff.

- In the event Mr. Weiderhold's staff desires training in the use of document management programs, Respondents, at their own cost, will provide training for up to four of the Inspector General's staff members.

### III.

### RESPONDENTS' COUNTERCLAIMS SHOULD BE GRANTED

In the event that these issues are not resolved consensually, Respondents intend to cross-move for a protective order and to assert the following counterclaims, among others:

29

A.  **Brake Discs Should Be Released for Root Cause Analysis**

Shortly after April 14, 2005, Mr. Weiderhold's office seized a number of the cracked brake discs. Since then, Respondents have repeatedly sought access to a few of these discs for testing in connection with the root cause analysis being undertaken by Amtrak, the FRA, Respondents and their subcontractors. Despite repeated meetings and correspondence, Mr. Weiderhold has declined to provide any of the discs in his possession. That has delayed the root cause analysis. We ask these discs be provided without further delay. Absent agreement on this issue, we will seek relief in the pending case.

B.  **The Inspector General Must Reimburse Respondents' Costs**

From the outset of this investigation, Respondents have informed the Inspector General's staff that compliance with these broad and vaguely worded requests would be extremely burdensome. *E.g.*, Resp. Exs. 15, 18, 23. Nevertheless, as demonstrated above, Mr. Weiderhold has declined to clarify any of his requests and his staff has attempted to renege on the one agreement they made to limit production to documents relating to the trailer car friction brakes. Respondents have therefore informed Mr. Weiderhold's staff that they would seek compensation for their extraordinary efforts in producing, to date, almost one million pages of records on an expedited basis.

Respondents are legally entitled to compensation for this extraordinary effort. Pursuant to Rule 45, in analyzing whether to shift expenses to the party seeking discovery,

> the questions before the district court are whether the subpoena imposes expenses on the non-party, and whether those expenses are "significant." If they are, the court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder "non-significant." [Rule 45] is susceptible to no other interpretation.

*Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001). Although the Advisory Committee Notes state that Rule 45 does not apply to "subpoenas issued by administrative officers," Amtrak is not an administrative agency and the Amtrak Inspector General is thus not an administrative officer. As expressly stated in the House Report to the Inspector General Act Amendments of 1988, "the committee recognizes that it has taken may [*sic*] [many] years of litigation for the National Railroad Passenger Corporation (*i.e.*, AMTRAK) to establish that is should not be considered an agency of the United States. Including AMTRAK as a 'designated Federal entity' is not intended to overturn this result." H.R. No. 100-771, at 16 (1988). Given that Amtrak is not an administrative agency, the Amtrak Inspector General subpoenas are subject to FRCP 45. Respondents' compliance with the subpoenas has cost them approximately $1 million so far, a "significant" amount by any measure and one that "must" be paid to Respondents.

In the event Mr. Weiderhold does not voluntarily withdraw, or at least correct the false statements in the Petition, Respondents will seek, as one of several sanctions, their attorneys' fees in responding to the Petition. These will exceed $100,000. Douglas Dec. ¶ 29.

**C.  Mr. Weiderhold's Demands for Additional Electronic Searches Should be Withdrawn**

The Petition complains that we have not agreed to use all 20 of OIG's proposed search terms. (Pet. Mem. at 19). As Respondents have previously noted, however, we have already produced all NeCMSC DIRs from 2000-2005, all NeCMSC corrective work orders in that period and the Knorr and ORX correspondence files for the period January 1, 1994 through April 2005. In addition, Respondents will shortly complete review and production of the paper and electronic files of Sylvan Labbé and Denis Oakes, their two brake specialists. Indeed, as we have noted, Messrs. Labbé and Oakes do not believe that such a review will produce any document putting

31

them on notice of a problem with cracked spokes on friction brake discs. *See* Labbé Dec. ¶¶ 4-7, 11-19; Oakes Dec. ¶¶ 4-20.

For this reason, Respondents do not believe that a search-term based inquiry of all of Respondents' databases would lead to the discovery of responsive documents that have not already been produced. Nevertheless, prior to Mr. Weiderhold's filing of the Petition, Bombardier and NeCMSC initiated a search of databases that might contain responsive documents. (Alstom has expressed its desire to await agreement on search terms prior to running any search.) As the declaration of Christopher Hansen demonstrates, use of the search terms insisted on by your office would produce between 41 and 58 million pages of "documents containing one or more of these words" from NeCMSC and Bombardier alone. Hansen Dec. ¶ 5.

