Broas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,
   AS INSPECTOR GENERAL,
NATIONAL RAILROAD PASSENGER
CORPORATION

            Petitioner

            v.

BOMBARDIER, INC.

ALSTOM TRANSPORTATION, INC.

NORTHEAST CORRIDOR MAINTENANCE
   SERVICES COMPANY

           Respondents.

Misc. Civil No. 1:05-mc-00367-PLF

**DECLARATION OF
TIMOTHY M. BROAS**

I, TIMOTHY M. BROAS, pursuant to 28 U.S.C. § 1746, declare that:

1. I am a member of Winston & Strawn LLP ("Winston & Strawn"), counsel for Respondent Alstom Transportation, Inc. ("Alstom"), including its interests in Respondent Northeast Corridor Maintenance Services Company ("NeCMSC"). I make this declaration in support of Alstom's, Bombardier Inc.'s ("Bombardier") and NeCMSC's (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

2. I am fully familiar with the matters underlying this application as a result of my supervision of Alstom's production and the Alstom portion of the NeCMSC production in

response to the subpoenas served by Amtrak's Office of Inspector General (the "OIG"). Unless otherwise noted, I make this declaration on personal knowledge.

**Meeting With OIG**

3. On June 2, 2005, my client Dana Wordes – Associate General Counsel, Alstom Transportation Inc. – and I attended a meeting with OIG staff. At that meeting, at Alstom's request, Mr. Weiderhold's staff agreed to limit the scope of the subpoenas to the friction brakes on the trailer cars. This agreement made sense, because the other three brake systems on the Acela trainsets do not contain discs with spokes.

**Production of Responsive Documents**

4. NeCMSC and Alstom have attempted to produce all responsive files in substantially the manner as they were "originally maintained and organized".

5. For specific categories of documents where either (i) the relatively small volume of documents or (ii) the manner in which they were maintained made it feasible to weed out non-responsive documents, we have undertaken to do so.

6. While it was not feasible, consistent with OIG's demand for expedited production of "notice" documents, to review over 90 boxes of paper-based Daily Inspection Reports for non-responsive documents, we undertook to exclude non-responsive documents from two key categories of NeCMSC documents: the Corrective Work Orders and the scanned Daily Inspection Reports.

7. Winston & Strawn attorneys and paralegals spent approximately 178 hours, at an approximate cost of $26,980, reviewing 9 boxes of Corrective Work Orders to exclude non-responsive documents.

8. Winston & Strawn attorneys, paralegals, and technical support staff spent approximately 269 hours, at an approximate cost of $43,705, reviewing the various categories of inspection reports maintained on the NeCMSC servers and considering possible path name or file name searches to exclude documents that were clearly non-responsive.

9. These documents were too voluminous to review individually on an expedited basis, and approximately 90% of these electronic documents were not text-searchable. For the text-searchable documents, we conducted a keyword search and document-by-document review for responsiveness. For the remaining documents, we nonetheless used file name searches to make sure we (i) produced categories of documents that might contain "notice" of problems with the friction brakes on the trailer cars, such as Arrow Reports and Daily Inspection Reports, and (ii) excluded non-responsive documents, such as cleaning audits.

10. For its part, Alstom has produced over 25,000 documents responsive to every single request. With the exception of the electronic data, Alstom's production is complete.

11. On behalf of NeCMSC, Alstom has conducted a search of the electronic data retrieved from the five laptops and one desktop computer of three Alstom employees at NeCMSC, using the 15 search terms proposed by Respondents, plus the additional 20 search terms proposed by the OIG. This search resulted in 35,353 documents that mention one or more of the terms, of which 22,098 of these documents are unique. Alstom has not yet undertaken a search of its electronic data because the OIG's proposed search terms are patently overbroad and unreasonable. Without further refinement, the OIG's search terms have no discernable relation to the spokes, or even brake systems or the Acela project itself. (For instance, a search term such as "fail" could conceivably relate to <u>any</u> system on <u>any</u> project.) The OIG has refused even to

3

discuss this issue with us. Alstom does not wish to, and I believe is not required to, go through the pointless exercise of searching its network files and hard drives for 35 terms that are not in any way limited to the issues that the OIG is purportedly investigating. Based on our experience with our search of the electronic data retrieved from the laptops of Alstom employees at NeCMSC, we expect that a similar search of Alstom's network files and hard drives would yield significantly larger results.

12. All told, Winston & Strawn attorneys, paralegals and technical support staff have thus far spent approximately 570 hours, at an approximate cost of $114,000, reviewing and preparing documents for production on behalf of NeCMSC and Alstom.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 18, 2005 in Washington, D.C.

