May. 27. 2005 12:55PM                                              No. 4444   P. 3

Page 2 of 2.

Thank you for your prompt attention to this matter.

Sincerely,

*[signature]*

Colin C. Carriere
Counsel to the Inspector General
(202) 906-4355

cc: Fred Weiderhold
    David Sadoff, Esquire
    Renee Jackson-Dixon

## CONFIDENTIALITY AGREEMENT

In recognition of the request of the XXXXXXXX (XXXXXXXX) to protect certain of its documents and records, which XXXXXXXX deems proprietary or trade secrets, the National Railroad Passenger Corporation Office of Inspector General (Amtrak OIG), and XXXXXXXX, through their duly authorized representatives hereby enter into the following agreement. The general purpose of this agreement is to protect from disclosure to third parties or competitors proprietary documents and records which XXXXXXXX will produce to the Amtrak OIG in response to its subpoena. The parties hereby further agree as follows:

1. XXXXXXXX will identify by marking or specifically designating as "PROPRIETARY" or "TRADE SECRET" those documents which it deems could reasonably be expected to cause substantial competitive harm. This marking or designation shall take place within twenty (20) days of XXXXXXXX's provision of records to Amtrak OIG. Documents which are not so marked or designated within the 20-day period, will not be considered proprietary. Within the 20 day period Amtrak OIG will treat as proprietary under this paragraph all documents and records which XXXXXXXX provides to the Amtrak OIG.

2. The documents or records, or copies thereof, shall not be provided to XXXXXXXX's competitors or third parties unless the conditions in Section four (4) of this Agreement have been satisfied. "Third parties" for purposes of this Agreement shall not include judicial bodies, legal counsel for the parties, Amtrak management, federal authorities, or consultants, persons or entities which the OIG designates to resolve issues in connection with the OIG's analysis, investigation or audit.

3. Amtrak OIG may provide the records to experts or consultants of its choosing. Should Amtrak OIG provide the documents to any experts, consultants, or Amtrak management, Amtrak OIG agrees that any such experts, consultants, or Amtrak management will be advised of the existence of this Confidentiality Agreement and shall be instructed that they are not to disseminate or divulge any information obtained from the aforesaid documents to any person other than the parties or counsel to the parties. Those persons shall sign a copy of this agreement as evidence of being bound by its terms.

Page 2 of 3.
*Confidentiality Agreement*

     4.    In the event that any of the records or documents, which XXXXXXXX has identified as proprietary, is requested pursuant to a Freedom of Information Act (FOIA) request, the Amtrak OIG shall exercise the following procedure. Amtrak OIG will provide written notice to XXXXXXXX of the request for records from the FOIA requester. XXXXXXXX shall be allowed ten (10) calendar days from the receipt of notification in which to object in writing to the request and to state all grounds upon which disclosure is opposed. Amtrak OIG will not release the records under the FOIA request during this ten (10) day period. If Amtrak OIG does not receive a written response from the XXXXXXXX within the ten-day period, Amtrak OIG in its discretion may release the records to the requester. In the event that after receipt of XXXXXXXX's written response Amtrak determines that the records are releasable, it shall notify XXXXXXXX in writing of its decision to release such records and a specific disclosure date. XXXXXXXX shall have the right to challenge the proposed release in a court of competent jurisdiction within ten (10) calendar days of receipt of such written notice by Amtrak OIG, with written notification to Amtrak OIG of its lawsuit. Amtrak OIG will withhold from release any challenged documents until the court's resolution of the issue. Nothing in this provision shall be in derogation of XXXXXXXX's right to seek judicial relief with regards to a FOIA request at any time prior to the time periods identified above in this paragraph.

     5.    This Confidentiality Agreement does not waive, alter, amend, derogate, decrease, or affect any of the terms, conditions or provisions of any contract or agreement between the National Railroad Passenger Corporation and XXXXXXXX.

*Page 3 of 3.*
*Confidentiality Agreement*

6. This Agreement shall not apply to information generally available to the public; or information which has been furnished to Amtrak OIG by a third party or third parties; or information which is already in the possession of Amtrak OIG at the time of this Agreement. Nor does it constitute admission by the Amtrak OIG that the designated records constitute proprietary or trade secret information.

