June 8, 2005
Page 3

treated as "outsiders" insofar as they can "have no vested interest in the programs and policies whose ... effectiveness they are evaluating." S. Rep. No. 95-1071, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2684 (emphasis supplied). On your own website, which is separate from Amtrak's website, one of the OIG's "Guiding Principles" is to "ensure the independence and objectivity of [the IG's] audits, investigations and other reviews." The OIG's independence from Amtrak is best demonstrated by the requirement that OIG "report to and be under the general supervision of the head of the designated federal entity [in this case, David M. Laney, Chair of Amtrak's independent Board of Directors], but shall not report to, or be subject to supervision by, any other officer or employee of [Amtrak]." 5 U.S.C. App. 3 § 8G(d).

Moreover, it is the Inspector General's legal and ethical obligation to go wherever the facts take the investigation, regardless of whether, in the end, Amtrak, Bombardier and/or a third party are found to be responsible for the loss of *Acela* service. Indeed, in his Congressional testimony, the Inspector General confirmed that Amtrak, no less than its contractors, is the subject of his investigation of the brake disc problem:

> "OIG is concentrating on the entirety of the root causes for the failures ... For example, did the disc fail because it is defective ... Are the [Amtrak infrastructure] loads and forces acting on the disc greater than [Amtrak] specified? ... In our analysis, we want to know whether [Amtrak's] specifications for the brake discs are appropriate ... Were the [Amtrak] specifications reviewed and approved by the right persons?"

(Emphasis supplied). As part of the OIG's effort to determine why "the cracks were not identified sooner, and what inspection processes failed," Inspector General Weiderhold testified that OIG has interviewed "Amtrak maintenance staff." (Emphasis supplied). The Inspector General also testified that "OIG has conducted several reviews of Amtrak's mechanical inspection procedures and those of its contractors ... over the past few years." (Emphasis supplied). In short, because OIG is no more adverse to Bombardier than it is to Amtrak, any purported adversarial relationship between Bombardier and Amtrak is of no consequence to your investigation.

*Fourth*, the Inspector General should consider the policy and practical consequences of declaring that a law firm representing Amtrak can never represent another client in an OIG investigation. For example, if OIG and Amtrak are identical for conflicts purposes, the two entities should be synonymous under the March 2004 settlement (the "Settlement Agreement"). Among other things, the Settlement Agreement subjects disputes between Amtrak and Bombardier to elaborate pre-litigation

300178470v6

June 8, 2005
Page 4

Dispute Resolution Board ("DRB") procedures and prohibits discovery absent a DRB finding of "good cause".

Accordingly, if you conclude that Bombardier is presently adverse to Amtrak and that the OIG stands in Amtrak's shoes for conflicts purposes, then it would seem that there is a "dispute" that the Settlement Agreement requires be presented to the DRB. By the same token, the present subpoenas should not have been issued without a prior "good cause" finding by the DRB. In addition, if OIG and Amtrak are indistinguishable under the Settlement Agreement, would not all your files and investigators be subject to discovery in the event of post-DRB litigation between the railroad and a supplier? Finally, we would think that your office would not want its investigation delayed every time a firm representing Amtrak represents a third party in one of your investigations. In short, there a variety of reasons why the Inspector General should not carry Amtrak's water on conflicts issues.

**Document Production Cooperation**

As you know, on May 18, 2005, the Inspector General and other OIG representatives met to discuss ways that Bombardier could continue its cooperation with your investigation. As a result of that meeting, we agreed that Bombardier would provide OIG with an outline of possibly responsive files. The purpose of that outline is to help your office decide which file categories should be produced first and how the subpoenas might be further refined to provide further clarity and minimize the production of irrelevant documents. Our outline of Bombardier's files was provided to you on May 31 and, under separate cover, NeCMSC has provided you with its file outline.

