**NATIONAL RAILROAD PASSENGER CORPORATION**
Inspector General, Legal Counsel's Office, 10 G Street, NE, Suite 3E400, Washington, DC 20002



*VIA FACSIMILE AND FIRST-CLASS MAIL*

June 28, 2005

Timothy Broas, Esquire
Winston & Strawn, LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817

RE: Amtrak OIG Subpoenas to Alstom (No 05-07)

Dear Mr. Broas:

I am writing in connection with the above-listed subpoena which the Amtrak Inspector General issued to your client, Alstom Transportation Inc. ("Alstom").

When we met on June 8, 2005 we discussed the aforementioned subpoena issued to Alstom and what we perceived as Alstom's alteration of its position regarding complying with the IG's subpoena. I will not discuss all of the items or issues discussed therein, but will discuss the matters most pertinent to Alstom complying with the subpoena in a reasonably expeditious manner. We had offered in our previous meetings with you to work on methods or ways to accommodate Alstom so that the documents could be produced in a layered fashion and to gain a greater understanding of the document population possibly to narrow certain of the subpoena subparts. It is apparent that we have not reached such understanding.

Because of the positions which you were taking with respect to compliance, at the June 8 meeting, I requested that you set forth in writing: (1) the extent to which Alstom was willing to comply with the subpoena (2) the suggested deadlines regarding when it expected that it could complete production for each subpoena subpart,[1] (3) subpoena language which you believed required clarification, and (4) memorialization of what you described as the electronic files which were destroyed or lost as a result of the server malfunction. You informed us that you expected to submit such written document on June 13.

---

[1] We have informed you on several occasions that we did not want delay with respect to the production. The OIG proposed item 2 because it was willing to consider Alstom's representations concerning how long production of responsive documents would take.



EXHIBIT
24

Page 2 of 2.
June 28, 2005

We have not heard from you in connection with Alstom's position. In light of those circumstances, the Amtrak Inspector General has established the following with regards to Alstom's response to the subpoena:[2]

(1) Please comply fully with the terms and conditions of the May 15 subpoena, except as altered or carved out by the IG's subpoena to Alstom, dated June 20, 2005.[3]

(2) Even though you may layer your response, provide the full and complete response to the subpoena no later than July 28, 2005.

(3) Specifically identify the subpoena portions to which each document or generic category of documents is responsive or produced the documents in such a manner that the OIG can determine the link between the documents produced and the subpart which requests their production.

(4) On the date set forth above for full compliance, please provide a *Vaughn* privilege index.

Sincerely,

Colin C. Carriere
Counsel to Amtrak Inspector General

cc: David Sadoff
    Fred Weiderhold
    John Grimes

---

[2] As you are aware, the subpoena requests electronic and paper documents and records.

[3] As you requested we faxed you a courtesy copy of the June 20 subpoena on June 24, 2005.

NATIONAL RAILROAD PASSENGER CORPORATION
Inspector General, Legal Counsel's Office, 10 G Street, NE, Suite 3E400, Washington, DC 20002



*VIA FACSIMILE AND FIRST-CLASS MAIL*

June 28, 2005

Philip Le B. Douglas, Esquire
Pillsbury Winthrop Shaw Pittman
1540 Broadway
New York, New York 10036-4039

       RE: Amtrak OIG Subpoenas to Bombardier (No 05-05)

Dear Mr. Douglas:

  I am responding to your letter, dated June 23, 2005, with respect to the above listed subpoena which the Amtrak Inspector General issued to your client, Bombardier, Inc.

  When we met on June 8, 2005 we discussed the aforementioned subpoena and what we perceived as Bombardier's alteration of its position regarding complying with the IG's subpoena. I will not discuss all of the items or issues discussed therein, but will discuss the matters most pertinent to Bombardier complying with the subpoena in a reasonably expeditious manner.[1] We had offered in our previous meetings with you to work on methods or ways to accommodate Bombardier so that the documents could be produced in a layered fashion and to gain a greater understanding of the document population possibly to narrow certain of the subpoena subparts. It is apparent that we have not reached such understanding.

