Funding to address Amtrak's losses is provided through DOT's appropriations, which require the Secretary of Transportation to make quarterly grants available to Amtrak to cover operating losses and capital expenditures. Each Amtrak grant request to the Secretary must be accompanied by a detailed financial analysis, revenue projection, and capital expenditure projection justifying federal support. In addition, Amtrak is required to transmit to the Secretary and to appropriate House and Senate committees a comprehensive annual business plan. Congress approved a total of $1.2 billion for Amtrak's quarterly grants for fiscal year 2004. There were about 21,500 total Amtrak employees in fiscal year 2004, with 18,900 Amtrak union employees and 2,600 Amtrak management employees.

The Amtrak Office of Inspector General was established by the Inspector General Act Amendments of 1988, Public Law 100-504, to provide independent audits and investigations; to promote economy, efficiency, and effectiveness; and to prevent and detect fraud and abuse in Amtrak programs and operations. The current Amtrak IG took office on April 3, 1989, after appointment by the Amtrak Chairman. This position is one of 28 IGs in designated federal entities (DFE) who are appointed by their agency heads, in contrast to the 29 IGs who are nominated by the President and confirmed by the Senate. Regardless of their appointment process, these statutory IGs have basically the same duties and responsibilities for the oversight of their respective agencies as set forth in the Inspector General Act of 1978, as amended.

In fiscal year 2003, the Amtrak IG's budget increased by almost 80 percent from $6.3 million in the prior fiscal year, to $11.3 million. Most of this increase was for additional investigative staff to address identified risks, and for professional contracts, computer equipment, and software. For fiscal year 2004 the Amtrak IG had 88 staff and a $12.5 million budget.

The Amtrak IG's Office of Investigations receives allegations of misconduct from various sources including employees, confidential informants, congressional sources, federal agencies, and other third parties. The IG estimates that $17 million in ticket sales occurred on board Amtrak trains in fiscal year 2004. Of these sales, the IG estimates that over $1 million in revenues were lost due to failures to charge proper on-board fares. Also, because approximately 70 percent of these sales are cash transactions, there is a risk of embezzlement or theft. In addition, Amtrak has 250 staffed ticket offices nationwide that handle in excess of $250 million in cash annually, thus making this an additional area for IG attention.

In 1996 the IG's Revenue Protection Unit became a part of the IG's Office of Investigations to assist IG investigators in detecting theft, fraud, and irregularities on board Amtrak trains. The IG also created an Office of Security Oversight in 2004 to provide continual review of Amtrak's security preparedness and counter terrorism programs. In fiscal year 2004, the Office of Investigations had a total of 35 staff and hired outside consultants on an as-needed basis for a total of $160,500.

GAO-05-306R Activities of the Amtrak IG

The Amtrak IG's Office of Audits is responsible for conducting independent reviews of Amtrak's internal controls, overseeing and assisting in audits of Amtrak's financial statements, reviewing information technology programs and information security, providing assistance to and oversight of Amtrak financial operations, reviewing certain procurements and material acquisitions, and monitoring compliance with laws and regulations. The Office of Audits had a total of 44 staff in fiscal year 2004, half of the IG's total staff. The Amtrak IG also provides oversight of Amtrak programs through the Inspections and Evaluations Unit. This unit has 8 staff members who focus on management actions and performance in specific areas and provide recommendations to improve the efficiency or effectiveness of the effort in these areas. Evaluations include measuring Amtrak's compliance with legislation, congressional directives, and corporate policies.

The DOT IG has a substantive role in assessing Amtrak's financial performance as required by the Amtrak Reform and Accountability Act of 1997.[2] This act directs the Secretary of Transportation to contract annually for an independent assessment of Amtrak's need for federal financial support. The act also requires the DOT IG to oversee this contract and to reassess Amtrak's financial performance and needs for every year after 1998 in which Amtrak requests federal financial assistance. In 2002, the DOT IG concluded that Amtrak had not made sufficient progress in financial improvements to achieve and sustain operating self-sufficiency. In 2004, the DOT IG concluded that the existing Amtrak system was not sustainable at current funding levels. The DOT IG had fiscal year 2004 budget authority of about $63 million and 430 full time staff to provide independent audits and investigations at DOT, including broad financial performance and requirements audits of Amtrak.

