Appendix I

working relationship and understanding and which the Amtrak OIG is better suited for the work at hand. In essence, why reformulate a successful solution.

*Use of IG Resources:*

The Amtrak OIG resources must be viewed in proper context, that is, is there an adequate number of the right kind of workers for mission requirements? On several occasions, I have attempted to gauge how the Amtrak-OIG fares against other DFE-OIGs and cabinet-level PAS OIGs, using ratios such as FTEs/agency budgets, FTEs/number of investigations, OIG FTEs/agency FTEs, etc. These efforts provide 'ballpark' type checks, but they are not conclusive. In general, I know I have a very low 1811-investigator-to-case ratio (my agents and investigators have case ratios in the 1:20-30 area, whereas most OIGs do not like to exceed a 1:5-7 ratio). I also know that the FTE auditor to questioned cost ratio for the Amtrak-OIG is among the highest in the OIG community, but I also know that some OIGs have greater/lesser opportunities to achieve meaningful results in this area.[3]

With respect to having a qualified work force, Amtrak OIG auditors are well trained and well suited to their mission requirements. All Amtrak OIG auditors meet and in many cases exceed the education and training levels of other OIG counter-parts. Similarly, OIG investigators are highly experienced and, more recently, the Amtrak OIG has recruited heavily from Federal law enforcement entities, including the Federal Bureau of Investigation, DOT-IG, Internal Revenue Service CID, and the United States Department of Justice. Person for person, the Amtrak OIG is better staffed than most DFE and many PAS OIGs.

Acting as an independent IG shop has afforded Amtrak OIG a unique ability to attract highly qualified individuals with diversified talent through the hiring of retiring agents from other agencies, which it would not otherwise be able to do under the federal system. Utilizing this pool of talent greatly enhances the Amtrak IG's ability to provide the proper skill sets necessary to meet the diverse challenges of providing oversight to a serviced based commercial entity.

The Amtrak OIG has more attorneys on its staff than most other OIGs because of the complexities of cases and issues we are handling and the need to be independent of the Amtrak OGC. Cabinet-level IGs rely heavily on the various Departments' general counsel offices.

---

[3] I readily agree with you there are some areas of government spending, like health care and defense, that should have more OIG resources assigned if the singular measure of success were return on audit/investigations dollar invested.

5

Appendix I

*Uniqueness:*

Although there are often financial benefits to consolidation of entities, whether they are private or governmental, we are not aware of any analysis that shows a financial benefit to consolidation in this instance. Moreover, given Amtrak's uniqueness, and Congress' pressing concern with the viability of the Company, the level of scrutiny, which we provide, is essential. It is possible that there may not be the same level of scrutiny under consolidation (despite the splendid achievements of the DOT-IG), considering all of the major issues, which the DOT OIG is facing, e.g., their Top Ten Challenges. Finally, the Amtrak OIG's role in combating terrorism has taken on added significance since September 11. There are unique issues and concerns regarding terrorism which relate to passenger railroads that do not exist in other transportation fora. This is most effectively confronted with an IG force dedicated to passenger railroads.

*Conclusions:*

The current organizational independence between the DOT-OIG and the Amtrak OIG works well and is not in need of fixing. Consolidation would most likely not reduce expenses, and would most likely result in fewer OIG investigations, evaluations and inspections. This Report, while highlighting the activities of the Amtrak OIG, does not indicate any lack of oversight, or any perceived lack of independence in regards to oversight activities. This brings into question the benefit to be gained by removing the Amtrak OIG's direct contact with and intimate knowledge of the daily operations of Amtrak. While benefits can be realized through access to DOT-IG resources, an independent Amtrak OIG allows for the focus of personnel and resources to be allocated and directed based on the needs and requirements of the oversight of a commercial enterprise.

**B.   INVESTIGATION ACTIVITIES**

As a threshold matter, the Office of Investigations' activities and decisions regarding what matters to investigate have been made solely by OIG officials, and not Company management. During the time period of your review, we reviewed all allegations, accepted some for thorough investigations, and referred others to management for their initial actions and our subsequent review or monitoring (such as time and attendance matters).

Historically OIG-OI has focused investigative resources on matters and or areas of attention as required. A focused approach to stem fraud, theft and embezzlement at the cash transaction level has created an increase in the level of investigations involving

6

Appendix I

union employees; however, as a percent of population, management employees are more frequently targets of investigative activity.

