4

today. Let me just correct the story. It starts out: "The brake problem that sidelined Acela high speed trains last month appears to be the result of fatigue in the metal components." First of all, that is a gross misstatement, because what has happened here is not the failure of a brake system, it is the failure of Amtrak to be able to properly run a high speed system or high speed corridor. It is difficult when you have a dysfunctional organization trying to operate.

Then it says—let me read the next part. "Amtrak is losing a million dollars every week that the Acela express train is out of service and faces a serious cash crunch to continue operations to the end of the fiscal year." Even if Acela were running, it would still face similar losses.

Then let me read, "Meantime, the April 15th shutdown of the high speed service continues to inconvenience thousands of commuters on Amtrak's northeast corridor, which runs from Washington to New York." Now listen to this, this is the best part. "Amtrak has substituted more regular speed Metroliner service between the three cities." Acela only ran between one and two miles an hour difference than the Metroliner.

So there are a number of errors and misconceptions that the press is reporting today. In fact, ladies and gentlemen of the Subcommittee, this is probably the most costly and mismanaged rail project in the history of passenger rail service, not only in the country but probably the world. Three point two billion dollars spent to date. In fact, if you look at the costs over the period of time, it is subsidized to the tune of about $14,000 per passenger that we are running on this. We probably could have bought limousines and brought them back and forth from Washington to New York and Boston cheaper.

This is frightening, because it was not Amtrak that discovered the flaw in this braking system. It was not the vendor, who has been paid millions of dollars and is also responsible. But what it was in fact was FRA that accidentally, as I understand it, found this flaw. What you have here, ladies and gentlemen, is again, a problem from the very start in the structure and Amtrak trying to run a high speed corridor.

Even if we fix this, they won't get it right. First of all, the bungled the acquisition, they bought the wrong equipment. They changed the specs. Read the history of it. They have bungled management. I could go on and detail that, but it is almost farcical. They have bungled oversight. Again, FRA found this, neither the vendor nor Amtrak found this error that could have resulted in a great tragedy.

I am a strong supporter of high speed rail system and service, not only for the northeast corridor but across the United States. It will take billions and billions of dollars to build these. I have no problem with supporting that corridor, the northeast corridor or additional corridors which we desperately need in at least a dozen approved corridors across the United States. But I'll be darned if I will give it to people with a record like this. We need to take Amtrak out of the high speed service, turn it over to a consortium of the States and the private sector. We can run a service that will relieve our congested airports and highways.

5

Finally, Mr. Chairman, I am going to ask, I have looked at this whole problem, the whole bungled acquisition. One thing that frightens me is the hosing that the taxpayers have taken in this entire matter of again, a bungled management oversight and acquisition program. I have found that tens of millions of dollars have been spent in legal fees, some for in-house and some for contracted consulting service. I have a letter today, and I will ask for that to be part of the record, I am going to ask the Inspector General of the Department of Transportation to investigate and review all the expenses, not just on this braking system, but on this entire failed enterprise, report back to me and also to the Subcommittee.

So with that, Mr. Chairman, again, I am a strong supporter of high speed service alternatives for passengers on rail, and look forward to working with you and hopefully changing this whole structure, not just the brakes. Thank you.

Mr. LaTourette. I thank the gentleman for his observations. Without objection, your letter will be made part of the record.

[The information follows:]

6



# U.S. House of Representatives

## Committee on Transportation and Infrastructure

### Washington, DC 20515

**Don Young**
**Chairman**

Lloyd A. Jones, Chief of Staff
Elizabeth Megginson, Chief Counsel

**James L. Oberstar**
**Ranking Democratic Member**

David Heymsfeld, Democratic Chief of Staff

May 11, 2005

Mr. Kenneth M. Mead
Inspector General
U.S. Department of Transportation
400 Seventh St, SW
Washington, DC 20590

Mr. Fred E. Weiderhold, Jr.
Inspector General
National Railroad Passenger Corporation
10 G Street NE
Washington, DC 20002

Dear Mr. Mead and Mr. Weiderhold:

     I respectfully request that the Department of Transportation Inspector General, contemporaneous with the Inspector General of the National Railroad Passenger Corporation, audit and investigate all of Amtrak's legal expenditures and costs, including counsel or other project professional services retained under private or other auspices, relating to the Northeast High Speed Rail Improvement Project since its inception.

     Please include detail on Amtrak's legal procurement process and expenditures relating to the acquisition and maintenance of the Acela equipment, the electrification of the Northeast Corridor (NEC) and other improvements required for the project.

