19

Mr. OBERSTAR. Mr. Chairman, could I ask Mr. Weiderhold just to repeat that comment about only one line in the manual that deals with that?

Mr. WEIDERHOLD. Yes, sir. What we found was, when we started looking at these detailed procedures, you want to start at the beginning. We had found these procedures in the SAB WABCO manual. When we traced that specific recommendation to look for cracks and spokes up the supply chain and over to the maintainer, what we found was it was only referenced in the service bulletin. So when you get to, this is not 66 pages, but this is probably 30 pages worth of instructions that are issued by Knorr, when you get to a very critical stage on the axle-mounted disc, the part that I have highlighted here, which is just one line, refers you to this procedure.

Now, what happens as you get further into the service bulletin, which is what the maintainers use, within the service bulletin there are pictures of the disc and they tell you what to check for. They tell you what to check for what are called the normal wear and tear on the friction surfaces, which is what peoples' eyes are drawn to. When you get under the train and you look at all the gear down there, you kind of look for the shiny surface, because that gets the most wear and tear.

If you don't know to look at the hub or to look at the spokes, and if you're not trained to look at that, then you are not going to look at it. There is carbon dust flying around, there is a lot of things on the running gear, and that is one of the reasons why those cracks went unnoticed for as long as they did. So we have a breakdown in a critical inspection process, and we have a breakdown in the safety critical part.

Next, I think one of the big questions, and the questions that you asked me, Mr. Chairman, was who is responsible or who knew what when. Let me kind of tell you where we are to date. From all of our interviews and document reviews thus far, we have no evidence that Amtrak was ever made aware of the brake disc spoke and hub cracks prior to April 14th, or was even aware of the manufacturer's detailed procedures for brake disc inspections. We have spoken with Amtrak employees from the shop floor through first line management to senior managers, and thus far no one has stated that they had any knowledge of brake spokes cracking prior to April 14th.

As is our practice, we basically took this chart, we looked at this organizational layout, we looked at the relationship among the supply chain and our maintainer, and then we began our interviews. Our first interview was a visit to ORX, that organization on the bottom right hand, who basically seize the wheel sets off the train and should have, should have the best eyes to put onto the brake disc.

When we visited ORX, we were very impressed with their facility and the forthcomingness of the ORX employee. We were informed by ORX on at least two occasions they recalled finding and reporting cracks in the Acela brake disc spokes. However, at the time of our interviews, ORX staff could not recall the exact dates of finding and reporting the problem. They believed this occurred some 12 to 24 months ago.

20

We asked ORX to research their records, and they have supplied us with additional information that we are now reviewing. We are zeroing in on the time line, ORX is cooperating and we are seeking out current and former employees to pinpoint better when and to whom these reports would have been made. I cannot overemphasize that we have a number of open questions that need to be resolved, and we are only midstream in our investigation. I would not normally release information such as this at this stage of the investigation, but I think it is important to share it with the Committee, because we are investigating failures of a safety critical part.

We got, all of us collectively, got very lucky that this was found when it was. When the examination of the brake discs was made, the first slight through the train was a visual inspection. I think that's where the Committee was informed that there were failures on a rate of 20 to 30 percent. When you do a more definitive test, when you do a magnetic particle inspection test, you find that you miss half of the cracks. So a visual inspection alone is not going to do it. You are going to have to adopt some procedures, probably taken from airline experiences, to look for those cracks, to understand when they began, how long they stayed before they propagate.

Because the danger is, here is what we think we know so far, the danger is the crack propagates very early, and it starts out small, maybe invisible. Over time, that crack will reside and stay there for a while and then it will slowly makes it round around the first spoke. Once it goes through the entire first spoke, the disc itself, it is hard to see because the spoke pulls both in tension and compression. So when the disc is hot, you can't observe it, but it's pulled farther apart. When it cools, it closes the crack back down. That's the mechanism. So that's why those little cracks were kind of hard to see, because there was compression to return the crack to its normal position.

But once you get through that first spoke, it will start propagating to the adjacent spokes. Eventually it will make its way through all six spokes. If that happens, we could have a catastrophe on our hands. When the inspections were made, the first report that came out found 317 spoke cracks over 300 discs. That means that there were some discs that had more than one crack in the disc. Some discs had two cracks, cracks in two spokes, some had cracks in three spokes. We are finding after the mag particle inspection there were probably discs out there with cracks in as many as four or five spokes. There were only a handful of these, but it shows you that you were getting dangerously close to a very, very serious problem.

We have, I have issued subpoenas to everybody on that chart. I have done that both in a friendly way and I have also done that to make sure that we get all of the information that relates to this problem to try to answer the questions of who knew what when. As soon as we have that information, we will certainly provide it to the Committee.

Thank you for the extra time, Mr. Chairman.

Mr. LaTourette. I thank you very much, Mr. Weiderhold.

Ms. Hecker, thank you for coming, and we look forward to hearing from you.

21

Ms. HECKER. Thank you, Mr. Chairman.

I am very pleased to be here today to provide some contributions based on completed GAO work. We don't have anything on the brakes and none of the details that you have heard. But we have a comprehensive report that we completed on the overall Northeast Corridor Improvement Project, of which the Acela was a portion. Then another report on the settlement and the dispute between the consortium and Amtrak and a special issue about maintenance as a key part of that settlement.