Even if, contrary to your instructions, Respondents added search terms designed to limit responsive documents to the Acela project, Respondents would have to review between 21 and 27 million pages of documents, just from NeCMSC and Bombardier. Hansen Dec. ¶ 8.

Assuming that a review of 27 million pages of documents simply for responsiveness and privilege purposes would require 30 seconds a page (excluding any subsequent quality control reviews), at a blended hourly rate of $300, such a review would cost Respondents at least $67 million. Assuming that forty lawyers devoted 10 hours a day, five days a week, 52 weeks a year, to this review, the production of these electronic records would take no less than 2 years. Douglas Dec. ¶ 22.

Because this gigantic search has little or no likelihood of producing records that have not already been produced, Respondents ask that Mr. Weiderhold voluntarily withdraw this self-evidently frivolous demand. Respondents will seek appropriate relief if Mr. Weiderhold persists in his demand that this search be conducted.

32

### D. The Inspector General Should Recuse Himself

For the reasons set forth below, Mr. Weiderhold appears to have lost the objectivity and independence required under the Inspector General Act of 1978. 5 U.S.C. Appendix § 1, *et seq.* He should therefore recuse himself and transfer authority to Kenneth Mead, the Inspector General of the United States Department of Transportation. Mr. Mead appears to have sufficient authority to complete this investigation. See Resp. Ex. 66 at 11-12. If not, Mr. Laney and the Amtrak Board of Directors should cede that authority to Inspector General Mead.

Mr. Weiderhold has testified before Congress that he is charged with responsibility for, and in fact is, investigating the role of both Amtrak and its contractors in the loss of Acela service:

> OIG is concentrating on the entirety of the root causes for the failures.... For example, did the disc fail because it is defective...? Are the [Amtrak infrastructure] loads and forces acting on the disc greater than [Amtrak] specified? ... In our analysis, we want to know whether [Amtrak's] specifications for the brake discs are appropriate.... Were the [Amtrak] specifications reviewed and approved by the right persons?

Ex. 67 at 123-24. Even the Inspector General's brief acknowledges that his investigation should concern whether "Amtrak knew, or should have known, of the disc brake spoke cracks or their potential occurrence" and "whether Amtrak should modify its procedures and operations." Pet. Mem. at 4.

Nevertheless, none of the subpoenas served on Respondents seek any documents regarding the role of Amtrak infrastructure "loads and forces acting on the disc", the appropriateness of Amtrak specifications or even whether Amtrak had prior notice of disc cracks. Nor has Mr. Weiderhold's staff has betrayed any interest in the fact that loads experienced by axles on the Northeast Corridor in fact exceed Amtrak specifications or that Amtrak, over the objections of high-speed experts, insisted that the Acela brake discs be of monobloc design.

33

Instead, the Inspector General's brief goes out of its way to exonerate Amtrak, and Mr. Weiderhold's staff seems to be using his investigative powers to aid Amtrak in its commercial dispute with Respondents. As we have seen, Mr. Weiderhold filed a Petition rife with false allegations against Respondents without providing them with any opportunity to be heard. At the same time, the Inspector General's brief gratuitously exculpated Amtrak, even though he has admittedly conducted only "a preliminary review" of the evidence. Pet. Mem. at 10. Mr. Weiderhold suggests, without any evidence, that subcontractors informed Respondents of the spoke cracks referenced in Pet. Ex. 11, but volunteers that they did so "without informing Amtrak" and, more generally, that "Amtrak was not informed that cracked spokes had been discovered on Acela disc brake rotors." *Compare* Pet. Mem. at 10 *with id.* at 11.

Indeed, from the beginning of the investigation it appeared that the Inspector General was carrying Amtrak's water in its contractual dispute with Respondents. As Respondents informed Mr. Weiderhold's staff on June 8, 2005, an OIG investigator asked a witness whether Respondents knew of the broken spokes problem at the time they executed the March 16, 2004 Settlement Agreement of the prior litigation between Amtrak and Respondents, *Bombardier Corporation v. National Railroad Passenger Corporation*, No. 01-2335 (D.D.C.). Douglas Dec. ¶ 17. The obvious import of this question was that OIG was looking for a way to help Amtrak reopen a commercial settlement with Respondents that has been criticized in Congress.