_____
Timothy M. Broas

DeMarco

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR.,<br>AS INSPECTOR GENERAL,<br>NATIONAL RAILROAD PASSENGER<br>CORPORATION<br><br>Petitioner<br><br>v.<br><br>BOMBARDIER, INC.<br><br>ALSTOM TRANSPORTATION, INC.<br><br>NORTHEAST CORRIDOR MAINTENANCE<br>SERVICES COMPANY<br><br>Respondents. | Misc. Civil No. 1:05-mc-00367-PLF<br><br>**DECLARATION OF**<br>**MARIA DeMARCO** |

I, MARIA DeMARCO, pursuant to 28 U.S.C. § 1746, declare that:

1. I am the Management Information Services Project Leader at Northeast Corridor Maintenance Services Company ("NeCMSC"). I make this declaration in support of Alstom Transportation, Inc.'s, Bombardier, Inc.'s and NeCMSC's Response to the Petition of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation. Unless otherwise noted, this declaration is based on personal knowledge.

2. NeCMSC maintains a database known as "SPEAR 2000", which stores information contained in certain Corrective Work Orders ("CWOs").

3. Each CWO record in SPEAR 2000 is given a descriptive title (in all-capital letters) identifying the problem or issue that may require corrective action, so that the record can be retrieved by other users using a simple keyword search.

4. On October 14, 2005, I searched the CWO titles in the SPEAR 2000 database for the word "SPOKE". Although there were multiple hits on or after April 14, 2005, there were no hits prior to that date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 19, 2005 in Washington, District of Columbia.

Maria DeMarco

Douglas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR., <br>    AS INSPECTOR GENERAL, <br>    NATIONAL RAILROAD PASSENGER <br>    CORPORATION <br><br>               Petitioner <br><br>               v. <br><br> BOMBARDIER, INC. <br><br> ALSTOM TRANSPORTATION, INC. <br><br> NORTHEAST CORRIDOR MAINTENANCE <br>    SERVICES COMPANY <br><br>              Respondents. | Misc. Civil No. 1:05-mc-00367-PLF <br><br> **DECLARATION OF** <br> **PHILIP Le B. DOUGLAS** |

I, PHILIP Le B. DOUGLAS, pursuant to 28 U.S.C. § 1746, declare that:

1.  I am a member of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury Winthrop"), counsel for Respondent Bombardier Inc. ("Bombardier"), including its interests in Respondent Northeast Corridor Maintenance Services Company ("NeCMSC"). I make this declaration in support of Alstom Transportation, Inc.'s ("Alstom"), Bombardier's and NeCMSC's (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak"). Unless otherwise noted, I make this declaration on personal knowledge.[1]

---

[1] The declarations and exhibits that accompany this declaration will be cited respectively as "[Name] Dec." and "Resp. Ex. __". All emphasis herein is my own.

**Exhibit Authentication**

2.  Fair and accurate copies of the following documents appear in the separately bound volume of Respondents' Exhibits that accompanies this declaration:

   a.  The seven Inspector General subpoenas directed to Respondents. (Exhibits 1-7).

   b.  All subpoena-related correspondence to date between Respondents and Amtrak's Office of Inspector General (the "OIG") in chronological order. (Exhibits 8-65).

   c.  U.S. Government Accountability Office Report No. GAO-05-306R, "Activities of the Amtrak IG". (Exhibit 66).

   d.  *Getting Acela Back on Track: Hearing Before the Subcomm. on Transportation and Infrastructure*, 109th Cong. 17 (2005). (Exhibit 67).

   e.  A chart showing, for each category of documents produced by Bombardier and NeCMSC, the date of production, production numbers, a description of the files, and a reference to apparently applicable subpoena requests. (Exhibit 68).

**May 18, 2005 OIG Meeting**

3.  In early May 2005, it came to my attention that one or more OIG subpoenas apparently directed to Bombardier may have been misdirected. Bombardier, which has a number of affiliates in the United States, is itself based in the Province of Quebec in Canada. Upon information and belief, Marc-André Raymond of Bombardier twice called the office of OIG's Chief Inspector, John E. Grimes, in order to offer to accept service of the subpoena. Because

2

those calls were not returned, I telephoned Colin Carriere, Esq., counsel to the Inspector General, on May 12, 2005. I informed Mr. Carriere that I would accept service on Bombardier's behalf and asked that he meet with me and Mr. Raymond to discuss the subpoena. As a result of that call, Mr. Carriere faxed me a copy of the subpoena (*see* Resp. Ex. 1) and agreed to meet with us on May 18, 2005 at the Inspector General's Washington, D.C. offices.

4. On May 18, 2005, Laura Smith, another lawyer in Pillsbury Winthrop's New York office, Mr. Raymond with Bombardier in St. Bruno, Quebec and I traveled to Washington, D.C. to meet with Mr. Carriere, David Sadoff, Esq., Associate Counsel to the Inspector General, and Supervisory Special Agent Renee Jackson-Dixon, all of whom were representing the Inspector General. Mr. Weiderhold joined us during the latter half of the meeting.

5. During the meeting, I said that the exhaustive production sought by the subpoenas could overwhelm both Bombardier and OIG with great quantities of irrelevant documents extending as far back as 1994. We agreed with Messrs. Carriere and Sadoff, therefore, that Bombardier would inventory its facilities and provide OIG with a preliminary "lay-of-the-land" survey of possibly responsive files. The purpose of this exercise was to provide the Inspector General's Office with information that would help it discuss with Respondents which files were truly needed and the order in which they should be produced. Noting that the subpoenas were very broad and at times unclear, I asked that, after OIG had reviewed the records survey, the parties meet again to discuss ways to clarify and narrow the subpoenas.