7. The parties recognize that the Amtrak Office of Inspector General (OIG) has obligations to disclose certain records and information by federal statutes or regulations, including but not limited to Congress or any Congressional Committee or subcommittees, the General Accounting Office (GAO) and the Office of Management and Budget (OMB). XXXXXXX recognizes and understands that the Amtrak OIG will be providing the results of its investigation to members of Congress or Congressional committees, which may include certain data or information which XXXXXXX provides to the Amtrak OIG in response to the subpoenas, both material marked confidential or proprietary as well as that which is not designated as such.

8. This Agreement is not in derogation of any rights, obligations or responsibilities which the Amtrak OIG has under the Inspector General's Act, including the right to seek information in connection with the audit or subpoena and right or obligation to provide information to the United States Department of Justice and Congress.

9. The exclusive jurisdiction for the enforcement of this confidentiality agreement shall lie in the Federal Court for the District of Columbia.

National Railroad Passenger                        XXXXXXXX Corporation
Corporation, Office of Inspector
General

By_____            By_____

Title_____            Title_____

Dated:

**BOMBARDIER**

TRANSPORTATION

Bombardier Inc.
1101 Parent Street
Saint-Bruno, Québec, Canada J3V 6E6
www.bombardier.com
TEL 450-441-2020
FAX 450-441-1515

May 31, 2005

**BY TELEFAX: 202-906-4695**

Hon. Fred E. Weiderhold, Jr.
Inspector General
National Railroad Passenger Corporation
Office of the Inspector General
10 G Street, N.E.
Suite 3E-400
Washington, D.C. 20002

    Re:  <u>Subpoenas Served on Bombardier Inc.</u>

Dear General Weiderhold:

    We are writing on behalf of Bombardier Inc. ("Bombardier") in response to your May 4, 2005 subpoenas addressed to "Bombardier" in Barre, Vermont and in Montreal, Quebec. In your May 11, 2005 testimony before Congress, you referred to these subpoenas as "friendly" and complemented Bombardier and NECMSC on our cooperation with your investigation. Consistent with the cooperation we have shown to date, we asked our counsel to accept service of these subpoenas on our behalf despite their having been misdirected, and met with you and your staff on May 18, 2005 to seek ways to expedite the investigation and avoid the production of materials of little or no use to your investigation.

    During the May 18 meeting, we informed your staff that the exhaustive production sought by the subpoenas could overwhelm both Bombardier and your office with great quantities of irrelevant documents. We agreed therefore that Bombardier would inventory its facilities and send you a preliminary "lay-of-the-land" description of files that may be called for by the subpoenas in an effort to provide your office with information that would help you determine which files you truly need and the order in which they should be produced. This inventory is attached. Once you have reviewed it, we would be pleased to discuss the subpoenas with you in order to clarify, where necessary, their meaning or scope and to determine how your office would like to proceed.

Regards,


Marc-André Raymond
Legal Advisor
Contracts Department, North America


MAR:gt



EXHIBIT
10

**BOMBARDIER**

TRANSPORTATION

Bombardier Inc.
1101 Parent Street
Saint-Bruno, Québec, Canada J3V 6E6
www.bombardier.com
TEL 450-441-2020
FAX 450-441-1515

To:    Office of the Inspector General
From:  Bombardier Inc. ("Bombardier")
Date:  May 31, 2005

<u>PRELIMINARY SURVEY OF BOMBARDIER DOCUMENTS</u>

As agreed on May 18, 2005, we set forth below a preliminary "lay of the land" with respect to Bombardier documents concerning the Acela brake system. Although we have not yet had an opportunity to undertake a comprehensive inventory of all potentially responsive information, we have, at this point, met with various engineers, project managers, information technology personnel, purchasing agents and others with knowledge of Bombardier's record-keeping, and have reviewed samples of potentially responsive information. This initial assessment should aid in defining the proper scope of the subpoenas served on Bombardier. To ensure preservation of all responsive materials, Bombardier, shortly after receiving the subpoenas, issued a directive to all affected employees not to destroy any materials potentially responsive to the subpoena.