We are concerned by the statement in your June 1, 2005 letter that our May 31 letter producing the Bombardier file outline "fails to address prior correspondence from OIG" and by your suggestion that we are not complying with an agreement to immediately produce " 'notice' records, i.e. those documents and records which discuss or pertain to any information or notice with respect to deficiencies or problems with the Acela brakes." Contrary to the suggestion in your letter, we have lived up to all our obligations and commitments to your office. As recently as May 11, 2005, Inspector General Weiderhold testified that the subpoenas of Bombardier and NeCMSC were "friendly" and occasioned by Knorr's, not our, failure to cooperate. As you know, Bombardier and NeCMSC had previously produced all documents requested by OIG without a subpoena. When OIG had difficulty serving a subpoena on Bombardier, I volunteered to accept service on their behalf. It was at my suggestion that, only a few

300178470v6

June 8, 2005
Page 5

days after service of the Bombardier subpoena on May 12, 2005, we had a cordial meeting at your office to discuss ways to expedite document production.

As I will attempt to demonstrate below, nothing has occurred since that meeting to justify any suggestion that Bombardier is not cooperating with OIG. For example, even though your June 1, 2005 letter correctly points out that Bombardier has not yet produced the contracts you requested, this was not Bombardier's fault. As we informed you on May 18, Bombardier would like a confidentiality agreement to protect commercially sensitive pricing information in its subcontracts. You agreed to send us a form agreement used by your office but were unable to do so prior to May 27, 2005. Attached are our proposed revisions to that agreement.

You state that with regard to "notice records," "[i]t was our understanding from the May 18 meeting that Bombardier was working to produce those records expeditiously" and that "[w]e would expect that these [notice] records will be reasonably segregated and not produced or identified among a host of other records." During the May 18 meeting, however, Bombardier did not agree to either of these points. Although Bombardier was, and remains, willing to implement a "phased production" of the records that will include any "notice documents" called for by the OIG subpoenas, I declined your request that we "waive the work-product privilege" so that my firm could locate, segregate and produce all such "notice" documents. I pointed out that any such waiver was impossible because it would involve a huge legal effort and prejudice any litigation between Bombardier and its subcontractors. In any event, because identifying and segregating "notice records" would require months of legal work, your June 10 deadline for such a production – which was not disclosed until June 1 – is completely unrealistic.

On May 18, we did not tell OIG that "Bombardier was working to produce those [notice] records." To the contrary, I specifically advised your office that "NeCMSC and Bombardier have not started to gather documents", but instead "are still determining the volume and location of documents." This is what prompted you to ask for a letter setting forth, in your words, the "lay-of-the-land" regarding potentially responsive files. We agreed that the parties would use that letter to discuss a "layered" production and a "potential narrowing" of the subpoenas' scope. Consistent with Bombardier's continuing desire to cooperate with your investigation, Bombardier subsequently sent teams to Montreal and the Ivy City facility in Washington to review files and interview witnesses in order to prepare the file description you received on May 31, 2005. There was, of course, no legal obligation for Bombardier and NeCMSC to undertake this considerable effort or incur the large resulting legal expense.

300178470v6

June 8, 2005
Page 6

    Now that we have, with your agreement, gone to the effort of preparing and sharing with you a description of responsive files for both Bombardier and NeCMSC, we respectfully suggest that we use this information to discuss reasonable ways to organize document production, narrow the subpoenas' scope and clarify their meaning. As I noted at our meeting, the subpoenas are quite broad, at times vague and, if not modified, will result in an avalanche of largely irrelevant records.

    In addition, OIG should provide us with the search terms we are to use in reviewing the huge volume of potentially responsive electronic data. Also, please let us have your comments on the enclosed draft confidentiality agreement.

Very truly yours,

Philip Le B. Douglas

Enclosure

300178470v6

**Bombardier Comments**<br>6/7/05

## CONFIDENTIALITY AGREEMENT

In recognition of the request of Bombardier Inc. (Bombardier) to protect certain of its documents and records, which Bombardier deems proprietary or trade secrets or otherwise subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure, the National Railroad Passenger Corporation Office of Inspector General (Amtrak OIG), and Bombardier, through their duly authorized representatives hereby enter into the following agreement. The general purpose of this agreement is to protect from disclosure to third parties or competitors proprietary documents and records which Bombardier will produce to the Amtrak OIG in response to its subpoena. The parties hereby further agree as follows:

1. Bombardier will identify by marking or specifically designating as "PROPRIETARY" or "TRADE SECRET" those documents which it deems could reasonably be expected to cause substantial competitive harm or which otherwise fall within the ambit of FRCP 26(c). This marking or designation shall take place within twenty (20) days of Bombardier's provision of records to Amtrak OIG. Documents which are not so marked or designated within the 20-day period will not be considered proprietary. Within the 20 day period Amtrak OIG will treat as proprietary under this paragraph all documents and records which Bombardier provides to the Amtrak OIG.