  , Because of the positions which you were taking with respect to compliance, at the June 8 meeting, I requested that you set forth in writing: (1) the extent to which Bombardier was willing to comply with the subpoena (2) the suggested deadlines regarding when it expected that it could complete production for each subpoena subpart,[2] (3) subpoena language which you believed required clarification, and (4) memorialization of what you described as the electronic files which were destroyed or lost as a result of

---

[1] Please do not imply or infer from my decision to not specifically addressing certain issues, objections or matters set forth in your letter that the OIG accepts or agrees with your statements.

[2] We have informed you on several occasions that we did not want delay with respect to the production. The OIG proposed item 2 because it was willing to consider Bombardier's representations concerning how long production of responsive documents would take.

EXHIBIT 25

Page 2 of 3.
June 28, 2005

the server malfunction.[3] You informed us that you expected to submit such written document on June 13.[4]

Your June 23 letter does not respond fully to the issues noted in the preceding paragraph, nor allay our concerns with respect to undue delay in responding to the subpoena. First, you state (at 2) that "you commenced production on June 20, 2005." As the OIG emphasized on several occasions at the June 8 meeting, providing dates upon which Bombardier can commence production is meaningless. We requested that you identify with respect to each subpart when you could reasonably complete production. Bombardier has failed or refused to so in the June 23 letter.[5]

Moreover, your letter reserves the right, in Bombardier's discretion to redact information that, inter alia, constitutes commercial or financial information or "otherwise non-producible". (at 3-4). We disagree with this position. It is not appropriate to withhold data responsive to this subpoena if you believe that it is financial or commercial. In this regard we have offered protection of proprietary data under a confidentiality agreement, which we have provided to you. We are unsure of what you mean or intend by the term "non-producible" and the types of documents which would be encompassed within this category.

With regards to several subpoena subparts, Bombardier states that it intends to limit its production of responsive documents to those that relate to the friction brakes on the Acela trailer cars or those "prepared in the course of inspecting and maintaining the friction brakes on the Acela trailer cars". The OIG has never agreed to such limitations and we are not clear concerning the ramifications or meaning of your unilateral attempt to read the subpoena language.

---

[3] Your letter does not appear to address the issue of the alleged mishap concerning the server. It is unclear from our June 8 discussion whether the server malfunction pertains only to NeCMSC documents.

[4] You have captioned your letter with a heading which reads: "Confidential Investigative Communication Disclosure Restricted to Head of Designated Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)". It is unclear what you intend by such designation, and we never agreed to such terms. Section 8G(d) states: Each Inspector General shall report to and be under the general supervision of the head of the designated Federal entity, but shall not report to, or be subject to supervision by, any other officer or employee of such designated Federal entity. The head of the designated Federal entity shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." This provision does not address confidentiality and does not restrict the OIG in its dissemination of information.

[5] Bombardier does not appear to state a completion date for completing production for any subpart.

Page 3 of 3.
June 28, 2005

Given those circumstances, the Amtrak Inspector General has established the following with regards to Bombardier's response to the subpoena:[6]

(1) Please comply fully with the terms and conditions of the May 15 subpoena, except as altered or carved out by my letter to you, dated June 16, 2005.[7]

(2) Even though you may layer your response, provide the full and complete response to the subpoena no later than July 28, 2005.

(3) Specifically identify the subpoena portions to which each document or generic category of documents is responsive or produced the documents in such a manner that the OIG can determine the link between the documents produced and the subpart which requests their production.

(4) On the date set forth above for full compliance, please provide a *Vaughn* privilege index.

Sincerely,

Colin C. Carriere
Counsel to Amtrak Inspector General

cc: David Sadoff
    Fred Weiderhold
    John Grimes

---

[6] As you are aware, the subpoena requests electronic and paper documents and records.

[7] The second subpoena to Bombardier requests a separate production for: All documents, correspondence, emails, notes, internal logs, records of conversation by Bombardier among its employees, agents or representatives or between Bombardier representatives and any other entity, including, but not limited to Alstom, Knorr, Wabco, Wabtec, Sab Wabco, Faiveley Transport, ORX, NECMSC, regarding cracks or malfunctions, including defective/deficient products, pertaining to the Acela brakes.



Pillsbury
Winthrop
Shaw
Pittman...