**Amtrak IG Investigations**

The Amtrak IG's Office of Investigations reported opening 798 investigative cases during fiscal years 2000 through 2004, with the number of investigations increasing from 157 cases in fiscal year 2000 to 203 in fiscal year 2004, for an increase of 29 percent. Of the total reported investigations for the period, 47 percent were directed at fraud, theft, and embezzlement. The remaining cases were spread across investigations categorized by the IG as other criminal issues, false time and attendance records, mismanagement, abuse of position, noncriminal allegations, false claims, kickbacks, waste, and other irregularities.

Comparing fiscal year 2000 to fiscal year 2004, the number of investigations opened that address fraud, theft, and embezzlement increased from 69 to 100 cases. The number of criminal investigations increased from 6 to 23. (See fig. 1 and table 1). These investigative cases included, among other things, wrongdoing by Amtrak conductors, ticket offices, vendors, and food service employees resulting in criminal indictments, guilty pleas, felony prosecutions, and pending civil and criminal

---

[2] Public Law 105-134, 111 Stat. 2570 (December 2, 1997).

referrals.  The IG has reported about $6 million in fines, penalties, restitutions, and other fees over the 5-year period.

**Figure 1:  Classification of Investigative Cases Opened by Type from Fiscal Years 2000 through 2004**



**Table 1:  Number and Percentage of Investigative Cases Opened by Type from Fiscal Years 2000 through 2004**

| Amtrak Office of Inspector General Classification | FY 2000 | | FY 2001 | | FY 2002 | | FY 2003 | | FY 2004 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent | No. | Percent | No. | Percent |
| Fraud/theft/embezzlement | 69 | 44 | 86 | 56 | 61 | 47 | 62 | 40 | 100 | 49 |
| Mismanagement, kickbacks, abuse of position, false claims | 39 | 25 | 25 | 16 | 21 | 16 | 43 | 28 | 30 | 15 |
| Non-criminal other, waste, other | 27 | 17 | 24 | 15 | 29 | 23 | 26 | 17 | 34 | 17 |
| Time & attendance | 16 | 10 | 9 | 6 | 10 | 8 | 11 | 7 | 16 | 8 |
| Criminal other | 6 | 4 | 11 | 7 | 8 | 6 | 12 | 8 | 23 | 11 |
| Totals | 157 | 100 | 155 | 100 | 129 | 100 | 154 | 100 | 203 | 100 |

Source:  Amtrak IG

Our review of information from investigations closed during fiscal year 2004 indicated that 50 percent of the subjects investigated were Amtrak union employees. For the same year, we found that Amtrak management officials were subjects of 32 percent of the investigations. Of the remaining cases, outside entities such as contractors were the subject of 13 percent of the investigations. Four percent of the case files did not identify the subjects of investigation, and one percent of cases had other subjects.

To compare how the subjects of investigations may have changed before and after the IG's increase in investigative staff and budgets, we compared information from the closed investigations for fiscal years 2002, 2003, and 2004 to analyze trends in the focus of the IG's investigations. We found that Amtrak union employees were subjects of investigations in 41 cases closed in fiscal year 2002 and 76 cases in 2004, an increase of 85 percent. As a percentage of all closed investigations, Amtrak union employees increased as subjects of investigations from 36 percent to 50 percent. For this time period, we found that Amtrak management officials were subjects of investigations in 36 cases in fiscal year 2002 and 48 cases in fiscal year 2004, an increase of 33 percent, but with no appreciable increase as a percentage of total investigations for those years which stayed fairly constant at about 30 percent. (See fig. 2 and table 2).

**Figure 2: Comparison of Subjects of Allegations in Closed Cases from Fiscal Years 2002 through 2004**



Source: Amtrak IG.

GAO-05-306R Activities of the Amtrak IG

**Table 2:  Number and Percentage of Closed Cases by Subject of Allegations from Fiscal Years 2002 through 2004**

| Amtrak Office of Inspector General classification of subjects | FY 2002 | | FY 2003 | | FY 2004 | |
|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent |
| Union/union management | 41 | 36 | 62 | 38 | 76 | 50 |
| Management/executive management | 36 | 31 | 50 | 30 | 48 | 32 |
| Outside entity/outside | 25 | 22 | 36 | 22 | 20 | 13 |
| Not available | 10 | 9 | 13 | 7 | 6 | 4 |
| Other | 2 | 2 | 4 | 3 | 2 | 1 |
| Totals | 114 | 100 | 165 | 100 | 152 | 100 |

Source:  Amtrak IG
Note:  The category identified as Union/union management refers to Amtrak union employees, and the category identified as Management/executive management refers to Amtrak management.