Critically, to the extent that the inquiry was intended to gauge any Amtrak OIG bias against collective bargaining employees, neither the facts nor the figures establish such hypothesis. Considering the investigations initiated during this period with the relevant employee populations in each category, the statistical likelihood of a management employee being the subject of an investigation was five hundred percent greater than that for collective bargaining employees.[4]

Moreover, in assessing the ratios and statistics in comparing the number of investigations related to collective bargaining employees compared to management employees, the reader should also bear in mind certain considerations. First, because the OI operates significantly in a reactive capacity, usually its decisions are driven by the allegations received, regardless of the source. During the OIG's life span the vast majority of investigative cases have been of a reactive, rather than proactive, nature. Moreover, during the tested time period, because of Amtrak's poor financial condition, the OIG has engaged in a concentrated effort over the last few years to assess and investigate operations or circumstances where employees handle cash. Given Amtrak's business structure it is not surprising that there are far more cash transactions which are handled by union employees (e.g., ticket agents, conductors, lead service attendants) than are handled by management employees. This is critical to deterring fraud, assessing internal controls, protecting the integrity of the various financial streams, and lowering insurance rates.[5] In light of investigations of a proactive nature, future proactive investigations could concentrate on activities in which more management is involved or both management and union employees are involved. Thus, the figures would differ based upon proactive programs which the OIG is conducting for any given period.

The continued increase in allegations being made by the overall employee population depicts the success of the Amtrak OIG in opening the lines of communication to all complainants and encouraging employees and others to come forward when faced with questionable practices or conduct. This is further illustrated by an increase from 22% to 32% of total allegations made against union employees being made by other union

---

[4] While in FY2004 76 cases or 50% of closed investigations involved Union Employees, this represents just .04% of the total union population; in contrast the 48 cases or 33 percent of closed cases, represent that management employees are targeted 5 times as often with 2% of the management population being subjects of investigations in FY2004.

[5] As noted in the prior section of this response, many of these proactive investigations of employees handling cash led to successful criminal prosecutions during this time period.

7

Appendix I

employees. Thus, the collective bargaining employees have shown an increasing level of confidence in the OIG to solve problems related to fraud, waste and abuse.

I hope these additional comments further explain the bases for the Amtrak OIG's position. Thank you for allowing us the opportunity to respond.

Respectfully,

Fred E. Weiderhold, Jr.
Inspector General

8

(194459)

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>                              TDD:    (202) 512-2537<br>                              Fax:    (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| Public Affairs | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON RECYCLED PAPER

# GETTING ACELA BACK ON TRACK

(109–17)

## HEARING
BEFORE THE
SUBCOMMITTEE ON
RAILROADS
OF THE
## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
## HOUSE OF REPRESENTATIVES
ONE HUNDRED NINTH CONGRESS

FIRST SESSION

MAY 11, 2005

Printed for the use of the
Committee on Transportation and Infrastructure



U.S. GOVERNMENT PRINTING OFFICE
22–496 PS            WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250  Mail: Stop SSOP, Washington, DC 20402–0001