     It would be most appreciated if you could provide both me and the House Subcommittee on Railroads with your findings as soon as possible.

     Sincerely,

John L. Mica
Member of Congress

JLM:grb

7

Mr. LaTourette. Mr. Blumenauer.

Mr. Blumenauer. Thank you, Mr. Chairman. I deeply appreciate the Committee having the hearing today to focus on these issues. I hear my good friend from Florida talk about turning something over to Amtrak and talking about their record. Well, the people, in my judgment, with the record that is not something that I am proud of is the record that Congress has of unrealistic expectations and failure to fund an adequate capital program.

The people that I am concerned about and one of the questions I would like to explore in the course of this hearing deals with, what is it that forces Amtrak to have to, as Ms. Hecker has in the first page of her testimony, talk about the fact that they can't buy something off the shelf. There are products that work all over the world with proven records of safety. Why is it that Amtrak is forced to have to assemble something that has serial number 0000001 in the backdrop of Congress and others' steady drumbeat to force Amtrak to move quickly over tracks where there is not adequate capital investment and where Congress refuses to give them the opportunity to be flexible in terms of the management. And they are still liable, in some cases, for costs that date back far before Amtrak was even formed.

So Mr. Chairman, I appreciate the hearing. I appreciate the fact that we are going to be getting at some short term concerns about these safety issues. I too am pleased that we got ahead of the curve and I am looking forward to answers about maintenance and expectation.

But I am hopeful that before this Subcommittee finishes its job that it stops having Amtrak service as some sort of punching bag and that we look at the forces that require us to have these train sets established in the first place and the unrealistic expectations and the pressures that are brought to bear with the regulatory agencies. I have had experience in my hometown when we are trying to get rail initiatives that we can't buy off the shelf equipment from Europe for smaller scale projects that add cost and complexity, and as near as I can tell, don't add safety.

So I think we ought to get at the regulatory regime and the context in which this goes. I will submit a more extensive statement, even thought it is hard to believe. But I want to at least put this on the record as we move forward.

Mr. LaTourette. I thank the gentleman very much.

It is the Chair's intention to permit every member to make an opening statement, particularly those in the northeast corridor who have great concerns with Acela. But staff has advised me that Mr. Jamison and his wife are expecting a child any minute. So if we could sort of move through it expeditiously, I would appreciate it.

Mr. Westmoreland? No statement. Mr. Nadler.

Mr. Nadler. Thank you, Mr. Chairman.

Mr. Chairman, I thank you for holding this hearing today regarding Amtrak's Acela. This is an issue of particular concern to me, given that my district contains Penn Station in New York City, by far the largest Amtrak station in the country. I am personally a frequent rider of Amtrak from New York to Washington, practically every week that Congress is in session. So I have a great person

8

interest in seeing Amtrak's Acela back in operation and running in reliable service.

We know that Amtrak has problems. While I am interested to hear from the witnesses today as to the particular causes of this particular problem, we know the larger answer to the larger problem is quite clear. I hope that the Acela issue is not used as an excuse to further dismantle the railroad.

The Administration has long seen problems with Amtrak and decided to chuck the whole thing. The Administration wants to derail the system by breaking Amtrak up into small pieces, gutting protections for railroad workers and trying to split the northeast corridor, the jewel of the Amtrak system, in a way that has failed spectacularly elsewhere, most notably in Great Britain.

And in a spectacular display of contempt for the northeast part of the country, the Administration has proposed spending no money on Amtrak this year in order deliberately, intentionally to drive it into bankruptcy. This Administration looks at Amtrak and says, if only we had better management, or if only we busted the unions. Or if only we let private companies come in and run the trains. If only we had competition, then we would have a profitable passenger rail network and everything would work itself out.

Apparently the Administration forgets, as do some members of this panel, that the reason Amtrak was created in the first place was because the private railroads begged the Government to stop making them carry passengers. We took these money-losing routes off the hands of the private railroads with their inadequate infrastructure and attempted to create a new railroad. Not surprisingly, things have not gone entirely smoothly.

I believe the answer is actually quite simple. First, people need to stop making the false assumption, the absurd assumption that transportation systems are profitable. The airlines and the highways are both heavily subsidized by taxpayers, and they should be. Because they provide a vital public service and they are critical to our economy. But neither of them is profitable, at least not without significant public investment. At the very least, they are not self-sufficient. We should not try to require Amtrak to be self-sufficient, either. It is impossible, it is illusory. It does not make good sense as transportation public policy and the requirements that this Congress has imposed on Amtrak, to promise to be self-sufficient, are requirements to be hypocritical and self-defeating.