The issues that I will cover today will be, four issues that I will cover. First, quickly, some of the issues that have affected the Acela development since its inception. I think some of the members already alluded to that, the issues that led to the suits and counter-suits and then the settlement. Then how our report basically identified that while the settlement was probably a good thing in many ways, certainly it kept the parties working together, it really wasn't self-executing. There were lots of risks and challenges that remained, and they remain today and I think provide a very relevant context for the discussion today about the Acela performance.

Then a second product that we did on the overall management of the project and how the issues here relate to challenges in managing large scale projects. On the first issue, basically as has been alluded, there have been significant issues affecting the Acela program since its inception. The first four points really were all about the production of the train sets. As several of you alluded, there was new technology, it was not over the shelf, which presented considerable risks. It was finalized, the procurement, before the new safety standards were promulgated. Those safety standards had a very substantial impact on the weight and cost of the train set.

Third, there were obviously many production and manufacturing delays. And finally, because of those delays and the pressures that all of you have alluded to, there was extremely abbreviated testing on this train set. FRA told us that there was an electric locomotive that they told us was an appropriate model. The testing on that was 165,000 miles. The testing on the Amtrak Acela model was 35,000 miles. So you basically had an extremely abbreviated testing, which was an environment where you really would have been able to identify and presumably resolve some of the issues that have continued to plague the program.

The second issue is basically setting up that one of the unique things about this contractual relationship is that the consortium that built the train set actually agreed to build the facilities, maintain the train sets and supervise Amtrak employees until 2013. Amtrak would just provide the employees to conduct the maintenance.

The next page basically gets to the issues that led to the suit. There were major performance issues that led Amtrak to withhold payments. Bombardier then first sued. The allegations they had are very important to the discussion today, because they allege that they had been provided inaccurate information on the infrastructure conditions, as well as concerns about changed designed specifications.

22

The infrastructure conditions, I think several of you alluded, are important because the curves that affect the speed and the curves and the poor condition potentially have some relationship to the whole fatigue on the brake issue being discussed today.

Finally, then, Amtrak counter-sued. They maintain that the consortium had not met the performance requirements, had deficient engineering and poor management. The terms of the settlement, though, in March 2004, basically had the consortium agreeing to complete many outstanding modifications. Some are still outstanding, and that remains.

The most critical one perhaps is to achieve the performance requirements of the original contract. The main performance requirement is 17,500 miles of the mean distance between failures. So that's basically a core measure. The train set still hasn't reached it. And it needs a six month rolling average before that requirement will have been deemed to have been met. So the consortium is still liable for that.

Under the new terms of the relationship, they would provide training to Amtrak staff, provide technical information and honor the existing warranties and actually extended a bumper to bumper warranty. Amtrak then was responsible for assuming the facility management and the maintenance as of October 2006. This could be in jeopardy. This whole issue of these evolving roles could be affected by what we are talking about today.

The other major responsibility actually written in the agreement, that Amtrak was responsible for creating a transition plan to hire, designate particular staff, maintain the train sets and the facilities and make a choice about a procurement plan and how they would proceed.

As I said in my opening, we believe that the Acela program still faces considerable risk under the terms of the settlement and the terms of the original contract. As I mentioned, the first one is getting these modifications and performance requirements met. As I said, many are still open and the performance requirements for reliability, speed and comfort have yet to be achieved. Obtaining technical expertise for the maintenance and training, I think this relates to some of the details of the communication about the actual technical issues of maintenance. These are not unimportant issues, and they certainly pervade way beyond the brake issue.

Finally, there was the issue of sufficiently funding the maintenance and integrating the responsibility. All of these three concerns, we felt, ought to be dealt with in a comprehensive implementation plan. Our report recommended that Amtrak deal with these risks and have a comprehensive plan. To our knowledge, it is still not done. There are critical elements that are missing. We think it exacerbates the risks which now are so complicated by the brake problem.

Finally, I would say that not only would I put these issues in the context of the Acela, but in the context of the management of the Northeast Corridor Improvement Program. The challenge is clearly larger than the brakes, and reaches issues of broader challenges that Amtrak has had in managing large scale projects.

Our report on the Northeast Rail Improvement Project, and again, this has three elements. There was an electrification, there

23

was the train set to achieve the three hour time limit and then there were infrastructure improvements. Our review of how Amtrak managed this program is that it was very short-term and it was very segmented. It was focused on the electrification and of course there were suits and problems with that.

Then there was a focus on acquisition of the train sets, which I have just described, had many problems. There wasn't really adequate focus on the major infrastructure improvements and we actually have a number of the critical components identified that we couldn't even identify the status of. The project was not managed like a project and there was no financial plan. While it is probably true that they never got all the money they needed, they never presented it in the comprehensive form of a plan to identify, this is the plan we need. Rather, they worked the plan around the annual budget and what they received each year.

So an overall observation we have there, and it is one that actually required some action by both Amtrak and FRA, the oversight of this major modernization, I think Mr. Mica referred to it, it was the most costly Federal investment in inter-city passenger rail in the last century, and this one too. The oversight of it was grossly incomplete by both Amtrak and FRA. FRA told us they didn't even think they had the authority. We were surprised, we scoped it out and looked and agreed that they actually hadn't been given the authority.

So you had a $3.2 billion acquisition including the costs of other parties, who are very important: the State of New Jersey and the transit agencies that were party to this. It was not a comprehensively managed project.

As you alluded, we have some ongoing work on other aspects of Amtrak management. We hope when we are ready to report that those will provide further light on the systemic challenges and moving toward comprehensive solutions. Thank you, Mr. Chairman. I would be glad to take any questions.