The Inspector General, moreover, has rejected Respondents' requests that, consistent with the Inspector General Act, his staff not disclose information obtained from Respondents to Amtrak officials involved in the commercial dispute with Respondents. Resp. Ex. 13. From Mr. Weiderhold's refusal to do so (Resp. Ex. 14), Respondents can only conclude that he and his staff have in fact shared information and coordinated investigative and commercial dispute

strategy with Amtrak personnel involved in the commercial dispute with Respondents, including Amtrak's Office of General Counsel ("OGC"). The Inspector General himself, however, has acknowledged "the need to be independent of the Amtrak OGC." Resp. Ex. 66 at 19. Nevertheless, Amtrak officials have on occasion made statements that could only have been based on information obtained from Mr. Weiderhold or his staff.

For all these reasons, Mr. Weiderhold should recuse himself and turn the investigation over to Inspector General Mead.

## CONCLUSION

Respondents respectfully request that (i) Inspector General Weiderhold promptly withdraw the Petition and recuse himself from the pending investigation; (ii) that David M. Laney, Esq. direct a hearing into the issues raised by the Petition and this Memorandum; and (iii) the Inspector General placed in charge of this investigation provide the relief and agree to the limits on Respondents' production requested herein.

Dated: October 20, 2005

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: _/s/ Phil Douglas (RP)_
Philip Le B. Douglas
Attorneys for Bombardier, Inc. and Northeast Corridor Maintenance Services Company
1540 Broadway
New York, New York 10036-4039
(212) 858-1000

Of counsel:

Eric Fishman, Esq.
Laura L. Smith, Esq.

WINSTON & STRAWN LLP

By: _/s/ Timothy Broas (FCP)_
Timothy M. Broas
Attorneys for Alstom Transportation, Inc. and Northeast Corridor Maintenance Services Company
1700 K Street, N.W.
Washington, D.C. 20036-3817
(202) 282-5000

Of counsel:

Franklin Parker, Esq.

DECLARATIONS

BEFORE FRED E. WEIDERHOLD, JR.
INSPECTOR GENERAL, NATIONAL
RAILROAD PASSENGER CORPORATION

---

IN RE AMTRAK OIG SUBPOENAS
TO ALSTOM, BOMBARDIER
AND NECMSC

Confidential Investigative
and Settlement Communication
Disclosure Restricted to
Head of Designated Federal Entity
Pursuant to 5 U.S.C. App. 3 § 8G(d)

---

## RESPONDENTS' DECLARATIONS AND AFFIDAVITS IN SUPPORT OF REQUEST FOR A HEARING

PILLSBURY WINTHROP SHAW PITTMAN LLP
Attorneys for Bombardier Inc.
1540 Broadway
New York, New York 10036-4039
(212) 858-1000

WINSTON & STRAWN LLP
Attorneys for Alstom Transportation, Inc.
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000

October 20, 2005

Behety

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR., AS INSPECTOR GENERAL, NATIONAL RAILROAD PASSENGER CORPORATION<br><br>Petitioner<br><br>v.<br><br>BOMBARDIER, INC.<br><br>ALSTOM TRANSPORTATION, INC.<br><br>NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY<br><br>Respondents. | Misc. Civil No.<br><br>**AFFIDAVIT OF NORBERT BEHETY** |

NORBERT BEHETY, being first duly sworn, deposes and says:

1. I am over the age of 18 and believe in the obligation of an oath.

2. I am the Engineering Manager for Northeast Corridor Maintenance Services Company ("NeCMSC") and am also an employee of Alstom Transportation, Inc. ("Alstom"). I have been employed by Alstom since 1982, and have been with NeCMSC since July 2004. I have been involved with the Acela project since July 2004.

3. As NeCMSC Engineering Manager I am responsible for the operational reliability of the Acela trains. I am responsible for identifying any potential problems and reporting them

to Bombardier and Alstom if it is not in my hands to solve them. Accordingly, I would have been notified of any issues relating to defective, cracked or broken friction brake disc spokes.

4. Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes ("Spoke Issues") on the Acela trains.

5. This concludes my affidavit.

Norbert Behety

Subscribed and sworn to before me this
17th day of October, 2005

Notary Public
My Commission Expires:

VALERIE T. BEVERLY
Notary Public District of Columbia
My Commission Expires April 14, 2007