6. From the outset of the meeting, Messrs. Carriere and Sadoff demanded that Bombardier and NeCMSC search all potentially responsive files for <u>any</u> document indicating that Bombardier and NeCMSC might have been on "notice" of <u>any</u> Acela brake problem. Upon

3

information and belief, the Acela trains have four separate brake systems, only one of which was implicated by the disc spoke cracks discovered on April 14, 2005. In subsequent correspondence, OIG repeated its demand that Respondents search for and segregate " 'notice records', *i.e.* those documents and records which discuss or pertain to <u>any</u> information or notice with respect to [<u>any</u>] deficiencies or [<u>any</u>] problems with [<u>any</u>] Acela brakes". *E.g.*, Resp. Exs. 9, 14.

7. During the May 18 meeting, I responded in substance that this demand would require a huge effort over many months and could require Bombardier and NeCMSC to disclose privileged attorney-client and work product information. When Mr. Carriere or Mr. Sadoff asked that Respondents waive their privileges, I responded that this could prejudice Respondents in any litigation with subcontractors. In response to OIG's suggestion that the parties enter into a non-waiver agreement, I responded that such an agreement might not be binding on third parties. Nevertheless, throughout the meeting, Messrs. Carriere and Sadoff remained adamant that Respondents search all their files, segregate and produce any and all documents containing <u>any</u> information of <u>any</u> brake "problem". Indeed, the Inspector General's representatives showed little interest in any other topic. I was clear at the time that such a request was unacceptable to my clients. I did state, however, that my clients expected, without waiving any of their rights, to make a presentation to OIG regarding issues relevant to the investigation.

8. Mr. Raymond and I provided preliminary information about categories of documents that would likely be produced in response to the subpoenas, including the expected volume of information (hundreds of thousands of pages) and (to the extent then known to us) the organization of responsive Bombardier and NeCMSC files. In particular, we alerted OIG to our

4

intent to first produce (i) periodic inspection reports ("DIRs") generated at NeCMSC facilities and (ii) the Corrective Work Orders ("CWOs") resulting from those DIRs. I believed at the time, and continue to believe to this day, that these DIRs and CWOs would be the first and most likely places that any NeCMSC discovery of a brake problem would be recorded. We informed OIG that there were at least 200 boxes of such records in off-site storage. Mr. Raymond specifically told Mr. Weiderhold's staff that the DIRs are currently organized by trainset and date of inspection, not by system or component of the trainset, and that there is no practical way to segregate the brake information from all other DIR records. In fact, one of the many forms filled out for each trainset during its daily inspection is the "Preventive Maintenance Work Order," which has several items pertaining to the condition of the brakes, interspersed with items pertaining to all other trainset systems.

9. The Inspector General's staff has known from the outset, therefore, that Respondents would first produce NeCMSC's DIRs and CWOs, and that these records would be voluminous. Nevertheless, Respondents were never asked to forego or even delay this production.

10. At one point in the meeting, I asked OIG to identify any search terms it wanted Respondents to use in retrieving possibly responsive records from their voluminous electronic files.

11. During the meeting, I also urged OIG to provide Bombardier and NeCMSC with an opportunity to address any investigative concerns that might arise during the course of OIG's investigation. I asked that my clients be given the opportunity to respond before any OIG conclusions were made public.

5

12. This declaration does not provide a complete summary of the May 18, 2005 meeting. Respondents' letters addressing that meeting accurately describe other aspects of that discussion.

**"Lay-of-the-Land" Document Surveys**

13. Shortly after the May 18, 2005 meeting, Pillsbury Winthrop lawyers and paralegals traveled to Montreal, Quebec, and Washington, D.C., to conduct initial interviews and to identify potentially responsive Bombardier and NeCMSC files. Upon information and belief, these initial surveys encompassed (to the extent applicable in each geographical location) the following business areas: Supply Management; Business Services; Reliability, Availability, Maintainability, and Safety ("RAMS"); Technical Documentation; Engineering Systems; Customer Service; Quality Assurance; and Information Technology. At least twenty witnesses were interviewed during this initial survey. Pillsbury Winthrop attorneys and paralegals dedicated at least 70 hours to this initial survey process, excluding travel time.

14. This work resulted in two "lay-of-the-land" memoranda sent by Bombardier and NeCMSC to the Office of the Inspector General on May 31, 2005 and June 7, 2005, respectively. Resp. Exs. 10 & 12. These memoranda stated that "[t]his initial assessment should aid in defining the proper scope" of the subpoenas served on Bombardier and NeCMSC. Thereafter, Respondents asked that OIG meet to discuss ways of narrowing and clarifying the subpoenas. Resp. Ex. 13 at 6; Resp. Ex. 23 at 2. The OIG ignored these requests and no such meeting ever occurred.