I.    **<u>Documents Maintained on the Bombardier Servers</u>**

Much of the data responsive to the subpoena is stored electronically on Bombardier's servers. Categories of potentially responsive electronic data include the following:

- Contract Tracking System ("CTS") database (searchable database of official Acela project correspondence and meeting minutes for entire project)

- EO Letter database (list of official correspondence and meeting minutes with Knorr)

- ISC-ISL database (engineering letters provided to Supply Management to be forwarded to a supplier)

- Open Technical Issues database (list of open items)

- Open Item List database (list of open items)

- Schematics (entire project)

- Drawings (entire project)

- Modification notices

- Modification Field Engineering Test ("MFET") files

- Request Inspection Notices

- Failure Analysis Reports

- "041-Drawing" Filemaker Pro database (list of drawings received from Knorr)

- "041-Document" Filemaker Pro database (list of documents received from Knorr)

Bombardier's servers also handle electronic mail. Bombardier will undertake to search and produce electronic mail files once the parties agree on key individuals and search terms.

There are daily, weekly, and monthly backups of the Bombardier servers. Although the backup tapes are usually recycled after a set period of time, Bombardier has issued an order that all backup tapes be preserved in response to the subpoenas.

## II. Paper Documents Stored Off-Site

As part of the preparation for discovery in the *Bombardier v. Amtrak* lawsuit, original records were collected from various Bombardier offices and facilities. More than 3,900 boxes of documents related to the Acela project were moved off-site. Except when departments have specifically asked for the return of the originals, the off-site document collection is likely the most complete and well-cataloged set of Bombardier documents related to the Acela Project as of January 2004.

A preliminary review of the off-site records index reveals that the collection includes documents related to the brake system, Knorr, ORX and Wabco. The documents were originally maintained at various Bombardier locations by Engineering Systems, Engineering Systems (Trucks), Testing, Finance, Supply Management, Quality Assurance, and Technical Documentation.

## III. Documents Maintained by Functional Areas

We provide below a general description of the documents kept by each functional area that may, based on our preliminary reviews, have some relation to the brake system.

### A. Supply Management

Supply Management maintains official project correspondence between Bombardier and its vendors.

### B. Business Services

Business Services maintains purchase orders and invoices from Bombardier's suppliers.

### C. Reliability, Availability, Maintainability, and Safety ("RAMS")

The RAMS group maintains analyses prepared by Bombardier's suppliers.

2

D.   Technical Documentation

Technical Documentation maintains instructional materials and administrative support information for courses given to Amtrak personnel.

E.   Engineering Systems

Engineering Systems maintains a wide variety of technical documents, both internally-generated and materials received from suppliers or Amtrak.

F.   Customer Service

Customer Service maintains a variety of documents related to modifications, work orders, testing and reports.

G.   Quality Assurance

Quality Assurance maintains documents related to the initial inspections of the brake equipment, qualification reports, as well as pre-shipment material inspection reports.

IV.  **Documents Maintained by Individuals**

We estimate that no fewer than 40 current Bombardier personnel may maintain personal files in paper and/or electronic form. Once there is agreement on proper search parameters, we will undertake to search and produce information from an agreed-upon list of individuals.

1. 2005 4:14PM                                                              No. 4521    P. 2



NATIONAL RAILROAD PASSENGER CORPORATION
Inspector General, Legal Counsel's Office, 10 G Street, NE, Suite 3E400, Washington, DC 20002



**VIA FACSIMILE AND FIRST-CLASS MAIL**

June 1, 2005

Marc-Andre Raymond, Esquire
Bombardier, Inc.
1101 Parent Street
Saint-Bruno, Quebec, Canada J3V 6E6

RE: Amtrak OIG Subpoenas to Bombardier Inc. (No. 05-05)

Dear Mr. Raymond:

I am in receipt of your letter, dated May 31, 2005, (addressed to the Amtrak Inspector General) in connection with the aforementioned subpoena which the Amtrak Inspector General issued to Bombardier, Inc.1

Critically, your letter fails to address that part of our discussion, reiterated in my May 27 letter to you, regarding the prompt production of the contract-related documents as well as what we identified as the "notice" records, i.e., those documents and records which discuss or pertain to any information or notice with respect to deficiencies or problems with the Acela brakes. It was our understanding from the May 18 meeting that Bombardier was working to produce those records expeditiously. We do not want to delay the production of those records and request that you provide such records no later than the close of business on June 10, 2005.