2. The documents or records, or copies thereof, shall not be provided to Bombardier's competitors or third parties unless the conditions in Section four (4) of this Agreement have been satisfied. "Third parties" for purposes of this Agreement shall not include judicial bodies, legal counsel for the parties, the chairman of the Board of Directors of Amtrak, federal authorities, or consultants, or experts which the OIG designates to resolve issues in

300178666v2

**Bombardier Comments**
6/7/05

connection with the OIG's analysis, investigation or audit. Before making disclosure to any of the persons or entities designated in the preceding sentence, the Amtrak OIG will provide Bombardier with not less then ten days written notice.

3. Amtrak OIG may provide the records to experts or consultants of its choosing. Should Amtrak OIG provide the documents to any experts, consultants, or the chairman of the Board of Directors of Amtrak, Amtrak OIG agrees that any such experts, consultants, or the Amtrak chairman will be advised of the existence of this Confidentiality Agreement and shall be instructed that they are not to disseminate or divulge any information obtained from the aforesaid documents to any person other than the parties or counsel to the parties. Those persons shall sign a copy of this agreement as evidence of being bound by its terms.

4. In the event that any of the records or documents, which Bombardier has identified as proprietary, is requested pursuant to a Freedom of Information Act (FOIA) request, the Amtrak OIG shall exercise the following procedure. Amtrak OIG will provide written notice to Bombardier of the request for records from the FOIA requester. Bombardier shall be allowed ten (10) calendar days from the receipt of notification in which to object in writing to the request and to state all grounds upon which disclosure is opposed. Amtrak OIG will not release the records under the FOIA request during this ten (10) day period. If Amtrak OIG does not receive a written response from Bombardier within the ten-day period, Amtrak OIG in its discretion may release the records to the requester. In the event that after receipt of Bombardier's written response the Amtrak OIG determines that the records are releasable, it shall notify Bombardier in writing of its decision to release such records and a specific disclosure date. Bombardier shall have the right to challenge the proposed release in a court of competent jurisdiction within ten (10) calendar days of receipt of such written notice by Amtrak OIG, with written notification to

300178666v2

Amtrak OIG of its lawsuit. Amtrak OIG will withhold from release any challenged documents until the court's resolution of the issue. Nothing in this provision shall be in derogation of Bombardier's right to seek judicial relief with regards to a FOIA request at any time prior to the time periods identified above in this paragraph.

5. This Confidentiality Agreement does not waive, alter, amend, derogate, decrease, or affect any of the terms, conditions or provisions of any contract or agreement between the National Railroad Passenger Corporation and Bombardier.

6. This Agreement shall not apply to information generally available to the public; or information which has been furnished to Amtrak OIG by a third party or third parties; or information which is already in the possession of Amtrak OIG at the time of this Agreement; provided, however, that this paragraph shall not apply to information that has been disclosed to the Amtrak OIG in breach of a contract with Bombardier or in violation of any obligation owed to Bombardier of any law. Nor does this Agreement constitute admission by the Amtrak OIG that the designated records constitute proprietary or trade secret information.

7. The parties recognize that the Amtrak OIG has obligations to disclose certain records and information by federal statutes or regulations, including but not limited to Congress or any Congressional Committee or subcommittees, the General Accounting Office (GAO) and the Office of Management and Budget (OMB). Bombardier recognizes and understands that the Amtrak OIG will be providing the results of its investigation to members of Congress or Congressional committees, which may include certain data or information which Bombardier provides to the Amtrak OIG in response to the subpoenas, both material marked confidential or proprietary as well as that which is not designated as such. Before making any such disclosures, the Amtrak OIG will provide Bombardier with no less than 10 days' written notice.

300178666v2

**Bombardier Comments**
**6/7/05**

8. This Agreement is not in derogation of any rights, obligations or responsibilities which the Amtrak OIG has under the Inspector General's Act, including the right to seek information in connection with the audit or subpoena and right or obligation to provide information to the United States Department of Justice and Congress.