WINSTON & STRAWN LLP

**Confidential Investigative Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

June 28, 2005

**BY FAX**

Colin C. Carriere, Esq.
Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

      Re:    OIG Subpoenas [sic] to NeCMSC (No. 05-09)

Dear Mr. Carriere:

    As you requested, we are including a description of NeCMSC's Memorial Day e-mail server failure that Ed Flanders addressed during our June 8, 2005 meeting.

    Very truly yours,

Philip Le B. Douglas
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1704

Timothy M. Broas
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5750

Enclosure

EXHIBIT
26

300181790v1

## Description of NeCSMC Memorial Day E-Mail Server Failure

We are writing to confirm our June 8, 2005 discussion with you regarding the NeCMSC e-mail server failure that occurred on Memorial Day (May 30, 2005). As we informed you, excessive heat caused by the automatic shut down of the air conditioning system (described more fully below) resulted in the failure of the e-mail server. Due to the efforts of NeCMSC, most of the server data (including the regular file servers, the financial system data and the "Spear" maintenance record data) was recovered. Despite the retention of two expert consultants at significant cost, however, NeCMSC has been unable to restore e-mail from the e-mail server. Nevertheless, much of the e-mail responsive to the Subpoena should be available on the hard drives of personal computers of NeCMSC personnel. Furthermore, e-mail responsive to the Subpoena which was sent to and from NeCMSC should be available from other parties who received subpoenas (e.g., Bombardier, Alstom, Knorr, etc.).

The events leading up to the e-mail server failure and NeCMSC's efforts to restore the e-mail lost from that server are set forth below.

### The E-Mail Server Failure

Because the Acela fleet was grounded, NeCMSC and Amtrak decided to close the high-speed trainset maintenance facility at Ivy City on Memorial Day, Monday, May 30, 2005. (The facility was open for business on Saturday, May 28 and Sunday, May 29, 2005.)

The shop floor of the facility is roughly L-shaped. There are four parallel tracks in the facility, running north-south. Tracks 9, 10, and 11 run the full length of the facility (the long part of the L), while track 12, though also parallel, is much shorter (allowing room for a lobby at the main entrance to the facility). Each track has bay doors on its north and south end. During ordinary business operations, all eight bay doors are left open. There is no air conditioning in the shop area, but there is an exhaust system with exhaust fans and louvers. The NeCMSC offices – including the server room – are on the second floor, alongside track 11. The server room and some of the other offices are air conditioned.

The facilities are ordinarily open 24 hours a day, 7 days a week. Personnel work three shifts: day (7:00 a.m. to 3:00 p.m.), afternoon (3:00 p.m. to 10 p.m.) and evening (10:00 p.m. to 7:00 a.m.). Accordingly, the last Sunday shift (on May 29, 2005) ended around 7:00 a.m. on Monday morning (May 30, 2005). At that time, the facility was closed down, a range of track lights were turned off, and the bay doors were shut (except for the south door on track 10, which remained open until 8:00 a.m. for the cleaning crew). Only a single employee (an S&I Supervisor) was scheduled to be on duty for each shift on Memorial Day.

On Memorial Day, three trains were in the facility, on tracks 9, 10 and 11. Track 12 was not occupied by a train. As is customary, the trains were left in a powered-up mode with their heating, ventilation and air conditioning ("HVAC") systems in operation. Car 3508 of Trainset No. 4 on track 11 was positioned under the HVAC unit for the server room. (Given the length of the trains, it is normal for a car to be in that position when a train is on track 11.)

300181784v1

From 7 to 8 a.m., the south door on track 10 was open for the cleaning crew, but the other seven doors were shut. When the cleaning crew finished, the south door was shut on track 10. Around 10 or 10:30 a.m., the north and south doors on track 12 were opened by the S&I Supervisor for ventilation purposes.

It was 80 degrees Fahrenheit outside, and the metal-roofed facility quickly became excessively hot. The compressor of the server room HVAC unit overheated and shut down, and without any air conditioning, the server room rapidly overheated. Around 10:24 a.m., the first server failed due to excessive heat. An audible alarm in the server room went off to indicate that a server failed that can be heard in the offices (which were unoccupied), but not on the shop floor where the S&I Supervisor was located.