To analyze trends in the sources of allegations, we obtained information from the IG's closed investigations for fiscal years 2002, 2003, and 2004.  This information included cases where the sources of allegations were confidential or otherwise unavailable.  For those cases where the sources were available, we found that Amtrak union employees were increasingly the sources of allegations, from 21 cases in fiscal year 2002 compared to 38 cases in fiscal year 2004.  As a percentage of total closed cases, the sources of allegations from Amtrak union employees increased from 18 percent to 25 percent for those years.  In addition, Amtrak management increased as a source of allegations, from 41 cases in fiscal year 2002 to 60 cases in fiscal year 2004.  As a percentage of total closed cases, the source of allegations from management increased slightly from 36 percent to 39 percent.  (See fig. 3 and table 3).

**Figure 3:  Comparison of Sources of Allegations in Closed Cases from Fiscal Years 2002 through 2004**



Source: Amtrak IG.

**Table 3:  Number and Percentage of Closed Cases by Source of Allegations from Fiscal Years 2002 through 2004**

| Amtrak Office of Inspector General classification of sources | FY 2002 | | FY 2003 | | FY 2004 | |
|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent |
| Management/executive management | 41 | 36 | 55 | 33 | 60 | 39 |
| Union | 21 | 18 | 39 | 24 | 38 | 25 |
| Anonymous/confidential | 20 | 18 | 29 | 18 | 24 | 16 |
| Not available | 14 | 12 | 10 | 6 | 3 | 2 |
| Office of Inspector General | 8 | 7 | 13 | 8 | 8 | 5 |
| Outside entity/other | 10 | 9 | 19 | 11 | 19 | 13 |
| Totals | 114 | 100 | 165 | 100 | 152 | 100 |

Source:  Amtrak IG

Note: The  category identified as Management/executive management includes all Amtrak management sources and the category identified as union includes all union sources.

**Amtrak IG Audits**

During the 5-year period, fiscal years 2000 through 2004, the Amtrak IG issued 246 audit reports that showed an evolving change in the IG's audit focus. To illustrate, in fiscal year 2004, 47 percent of all audits were of internal operations, which include environmental issues, inventory, ticket sales, and station controls. Also in fiscal year 2004, 29 percent of the IG's audits were for procurement support, which includes audits of questioned costs, contractor labor rates, scope of work, and other contracting issues. In contrast, for fiscal year 2000 the IG's audits of internal operations were 25 percent of all audits and procurement support was 46 percent of all audits. To partially explain this switch in emphasis, the IG stated that an increased focus on Amtrak's internal operations is a result of the risk associated with cash transactions and the increase in investigative cases which indicates a lack of effective internal controls. The remaining IG focus includes audits of labor, material, and equipment from various freight railroads and terminal companies that support Amtrak's passenger services. Additional IG audits addressed Amtrak leases and licensing agreements, Amtrak's self-insured health care plans for its employees, and information technology. (See table 4).

**Table 4: Number and Percent of Audit Reports by Subject Matter from Fiscal Years 2000 through 2004**

| Classification | FY 2000 | | FY 2001 | | FY 2002 | | FY 2003 | | FY 2004 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent | No. | Percent | No. | Percent |
| Internal operations | 15 | 25 | 17 | 33 | 13 | 32 | 17 | 39 | 24 | 47 |
| Procurement support | 27 | 46 | 20 | 39 | 17 | 41 | 15 | 34 | 15 | 29 |
| Contractor audits | 4 | 7 | 7 | 14 | 2 | 5 | 6 | 14 | 6 | 12 |
| Self-insured health care program | 3 | 5 | 3 | 6 | 3 | 7 | 4 | 9 | 1 | 2 |
| Other | 10 | 17 | 4 | 8 | 6 | 15 | 2 | 4 | 5 | 10 |
| Totals | 59 | 100 | 51 | 100 | 41 | 100 | 44 | 100 | 51 | 100 |

Source: Amtrak IG

Over the 5-year period, the Amtrak IG's audits questioned about $75 million in costs where the IG found either violations of laws, regulations, contracts, grants, or agreements; or that the expenditure of funds for an intended purpose was unnecessary or unreasonable. In addition, for the same period the IG reported about $15 million in unsupported costs that do not have adequate documentation, and $12.6 million in funds to be put to better use where the IG has identified inefficiencies.