EXHIBIT
67

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

DON YOUNG, Alaska, *Chairman*

| | |
|---|---|
| THOMAS E. PETRI, Wisconsin, *Vice-Chair* | JAMES L. OBERSTAR, Minnesota |
| SHERWOOD L. BOEHLERT, New York | NICK J. RAHALL, II, West Virginia |
| HOWARD COBLE, North Carolina | PETER A. DeFAZIO, Oregon |
| JOHN J. DUNCAN, JR., Tennessee | JERRY F. COSTELLO, Illinois |
| WAYNE T. GILCHREST, Maryland | ELEANOR HOLMES NORTON, District of Columbia |
| JOHN L. MICA, Florida | |
| PETER HOEKSTRA, Michigan | JERROLD NADLER, New York |
| VERNON J. EHLERS, Michigan | ROBERT MENENDEZ, New Jersey |
| SPENCER BACHUS, Alabama | CORRINE BROWN, Florida |
| STEVEN C. LaTOURETTE, Ohio | BOB FILNER, California |
| SUE W. KELLY, New York | EDDIE BERNICE JOHNSON, Texas |
| RICHARD H. BAKER, Louisiana | GENE TAYLOR, Mississippi |
| ROBERT W. NEY, Ohio | JUANITA MILLENDER-McDONALD, California |
| FRANK A. LoBIONDO, New Jersey | |
| JERRY MORAN, Kansas | ELIJAH E. CUMMINGS, Maryland |
| GARY G. MILLER, California | EARL BLUMENAUER, Oregon |
| ROBIN HAYES, North Carolina | ELLEN O. TAUSCHER, California |
| ROB SIMMONS, Connecticut | BILL PASCRELL, JR., New Jersey |
| HENRY E. BROWN, JR., South Carolina | LEONARD L. BOSWELL, Iowa |
| TIMOTHY V. JOHNSON, Illinois | TIM HOLDEN, Pennsylvania |
| TODD RUSSELL PLATTS, Pennsylvania | BRIAN BAIRD, Washington |
| SAM GRAVES, Missouri | SHELLEY BERKLEY, Nevada |
| MARK R. KENNEDY, Minnesota | JIM MATHESON, Utah |
| BILL SHUSTER, Pennsylvania | MICHAEL M. HONDA, California |
| JOHN BOOZMAN, Arkansas | RICK LARSEN, Washington |
| JIM GERLACH, Pennsylvania | MICHAEL E. CAPUANO, Massachusetts |
| MARIO DIAZ-BALART, Florida | ANTHONY D. WEINER, New York |
| JON C. PORTER, Nevada | JULIA CARSON, Indiana |
| TOM OSBORNE, Nebraska | TIMOTHY H. BISHOP, New York |
| KENNY MARCHANT, Texas | MICHAEL H. MICHAUD, Maine |
| MICHAEL E. SODREL, Indiana | LINCOLN DAVIS, Tennessee |
| CHARLES W. DENT, Pennsylvania | BEN CHANDLER, Kentucky |
| TED POE, Texas | BRIAN HIGGINS, New York |
| DAVID G. REICHERT, Washington | RUSS CARNAHAN, Missouri |
| CONNIE MACK, Florida | ALLYSON Y. SCHWARTZ, Pennsylvania |
| JOHN R. 'RANDY' KUHL, JR., New York | JOHN T. SALAZAR, Colorado |
| LUIS G. FORTUÑO, Puerto Rico | |
| LYNN A. WESTMORELAND, Georgia | |
| CHARLES W. BOUSTANY, JR., Louisiana | |
| VACANCY | |

(II)

### SUBCOMMITTEE ON RAILROADS

STEVEN C. LaTOURETTE, Ohio *Chairman*

THOMAS E. PETRI, Wisconsin
SHERWOOD L. BOEHLERT, New York
JOHN L. MICA, Florida
SPENCER BACHUS, Alabama
JERRY MORAN, Kansas
GARY G. MILLER, California
ROB SIMMONS, Connecticut
TODD RUSSELL PLATTS, Pennsylvania
SAM GRAVES, Missouri
JON PORTER, Nevada, *Vice-Chair*
TOM OSBORNE, Nebraska
MICHAEL E. SODREL, Indiana
LYNN A. WESTMORELND, Georgia, *Vice-Chair*
DON YOUNG, Alaska
  *(ex officio)*

CORRINE BROWN, Florida
NICK J. RAHALL II, West Virginia
JERROLD NADLER, New York
ROBERT MENENDEZ, New Jersey
BOB FILNER, California
ELIJAH E. CUMMINGS, Maryland
EARL BLUMENAUER, Oregon
LEONARD L. BOSWELL, Iowa
JULIA CARSON, Indiana
PETER A. DeFAZIO, Oregon
JERRY F. COSTELLO, Illinois
EDDIE BERNICE JOHNSON, Texas
JAMES L. OBERSTAR, Minnesota
  *(ex officio)*

# CONTENTS

## TESTIMONY

|  | Page |
|---|---|
| Crosbie, William, Senior Vice President of Operations, Amtrak | 46 |
| Hecker, JayEtta Z., Director, Physical Infrastructure Issues, Government Accountability Office | 13 |
| Jamison, Robert D., Acting Administrator, Federal Railroad Administration | 13 |
| Jelensperger, Francis, President, Alstom Transportation Inc. of America | 46 |
| Spurr, William A., President, Bombardier Transport of North America | 46 |
| Weiderhold, Fred E., Jr., Inspector General, Amtrak | 13 |