Second, we need to finally start investing adequate resources in Amtrak to allow the railroad to provide stable, reliable service. One of the reasons, I believe, perhaps the chief reason for the problems we are having with the Acela now is that the prototype testing was rushed and skimped on to a large extent to save money, because they did not have the funds. We spend approximately $50 billion a year on highways and aviation, but only about $1 billion on Amtrak, even though rail is a more energy efficient mode of transportation.

Mr. Menendez and I are working on legislation called TRAIN-21 that would provide Amtrak the funding it needs to improve service in its current system, as well as provide a funding mechanism to upgrade high speed corridors around the country. I believe that positive measures that invest in rail, such as TRAIN-21, are what

9

is needed to keep Amtrak stable, or rather to restore it to stability, and to give it the resources it needs to get the Acela back on track and to get better systems in place.

I hope this hearing can be useful in determining exactly what steps need to be taken to fix this problem in the most efficient manner possible. I look forward to working with my colleagues to make sure that Amtrak has the resources it needs to do the job and does not fall prey to the kind of delusions that the Administration and some members of this panel that we heard a few minutes ago are subject to.

Thank you, Mr. Chairman.

Mr. LATOURETTE. I thank the gentleman.

Ms. Brown tells me that Mr. Cummings, you are next in seniority. Mr. Cummings.

Mr. CUMMINGS. Thank you very much, Mr. Chairman.

I want to associate myself with everything that has been said by my Democratic colleagues. I want to thank you, Mr. Chairman, for calling this hearing today to enable us to assess what must be done to ensure that Acela does not continue to be plagued by service interruptions.

Acela is critical to Amtrak's revitalization and to transportation on the northeast corridor. We must ensure that Acela is a reliable service. Unfortunately, the history of Acela has been one of disappointment almost from its inception. The scheduled start date of Acela service was delayed by more than one year, and when the service finally did begin, the first Acela train arrived at its destination more than 10 minutes late. The current problems with Acela's brake system are just one in a series of equipment failures that have resulted in service interruptions since 2001.

A brief review of the history of the creation of Acela reveals essential lessons that must be considered by the Subcommittee as we examine what should be done now to improve Acela. After committing to develop high speed service, Amtrak examined high speed trains already in use in Europe. However, according to statements by Amtrak board members reported in the papers at the time, Amtrak ultimately chose a new and completely untried system because it came with an attractive financing package provided by the Canadian government. Amtrak ordered the first Acela trains even before the Federal Railroad Administration had promulgated safety regulations for such Tier II trains.

When these regulations were announced, they required Acela's engines to be heavier than any other high speed train in the world. Compliance with these regulations also required Amtrak to make extensive design changes. Despite the fact that Acela design was new, Amtrak apparently felt pressure to put it into service quickly, and therefore decided not to build and test a prototype. As a result, design flaws, such as the impact of its weight that might have been resolved before Acela was in revenue service, are now being addressed through these repeated service suspensions.

What happened between the time the promise of groundbreaking high speed rail service was made and the delay a year later than planned that this troubled train was put into revenue service? To begin with, Amtrak was pressured to develop its high speed service as quickly as possible, but the effort was underfunded. Unfortu-

10

nately, these pressures shaped Amtrak's choices, starting with the choice of the Acela design itself, which could be described as a choice of funding over function.

Further, the Administration and Congress committed to develop high speed rail service without committing to spend the full amount necessary to create the track infrastructure needed to support truly high speed service. As a result, Acela is designed to travel at 150 miles per hour but it is able to achieve that speed on less than 35 miles of track along the entire northeast corridor. Consequently, the introduction of Acela has not reduced the trip time between New York and Boston to less than three hours, as required by the 1992 Amtrak Reauthorization and Development Act.

Finally, unfortunately it seems that Amtrak failed to manage properly the limited funding it was given to upgrade track along the northeast corridor. A report issued by the well-respected GAO in February 2004 found that "Neither Amtrak nor the FRA exercised effective management or oversight of the northeast high speed rail improvement project." The GAO report also found that Amtrak failed to develop a comprehensive management plan for its infrastructure project.

In other words, the story of Acela train is the story of Amtrak itself. Amtrak has been given competing goals over the years, sometimes being told to focus on providing the broadest possible service and at other times being told to obtain financial self-sufficiency. Throughout its existence, however, it has been underfunded and the capital infrastructure on which it operates is still in need of extensive upgrades and repairs.