Mr. LATOURETTE. Thank you very much. Again, I want to thank you all. I tell the members of the Subcommittee, it looks like our first series of votes is going to be about 11:30. It will be my hope, because of Mr. Jamison's situation and others, we could vote as quickly as possible and get back.

Mr. Jamison, I understand from talking to Amtrak that they have made a request to operate an instrumented Acela train on the northeast corridor in an attempt to begin the process of getting the train back into service. Has the FRA reviewed and approved that request?

Mr. JAMISON. We have. We expect that test to take place sometime later this week.

Mr. LATOURETTE. Has the FRA made a determination as to what additionally is necessary on the part of Amtrak to put the Acela back into operation, aside from this test?

Mr. JAMISON. In a nutshell, it really depends on the solution. As Mr. Weiderhold referred to, there are still several alternatives on the table. There is still a lot of analysis yet to be done. So depending on whether or not there is a move to try to put the existing design rotor back into place or if there is a move to go to a new, redesigned rotor, there will be a lot of analysis required.

24

But, in a nutshell, we are going to require qualification of the new components or the existing replacement component; a new inspection, testing and maintenance plan that addresses some of the inspection issues that have been pointed out, to make sure that, if these cracks are so hard to detect through visual inspection, to state what other types of inspection techniques are necessary to return it to service, and finally, a review of the training program to make sure that items, such as were pointed out by Mr. Weiderhold, when manufacturers' specifications update current inspection techniques and correspondence which routinely happens, to make sure that that information is actually getting to the people doing the inspections.

Mr. LaTourette. During her testimony, Ms. Hecker mentioned, I think it's GAO's opinion that the settlement agreement between Amtrak and the consortium has risks and challenges yet remaining. The Secretary of Transportation sits on the Amtrak board of directors. Are you aware of what role the DOT played in approving the settlement agreement and also ensuring its successful implementation to this point in time?

Mr. Jamison. Actually, I am not 100-percent sure of the vote at that time, since it preceded me. I believe that our member voted "yes" to the settlement agreement.

Mr. LaTourette. Aside from voting on the settlement agreement, maybe you could get back to us, if you would, someone at FRA or DOT, specifically what role DOT or the representative of DOT had in not just passing on the settlement but participating in the discussions on the settlement. When other witnesses come, I have some questions on the settlement as well.

And lastly, I am going to ask Amtrak this, it does not have anything to do with this hearing, but there was a report on one of the local television stations last night relative to the tunnel under the Cannon Building. It is my understanding that the tunnel is patrolled by the Amtrak police, and as a matter of fact, the camera crew was met by the police when they arrived. That only passenger trains travel through that tunnel, and that rail access is controlled by a switch operated by CSX, and that both CSX, in cooperation with FRA and also DHS, has developed extensive security plans for that tunnel, which obviously we are not going to discuss in public. Am I incorrect in any of those observations?

Mr. Jamison. That is my belief as well. I would also add that in my other duties, I am currently also Deputy Administrator of the Federal Transit Administration. FTA provided technical assistance, including a vulnerability assessment, to Virginia Railway Express (VRE) that addressed some concerns about that tunnel. I would be happy to discuss some of the findings and some of the actions that have taken place. But I agree with your statement.

[The information received follows:]

The settlement was negotiated between Amtrak and the Consortium, and the related discussions were undertaken without the involvement of the U.S. Department of Transportation, including FRA. Amtrak's Board, including the Secretary's representative on the Board, were briefed on the progress of negotiations and participated in general discussions about strategy and the acceptability of alternative outcomes.

Mr. LaTourette. Thank you.

25

Mr. Weiderhold, I am going to ask unanimous consent, because I did not see it attached to your testimony or the 8 1/2 by 11 sheets of your charts, so without objection, those will be made part of the record.

I just wanted to be clear on two of them, one, the schematic flow chart and then also the SAB WABCO scheduled maintenance observation. As I understood your testimony, the WABCO service notification indicates that aside from inspecting the brake surface that also it was their recommendation that the spokes be inspected for cracks as well.

Mr. WEIDERHOLD. That is correct, sir.

Mr. LATOURETTE. But somehow, as you look at this flow chart that you provided from WABCO to Knorr to the consortium back down to where it eventually winds up, either at ORX or on the shop floor, it is your understanding that that information, other than a slight reference to please refer to a larger, another document, is it your finding to this point in time that that information did not make it to the men and women, I suppose, that were actually performing the inspection services?

Mr. WEIDERHOLD. Yes, sir. We spoke to the NEC-MSC senior managers, we talked to supervision, we talked to the guys with the lights that go under the train, and they were unaware of that requirement.

Mr. LATOURETTE. I mentioned in my opening remarks the newspaper article this morning. The last box, well, it's not even a box, I don't know what kind of shape that is that you put down here at the bottom, it has ORX, which is the company that I think you mentioned is located in Altoona, Pennsylvania.

Mr. WEIDERHOLD. That's correct, sir.

Mr. LATOURETTE. According to the newspaper this morning, and I think also from your observations, you have collected information that 12 to 24 months ago, someone at ORX recalls seeing the cracks in the spokes that are the subjects of our concerns today?