Thank you for your prompt attention to this matter.

Sincerely,

Colin C. Carriere
Counsel to the Inspector General
(202) 906-4355

---

1 In connection with the subpoena, please address further correspondence to me or David Sadoff, Esquire, the attorneys acting on behalf of the Inspector General in this matter.

EXHIBIT 11



**Pillsbury
Winthrop
Shaw
Pittman**

1540 Broadway  Tel 212.858.1000
New York,  Fax 212.858.1500
NY 10036-4039  www.pillsburylaw.com

Confidential Investigative Communication
Disclosure Restricted to Head of Designated
Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

June 7, 2005

**BY FAX**

Colin C. Carriere, Esq.
Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:  OIG Subpoena to NeCMSC (No. 05-05)

Dear Mr. Carriere:

After review and approval by counsel to Alstom, we hereby submit NeCMSC's "lay-of-the-land" description of files that may be called for by the OIG subpoena addressed to NeCMSC. As we discussed on May 18, 2005, the purpose of this outline is to help OIG determine which files you truly need and the order in which they should be produced. Once you have reviewed the file outline, we and counsel for Alstom would be pleased to discuss the NeCMSC subpoena in order to clarify, where necessary, its meaning and scope and to determine how your office would like to proceed.

We also need to agree on the search terms NeCMSC is to use in reviewing potentially responsive electronic data.

Very truly yours,

Philip Le B. Douglas

Enclosure

cc:  Timothy Broas, Esq.
     Winston & Strawn



300179107v1

CONFIDENTIAL INVESTIGATIVE COMMUNICATION
DISCLOSURE RESTRICTED TO HEAD OF DESIGNATED
FEDERAL ENTITY PURSUANT TO 5 U.S.C. APP. 3 § 8G(d)

To:   Office of the Inspector General
From: Northeast Corridor Management Services Company ("NeCMSC")
Date: June 7, 2005

## PRELIMINARY OVERVIEW OF NeCMSC DOCUMENTS

As agreed on May 18, 2005, we set forth below a preliminary "lay of the land" with respect to NeCMSC documents concerning the Acela brake system. Although we have not yet had an opportunity to undertake a comprehensive inventory of all potentially responsive information, we have, at this point, met with various engineers, project managers, information technology personnel, purchasing agents and others with knowledge of NeCMSC's record-keeping, and have reviewed samples of potentially responsive information. This initial assessment should aid in defining the proper scope of the subpoena served on NeCMSC. To ensure preservation of all responsive materials, NeCMSC, shortly after receiving the subpoenas, issued a directive to all affected employees not to destroy any materials potentially responsive to the subpoena.

### I.   Paper Documents

NeCMSC has three main facilities located in Ivy City (Washington, D.C), Sunnyside, New York and Boston, Massachusetts. We provide below a preliminary overview of the paper files stored at these facilities.

### A.   Ivy City Facility

The NeCMSC facility in Washington, D.C., known as "Ivy City," has four main areas: the Main Office, the Engineering Offices (including quality assurance), the Purchasing/Finance Offices (shared with Human Resources) and the maintenance/inspection area. We have preliminarily surveyed documents in the three office areas; we have not yet had an opportunity to survey documents from the maintenance/inspection area.

####    1.   Files at the NeCMSC Main Office

Each time a trainset is inspected (whether as part of a daily, 92-day or annual inspection), forms are completed regarding the inspection results. The inspection record for each trainset constitutes a separate Inspection Record. Although the inspections involve the brakes, there is no separate file or index of brake-related information contained in the Inspection Records.