9. The exclusive jurisdiction for the enforcement of this confidentiality agreement shall lie in the Federal Court for the District of Columbia.

10. All documents that have been marked pursuant to this Agreement will be returned to Bombardier at the conclusion of the Amtrak OIG'S investigation.

| National Railroad Passenger Corporation, Office of Inspector General | Bombardier Inc. |
|---|---|
| By_____ | By_____ |
| Title_____ | Title _____ |
| Dated: | |

4

300178666v2

NATIONAL RAILROAD PASSENGER CORPORATION
Inspector General, Legal Counsel's Office, 10 G Street, NE, Suite 3E400, Washington, DC 20002



*VIA FACSIMILE AND FIRST-CLASS MAIL*

June 16, 2005

Phillip Le B. Douglas, Esquire
Pillsbury Winthrop Shaw Pittman
1540 Broadway
New York, New York 10036-4039

                RE: Amtrak OIG Subpoenas to Bombardier Inc. and
                NECMSC (Nos. 05-05 and 05-09)

Dear Mr. Douglas:

      I am responding to your letter, dated June 8, 2005. Critically, your letter does not fully or accurately depict the discussions which we have had concerning the aforementioned subpoena which the Amtrak Inspector General issued to your client, Bombardier, Inc. on May 12, 2005. Nor does it reflect the level of cooperation, which you had assured us as the reason you wished to have such discussions. As a threshold matter, the Inspector General issued the subpoena to Bombardier more than a month ago, and as of today has not received a single responsive record or document. Thus, I am constrained to respond to your letter.[1]

      First, the letter does not reflect either Bombardier's affirmative representations at the meeting or our responses. This is the reason, in part, why I have asked that you place Bombardier's positions with regards to the subpoena in writing and also request that further communications be set forth in writing, unless impractical.

---

[1] You have captioned your letter with a heading which reads: "Confidential Investigative Communication Disclosure Restricted to head of Designated Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)". It is unclear what you intend by such designation, and we never agreed to such terms. Section 8G(d) states: Each Inspector General shall report to and be under the general supervision of the head of the designated Federal entity, but shall not report to, or be subject to supervision by, any other officer or employee of such designated Federal entity. The head of the designated Federal entity shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." This provision does not address confidentiality and does not restrict the OIG in its dissemination of information.

EXHIBIT 14

Page 2 of 4.
June 16, 2005

   As an initial matter your letter discusses a conflict of interest issue, which the Amtrak General Counsel has raised regarding your firm's representation of Bombardier "in connection with the three subpoenas issued by your office". The reference to your representation with regards to the interests in the three subpoenas is confusing and appears inconsistent with our understanding of your statements at the meeting. We understood you to be representing Bombardier and also representing Bombardier's 50% interest in the Northeast Corridor Management Services Company (NeCMSC"). Please clarify.

   The conflict of interest issue is a serious matter concerning your firm's representation of two potentially adverse clients (Bombardier and Amtrak). Your letter suggests that the Inspector General is carrying "Amtrak's water on conflicts issues". Once again, I am perplexed regarding the basis, or lack thereof, of such a representation. As I stated on June 8, you must resolve the conflicts issue with Amtrak's General Counsel's Office.

   Your description of the May 18 meeting is not consistent with our recollection. During our meeting on May 18 you represented that Bombardier wished to cooperate and that there was a significant number of potentially responsive documents and records. To address your claims of burdensomeness we requested that Bombardier identify in writing the nature and location of responsive records; what we described as the "lay of the land". Depending on the specificity of that description, we suggested that further discussions or correspondence might be appropriate to possibly narrow the scope of documents which Bombardier would be required to produce, provided that no responsive documents were destroyed. Bombardier represented that it would provide the OIG with its "lay of the land" description of responsive documents no later than the middle of the week following May 18.[2]

   However, we requested that Bombardier produce two categories of records promptly: (1) contract documents, and (2) "notice records" - those documents and records which discuss or pertain to any information or notice with respect to deficiencies or

---

[2] In a letter dated May 26, 2005, Bombardier's counsel stated that Bombardier was still working on a description of responsive files, and requested a form of confidentiality agreement. On the following day, May 27, the OIG responded to the May 26 letter and provided a draft Confidentiality Agreement. On May 31, Bombardier counsel provided a generalized description of the records. Your redraft of the Confidentiality Agreement (provided on June 8) does not allow for us to meet our obligations under the Inspector General Act. I am attaching a revised Confidentiality Agreement, which hopefully allows for both your concerns and ours to be satisfied.