Jeremy Edwards, a member of NeCMSC's IT team, received a message from a monitoring service (SATS, a California company) around 1:30 p.m. The message indicated that the "monitor range [was] not responding." When Mr. Edwards logged in, he found that multiple servers were non-responsive.

Mike Doyle, an S&I supervisor, arrived around 3 p.m. for the afternoon shift. It was very hot on the shop floor, even though the south door of track 11 had been opened, as well as the north and south doors on track 12. Mr. Doyle was unable to check his e-mails at that time.

Mr. Edwards telephoned Jorge Angulo, the facilities maintenance supervisor, at approximately 3:30 p.m. and informed Mr. Angulo that servers had shut down due to the heat. At 4:05 p.m., Mr. Angulo arrived at the Ivy City facility and found the HVAC unit that served the server room was in a "fault" condition and could not be reset because it was too hot to touch. (We understand that the temperature in the server room may have reached 140-150 degrees toward the ceiling.) At Mr. Angulo's request, Mr. Doyle shut down the HVAC system of the train on track 11. Mr. Angulo verified that the exhaust system of the facility was operational: all the exhaust fans on the shop floor were turned on, and the louvers were all open. Mr. Angulo allowed the server unit HVAC to cool prior to resetting.

At 4:35 p.m., when the server room cooled to 111 degrees Fahrenheit, Mr. Angulo was able to reset the server room HVAC unit. (This was done manually via a switch on the roof.) Mr. Angulo has determined that the HVAC unit shut down due to signals it received from the heat sensor.

### Recovery Efforts

Mr. Edwards attempted to salvage NeCMSC's data and prevent any additional losses. Due to his efforts over a ten-hour period, most data was saved (*e.g.*, information maintained on the regular file servers, the financial systems and applications, and the "Spear" system maintenance files). We have now learned, however, that certain e-mail data was lost.

The NeCMSC e-mail server was built with multiple redundancies; if one of the five drives fails, the system can usually recover. Here, however, two physical drives failed due to the heat. Although one of the failures was only temporary (that is, the drive began working again after it cooled down), Mr. Edwards found that the system as a whole could no longer be restored by replacing the permanently failed drive, because the data had already been corrupted.

300181784v1

At NeCMSC, users can access e-mail three ways: (i) via a desktop computer; (ii) through a web-based program on a laptop; or (iii) via a "full client" on a laptop. Once the e-mail server was lost, only users in the third category had local e-mail files that might be saved. However, if those users logged in to the system before saving their local e-mail files separately, their computers would synchronize with the e-mail server and overwrite the existing e-mail files with a new zero-byte e-mail file. Mr. Edwards managed to contact most of the affected users in time to prevent loss of their locally-stored e-mail files. (One attempted to save his locally-stored e-mail before logging in, but was not successful.)

All of the e-mail drives were provided to Kroll Ontrack, Inc. ("Kroll") for analysis and recovery on an "emergency service" basis on Tuesday, May 31. Unfortunately, in light of the multiple failures, Kroll was ultimately unable to recover e-mails from the e-mail drives.

NeCMSC backs up its computer systems onto sixteen backup tapes for disaster recovery purposes only. If there is no disaster, the backup tapes from the prior week are reformatted and are used again, overwriting the previous week's backup tapes. The backup system operated properly over the Memorial Day weekend with respect to certain systems, overwriting eight out of the sixteen backup tapes in the process. Unfortunately, the e-mail backup did not run before the Memorial Day failure. The eight backup tapes that were not overwritten were provided to eMag, a computer forensic consulting company in Atlanta, with particular expertise concerning tapes, for analysis and recovery. eMag conducted its analysis between June 3 through June 6, and concluded on Monday, June 6, that no e-mail was recoverable from the backup tapes.

NeCMSC paid Kroll and eMag a total of approximately $15,000 to perform their analyses.

### Production of Responsive E-Mails

As noted earlier, notwithstanding loss of e-mail from the e-mail server and backup tapes, NeCMSC believes that much of the e-mail responsive to the Subpoena is available on the hard drives of personal computers of NeCMSC personnel which was not lost as a result of the server failure. NeCMSC has secured such e-mail, and will produce responsive e-mail upon completion of the review of that data.