GAO-05-306R Activities of the Amtrak IG

**Consolidation of Amtrak IG and DOT IG**

In our August 2002 report, we concluded that the consolidation of selected IG offices could, if implemented properly, serve to enhance the overall independence, economy, efficiency, and effectiveness of the IG community. We also recognized potential risks of consolidation that would have to be mitigated through proactive and targeted actions in order for the benefits to be realized without adversely affecting audit coverage in designated federal agencies. Our prior report also provided matters for congressional consideration that included amending the IG Act to consolidate IGs in designated federal entities with IGs appointed by the President and confirmed by the Senate, where the IGs have related agency missions or where potential benefits to IG effectiveness can be shown. Among examples of potential consolidations provided in the prior report was the consolidation of the Amtrak IG and DOT IG offices because of the related missions of their agencies and the resulting increase in the independence of Amtrak oversight.

The DOT IG already has considerable oversight responsibility for Amtrak operations and financial matters. In accordance with the requirements of the Amtrak Reform and Accountability Act of 1997, the DOT IG performs financial performance audits of Amtrak. The DOT IG also considers Amtrak's role as part of an overall transportation strategy that includes highways, airports, and railroads. The DOT IG concluded in the 2004 Amtrak financial performance report that the existing Amtrak system is not sustainable at current funding levels and that Amtrak could languish as an undeveloped alternative to congested roads and airports.[3]

Given the related agency missions and potential benefits in improved oversight, we continue to believe that consolidation of the Amtrak and DOT IGs is a viable action for congressional consideration. However, while both the Amtrak and DOT IGs recognize a potential enhancement to independent oversight through consolidation, there are agency-specific considerations that would need to be addressed. For example, the key risk pointed out by the Amtrak IG would be the initial lack of first-hand knowledge and day-to-day contact with Amtrak operations and personnel on the part of DOT IG staff. This potential risk is based on an assumption of the loss or relocation of Amtrak IG employees and a resulting loss of Amtrak institutional experience, a situation that may not occur, depending on how the consolidation is implemented.

Other unique aspects of Amtrak would also need to be considered if the IG offices were consolidated, including the following:

- Amtrak is a service organization with extensive decentralized operations.

---

[3] DOT IG, *Assessment of Amtrak's 2003 and 2004 Financial Performance and Requirements, National Railroad Passenger Corporation*, Report Number: CR-2005-013 (Washington, D.C.: Nov. 18, 2004).

GAO-05-306R Activities of the Amtrak IG

- Because Amtrak operations involve extensive cash handling at decentralized levels, a focus on investigative activities at these levels is important.
- A heightened focus on the security and safety of Amtrak operations has become increasingly important since September 11, 2001.
- Amtrak functions in a mixed private/public sector model.

A targeted plan that deals with the unique characteristics of Amtrak and the resulting needs for IG oversight would have to be put in place if the DOT and Amtrak IG offices were consolidated. We believe that by mitigating potential weaknesses, consolidation need not result in any material reduction in the oversight of Amtrak and has the potential to create more efficient and independent oversight. For example, the IG's day-to-day contact with Amtrak personnel and communication with the agency head can be successfully maintained as long as the IG has a physical presence at Amtrak and takes other proactive steps to mitigate any potential reduction in communication and audit coverage given the unique characteristics and oversight needs of Amtrak. A dedicated staff for Amtrak oversight issues would likely need to be maintained and a consolidated IG office would still need to carry out risk assessments of Amtrak activities. Currently, in addition to other cities, the DOT IG has an office in each metropolitan area where there is an Amtrak IG office. Therefore, the DOT IG's oversight of Amtrak could be planned to take advantage of the combined resource base in these metropolitan areas, thus achieving greater efficiency. Consolidation could also enable the larger DOT IG office to better target overall resources to areas of greatest value and risk to Amtrak operations.