### PREPARED STATEMENTS SUBMITTED BY MEMBERS OF CONGRESS

| Brown, Hon. Corrine, of Florida | 61 |
|---|---|
| Costello, Hon. Jerry F., of Illinois | 72 |
| Oberstar, James L. of Minnesota | 108 |

### PREPARED STATEMENTS SUBMITTED BY WITNESSES

| Crosbie, William | 74 |
|---|---|
| Hecker, JayEtta Z | 80 |
| Jamison, Robert D | 98 |
| Jelensperger, Francis | 102 |
| Spurr, William A | 115 |
| Weiderhold, Fred E., Jr. | 123 |

### SUBMISSIONS FOR THE RECORD

| Jelensperger, Francis, President, Alstom Transportation Inc. of America, responses to questions | 106 |
|---|---|
| Mica, Hon. John L., a Representative in Congress from Florida: | |
|    Letter to the Inspector Generals for the U.S. Department of Transportation and Amtrak, May 11, 2005 | 6 |
|    California Rail News, "Amtrak's Gunn Displays a Disarming Honesty", August 2002 | 30 |
| Spurr, William A., President, Bombardier Transport of North America, responses to questions, and chart | 120 |

### ADDITION TO THE RECORD

| Federal Transit Administration, Transit Threat Level Response Recommendation, report | 129 |
|---|---|

Case 1:05-mc-00367-PLF   Document 28   Filed 10/07/2006   Page 12 of 15

# GETTING ACELA BACK ON TRACK

### Wednesday, May 11, 2005

House of Representatives, Committee on Transportation and Infrastructure, Subcommittee on Railroads, Washington, D.C.

The committee met, pursuant to call, at 10:00 a.m. in room 2167, Rayburn House Office Building, Hon. Steve LaTourette [chairman of the committee] presiding.

Mr. LaTourette. Good morning. The Subcommittee on Railroads will come to order.

I want to welcome all of our members and witnesses here today for the hearing entitled Getting Acela Back on Track. This will be one in a series that this Subcommittee will hold relative to Amtrak. Today's hearing will focus on the Acela train sets and the great difficulty. There will be additional hearings, we believe, in the months of May and June focusing on other aspects of Amtrak's operations. Then hopefully with the bipartisan work of all members of this Subcommittee, we hope to look at a number of reform proposals that are being circulated relative to the operation of Amtrak.

As all of you are probably aware, Amtrak's Acela train, which runs in the northeast corridor, was removed from service last month due to cracked brakes. As of today, all 20 Acelas remain parked while Amtrak, Bombardier and Alstom and various subcontractors work out the necessary repairs. Back in the 1990s, the Acela train was billed as America's answer to the French TGV and the Japanese bullet train. But the Acela has been faced with challenges from the beginning, even before the train went into service in the year 2000.

In 1999, the manufacturers had to deal with design issues which reduced the train's speed on curves and increased trip times. Then problems arose with excessive wheel wear, undercarriage vibration and broken bolts. The introduction of the Acela was delayed for many months while engineers developed a fix.

In 2002, after about 18 months of service, cracks began to develop in the brackets for the Acela's yaw dampers, a suspension component that look like a giant shock absorber. Engineers eventually worked out a solution to that problem as well.

Last month, Amtrak and the FRA were running an Acela speed test in the northeast corridor with the intention of raising the train's operating speed over a certain stretch of track. After the test, an FRA official asked to have a look at the train's undercarriage. That official was Rich Thomas, the FRA's motive, power and equipment specialist for region II. I think I would like to express on behalf of the Subcommittee a debt of gratitude to Rich.

(1)

2

His sharp eyes caught an important defect that everyone else to that moment in time had missed, serious cracks in the Acela's disc brakes. I don't know if the FRA gives out commendations and medals, but I think Rich certainly deserves one for his eagle eyes.

After further inspection, inspectors found cracked brakes on virtually ever axle of every Acela train and the entire fleet was grounded. The decision to remove Acela train sets from service, though dramatic, was the right thing to do. In my opinion, Amtrak put the safety of its passengers and commuter operators in the northeast corridor and the traveling public at large ahead of revenue. They put safety first, and for that I think they should be commended.