So, Mr. Chairman, we must set clear goals for Acela. We must fund it adequately and we must be vigilant in demanding that Amtrak respond to our investment by improving its own management and service efficiency. We cannot continue to repeat our past mistakes regarding our Nation's inter-city passenger rail service.

With that, I yield back.

Mr. LaTourette. I thank the gentleman.

Mr. Oberstar?

Mr. Oberstar. Thank you, Mr. Chairman.

I think it is important to have this hearing. I hope it does not evolve into a hearing on whether Acela or whether Amtrak, but stay focused on the issue of what went wrong here in this very important aspect of the Acela technology. I am for Amtrak, said it many times, I don't need to repeat all that. I think the Acela was a great innovation in American rail technology. It still leaves us a third world country in terms of high speed passenger rail transportation.

But this technology of Acela, Mr. Chairman, has had repeated problems. What we are confronted with today as the subject of our hearing is the disc brakes, or brake discs. This is not a new issue of technology. Fifteen years ago, a DC-10 crashed in Iowa, crash landed in Sioux City after losing a disc in the tail engine. Titanium, not just any piece of metal, highest quality metal cast anywhere in the industrialized world. It failed.

We can take lessons from the DC-10 experience and apply them to Acela as we do throughout aviation. Redundancy in the manu-

11

facturing process and redundancy in the oversight and conduct and oversight of maintenance.

There are two issues here. One is the casting of the brake discs themselves, and the maintenance conducted on those brakes. Let me deal with the first issue. The bible of steel, which I keep in my office, Making, Shaping and Treating of Steel, the U.S. Steel Company, has an entire chapter on castings of steel and iron. What is critically important are, or factors that are critically important are the temperature at which the steel is cast, the rate at which the cast is cooled, the gating through which the steel is poured from the ingot into the mold, and the purity of the product itself.

As far as I can tell from the testing done so far, neither Bombardier-Alstom nor Amtrak has gone far enough into the technology of the casting of this steel. That is why I have asked for further inquiry into this matter of the original equipment manufacturer's technical manual. I have asked the Amtrak inspector general to deliver the technical manual on brake disc rotors. I think we will, I will probe, of course, in this hearing, the extent to which oversight has been conducted by the Federal Railroad Administration, Amtrak itself and its contractor, Bombardier.

The failure in the DC-10 was a failure both of casting and of oversight. There have been no accidents yet on Acela, been no injuries or fatalities, thank God. But there were 110 lives lost in that failure of the United Airlines DC-10 in Sioux City, Iowa. Fine, fine submicroscopic hairline crack, propagated over a period of time to cause catastrophic failure. The discs separated, the engine went through the hydraulic lines, landed in a cornfield, was recovered by NTSB. And the metallurgical analysis done in meticulous detail, notably absent in the inquiries so far, and in that respect this hearing may be somewhat premature, but nonetheless, it is important for us to stay on top of this matter.

The same principle applies here. You have a fine crack, and it propagates. Then you are in the presence of a real or potential catastrophic failure. The design life of the brake disc rotors, from all the documents I have read, and I have read a good many of them, 1 million miles. But the cracks appeared much earlier, 300,000, 400,000, 650,000 miles. Now, if this vehicle had been traveling at true high speeds of 175, 185 miles an hour, it very likely could have had catastrophic failure.

So we have to review in considerable detail not only the casting, the manufacture and the specifications for this part, but also the conduct of maintenance. That is critical to safety. That is where I think there has been a lapse.

Back to the casting, you have to look at the shape, the metal specifications, chemical composition of the molten metal, whether there is a possibility that sulfur wax from the molds could have propagated into the molten metal, creating gating, risering and whether in fact the metal was heated to its required specification, 3,000 degrees Fahrenheit. Until we understand all of those issues, we are not going to fully understand what has gone wrong here. Those are the issues, should be the primary factors.

Then I think we have to look very carefully at the qualifications of the maintenance personnel, their skill in detecting submicroscopic cracks in the hubs, the connections of the spokes. And I

12

think we need to oversee Amtrak's and Bombardier's inquiry into this process. I think we need some outside metallurgical consultants to take a close look at this issue, Mr. Chairman.

I thank you very much for the time.