Mr. WEIDERHOLD. Yes, sir. We have conducted two site visits, several interviews, both in person and in telephone interviews with current and former ORX employees. They do recall finding cracks in the spokes. We asked them to pull their quality assurance, quality control, QA/QC records. We do have some documentation that validates their recollection. We are in the process of kind of tracking that down. The time line is very important. And the time line may be, I learned last night the time line may be 12 to 36 months.

Mr. LATOURETTE. Okay. And specifically, I think I heard you say, but I would just ask you to repeat it, and if you didn't, I apologize, but was it your finding to this moment in time that that information, if that in fact is what ORX was discovering 12 to 36 months ago, to your investigation to this moment in time, was never communicated to Amtrak?

Mr. WEIDERHOLD. No, sir, we have no information at all that Amtrak ever received that information.

Mr. LATOURETTE. Do you have information that that finding of 12 to 36 months ago was reported to anyone on your flow chart?

Mr. WEIDERHOLD. Yes, we do. We had been given information that the cracks were reported to Knorr.

Mr. LATOURETTE. Anybody else besides Knorr?

26

Mr. WEIDERHOLD. We have an allegation that we need to run down, I am not comfortable yet until we do some more interviews.

Mr. LATOURETTE. Okay. But that, I assume, as you continue your investigation, if in fact the ORX information proves to be reliable based upon not only memory but documentation, is it your intention to work through this maze to determine where that information went and where it stopped?

Mr. WEIDERHOLD. Yes, sir, and I think the use of the term maze is a good, descriptive adjective.

Mr. LATOURETTE. Is it also your intention or have you completed the discussion as to why the WABCO service bulletin that indicated that we should, not we, but inspectors should not only look at the surface of the brake but also the spokes, why that did not make it from WABCO to the shop floor?

Mr. WEIDERHOLD. We have not conducted interviews of the WABCO and Knorr individuals yet. We would hope to do that soon in order to answer that question. All we can do is track the document flow. And based upon the document flow, it seems strange that a critical inspection step was truncated with a one-sentence reference. I think that's really what I would call a lost in translation problem.

Mr. LATOURETTE. And my last question is, you mentioned you have issued some friendly subpoenas. Has everyone on this flow chart been cooperative as you proceed with your investigation?

Mr. WEIDERHOLD. You have to understand, Mr. Chairman, I want to correct one thing, just like Mr. Mica was correcting some of the mistakes in the Post, there was in the Post, I believe, reports that we have had some recalcitrance. That recalcitrance was not with Bombardier and Alstom or NEC-MSC. They have been cooperating fully. We sometimes have to issue what we call friendly subpoenas because the contractual relationships and confidentiality agreements that exist between and among these parties require that they keep that information close. The only way that information would be released is through the subpoena process. We oftentimes have to issue what are called friendly subpoenas.

The answer to the rest of your question is, no, we have not had, we have had some people either get lawyered up or basically tell us that they don't have time to meet with us. We ask not just once but twice and three times, because we thought it was in their better interest to kind of come and talk to us, just an hour of their time to come and let us know kind of what happened here.

Mr. LATOURETTE. And just so I'm clear, you have subpoena duces tecum authority, but if you were lobbying on behalf of the IGs of the world, you would like to have a little more authority to get at people that may not want to discuss things with you?

Mr. WEIDERHOLD. That's correct, Mr. Chairman. In the IG world, with the exception of maybe Justice and I think DOD, all of the cabinet level IGs, as well as the smaller IG office, were referred to as the designated Federal entity IGs. There are about 30 of us. We only have duces tecum subpoena authority, we do not have testimonial subpoena authority. I think that the Committee, Congress ought to consider granting the IG community that in all matters relating to safety and security. That would be extremely beneficial in moving these types of investigations along.

27

Mr. LATOURETTE. Thank you.

Mr. MICA. Mr. Chairman, if you would yield just a second, would it be possible to request that FRA report to the Committee on those who have not been cooperative or any who in their estimation are not cooperating with their investigation?

Mr. LATOURETTE. Sure. I would make that request of both you, Mr. Weiderhold, and also the FRA. I think that's an excellent suggestion.

Obviously not only your suggestion on subpoena power, but we're dealing with a safety issue. I think Mr. Oberstar was right in indicating this could have been catastrophic had it not been for the good work of the FRA inspector. So I would ask you to get back to the Committee staff if you find somebody being recalcitrant.

I appreciate your correcting the record, and again, not to harp on it, but that's why we don't really like to read about the hearing before the hearing has occurred, because sometimes there can be misstatements.

Ms. Brown.

Ms. BROWN. Thank you.

I guess what I am most concerned about was that a disaster could have occurred, but we were very lucky. That dog just doesn't hunt. We need to know who was responsible for the inspections, whose responsibility it was, and is it not a part of the procedures to check for maintenance, and whose responsibly was it to check over a period of time? That's the part that I'm kind of confused about.

Mr. WEIDERHOLD. I have an adage that safety is everybody's responsibility. Safety trumps everything. I think everybody on that organization chart has a responsibility for safety. Where liability lies, I will leave that to the lawyers. But safety is everybody's concern.

One of the things we had worked with NEC-MSC on a few years ago was to actually get to that checklist on the floor so we could kind of cull out and highlight any inspection on a safety-critical part. Because normally you have more detail, different tools, you have a higher certified supervisor, all those things take place on other safety critical parts. But for some reason, and it is a why, both of those are the right questions to ask, for some reason that did not work in that case.