All of the original paper Inspection Records are submitted to the Main Office in the Ivy City facility for storage. NeCMSC now has over 200 boxes of such Inspection Records. The

300177624v3

Inspection Records for the last several months are kept in a locked file cabinet in the Ivy City facility, and the older records are located in an off-site storage facility.

The Inspection Records from April 1, 2003, to the present are also available in electronic form (scanned into non-searchable PDF files). Each facility is responsible to scan its own Inspection Records and place them on the NeCMSC server before shipping the originals to Ivy City.

In addition to the Inspection Records described above, the NeCMSC Main Office contains at least 60 feet of bookshelves. The boxes and binders on these bookshelves do not, on their face (that is, based on the spine of the binder or description on the box), appear to have any direct relation to the brake system. However, more detailed review is necessary before we can determine whether they may contain any such information.

### 2. Files at the NeCMSC Engineering Offices

Our rough estimate is that NeCMSC Engineering Offices contain at least 50 feet of bookshelves. A preliminary review suggests that around 50% of the binders on these shelves contain at least some passing reference to the brake system. However, we believe that the paper copies of most documents on the bookshelves have been superseded in whole or in part by updated engineering documents, and are thus obsolete. NeCMSC now keeps the latest versions of most engineering documents on the NeCMSC server.

### 3. Files at the NeCMSC Purchasing/Finance Offices

The NeCMSC Purchasing/Finance Offices maintain their current records in at least 8 filing cabinets on-site. An off-site storage facility is used for archived records. Our preliminary review shows that some of the files relate to Knorr, ORX, and Wabco. For instance, we noticed (i) approximately a foot and a half of invoices from Knorr from 2000-present, (ii) about one inch of invoices from ORX in the past 6 months or so, and (iii) less than a quarter inch of invoices from Wabco from several years ago. We understand that additional invoices from ORX and Wabco may be in off-site storage.

### B. Sunnyside Facility

As mentioned above, the inspection records generated at Sunnyside are scanned and placed on the NeCMSC servers, and the originals are shipped to Ivy City approximately every six months. Although we have not had the opportunity yet to survey the documents at the facility, we understand that no other NeCMSC records relating to the brakes are kept at Sunnyside.

### C. Boston Facility

Likewise, the inspection records generated at the Boston facility are scanned and placed on the NeCMSC servers, and the originals are shipped to Ivy City approximately every six months. Although we have not had the opportunity yet to survey the documents at the facility, we understand that no other NeCMSC records relating to the brakes are kept at Boston.

300177624v3

## II. Documents on the NeCMSC Servers

Electronically available documents on the NeCMSC servers include:

- Technical Service Bulletins (searchable and complete).
- Service Bulletins from Knorr ("SBU").
- Inspection Records (since April 1, 2003).
- SPEAR (the purchasing order database).
- "041-Drawing" Filemaker Pro database (list of drawings received from Knorr).
- "041-Document" Filemaker Pro database (list of documents received from Knorr).

NeCMSC's servers also handle electronic mail. NeCMSC will undertake to search and produce electronic mail files once the parties agree on key individuals and search terms.

The NeCMSC servers are backed up to tape once per week, and the backup tapes are reused each month (*i.e.*, data older than one month is overwritten). This scheduled over-writing has now been suspended.

There was some permanent loss of data at NeCMSC in 2003-04. <u>First</u>, a fire destroyed the original tape backup drive in 2003. When the drive was replaced, NeCMSC personnel determined that the old backup tapes were corrupted and thus unreadable. Any backup data from the beginning of the project through June 2003 has thus been lost. <u>Second</u>, soon after NeCMSC changed its email system from Lotus notes to Microsoft Exchange in May 2004, the Lotus Notes server crashed. NeCMSC personnel subsequently determined that at least 50% of the email stored in Lotus Notes databases that had not been archived to personal folders had been corrupted. Such email databases could not be rebuilt, even from the backup tapes.