Page 3 of 4.
June 16, 2005

problems with the Acela brakes.[3] It was our understanding from the May 18 meeting that Bombardier was working to produce those records expeditiously.[4] We understood Bombardier counsel to agree to those terms and at a minimum certainly do not recall the objection which you are now raising.[5]

As I noted in my June 1 letter to Mr. Raymond we do not want to delay the production of those two categories of records, and requested that Bombardier provide such records no later than the close of business on June 10, 2005. In this regard, we identified for Bombardier the categories of documents which we wished to receive on an expedited basis.

In your letter at page 4 you discuss the Amtrak Inspector General's May 11 testimony regarding the subpoenas being "friendly" and discussed Knorr's lack of cooperation, not Bombardier's. I am not sure of the pertinence of such representations, given that the testimony occurred prior to our discussions regarding the subpoena. Even if arguably Bombardier was cooperating as of that time does not mean that it is continuing to cooperate as of this time. Moreover, a "friendly" subpoena in no way reduces the recipient's legal obligation to diligently search for responsive documents, to promptly produce those documents, and otherwise to comply fully with the terms of the subpoena.

In your June 8 letter, and our meeting on the same date, you dispute that Bombardier agreed to produce the "notice" documents categorized or linked in a segregated fashion.[6] We disagree with your assessment. We request again that you prioritize Bombardier's response to the subparts identified below (Nos. 7 and 8) and produce them promptly in a time period which we will establish, that we originally requested for June 10, which you state was an unreasonable time period.[7]

---

[3] These documents are responsive to subparts 7 and 8 of the subpoena.

[4] We are certainly concerned about and dispute your representation on page 5 of your letter that we discussed providing the "notice" records in a segregated manner for the first time on June 1.

[5] Although you took a position at the May 18 meeting that would not waive any work-product privileges, we understood such concern to relate to a discussion regarding Bombardier producing all of its responsive records, subject to a confidentiality agreement, and not that Bombardier was not willing to link the responsive records to specific subpoena subparts.

[6] Along these lines, we requested at the June 8 meeting that Bombardier clarify and specify in writing the manner and extent that it was willing to comply with the subpoena and to identify areas of alleged ambiguity. Bombardier promised to provide such letter no later than Monday, June 13. As of today we have not received such written response.

[7] In addition, as we noted at the June 8 discussion, we would be surprised if these records would be considered these records privileged or proprietary.

Page 4 of 4.
June 16, 2005

In your June 8 letter you suggest that producing the subpoenaed records in a segregated manner or linking them would somehow waive the work-product privilege and prejudice any litigation between Bombardier and its subcontractors. We still are unaware of the legal principles upon which you rely to refuse to produce the documents, linked to specific subpoena subparts. We have asked you to produce legal precedent or support such position. Moreover, the fact that you may be required to produce records in response to the subpoena which may be relevant to potential future litigation, is not a basis for refusing to comply with the IG's subpoena.

Because these records are important to our investigation, we are on this date issuing a second subpoena for certain "notice" records, for which subpoena Bombardier is required to respond separately.[8]

Sincerely,

*[signature]*

Colin C. Carriere
Counsel to Amtrak Inspector General


Encl.

cc: David Sadoff
    Fred Weiderhold
    John Grimes

---

[8] In the second subpoena we are not requesting a duplicate production of documents. The documents that are responsive to both subpoenas are to be produced under the second subpoena. To the extent that you will represent Bombardier regarding the second subpoena, we will issue you a courtesy copy.