If your office has any questions, or would like to interview the relevant NeCMSC personnel and/or the experts retained by NeCMSC in an effort to restore the lost e-mail, please let us know.

300181784v1

# ALSTOM

June 28, 2005

Colin C. Carriere, Esq.
Office of Inspector General
National Railroad Passenger Corp.
10 G Street N.E., Suite 3E-400
Washington, D.C. 20002

Re: Subpoena Duces Tecum 05-07 and 05-18

Dear Mr. Carriere:

The first set of documents produced by ALSTOM Transportation Inc. in response to the referenced subpoenas is enclosed.

As we agreed in our meeting on June 2, 2005, we are providing you with copies of certain documents on a priority basis. CDs ATI 1 and ATI 2 contain Bates stamped copies of documents produced from over 300 boxes of project files in ALSTOM's custody. CDs ATI 3 through 9 contain copies of maintenance manuals that we copied from the original CDs in ALSTOM's possession. The manuals are not Bates stamped.

The following documents are enclosed:

| CD # | File Name or Description | Bates Stamps |
|---|---|---|
| ATI 1 | 00000001.pdf – 00000501.pdf | ATI 00001 – ATI 00517[1] |
| ATI 2 | 00000001.pdf – 00000860.pdf | ATI 00517 – ATI 01387 |
| ATI 3 | Running Maintenance Manual Vol I | |
| ATI 4 | Running Maintenance Manual Vol II | |
| ATI 5 | Heavy Repair Manual | |
| ATI 6 | Illus. Parts Manual – Coach Car | |
| ATI 7 | Illus. Parts Manual – First Class Car | |
| ATI 8 | Illus. Parts Manual – Café Car | |
| ATI 9 | Illus. Parts Manual – End Coach Car | |

---

[1] Two documents were inadvertently numbered with the same Bates number, ATI 00517.

ALSTOM Transportation Inc.
353 Lexington Avenue, Suite 1100
New York, NY 10016
Tel: (212) 557-7260
Fax: (212) 972-4404
dana.wordes@transport.alstom.com



EXHIBIT 27

Colin Carriere, Esq.                -2-                June 28, 2005

We will provide additional documents as we complete our review. Please feel free to call Tim Broas or me if you have any questions. In addition, as we agreed, the original documents will be available for your inspection at ALSTOM's facility in Hornell, New York.

Very Truly Yours,

*[signature]*

Dana Wordes
Associate General Counsel

cc: Timothy Broas, Esq. w/ enclosure

# WINSTON & STRAWN LLP

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

BUCKLERSBURY HOUSE
3 QUEEN VICTORIA STREET
LONDON, EC4N 8NH

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

(202) 282-5000

FACSIMILE (202) 282-5100

www.winston.com

338 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

TIMOTHY M. BROAS
(202) 282-5750
tbroas@winston.com

June 30, 2005

**VIA FACSIMILE (202) 906-4309 and U.S. MAIL**

Colin C. Carriere, Esquire
Inspector General
Legal Counsel's Office
National Railroad Passenger Corporation
10 G Street, N.E. Suite 3E400
Washington, D.C. 20002

Re: **Amtrak OIG Subpoena to Alstom**

Dear Mr. Carriere:

Yesterday we received your letter dated June 28, 2005 pertaining to the Amtrak OIG Subpoenas to Alstom.

At the outset, let me remind you that, in addition to the June 8 meeting with you and your colleagues and representatives of Bombardier, I met with you and your colleagues on June 2, 2005 with my client, Dana Wordes, of Alstom Transportation, Inc. Among other things discussed at that June 2 meeting, you, Mr. Grimes and Mr. Sadoff agreed that Alstom's and NeCMSC's response to the subpoenas would be limited to documents relating to passenger car brake systems only, and that Alstom and NeCMSC would not have to produce documents relating to the power or locomotive car brake systems. That agreement was repeated and confirmed, clearly and unequivocally, multiple times throughout our meeting. You also advised me and Ms. Wordes that the OIG would like to receive certain categories of documents on a priority basis, and that production of other categories could be delayed in favor of the Company's focused efforts on the prioritized items. We informed you that we would take your request under advisement and respond to you on behalf of Alstom and the NeCMSC the following week.