The consolidation of the two IG offices could also enhance the independence of Amtrak audits and investigations. The Amtrak IG is appointed, and may be removed, by the head of Amtrak. In contrast, the DOT IG is nominated by the President and confirmed by the Senate, and may be removed only by the President. Appointment by the President with Senate confirmation has been recognized previously by Congress as a way to enhance IG independence. Typically, the further removed the appointment source is from the entity to be audited, the greater the level of independence. For example, the perceived limitation of the Federal Deposit Insurance Corporation IG's independence as an agency-appointed IG was recognized as a reason to convert the IG to appointment by the President with Senate confirmation.[4] In addition, the Tennessee Valley Authority IG was an agency-appointed IG, but was converted to appointment by the President with Senate confirmation to enhance the independence of that office.[5] Consolidation of the Amtrak IG with the DOT IG could also serve to enhance independence.

Other IG offices have also been consolidated. For example, through statute, the Department of State IG provides oversight of the Broadcasting Board of Governors and the International Broadcasting Bureau. There are also examples where oversight, provided by IGs appointed by the President and confirmed by the Senate,

---

[4] Public Law 103-204, 107 Stat. 2369 (December 17, 1993).
[5] Public Law 106-422, 114 Stat. 1872 (November 1, 2000).

GAO-05-306R Activities of the Amtrak IG

crosses several federal agencies.  For example, the IG at the Agency for International Development is authorized by specific statutes to provide oversight of the Overseas Private Investment Corporation, the Inter-American Foundation, and the African Development Foundation.

**Agency Comments and Our Response**
In commenting on a draft of this report, the Amtrak IG discussed the unique operations of his office, current Amtrak oversight, and his views about consolidation. The Amtrak IG stated that, while there are arguments for consolidation, there are also strong and practical reasons for keeping the Amtrak and Transportation IG offices separate.

In describing some of the unique aspects of Amtrak, the IG points out that Amtrak is a service organization in the business of national rail passenger service and operates in a mixed private sector/public sector environment.  For example, the IG refers to Amtrak as a "de facto" government corporation that is exempt from most Office of Management and Budget circulars and many statues that directly impact IGs.  In addition, the IG points out that Amtrak is not subject to Federal Procurement Regulations, Amtrak employees are not under Federal Civil Service, and Amtrak financial statements are prepared according to generally accepted accounting principles used in the private sector.

The IG also discussed the independence of his office, stating that the resolution of reporting responsibility of the IG to the Chairman of the Amtrak Board has improved the IG's independence.  We agree that this is a positive development that should be maintained.  The IG also stated that the quality of work of the Amtrak IG is enhanced by having an OIG presence within the organization itself, including attending many key staff meetings.

The Amtrak IG's comment letter also includes additional analysis of his office's investigative activities.  The IG stated that investigations are driven by the allegations regardless of the source.  For example, the IG pointed out that there has been a concentrated effort over the last few years to assess and investigate operations or circumstances where employees handle cash and that investigations have covered both Amtrak management and union employees.  Our analysis also indicates that both Amtrak management and union employees have been subjects of IG investigations.

We agree that there are arguments both for and against consolidation in this case.  The IG's comments and our report highlight many of the specific considerations that would need to be taken into account if the IG offices were to be consolidated.  These considerations represent specific trade-offs that would need to be weighed in any consolidation decision.  In this regard, we continue to believe that a targeted plan that deals with the unique characteristics of Amtrak could be put in place to mitigate potential risks and enhance the oversight of Amtrak through consolidation with the DOT IG.  For example, our report recognizes that cash handling at decentralized levels and a heightened focus on security and safety are examples of Amtrak

characteristics that would need to be addressed by any office consolidation. Our report also states that the IG's day-to-day contact with Amtrak personnel and communication with the agency head can be successfully maintained as long as the IG has a physical presence at Amtrak and takes other proactive steps to mitigate any potential reduction in communication and audit coverage. In addition, we noted that a dedicated staff for Amtrak oversight issues would likely need to be maintained with an understanding of Amtrak's unique operating environment.

Given the related agency missions and potential benefits of consolidation discussed in our August 2002 report and this report, we continue to believe that the consolidation of the Amtrak and DOT IGs is a viable action for congressional consideration. At the same time, as discussed in our report and the IG's comments, the unique characteristics of Amtrak and the related needs for oversight would need to be specifically addressed for any consolidation to be fully effective.