I would also like to bring attention to another fact that seems to have been lost in all of this. Amtrak, due in large part to the size of its fleet and flexibility of its dedicated work force, was able to recall equipment from around the country to build complete Metroliner sets and place them in the Acela express time slots between New York and Washington with very little disruption to its customer base. This was a herculean task that was planned with little notice and executed with discipline and precision. If this had been almost any other operator, I question whether the results would have been the same.

We need to get to the root cause of the current difficulties with Acela, but more than that, we need to know how the lessons learned can help us improve rail safety in the future. For example, there is a serious question of information flow. I understand that the Acela technicians on the shop floor had not been fully informed as to what type of cracks to look for and where to look on the discs for cracks. There were no testing procedures in place to find these cracks, and the shop technicians apparently did not have access to the appropriate manufacturer's service bulletins.

In closing, I want to say that today's hearing is not about assessing blame, but rather about finding the best way to ensure the safety and efficiency of high speed rail service on the northeast corridor.

Before I yield to our distinguished Ranking Member, Ms. Brown, I want to issue an apology to the witnesses and members of the Subcommittee today. Even though the Chair believes that testimony to appear at this and any other hearing is embargoed until the time of the hearing, for some reason I woke up this morning and was able to read the testimony in the newspaper. I hope in the future the staff and members or whoever who has access to the testimony that helps us prepare for these hearings in the future will respect that embargo.

One reason that that is important is at least one of the witnesses today has brought additional testimony and an addendum that may in fact alter the nature and character and substance of the testimony that he or she intends to give. It is very important to the integrity of the hearing process that that information remains with us.

Also, I would like to ask unanimous consent for 30 days for members to revise and extend their remarks and permit the submission of additional statements and materials by the witnesses. Without objection, so ordered.

3

Now it is my pleasure to yield to our distinguished Ranking Member, Ms. Brown of Florida.

Ms. BROWN. Thank you, Mr. Chairman. Good morning, and I am glad you got a chance to read the paper.

I want to first of all thank you for holding this hearing. I think this is a very important hearing.

On April 15th, during a routine inspection of the Acela express train, the Federal Railroad Administration discovered cracks in the train's brake discs. This led to an investigation of brake discs on the entire system. Among the 1,400 brake discs, about half of the rotors had failed. As a result, Amtrak has been forced to suspend express service.

Let me first of all congratulate Amtrak for being cautious and erring on the safety side. I understand while the FRA recommended that Amtrak ground the fleet, it was Amtrak's decision to do so. Too often, this Subcommittee has investigated mechanical failures after the accident has occurred.

A few weeks ago, I attended a press conference on the crisis, and I just want to once again state how much I appreciate Amtrak and Amtrak workers for stepping up to the plate, working hard to minimize service disruptions and addressing the needs of Amtrak passengers. Amtrak has a lot to deal with. Since its inception in 2000, Amtrak has been plagued with a host of problems. First, there were problems with construction. There were delays, and of course the overruns in cost in delivering this train.

But let me say that I do not think the entire problem was Amtrak's. The Northeast Corridor Maintenance Company, under the auspices of the consortium, is responsible for maintaining these trains, not Amtrak. The consortium, however, never discovered the cracks. I understand that there is evidence that the consortium should have been inspecting and replacing brake discs with cracked spokes and hubs, but this never happened. In fact, a technical manual and a separate service bulletin that was sent to the consortium both recommended routine inspections and replacement of cracks, but these recommendations were ignored.

I feel that if FRA inspections had not found the cracks in these spokes, the consortium would not have identified these problems until it was too late, until a major accident had occurred. I believe, however, that this tragedy was a blessing in disguise. But I wish that the Administration, who has proposed separate operations from infrastructure in a so-called Amtrak Reform plan, this crisis is the perfect example of why this is a bad idea.

About a month ago, this Committee visited Europe, the British system. We found out that the separation of maintenance and operations was a major reason why they had several disastrous accidents, and now the whole system is going forward with trying to pull it back together. We do not have to make that mistake here in the United States. We need to work together to ensure that we have quality transportation rail service in the United States.

I yield back the balance of my time.

Mr. LATOURETTE. I thank the gentlelady very much.

Mr. Mica?

Mr. MICA. Thank you, Mr. Chairman and Ranking Member. Both of you I think quoted the story that is in the Washington Post