Mr. LaTourette. I thank the gentleman very much for his observations. One of the reasons that members on both sides of the aisle benefit so greatly from the distinguished Ranking Member's institutional knowledge and other knowledge, I would venture to say you are probably one of the few members that has the steel bible here on his bookshelf in Washington, D.C.

[Laughter.]

Mr. LaTourette. Mr. Menendez.

Mr. Menendez. Thank you, Mr. Chairman, for holding this hearing and for this opportunity.

Mr. Chairman, if we can accomplish one thing at today's hearing, I hope that we can correct the misperception, at least my belief a misperception, that this whole problem was Amtrak's fault. Let's be clear. Amtrak did not design the brake discs, they did not produce them, and everything that I have seen at least to date indicates that they had no knowledge of any of the potential problems until the cracks were discovered. Amtrak has in fact, in my view, performed admirably by moving quickly in taking the Acela out of service, even though they knew it would cost millions of dollars in lost revenue.

I believe the real problem is the combination of unrealistic expectations and insufficient support that Amtrak has struggled with since its creation. Thirty-four years of funding Amtrak does not even equal one year of highway funding. We should not be surprised that Acela has suffered a number of embarrassing setbacks since they were encouraged to rush a high speed train into service in the name of becoming profitable. Instead of being able to select a train purely on its merits, they were forced to take a largely untested design because it had the most attractive financing deal.

To solve Amtrak's problems, we do not need to sell off the northeast corridor, force the States to pay the whole cost so that their State transit systems that largely run, as in my State of New Jersey, on Amtrak's lines and would leave tens of thousands of travelers either stranded or with increasingly high fares, or break it into a number of smaller companies, I don't think those are our solutions. Those solutions, in a similar set of circumstances, were utter failures in Great Britain.

What we need to do is make the serious financial commitment that should have been there from the beginning. We need to provide Amtrak with a stable and robust funding source so that it can fix its backlog of deferred maintenance, run more trains, run them faster and run them on time. To that end, I will soon be introducing my TRAIN-21 legislation, along with Congressman Nadler and others, that provides Amtrak the money it needs, establishes a new State matching program designed to improve the quality of train service in rail corridors throughout the country.

Amtrak is a national transportation asset that provides a vital service for the 25 million people who ride it each year. It is time we treated it as such.

13

As someone who sits right across from New York City in the context of my congressional district, and who lost many citizens on September 11th, it is astounding to me that we do not view Amtrak as a vital component of national security in the need for multiple modes of transportation in the eventuality of a terrorist attack. On that fateful day, when September 11th took place, the only way out of downtown Manhattan was ultimately through a ferry system into New Jersey. Days later, when the airlines were still grounded, it was rail that connected cities one to each other. Multiple modes of transportation are critical in the post-September 11th world. Amtrak is part of that.

We started the process, I hope, of understanding the value of Amtrak two weeks ago when the Committee reported out the Amtrak Reauthorization and RIDE-21, and we continue today by trying to figure out how Amtrak can get its most lucrative train back on track. I hope we can get some answers about what caused these brake problems, and I look forward to figuring out exactly who knew what and when.

Thank you, Mr. Chairman, for holding this hearing.

Mr. LaTourette. I thank the gentleman very much.

It is now time for our first panel. I want to thank all of the witnesses and remind you all that we have received your testimony, so has the Washington Post, apparently. But we have received your testimony and reviewed it. Because of the importance of this, we are not going to be real sticklers on the five minute clock. But if you could confine your comments to as close to that as possible, we would appreciate it.

On the first panel is Robert Jamison, the Acting Administrator and expectant father from the Federal Railroad Administration; Fred Weiderhold, Jr., who is the Inspector General for Amtrak; and JayEtta Hecker, who is the Director of the Physical Infrastructure Issues section of the GAO. Welcome to you all, thank you for coming today, and thank you for providing us with your testimony ahead of time.

Mr. Jamison, when you are ready.

**TESTIMONY OF ROBERT D. JAMISON, ACTING ADMINISTRATOR, FEDERAL RAILROAD ADMINISTRATION; FRED E. WEIDERHOLD, JR., INSPECTOR GENERAL, AMTRAK; JAYETTA Z. HECKER, DIRECTOR, PHYSICAL INFRASTRUCTURE ISSUES, GOVERNMENT ACCOUNTABILITY OFFICE**

Mr. JAMISON. Thank you, Mr. Chairman and members of the Subcommittee. I appreciate the opportunity to appear before you today, on behalf of Secretary Mineta, to discuss the recent developments concerning Amtrak's Acela service. As you have already mentioned, Mr. Chairman, an FRA Safety Specialist, Mr. Rich Thomas, first detected cracks on the spokes of an Acela train disc brake rotor on the evening of April 14th. The detection occurred while FRA personnel were closely inspecting a trainset that had been involved in test runs. The test runs, unrelated to the brake issue, were being conducted to ensure safe operating performance of the Acela at higher speeds in curves than are currently permitted.