The why, I think we have a pretty good indicator, based upon the documents. The who is tougher. Because if someone knew about this and for whatever reason put their head in the sand, that is a bad decision. We want to make sure that it was not an unintentional kind of oversight. We need to get that information.

Ms. BROWN. Ms. Hecker, you have done at least eight investigations of Amtrak since 2000 and you are working on one now. You have interviewed Amtrak employees and requested materials, we have this report. You have done an extensive investigation. I am wondering, how much has it cost Amtrak, and is this just another report that we are going to put on the shelf?

Ms. HECKER. How much do our studies cost in Amtrak employees' time?

Ms. BROWN. And money.

28

Ms. HECKER. Well, we only do work that's requested by Congress. We are set up to provide investigative support for issues that are of interest to the Congress. One of the few areas of Government accountability that Amtrak is covered by is that they both have an IG and that they are subject to GAO audits. I suppose the Congress could undo that, if you didn't think that we add value.

Ms. BROWN. No, I guess my question is, so Congress has requested these nine investigations?

Ms. HECKER. That's correct.

Ms. BROWN. Okay. How much has it cost Amtrak?

Ms. HECKER. We don't do studies of the amount of time that it takes people to respond to our requests. I don't have that information. I could say that on both of these investigations, we experienced substantial delays in getting the information required from Amtrak. In the case of one report, when we sent the report to them for comments, they disagreed vehemently with the report and said the problem was that they hadn't given us all the information that we should have had, and that delayed the report three months.

So yes, it takes time, but if you are comprehensive in the response the first time, it will take a lot less time.

Ms. BROWN. Well, I guess it's something that Congress needs to take a look at. Because like I said, we have had nine reports since 2000.

Ms. HECKER. I think some of those are testimonies that are based on the reports.

Ms. BROWN. Thank you. I yield back the balance of my time.

Mr. LATOURETTE. Mr. Mica.

Mr. MICA. Thank you, Mr. Chairman.

First of all, I appreciate the data flow chart on Acela brakes. I am more interested in a flow chart of who is responsible. Obviously if Amtrak signed a contract, and I understand with this consortium, to provide maintenance, someone was responsible. Who was responsible for overseeing that contract? Mr. Jamison?

Mr. JAMISON. I would refer the contractual questions to Mr. Weiderhold about exactly how the contract works inside Amtrak's guidelines. My overall concern is the requirement that Class I brake inspections be done daily and that the other overriding regulation, which is—

Mr. MICA. Well, I want to get into that in a minute. But who was responsible? I mean, here is a multi-million dollar contract, billion dollar contract probably, $700 million just for the equipment. Now, who is responsible for the contract management? Is it Amtrak or maybe this panel?

Mr. WEIDERHOLD. I think you could—

Mr. MICA. Do we have a flawed system in Amtrak in managing the contract?

Mr. WEIDERHOLD. I think what you've got is you've got less than an optimal model here. If—

Mr. MICA. I asked the staff for, can you get me a flow chart for Amtrak and who oversees what. We don't have one. That's scary.

Mr. WEIDERHOLD. I think there are a couple of ways to use this chart, if I could explain a little bit.

Mr. MICA. This again, I am going beyond the chart in who's responsible. Now, we also have the original equipment manufacturer

29

bulletin that has recommended inspections be done every 20,000 kilometers, approximately 10,000 miles. That wasn't done. Was that done, Mr. Jamison?

Mr. JAMISON. It was done, in our opinion. The issue is whether or not the—

Mr. MICA. It was done, in your opinion?

Mr. JAMISON. Yes. There is a requirement—

Mr. MICA. So we have a service record where the consortium, those that were responsible for the maintenance did perform this. I just want to know, is that true?

Mr. JAMISON. There is a daily requirement to do an in-the-pit, undercarriage inspection of all major components. I don't have the document in front of me that you are referring to.

Mr. MICA. Again, the original equipment manufacturer bulletin recommended an inspection of the spokes be done every 20,000 kilometers.

Mr. JAMISON. I'm not aware of that inspection, no.

Mr. MICA. The information I have, it was, the inspection was surface only, not the brake rotor spokes as required under the service manual. So someone was not doing the maintenance.

Now, Amtrak didn't discover the flaw and the consortium that was charged with maintenance didn't discover the flaw. FRA, how did you discover this, or was this?

Mr. WEIDERHOLD. How did I get notice of it?

Mr. MICA. I'm sorry?

Mr. WEIDERHOLD. How did I personally get notice of it?

Mr. MICA. No, how did FRA—

Mr. WEIDERHOLD. FRA discovered it during a post-test inspection of a speed test to improve curve speeds. They detected rust and actually—

Mr. MICA. We are very fortunate that someone did find it. Thank God this thing, you know, the Post talked about the high speed service. The average speed, I am told, of the Acela is between 83 and 84 miles per hour in the northeast corridor, in that range, which is one to two miles faster than the Metroliner, I'm also told, at least from New York to Washington, D.C. Thank God this thing was not going 150 miles per hour as it was designed continuously. Because we would have an incredible disaster, by any technical evaluation.

Part of the problem stems back, though, to a flawed acquisition, first, buying the most expensive equipment. I just want to put in the record, so we have this, because I like these records to go back and refer to. This is Mr. Gunn's statement saying, and this is back in 2002 when he was questioned about the system, we could have bought off the shelf technology at $2.5 million for the locomotive, about $2 million each for the deck and he says it himself here, instead we bought a $700 million, $34 million for the Acela locomotive and very expensive equipment, and probably could have made money. But I'd like this to be made part of the record if we could, Mr. Chairman, showing that from the beginning, the acquisition was flawed.