## III. Individually Maintained Documents

We estimate that no fewer than 100 current NeCMSC personnel may maintain personal files in paper and/or electronic form. Once there is agreement on proper search parameters, we will undertake to search and produce information from an agreed-upon list of individuals.



**Pillsbury
Winthrop
Shaw
Pittman** LLP

1540 Broadway
New York,
NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

CONFIDENTIAL INVESTIGATIVE COMMUNICATION
DISCLOSURE RESTRICTED TO HEAD OF DESIGNATED
FEDERAL ENTITY PURSUANT TO 5 U.S.C. APP. 3 § 8G(d)

June 8, 2005

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

BY HAND

Colin C. Carriere, Esq.
Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:  OIG Subpoenas to Bombardier Inc. (No. 05-05)

Dear Mr. Carriere:

    Bombardier Inc. ("Bombardier") has asked me to respond to your May 27 and June 1, 2005 letters to Marc-André Raymond, Esq. Before I turn to the substance of your letters, I will first address an issue raised by Amtrak's General Counsel regarding my firm's representation of Bombardier in connection with the three subpoenas issued by your office.[1]

**Alleged Conflict of Interest Regarding the OIG's "Friendly Subpoenas"**

    As you may be aware, Amtrak asserts that my firm's representation of Bombardier in connection with these subpoenas presents a conflict of interest due to the

---

[1] As I explained at our May 18, 2005 meeting, we are also representing Bombardier's 50% interest in Northeast Corridor Management Services Company ("NeCMSC"). I understand that you have met with counsel for Alstom, and that those lawyers are representing Alstom's 50% interest in NeCMSC.

300178470v6

EXHIBIT 13

June 8, 2005
Page 2

April 4, 2005 merger between Pillsbury Winthrop LLP ("Pillsbury Winthrop") with Shaw Pittman Potts and Trowbridge LLP ("Shaw Pittman"). Pillsbury Winthrop has represented Bombardier in its *Acela*-related dealings with Amtrak since early 2000. At the time of the merger, Shaw Pittman was representing Amtrak in a matter unrelated to Bombardier or the *Acela*.

We have informed Amtrak that we do not believe our representation of Bombardier is at present adverse to Amtrak. Nevertheless, we are currently working with Amtrak in an effort to resolve these issues amicably. Regardless of the outcome of those discussions, there are a variety of reasons why Amtrak's conflict of interest concerns should not have any bearing on my firm's ability to represent Bombardier in connection with the OIG's investigation of the *Acela* brake disc problem.

*First*, as both Amtrak and the Inspector General himself testified before Congress on May 11, 2005, Bombardier, NeCMSC and Amtrak are all cooperating to investigate the causes of the loss of *Acela* service and to restore service as soon as possible. According to Inspector General Weiderhold's written testimony, "there is considerable effort being expended by <u>all affected parties</u> to find a fix to Acela brake disc problem. It is in <u>everyone's best interest</u> to get the trainsets back into service quickly, but more importantly safely." (Emphasis supplied). In his oral testimony, the Inspector General complimented NeCMSC and Bombardier on their cooperation with his investigation and described the subpoenas served on these entities as "friendly".

*Second*, if Bombardier and Amtrak are unable to settle the conflict matter, it will take some time for this dispute to be litigated. There is no reason why your investigation should be delayed in the meantime. For its part, Bombardier is willing to agree that OIG's dealings with my firm will not constitute a waiver of, or otherwise prejudice, OIG's or Amtrak's position on the conflict issue. This should permit you to continue to investigate the *Acela* brake disc problem and Bombardier to be represented by counsel of its own choosing, while Bombardier and Amtrak seek to resolve the conflict issue.

*Third*, any adversity between Amtrak and Bombardier is irrelevant to our representation of Bombardier in the OIG investigation. I am sure you would agree that OIG investigations are completely independent of Amtrak management and any Amtrak commercial dispute with third parties. The Inspector General Act, 5 U.S.C. App. 3 § 2, requires "independent and objective" inspections and audits, and specifically provides that the OIG's host entity "shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation." 5 U.S.C. App. 3 § 8G(d). The legislative history to the Act makes clear that Inspectors General are to be