## CONFIDENTIALITY AGREEMENT

In recognition of the request of the Bombardier, Inc., to protect certain of its documents and records, which Bombardier, Inc., deems proprietary or trade secrets, the National Railroad Passenger Corporation Office of Inspector General (Amtrak OIG), and Bombardier, Inc., through their duly authorized representatives hereby enter into the following agreement. The general purpose of this agreement is to protect from disclosure to third parties or competitors proprietary documents and records which Bombardier, Inc., will produce to the Amtrak OIG in response to its subpoena. The parties hereby further agree as follows:

1.  Bombardier, Inc., will identify by marking or specifically designating as "PROPRIETARY" or "TRADE SECRET" those documents which it deems could reasonably be expected to cause substantial competitive harm. This marking or designation shall take place within twenty (20) days of Bombardier's provision of records to Amtrak OIG. Documents which are not so marked or designated within the 20-day period, will not be considered proprietary. Within the 20 day period Amtrak OIG will treat as proprietary under this paragraph all documents and records which Bombardier, Inc., provides to the Amtrak OIG. OIG's treatment of these identified documents as confidential under this agreement is not an acknowledgment that the documents are proprietary. This agreement does not preclude the OIG from challenging in court or other forums the proprietary of Bombardier's designation and requiring Bombardier to meet its burden of proving the confidential or privileged nature of these documents.

2.  The documents or records, or copies thereof, shall not be provided to Bombardier,

Inc., competitors or third parties unless the conditions in Section four (4) of this Agreement have been satisfied. "Third parties" for purposes of this Agreement shall not include judicial bodies, legal counsel for the parties, Amtrak management, federal authorities, or consultants, or experts which the OIG designates to resolve issues in connection with the OIG's analysis, investigation or audit.

3.  Amtrak OIG may provide the records to experts or consultants of its choosing. Should Amtrak OIG provide the documents to any experts, consultants, or Amtrak management, Amtrak OIG agrees that any such experts, consultants, or Amtrak management will be advised of the existence of this Confidentiality Agreement and shall be instructed that they are not to disseminate or divulge any information obtained from the aforesaid documents to any person other than the parties or counsel to the parties. Those persons shall sign a copy of this agreement as evidence of being bound by its terms.

4.  In the event that any of the records or documents, which Bombardier, Inc., has identified as proprietary, is requested pursuant to a Freedom of Information Act (FOIA) request, the Amtrak OIG shall exercise the following procedure. Amtrak OIG will provide written notice to Bombardier, Inc., of the request for records from the FOIA requester. Bombardier, Inc., shall be allowed ten (10) calendar days from the receipt of notification in which to object in writing to the request and to state all grounds upon which disclosure is opposed. Amtrak OIG will not release the records under the FOIA request during this ten (10) day period. If Amtrak OIG does not receive a written response from the Bombardier, Inc., within the ten-day period, Amtrak OIG in its discretion may release the records to the requester. In the event that after receipt of Bombardier, Inc., written response Amtrak determines that the records are releasable, it shall notify Bombardier, Inc., in

writing of its decision to release such records and a specific disclosure date. Bombardier, Inc., shall have the right to challenge the proposed release in a court of competent jurisdiction within ten (10) calendar days of receipt of such written notice by Amtrak OIG, with written notification to Amtrak OIG of its lawsuit. Amtrak OIG will withhold from release any challenged documents until the court's resolution of the issue. Nothing in this provision shall be in derogation of Bombardier, Inc., right to seek judicial relief with regards to a FOIA request at any time prior to the time periods identified above in this paragraph.

5.  This Confidentiality Agreement does not waive, alter, amend, derogate, decrease, or affect any of the terms, conditions or provisions of any contract or agreement between the National Railroad Passenger Corporation and Bombardier, Inc.

6.  This Agreement shall not apply to information generally available to the public; or information which has been furnished to Amtrak OIG by a third party or third parties; or information which is already in the possession of Amtrak OIG at the time of this Agreement. Nor does it constitute admission by the Amtrak OIG that the designated records constitute proprietary or trade secret information.

7.  The parties recognize that the Amtrak Office of Inspector General (OIG) has obligations to disclose certain records and information by federal statutes or regulations, including but not limited to Congress or any Congressional Committee or subcommittees, the Department of Justice, the General Accounting Office (GAO) and the Office of Management and Budget (OMB). Bombardier, Inc., recognizes and understands that the Amtrak OIG will be providing the results of its investigation to members of Congress or Congressional committees, which may include certain data