Indeed, the following week I had a telephone conversation with Mr. Sadoff in which I proposed a tentative schedule for Alstom and NeCMSC's (subject to Bombardier's counsel's

EXHIBIT 28

**WINSTON & STRAWN LLP**

Colin C. Carriere, Esquire
June 30, 2005
Page 2

concurrence) production, and reiterated our agreed limitation on the production to passenger car brake systems only. Mr. Sadoff did not agree to my proposed schedule, but we deferred our discussion in light of the planned June 8 meeting.

At the June 8 meeting with Mr. Douglas and Mr. Flanders, much of the discussion was related to Bombardier's response and the NeCMSC response. There was very little discussion regarding the Alstom response. However, both Mr. Douglas and I made it very clear at the June 8 meeting that there was no legal authority for your position that the parties are required to segregate what you refer to as "notice" documents not kept in the ordinary course of business. We asked you for legal authority for your claim that the companies had a duty to do so, and you could not and have not referred us to any such authority.

In the meantime, we have been focusing our efforts on producing documents from the NeCMSC. In our view, and based on our good faith discussions to date, the type of documents which you have prioritized call for production first and foremost by the NeCMSC, to be followed by Alstom's production. Accordingly, the efforts of Alstom, the NeCMSC, and my law firm, have been largely in an effort to produce NeCMSC documents as quickly as possible. Indeed, on Friday, June 24, the NeCMSC produced several CDs containing thousands of Daily Inspection Reports from the NeCMSC to the OIG. We expect to produce even more NeCMSC documents this week.

In the meantime, Alstom will begin producing documents to the OIG shortly. You will receive a production of CDs from my client, Dana Wordes, sometime this week, and Alstom will continue to produce responsive documents over the course of the next several weeks. Again, we are only producing documents concerning passenger car brakes, per our agreement with you.

Alstom will undertake its very best efforts to produce all of its responsive documents, including electronics documents, in the most efficient and timely manner. Until we agree on electronic data search terms, however, Alstom cannot produce responsive electronic documents by your requested deadline of July 28, 2005. As you know from the NeCMSC's letter to you, we proposed certain search terms, but have not heard back from you whether those terms are acceptable to you, nor have you proposed alternative search terms. Until such time that we have an agreement on search terms, we cannot even begin the process of searching for, reviewing, and producing electronic documents.

**WINSTON & STRAWN** LLP

Colin C. Carriere, Esquire
June 30, 2005
Page 3

    I am confident that once you begin receiving Alstom's documents this week, you will be satisfied that Alstom is diligently reviewing, copying and producing documents responsive to the subpoena. If you would like to meet with Ms. Wordes and me again, we would be happy to do so at our mutual convenience.

Very truly yours,

Timothy M. Broas

cc: Dana Wordes, Esquire



Pillsbury
Winthrop
Shaw
Pittman

WINSTON & STRAWN LLP

**Confidential Investigative Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

June 30, 2005

**BY FAX**

Colin C. Carriere, Esq.
Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:   OIG Subpoenas to NeCMSC (No. 05-09)

Dear Mr. Carriere:

Thank you for your June 27, 2005 letter regarding the subpoena served on NeCMSC on May 10, 2005.[1] We address your concerns below.

**Documents Produced to Date**

In response to your "concerns" about NeCMSC's purported "undue delay" in responding to the subpoena, we summarize below the documents NeCMSC has produced to date.

---

[1] Your letter, which was received by us at approximately 8:40 a.m. on June 27, 2005, refers to "Amtrak OIG Subpoenas to NeCMSC" (emphasis supplied) and claims that "[w]hen we met on June 8, 2005 we discussed the aforementioned subpoenas" (emphasis supplied). At the time you sent your June 27 letter, however, only the May 10 subpoena had been received by NeCMSC. The second OIG subpoena, which is dated June 24, 2005, was not served on NeCMSC until the afternoon of June 27. OIG did not mention the idea of a prospective second subpoena prior to June 16, 2005 and certainly did not discuss it at our June 8 meeting.

EXHIBIT 29