As agreed with your office, unless you announce its contents earlier, we plan no further distribution of this report until 30 days after its issuance date. At that time, we will send copies to the Amtrak IG; the DOT IG; the Deputy Director for Management of the Office of Management and Budget; the Chairman and Co-Chairman of the Senate Committee on Commerce, Science and Transportation; the Chairman and Ranking Democratic Member of the House Committee on Transportation and Infrastructure; other congressional committees; and interested parties. After our final distribution this report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions or would like to discuss this report please contact me at (202) 512-9471 or by e-mail at franzelj@gao.gov, or Jackson Hufnagle, Assistant Director, at (202) 512-9470, or by e-mail at hufnaglej@gao.gov.

Sincerely yours,

Jeanette M. Franzel
Director
Financial Management and Assurance

GAO-05-306R Activities of the Amtrak IG

Appendix I

Agency Comments from the Amtrack Inspector General

NATIONAL RAILROAD PASSENGER CORPORATION
Inspector General, Fraud Activities, 10 G Street, N. E., Suite 8E, Washington, D. C. 20002



February 24, 2005

Jeanette M. Franzel
Director
Financial Management and Assurance
United States Government Accountability Office
Washington, DC  20548

Dear Ms. Franzel:

Thank you for your draft letter and report related to the audit and investigative activities of the Amtrak Office of Inspector General (Amtrak OIG) and the issue of consolidating the Amtrak OIG with that of the Department of Transportation Inspector General (DOT-IG). My response is bifurcated into addressing: (A) the issue of consolidation and (B) audit and investigative activities.

**A.     OIG CONSOLIDATION CONSIDERATIONS**

My discussion concerning the issue of consolidation reflects generally the presentation or discussions which the Amtrak OIG presented to GAO during your inquiry, with a supplementation with regards to recent developments. Thus, it does not present many other matters which were not previously discussed or presented to you. However, because the report does not address directly all of the points which we made, this response provides for a more complete record.

The espoused goal of a consolidation of the Amtrak OIG with the DOT-OIG would be more effective oversight of Amtrak's operations and programs and better use of limited OIG resources. Arguably, this goal would be achieved by having a combined OIG operation that would operate with greater independence, improve the quality of work product, and make more effective use of limited OIG resources.

While there are arguments for consolidation, there are strong, cogent and practical reasons for keeping the OIGs separate. Additionally, there are ways in which the Amtrak OIG's independence and OIG's effectiveness can be improved without consolidation; and efforts have been recently implemented to effect these changes, as set forth briefly below.

Any discussion of consolidation must include an examination of the operating environments for the entities being overseen. Within the global OIG community, all OIGs operate under identical statutory authority, Inspector General Act of 1978 (as amended); however, the OIGs operate in three different environments. Some OIGs

Appendix I

oversee "grant agencies" and grant administration. Other OIGs oversee regulatory agencies and are concerned with the efficacy of enforcement activities. And a few OIGs oversee predominantly "service organizations" such SSA, VA, etc. Within some cabinet-level departments, there may be some combination of these activities, but generally most agencies have primary missions around one of the three activities. This means that OIGs adapt their oversight activities, and roles and responsibilities, to best suit their operating environment.

*Background:*

Amtrak is clearly a "service organization" in the business of national rail passenger service. Amtrak is a private corporation incorporated under District of Columbia laws, but, at the same time, Amtrak is a 'de facto' government corporation, with almost 90 percent of its assets under lien-hold (preferred stock) interest of DOT. The President of the United States appoints all of Amtrak's Board of Directors, with confirmation by the Senate. Amtrak is exempt from most OMB circulars and many statutes that directly impact OIGs (CFO Act, FISMA, GPRA, Privacy Act) and, Amtrak is not subject to Federal Procurement Regulations. Amtrak is considered a Class I. Railroad, and the majority of employees are covered by collective bargaining and employment under the Railway Labor Act; Amtrak employees are not under Federal Civil Service, so their jobs are not covered by OPM or the Merit System Protection Board. Amtrak maintains its business and financial records, and prepares financial statements, in accordance with GAAP. Amtrak is self-insured for purposes of providing medical and health benefits to its workforce.

*Practical Implications:*

For the Amtrak OIG, this operating environment results in adjusting audits, investigations, and evaluations approaches to comply with IG Act requirements in a mixed private sector/public sector environment. Let me provide several examples.