14

While conducting a very thorough post-test inspection of the brakes on the trainset, Mr. Thomas noticed what appeared to be rust from a small mark on one of the rotor's spokes. On closer examination, the mark proved to be a crack. After the initial discovery of the cracks, the FRA inspectors, along with personnel from Amtrak and the Acela maintenance contractor, then inspected the other trainsets. As the inspections concluded that evening, it became clear that a significant percentage of the disc brakes had similar cracks. After discussions with FRA personnel that night, Amtrak suspended Acela service immediately on April 15th and ordered a detailed inspection of the entire Acela fleet for the presence of such brake rotor cracks.

The good news is, as has already pointed out by members of this Subcommittee, these cracks were detected before they led to a catastrophic failure of the rotor with potentially very serious consequences. My staff and I met with Amtrak President David Gunn and his staff on April 15th, and again on April 20th to discuss the problem and potential solutions. Amtrak formed a working group consisting of its staff, its contractors who are responsible for Acela maintenance, the suppliers of the equipment and several technical experts to determine the cause of the problem and to explore solutions to the problem. FRA experts are fully cooperating with that effort. Amtrak has no intention of running the Acela equipment with cracks in the disc brakes, and all concerned understand that FRA will not permit that to happen.

FRA has a broad safety program. Our efforts to ensure the safety of the Acela service are but one component of a comprehensive railroad safety program. Although the railroad industry's overall safety record is very positive and most safety trends are moving in the right direction, very serious train accidents still occur, and the train accident rate has remained stubborn. To meet these challenges, FRA is targeting its regulatory program on the most frequent causes of train accidents. We are focusing our inspection resources on the areas of highest risk, and we are accelerating our R&D efforts that have the largest potential to mitigate those risks.

More than 70 percent of all train accidents are caused by either human factors or track defects. FRA is taking aggressive action to address these leading causes of accidents.

One component of our program is a focused national inspection plan. FRA recently began phasing in this national inspection plan to improve the agency's allocation of inspection resources. The NIP will use sophisticated trend analysis of inspection and accident data to produce an optimal distribution of resources to minimize fatality, injury and accident rates. We began implementing the NIP last month in the first two disciplines of operating practices and track, which correspond to the leading causes of accidents.

FRA closely monitors all aspects of Amtrak safety, as it does for all freight and passenger railroads. Amtrak's safety record is comparably quite good. In 2004, Amtrak's rate of accidents, 2.8 per million train-miles, was well below the industry average of 4 accidents per million train-miles. Contrary to the industry trend over the last two years, Amtrak's human-factor-caused accidents have fallen substantially, comprising 20 percent of Amtrak's accidents in 2004.

15

Employee injury rates, particularly in the transportation depart-ment, also improved in 2004.

FRA will continue to monitor Amtrak very closely and assure that its generally positive safety record is maintained and does not deteriorate.

As mentioned previously, we are working very closely with Am-trak as the railroad tries to determine a long-term solution to Acela's disc brake problem. Public safety is of utmost importance, and we will continue to ensure that the solution that Amtrak adopts fully protects Acela's passengers and crews. We will also en-sure that Amtrak's implementation of its equipment inspection pro-gram for the Acela trainsets is improved so as to ensure that any such safety-critical problems are found and corrected well before they reach the dimension that this problem had reached by the time that we detected it.

I believe that the extra effort that has already been pointed out, that was displayed by FRA Safety Specialist Thomas and the other FRA personnel involved in the Acela brake issue, quite possibly averted a very serious accident. Those efforts are emblematic of the dedication of the FRA employees to their safety mission. We will continue to exercise that level of effort in working with Amtrak to ensure that the resumption of Acela service is safely done.

I look forward to answering any of your questions.

Mr. LaTourette. Thank you very much, Mr. Jamison.

Mr. Weiderhold, thank you for coming, and we are ready to listen to you.

Mr. Weiderhold. Good morning, Mr. Chairman and members of the Committee.

Mr. Chairman, with your permission, I have two requests. One request, I have a written statement that I would like to be submit-ted for the record.