[The information follows:]

30

# Amtrak's Gunn Displays A Disarming Honesty

# Coast Observations

In two recent excerpts from public appearances, President David Gunn cleared the air by being candid about Amtrak finances and Acela's impact:

I've always been a bit of a critic of the industry .... My criticism is that too much of our activities are not focussed on the basic economics of the business. We spend an awful lot of time... [on] appropriations and legislative strategies and the like and there's precious little time we spend talking about improving revenue-cost ratio of our properties. That's an absolutely critical measure, because we're always running around... talking about expansion.

For years, we've been dreaming of the day when rail passenger service and transit will expand—double, triple, quadruple, the amount of transit and the amount of investment that's out there. And when you have an industry, and I don't know the current cost recovery figure but for say for the sake of argument that it's fifty percent, doubling tripling the size of these properties, because when you double or triple the size of these properties you go into lower cost recovery areas. I can tell you that the trouble with Amtrak and a lot of transit properties have with the politicians is they view us as a bottomless pit. And that's one thing that I don't think we do a good job at.

If you look at our cost recovery, a whole lot of different things drive it. It's the type of equipment we buy, it's our ability to control our labor cost, our absenteeism and the like, and our ability to generate and to utilize fuel efficient vehicles, and to make good use of capital. And we don't do a very good job on this score. We have big problems in all of these areas, but we tend to focus on trying to find somebody who will fund us.

And I remember at SEPTA, where I was General Manager, they went on this endless hunt for predictable funding. They figured that was the answer to their problem. They eventually got some funding but it immediately got chewed up and the cost recovery dropped from where it used to be, like Toronto to the high sixties, and it dropped. I think it got down to forty percent.

So what I'm trying to say is we're not focussing on the right... issue. Let's just look at for a minute—equipment. You all know that we have a new set of electric trains running between Boston and New York. Acela. I never understood why they did that change. It would be like Coca-Cola taking a good brand name, Meridliner, and changing it to "brown liquid in a bottle".

But anyway, what we now have is Acela. And actually what a cela is is the room before the first floor. [Laughter] I don't know why they did that. And anyway we have these new trains and they're really nice and they go like hell, up to 150 miles per hour. I took one, I rode the head end in the 150 mile an hour territory up to Boston, and all of a sudden we see a headlight.

You know I didn't want to say anything, but I was thinking this could be a real problem and a short career...these trains close really fast at 150 miles per hour, but in this case the train was stopped and we slowed down, and we went through a high speed turnout, and I pretended that I wasn't nervous at all.

Let me ask you a question. Between New York and Washington we can run Acelas or we can run the AEM-7, the Mighty Mite locomotive, which is an off-the-shelf locomotive from Europe. It's just a garden variety locomotive that we bought, and Amfleet cars, and we can run the same schedule as we can with Acela. Now I want to ask you something. If I have a train of passengers in an AEM-7 and Amfleet coaches in good condition, I realize there aren't very many of them left but if they were fixed up, and if you got an Acela, which train has the better profit margin? This is a trick question.

It's the Amfleet! I mean we went and spent a bundle of capital, we sold debt, we put the debt on our balance sheet. We're up to 3.7 billion dollars of indebtedness. Last year alone we added $700 million dollars of debt to our balance sheet. How do you pay for that? I don't know. And we put a train into service, which is good, it's a very nice train from a passenger's point of view, [but it] made our economic situation worse.

The only thing you can say is north of New York, we cut the running time from four and a half hours to about three hours and forty five minutes. That was the benefit. Now, we needed new equipment I guess, but what did we do? We went out and spec'ed equipment that is one of a kind. There'll never be another one bought, I think. At least there'll never be another bought anytime soon, I can tell you. They're one of a kind, they're very expensive to run.

I mean, you look at that train, it is five revenue cars, one cafe car, and two locomotives. There's enough power on that train to run a ten car train and make the schedule. But I mean it is overpowered. There's absolutely no sense to the amount of power we are consuming to the benefit we are getting on that train. So, what we have done to ourselves is that we have made our economic situation worse. Now, the only thing you can say is that now that we own them, we've gotta run them—it's better than not running them.

What I'm saying is in this industry, you always want to look at the net income impact on the bottom line. Why did this happen with the Acela? It wasn't just because Amtrak didn't push the numbers. But what happened is it got totally screwed up when the politicians got into it and the Buy America and the FRA rulemakers got into it, and we ended up with a train that had to be custom built and is much more expensive that a train that we bought off the shelf.

The point in all of this is I'm not sure we did ourselves any favors with what we've done because if Amtrak was viewed as a bottomless pit before and we just did something that cost us a lot of money, we've got the debt on our balance sheet, and we didn't improve our bottom line.

On the MacNeil/Lehrer report, he managed to set things straight about long haul subsidies versus the Northeast corridor:

JIM LEHRER: When you look at the longrange... I mean what you call intercity passenger service, particularly the transcontinental, I read something today that they only haul 18 percent of your passengers, but account for 75 percent of your loss?

DAVID GUNN: No. You've got to be very careful. There's a lot of mythology about Amtrak's economics. Everything loses money. In other words, people will say it's the long-distance trains, and if you got rid of them, the corridor would be a profitable company. Not so. The passenger movement or transportation market in the United States is thoroughly subsidized, whether it's highway airlines or rail. And what's happened, like the basic structure of Amtrak is the Northeast Corridor covers most of its operating costs, the costs of the train crews and maintenance of the cars and so forth, but it does not cover its capital expenses. And we have an enormous deficit in that area.