- Although Amtrak is not subject to the CFO Act, the IG works with the Board Audit Committee on the selection and appointment of the external auditor. The Board has also required the company to comply with all Sarbanes-Oxley (SOX) reporting requirements, and the OIG serves as a senior SOX oversight committee member. Amtrak keeps its books according to GAAP, and Amtrak is not subject to government obligation accounting and other GAGAS requirements. The Amtrak OIG serves both as the company's internal auditor and contract auditor for all intents and purposes.
- The Railway Labor Act and collective bargaining units outside the federal sector cover Amtrak employees. In Amtrak OIG investigations, typical Weingarten and

2

Appendix I

Kalkines warnings and similar investigations requirements may not be required, but as a matter of caution we apply them.

*GAO Evaluation Criteria:*

The GAO had previously surveyed the PCIE/ECIE OIG community and queried OIGs on their opinions on consolidation. The August 2002 GAO report evaluated OIG inputs and categorized these observations into three major categories with 28 key elements. I will generally comment on the three major areas of concern.

*Independence:*

The Amtrak IG should report to the Chairman of the Amtrak Board; this was the case from 1989 to 1999, albeit the Chairman and CEO roles had been combined for much of that time. Since 1999, the IG has advised the CEOs that he reports to the Chairman and to Congressional oversight committees. Additionally, the IG has provided the Chairpersons and CEOs with all OMB guidelines on the independence of the IG and what "general supervision" entails. During the course of GAO's inquiry, the OMB, with GAO's approval, has agreed that the Amtrak Inspector General's reporting line is to the Chairman of the Amtrak Board.[1]

The resolution of the reporting line helps resolve the 'appearance' and operation of IG independence. With respect to actual independence, I can attest further that the OIG has not been directed to restrict any audit, investigation, or evaluation by the current CEO, or his immediate predecessor. There have been several OIG work products that have been strongly opposed and/or objected to by the CEO and senior management, but the work product was produced and reported nonetheless. Similarly, the Chairman of the Board has accorded the Inspector General to take all actions consistent with independence and the letter and spirit of the IG Act.

Finally, the Chairman has made it clear that the IG has complete and unfettered access to the Chair and all Board Members on OIG matters. While the IG usually notices the Amtrak President/CEO on such communications as a professional courtesy, the IG does not 'clear' such communications with the President/CEO.

---

[1] See Office of Management and Budget, 2004 List of Designated Federal Entities and Federal Entities, 70 FR 4157-01 (January 28, 2005).

3

Appendix I

Thus, the Amtrak OIG is at the level of independence of many other similarly situated inspector general offices.[2]

*Quality of Work:*

Amtrak OIG work product excels in all statutory reporting categories for OIG performance. OIG reports have been hard hitting and effective; with over 200 employees terminated for cause over the past three years, including the investigation and removal of several senior managers.

Critically, having an OIG presence within the organization itself, including attending most Executive Staff meetings and other senior management meetings, provides the Amtrak OIG with vantage points. Given this unique inside positioning within Amtrak, the presence of the IG serves as an effective preventive control as well as provides timely knowledge of agency missions and priorities. For example, before Amtrak enters into any agreement to provide contract services for states and commuter authorities, the IG ensures that Amtrak is properly reporting and covering all required expenses. In other cases, the OIG has recommended and facilitated the institution of new project management initiatives, such as for the $900 million dollar New York Penn Station Fire, Life, Safety (FLS) project, and has facilitated closer executive review of Amtrak's critical Acela business line. Most OIGs, certainly those more occupied with broader policy examinations, cannot fill this role.

I must also comment upon and emphasize for you the current relationship between the DOT-OIG and the Amtrak-OIG. Clearly, the DOT-OIG has broad responsibilities for the entire DOT enterprise, and Amtrak is merely 1.5% of DOT's $58.7 billion FY 05 annual budget, and in some cases has specific requirements for appraising and commenting on Amtrak's annual budget submissions. The DOT-OIG also addresses larger financial policy issues affecting Amtrak and, quite appropriately, views Amtrak in terms of other larger DOT programs, e.g., funding and accountability for rail, transit, highways, etc. The Amtrak OIG performs essentially much closer oversight of Amtrak's day-to-day operations, including procurement activities, financial controls, internal controls, employee conduct, safety and security assessments, etc. On occasion, the two OIGs will coordinate investigations and share information on critical reviews; we have a very good

---

[2] To ensure independence some of the other designated federal entities have direct line item budgets from Congress. I have had discussion with Congressional authorization committee staff on the need for the Amtrak OIG to have a separate line item budget, and this will be our legislative priority in the current year re-authorization process. A line item budget will provide the OIG with even greater independence and operational flexibility.

4