Mr. LaTourette. Without objection, so ordered.

Mr. Weiderhold. The second request is to allow Mr. Oberstar to be hired on my staff, given his knowledge of steel. I think he is ex-actly on point when it comes to some of the issues that my office is very concerned with. I have an engineering degree, but it is about 30 years old. I know enough to be dangerous on that, sir, but I would be pleased to work with you on that issue.

I want to kind of echo the comments of some of the members in recognizing the FRA. I have worked with Mr. Thomas for a couple of years. I think that when we interviewed him, I asked him, I called him the following morning and I said, Rich, how did you find the crack. He said, Fred, we ended the run, I go under the train, and it was just out of the corner of my eye I saw a rust spot, and it didn't look like a surface crack. I think he pushed at it a little bit, and it had some indentation, there was rust, indications of rust. So he quickly called down Steve Play, who joined him under the train and they proceeded to check out and through visual in-spections they found a number of cracks in spokes.

Really what we want to do is to figure out kind of why it took so long for the FRA or anyone to notice those cracks before some type of corrective action was taken.

I also want to commend the FRA, because as soon as this oc-curred, they ordered, and Amtrak fully cooperated with, a fleet-

16

wide inspection of all the brake discs across the system on the non-Acela fleet. There are many, many more cars out there that needed to be inspected. The FRA executed that within a couple of days over the fleet. I have reviewed their reports and their reports make clear that there is no systemic problem with Amtrak cars, the non-Acela Amtrak cars. But I think the FRA should be recognized for that quick effort.

I do want to commend Amtrak. Within hours after being alerted with the FRA and speaking with the consortium, Mr. Crosbie, who is their senior VP of operations, I think about 12:30 in the morning made the decision to ground the fleet. That was certainly the right decision in hindsight. I think Amtrak did a very commendable job and acted in the best interests of everyone in making that timely decision.

Also, Amtrak did institute very quickly a recovery stage with respect to bringing the Metroliners back. I think that is good news, because what has happened is, there has not been any serious degradation of riders in the northeast corridor. I think regardless, in listening to the members, regardless of the positions on Acela as to how we got here, I think Amtrak is a common carrier, it does have common carrier obligations, it does need to keep its trains running, and it was able to accomplish that.

You will hear later on a lot of discussion about the fix. I think everybody is very interested in getting to the fix. We are concerned about that. We watched the various vendors in the supply chain, the Knorr Corporation, Fadely Transport, SAB WABCO and others working very hard daily, seven days a week, trying to figure out what went wrong. Likewise, the manufacturers' consortium of Bombardier and Alstom have been working very hard and have dedicated staff and a lot of time to getting to the fix.

But I want to elaborate a little bit more, and I think the members have all touched on this, about what more you need to do. And this gets to the OIG's role.

While the fix is a priority, I think it is our responsibility to examine the entirety of the root causes of the failure. The root cause does not stop at just finding the reason for the failure. There are, as this Committee is very familiar with, what I would call human factor issues that the NTSB is very familiar with, and that is, why did certain people make some decisions and why did some people make other decisions with respect to the brake discs.

Like you, we want to know why it took so long for the cracks to be discovered. There were many people involved in the inspection and servicing of the wheel sets onto which the brake discs are affixed. Why did so many brake discs with cracks passed unnoticed?

We also want to know who was aware of the cracking problem. Did the responsible person or persons act differently because an action or non-action would result in financial harm? Are there organizational impediments to information sharing?

Sometimes people make bad decisions with good intentions. We need to know if that happened here.

Very briefly, because I know we do not have a lot of time in the opening statements, I would like with your permission, Chairman LaTourette, at least talk about what we have found so far to kind of get the ball rolling. First, with respect to why the cracks went

17

unnoticed by the maintainers and the inspectors. We have two possible explanations for that, if you will bear with me.

First, the cracks are very hard to see. We had some of the Committee staff out at Ivy City looking at the Acela trains. I took them under the trains, they viewed the wheel sets off from under the cars. I think even with their, in some cases, younger eyes they would have had a hard time finding those cracks.

We do not have an actual disc for you today. They are fairly large, and as Mr. Oberstar points out, this is poured cast steel, they are pretty heavy. What I do have is a diagram over here, and there is a diagram attached to the back of the testimony that kind of gives you an orientation of the disc. Essentially you've got, if I can reach it over here, you've got the disc itself, you have the hub in the center, you've got six spokes that kind of radiate from the hub and you have this space here which is the friction ring for the brake pad to reply. That's how the wheels are stopped.