THE SIGNS ON THE WINDOWS of San Joaquins and Capitols promoting cafe service may just be window dressing. Anyone who thinks new San Joaquin menus featuring Salisbury Steak and Macaroni and Cheese will save dining service, order up pronto. Informed sources say the decision already was made to drop the second cafe job and adopt a simplified menu. Given the $1 million annual cost of that job, change is long overdue. A chronic absence of clear thinking has hobbled the food service for years. A recent Renaissance A RIDER IN LINE AT THE CAFE counter saw a Caltrans badge-wearer placing the signs, and asked what the purpose was. To get people to visit the Cafe Car." Rider. "But this IS the Cafe Car." Caltrans: "Well, we don't know what order the cars are going to be in, any given day." Rider. "So you're telling me that when you change the cars around, you change the windows around?" Caltrans badge stomps off to resounding laughter.... THE CHANGE THAT MAKES SENSE is to make some rational use of the non-revenue space in the Capitols and San Joaquins, which is upwards of 25 percent of the train, an even higher ratio than Acela. Caltrans has always claimed that there is no room for first class seats on the San Joaquins and Capitols. That room can be found in the 2/3 of the Cafe Car that is not needed for the food line or the server.... AS THE GERMANS HAVE DISCOVERED, first class seating with free beverages, laptop hookups and meal service at the seat is a big seller and commands a great price. It's time to replace irrational non-revenue furniture in the Cafe Cars and start producing fares in the vast empty space... BART IS SHARPENING ITS PENCILS to penalize Caltrain riders to SFO with a pair of surcharges. First, a $1.50 SFO premium, then a surcharge on top of regular prices for all new San Mateo stations. Nobody is saying how much the total is for Millbrae-SFO, but insiders say it's the highest Caltrain transit fare per mile. The current SFO shuttle is FREE, guys... CAPITOL CORRIDOR PLANS to redesign its timetables. Current complaints include: "Difficulty using the schedule to plan trips from one point to another; Confusion identifying train vs. motorcoach segments... Distraction by the number of colors, shapes, lines and type treatments; Difficulty in understanding connecting motorcoach schedules; Difficulty [with] symbols throughout, including use of vertical lines to indicate "skipped" stations; Connections to other transit systems are confusing; Footnoted items are not noticed by users." It looks like passengers aren't buying the Caltrans marketing dogma that the current format is the best ever.... UNION PACIFIC NEGATIVITY toward Amtrak has erupted again in a go-to-hell letter in response to a state offer of funding for a track capacity study of extension of one San Joaquin to L.A. Perhaps it's time for California to adopt a policy of only investing public funds in railroads that aren't involved in lobbying to kill Amtrak... CHECK OUT OUR REBUILT WEB SITE AT www.calrailnews.com and while you're there tell Congress to retain funding for Amtrak, especially long-haul trains serving California. E-mail Congress directly with a single click at: www.calrailnews.com

31

Mr. MICA. Then we had numerous, we have 15 different models of 20 train sets, is that right, Mr. Jamison, do you know?

Mr. JAMISON. There are 20 trainsets.

Mr. MICA. But there are 15 different models.

Mr. JAMISON. They all have unique characteristics, from my understanding.

Mr. MICA. And yes, in all the change orders, we changed the weight, the size, all of these things. So we have a train that really doesn't run on the tracks or the catenary that it was to be accommodated by. Are we going to have more lawsuits as a result of this, Mr. Jamison? Do you know? Is there a potential for lawsuits?

Mr. JAMISON. Well, since the contractual agreement that will be the basis of the lawsuits is between Amtrak and the Consortium, probably Mr. Weiderhold is better prepared to answer that.

Mr. MICA. One of the reasons I asked for the legal costs for Amtrak, we spend about $60 million a year on legal costs for Amtrak. We spend $4 million a month on maintenance for this system. If this had not been so entangled, we probably could have spent some of this money on maintenance or at least oversight instead of the mangled acquisition and lawsuits that have resulted.

Finally, again, we have to fix the problem with management, we have to fix the problem with oversight. Maybe each of you can tell us what you would recommend and how we proceed from here to fix this so that this does not happen again. Mr. Jamison, we will start with you.

Mr. JAMISON. As I testified earlier, I mean, before the Acela is brought back to service, our utmost concern is the safety of the crew and the passengers. There are basically going to be three requirements for returning Acela to service: doing qualification testing on the replacement component to make sure that it is designed to meet the loads and that we have tested to determine what the loads are in the corridor; to make sure that they do a revised inspection, testing, and maintenance plan that will get at the inspection procedures that are necessary and the different inspection techniques that are necessary—

Mr. MICA. Can you provide us with a recommended flow chart for Amtrak and how to follow and pursue, again, adequate contract management, so this will not happen again and your recommendation, just for the record?

Mr. JAMISON. We can provide some recommendations.