You should also understand, I think Mr. Oberstar will appreciate this, that there are a number of forces acting on the disc. There are lateral forces due to shocks and due to centrifugal force. This is normally measured in g-forces, as g-forces is the pull of gravity. I think people who serve on the Aviation Subcommittee are intimately familiar with what a g-force is. There are vertical forces that act on that disc as a result of the train moving up and down on the tracks, different amplitudes of forces that are applied. There are radial forces that are applied onto the disc. This disc is designed to heat up.

As you can well imagine, you have a lot of weight, going at speed, and the brakes are applied, this is carbon on steel, there is a heat buildup. So the discs have a design, essentially, to expand when they are hot and contract, go back into compression, when they are cold.

There are also brake torque forces around this in a circumferential direction of the brake disc. The possible reasons for the spoke cracking, the loads are higher than expected, or the discs simply don't meet the specification.

I think Mr. Jamison touched on how Rich found the crack in the disc. I won't expand on that too much.

I do have, and I think I put it up on the dais, Mr. Chairman, I do have some pictures of the cracks in the disc. Some of those were passed around, some of those are in color. You can see from some of these, I think it should be up there that some of these cracks are hairline and some of these cracks are a lot more visible to visual inspection.

The second reason the cracks passed unnoticed is a little bit more disconcerting. If I can refer you to another exhibit, another chart, I want to walk you through the brake disc supply chain and the organizational relationships involved in the acquisition, installation and maintenance and servicing of the disc. You can refer to, there should be a handout for you on the chart that looks like an organization chart over there. I am sorry, Mr. Chairman, next time I'll have this in Power Point so we can get it up on the screen.

But what you see in that chart is essentially the supply chain going from SAB WABCO, who is the OEM Of the original manufacturer of the brake disc part, as a sub to Knorr Corporation, that

18

is the owner of the brake disc assembly. They have a contractual relationship with the consortium that is made up of Bombardier and Alstom. They in turn create a wholly-owned subsidiary, that's the NEC-MSC, the Northeast Corridor Maintenance Service Corporation, who in turn issues a preventive management work order, which we would call a checklist, which is used, which goes to the shop floor.

The only other box on that chart, which is a very important box, is a company called ORX, very reputable company just outside of Altoona, Pennsylvania. ORX was the original assembler of the wheel sets. They have what we call a horizontal press. This is where the wheels are pressed onto the axle, the brake discs themselves are pressed onto the axle. So they were there when the wheel sets were originally assembled and when there is wear on the wheels or on the brake discs, the wheel sets are removed, they are sent to ORX. ORX inspects them, refurbishes them and then returns them back to NEC-MSC.

Within one day of the brake disc spoke cracks being reported, Amtrak management and the OIG were also provided with an excerpt from an inspection procedure manual prepared by the disc manufacturer, SAB WABCO, in November 2004. This procedure included steps for crack inspection in the hub and spoke areas of the disc at least every 20,000 kilometers.

There is another chart, if I could get it up, this chart becomes very important very quickly. This is an excerpt from the manual that Mr. Oberstar requested. These are instructions that are developed by the manufacturer at the get-go when the part is made. What they include in their detailed inspection, in the first step, is to look for cracks in the hubs, cracks in the connection spokes hubs and the friction ring. So there is a contemplation on the part of the OEM that there will be periodic inspections. Accompanying this procedure, there is also an inspection schedule requirement for this 20,000 kilometers, or about 12,400 miles cycle for the brake discs to be inspected, and specifically to be inspected for cracks.

What happens, when you go back to the organization chart, what happens is you have this large technical manual that is out there, 66-page technical manual, that has this step to inspect for cracks. The technical manual goes up and it is boiled down into something a little bit smaller. It is a service bulletin. In the service bulletin, the procedures shift. That detailed information, to inspect for the cracks, basically is kind of lost in translation. What happens when you get to the service bulletin, which is a shorter document, is there is only a one-line reference to go to the specific procedures for looking at the cracks.

That service bulletin in turns makes its way back over to the maintainers at the NEC-MSC. It makes its way into the training documents, into the training curricula for the maintainers. But in this case, it does not make it to the shop floor. So there was an expectation on the part of the OEM that there would be periodic inspections. But because of a breakdown in the way the procedures were promulgated and worked their way through the system, they never make it to the person that is actually doing the inspection. That is a major finding, that is a lesson learned, that is something that has to be corrected, especially for a safety-critical part.