[The information follows:]

As discussed in the hearing by the witness from the Government Accountability Office, the Acela trainsets did not go through a rigorous testing regimen at the prototype phase. Thus, it is unclear how the equipment will age and whether additional defects and design shortcomings will be identified during the aging process. It makes the most sense from FRA's perspective that Amtrak select one or two Acela trainsets as cohort leaders. A conscious effort should be made (1) to maximize the mileage and service time accumulated by these trainsets and (2) that on a periodic basis they be subjected to a rigourous examination to identify these components of the equipment that are most subject to deterioration due to age and use. In the way, an ongoing, updated preventive maintenance program, including assuring the availability of adequate inventories of critical replacement components, can be developed and implemented for the other 18 trainsets. This could help assure that a total loss of Acela serice due to mechanical failure is avoided in the future.

32

Mr. WEIDERHOLD. Sir, two thoughts. First, with respect to the brake discs very narrowly, there are some things that can be done on these processes that can be improved. There are a number of parts on the train. There are some that are more safety-critical than others. What you are talking about with respect to cleaner, more robust project management, definitely that is one of the biggest lessons learned thus far in our investigation.

I happen to agree with you to some extent on the project management issues facing Amtrak. I think there have been examples of large projects that could have been better managed over the years. I think David Gunn inherited some of those, he is having to manage through those. He is a railroader's railroader. He reminds me a lot of Graham Claytor, for whom I used to work. But he's got something that he needs to manage, and he and I work very closely, work very closely with senior managers.

There are some signs of hope. There is a fire-life safety project up in New York that is being used as a pilot program to put in world class project management techniques. That is a close to a billion dollar program for fire-life safety mitigation, security concerns in New York Penn Station. We are about 18 months into that. I think there are some organizational lessons learned and some process lessons learned that I hope to cede to other parts of the corporation, because that has been a problem in the past. So there is some hope, Mr. Mica, that the corner has been turned in a few areas.

Mr. MICA. Ms. Hecker?

Ms. HECKER. We have outstanding recommendations that Amtrak ought to adopt and follow best practices for managing large scale projects in the railroad industry. Our review found that they clearly had not done that.

We also have an outstanding recommendation that they ought to have a comprehensive transition plan to deal with implementation of the settlement and assumption and integration of the maintenance responsibilities. We have not had a positive response to that recommendation in terms of the comprehensiveness of the plan we are looking for. And we have recommendations in both of those reports for improved FRA oversight of both of those matters.

Mr. MICA. Thank you, Mr. Chairman.

Mr. LATOURETTE. I thank you very much. It would be the Chair's predisposition to recess. There are 8 minutes and 30 seconds left in this vote. When we come back, we will go to Mr. Oberstar, so he has plenty of time to proceed.

I would advise everybody that the Highway Subcommittee has a hearing set here at 2:00 o'clock, so if we could hustle back here and move expeditiously so we could get to the next panel, I would appreciate it. We stand in recess.

[Recess.]

Mr. LATOURETTE. The Subcommittee will come to order. Other members will join us as they are able to, then we will go to Mr. Oberstar, as promised, when he gets back. But at this time, since our witnesses are back, it is my pleasure to yield to Mr. Menendez of New Jersey.

Mr. MENENDEZ. Thank you, Mr. Chairman.

33

I want to thank the witnesses for their testimony, and I want to go over a few things here that have been said as part of your testimony.

Mr. Weiderhold, you are not at the point at which obviously you have concluded your review, you are somewhat away from that, right?

Mr. WEIDERHOLD. No, sir, I would say I am probably midstream through the process.

Mr. MENENDEZ. Midstream, all right. But to the extent that you have reviewed up to this point and based upon your testimony here today, there is a statement in, there is a paragraph in your statement on page four that says, "From all of our interviews and documents reviewed thus far, we have no evidence that Amtrak was ever made aware of brake disc spoke web cracks prior to April 14th, 2005, the date on which this was found, or was even aware of the manufacturer's detailed procedures for brake disc inspections."

Mr. WEIDERHOLD. That is entirely correct.

Mr. MENENDEZ. So that is the reality up to this point.

Mr. WEIDERHOLD. Yes, sir.

Mr. MENENDEZ. We might find something different tomorrow, but right now, that is the reality.

Mr. WEIDERHOLD. Yes, sir.

Mr. MENENDEZ. And in that respect, is it fair to say Amtrak didn't design these brakes?

Mr. WEIDERHOLD. Amtrak did not design the brakes.

Mr. MENENDEZ. They didn't manufacture it?

Mr. WEIDERHOLD. They did not manufacture it.

Mr. MENENDEZ. So to suggest that this is Amtrak's fault seems to me to be an enormous leap of responsibility from an entity that did not design it, didn't manufacture it, didn't produce it, and didn't know, at least up to this point from your testimony, that they had any prior evidence that they were ever aware of any of these cracks prior to the date on which the inspector found it is just a huge leap.

Mr. WEIDERHOLD. I think I can every clarify that one step more.

Mr. MENENDEZ. Sure.

Mr. WEIDERHOLD. If you look at the diagram that we have, this organization chart, one way to view this is if you took everything below Amtrak, it's almost like kind of a black box. What Amtrak contracted for is essentially a variation of consists at the block. In other words, bring the trains to me, put it in my terminus, let me run the trains, bring it back down the railroad, send it back to you and you maintain it.

What has changed a little bit since the settlement is Amtrak has certain responsibilities that it has to assume in taking over that maintenance operation. That is going to take place over a period of many months. It is scheduled to complete in October of 2006. I do not know if that time line is going to be affected by this problem.

But probably one way to look at this is Amtrak as a customer of receiving a product.

Mr. MENENDEZ. I appreciate that. So to the extent that based on this diagram you have given the Committee, it seems to me, and