34

tell me if this is a fair statement, that to the extent there is a problem of who knows what and what they did, it starts from here downwards, or from somewhere here upwards. Up to the consortium.

Mr. WEIDERHOLD. I think that's true, but at the same time, the experience we have with the train sets and several members have commented on the train's too heavy, the train's too wide and all the things that we kind of read in the press, I think that's a lot of history. The product is the product, at the end of the day.

I think as I mentioned, I think Amtrak has a responsibility here, but it has not and could not assume that responsibility to date.

Mr. MENENDEZ. Thank you. Let me ask you this. You also stated on page five of your testimony, we requested interviews with the supplier-manufacturer, but so far we have been told that they are too busy to meet with us. Who are those suppliers and manufacturers?

Mr. WEIDERHOLD. Well, the supply chain here is WABCO is the OEM and Knorr is the owner of the brake assembly. We had approached both companies. We had some preliminary conversations with WABCO. They have since been shut down. And Knorr is taking the lead on working on the fix, and they said they are too busy to meet with us right now.

Mr. MENENDEZ. So WABCO, when you say they shut down, they shut down in terms of communications with you?

Mr. WEIDERHOLD. They got lawyered up.

Mr. MENENDEZ. They got lawyered up, i.e., their lawyers told them, don't talk to you.

Mr. WEIDERHOLD. I would imagine that was the case.

Mr. MENENDEZ. And Knorr is basically saying, well, we're in the midst of trying to fix this, so we don't have time now to talk to you?

Mr. WEIDERHOLD. They are working very hard on the fix.

Mr. MENENDEZ. I hope they understand, though, that at the crux of this will be the necessity for them to talk to you or Mr. Chairman, if necessary, at some point, to this Committee. And I would be one who would be willing to be supportive of the Chair's use of whatever subpoena powers may be necessary to get them to come. We have to get at the root of what it is that caused this and what people knew and when they knew it and the consequences here.

Can I ask you one other question before I turn to Ms. Hecker? That is, your review really starts, to some degree, with the whole, or is focused with the issue of the brakes and whatever defects may have been found in those brakes and the process under which they were found to be, the cracks were found and maybe as to who knew what in the context of getting to that point.

But it doesn't go back to what I consider a foundation question, unless I am wrong, and I'd be happy for you to correct me, it doesn't go back to the foundation question as to how did we get Amtrak to make these decisions in the first place about choosing this particular set of transportation options in the Acela?

Mr. WEIDERHOLD. That in a way is probably a subject of a whole separate hearing, because there are a lot of opinions on that. We have been focused strictly on the brake disc problem.

But I can say, I was around when these decisions were made. I was around when Amtrak brought over the X-2000 train from Swe-

35

den and the German ICE train to test in 1992. There were two great trains that we had, we ran I believe for about six months each up and down the northeast. They performed pretty well.

The Acela train was a train on paper. But the Acela train brought with it at the time a financing package, because Amtrak did not have the money to devote to purchasing the train sets. In hindsight, if you ask the consortium or if you ask Amtrak right now would you have done it this way knowing what you know today, you would probably get a very different answer.

Mr. MENENDEZ. That point that you just said, Amtrak did not have the money, to me is so telling about the genesis of where we are today. I appreciate your answers up to this point.

Ms. Hecker, you said in your testimony, and I have read through some of the report, that Amtrak worked their plan around their annual budget and what they received each year.

Ms. HECKER. Yes, sir.

Mr. MENENDEZ. Now, that isn't a good business model, is it?

Ms. HECKER. No, it's not.

Mr. MENENDEZ. But then again, if you can't count on having a multiple year of revenue streams that are guaranteed to you, or that you can fairly project because you hobble along by Congressional appropriations that leave you far less off than you should be to operate successfully, how do you achieve success under that set of circumstances? Is it a fair criticism to say, well, they worked this year by year, and of course, any business plan you would like to work five, maybe ten years, but ultimately if you can't depend upon the resources, how do you plan ahead?

Ms. HECKER. Well, many Federal agencies, of course, face the problem of the dependency on Federal resources. For a number of years, I did work on the Coast Guard with their Deepwater acquisition. That clearly was dependent on annual funding. But there was a comprehensive plan, a financial management plan, and a scenario structured in their whole project that really made it, I think, clearer to the Congress what the consequences of a certain level of funding not being met in any year would be.

So it was the absence of a financial plan. It's true, they were dependent on the resources. And it's very hard to plan when you don't know how much you are going to get. But I don't think it undermines the value of having a comprehensive financial plan of what ideally the project would be.

In fact, I think it was you who said in response to a 1992 Act, the FRA prepared a whole blueprint that did have milestones, that did have cost estimates for the Northeast Corridor Improvement Project, including the new train set. But Amtrak didn't adopt that, they didn't use the set of milestones and didn't adopt the financial plan that—

Mr. MENENDEZ. But let me ask you a question. Even if they had adopted that financial plan, just answer this maybe for me yes or no, haven't we wholly underfunded Amtrak from what that financial plan would have been had they adopted it?

Ms. HECKER. Yes.

Mr. MENENDEZ. Okay. And lastly, your study also, from what I gather, and correct me if I'm wrong, does not start off as well with the foundation issues as to why these choices were made in the

36

first place, in terms of the Acela, what I just discussed with the In-
spector General. You don't go that far back, you move forward from
a different point in time, is that correct?

Ms. HECKER. I don't think we explicitly mention the financing
package, but we are aware that that was in fact a significant fac-
tor.

Mr. MENENDEZ. Mr. Chairman, just as a final note, I would note
that as in anything in life, when I was a trial attorney, we could
take a picture in time. And if we take a picture in time, it will de-
pict a certain set of circumstances. The question is, having the to-
tality of the circumstances to understand in part where we are
today. Thank you, Mr. Chairman.

Mr. LATOURETTE. I thank you very much.

Mr. Simmons, we will get to you in a second. I think I went out
of order when we broke for our emergency or whatever it was, I
promised Mr. Oberstar we would get to him. So I will go to Mr.
Oberstar then you.

Mr. OBERSTAR. Thank you very much, Mr. Chairman. I appre-
ciate your courtesy. I would like to ask unanimous consent that the
record remain open for written questions to be submitted to the
panel, in light of our truncated hearing, due to this evacuation of
the building.

Mr. LATOURETTE. Without objection.

Mr. OBERSTAR. Thank you.

I am concerned about two systemic issues here. One is the speci-
fications for the casting of the steel brake disc unit. And the inspec-
tion and maintenance process. What we have learned in aviation
is first of all, to have redundancy. Because in contrast to surface
transportation, there is no curb at seven miles in the air to pull
over and look under the hood or look at structures or engines. The
backbone of aviation safety is redundancy.

A second principle is excruciatingly painstaking inspection and
replacement of parts that are time-sensitive. There are several lev-
els of maintenance required for air frames and power plant. And
there are time limits which certain things have to be done, even
if there was a check a week ago, if this is your time limit that the
part has to be taken out and replaced with new.

There is a paper trail for everything. Every maintenance over the
lifetime of that aircraft. There is also coordination among manufac-
turer, airlines with same type and model aircraft, within the
records of the NTSB and the FAA.

I do not see this same level of attention to detail and mainte-
nance and specificity for safety in the rail sector, which is why
seven, eight years ago, I introduced very comprehensive legislation
to substantially elevate the level of quality of maintenance and
oversight of maintenance in the rail sector.

Now, I reviewed some of the work orders and nowhere on the
forms do I see a requirement to inspect hubs or spokes. There is
a requirement for inspection of friction rings for cracks, but not the
spokes. There was a service bulletin issued in 2003, it says failure
of the brake discs could "result in considerable damage to equip-
ment and extensive and possible fatal injury to passengers and on-
board personnel." The service bulletin referenced the technical
manual requiring inspection and replacement of the cracked

37

spokes. But when you go to the next step along the line, there was not the same requirement to inspect hubs and spokes. Now, in aviation, that would be a colossal failure, a problem.

A second collateral issue is the personnel doing the inspection work themselves and certified maintenance. In aviation, airline mechanics are certified by the FAA. They get an A&P license, air frame and power plant. Then they go through the training, they get their qualification status so that when this mechanic says this part is the wrong part, this part is defective or this aircraft will not go back into service, it doesn't go back into service. The same standard does not apply in railroad maintenance. That elevates the quality and the integrity of personnel performing maintenance to have this status.

Now, what we find here is lack of training, lack of communication and lack of clarity and instructions on maintenance. So where was the disconnect? Why did the workers not know they were supposed to be inspecting spokes for cracks?

Mr. WEIDERHOLD. I probably could not have phrased it any better than you just did in outlining exactly what the problems are, Mr. Oberstar. I think the analogies with the aviation industry are right on point. Because part of what we are going to be looking for is that redundancy.

Right now, all I have is paper. That's all I can compel right now. So I start with those procedures. And having a little bit of engineering background, you look for certain things. The other things I would look for in the chain you just described is I would expect the OEM would have done some type of testing beyond just a finite and limited analysis or the like. So I would like to see what those tests are.

One of the very interesting things right now is, working on the fix, is that all of, there is a new Knorr brake disc design and a manufactured product that goes to German, to Munich for testing, to Knorr Brimms, Knorr Brimms has a hydraulic pulsator to actuate and imitate the amplitude and the forces that are applied on the disc. The Knorr disc, the new disc is performing very well. It took lateral forces up to 150 gs, at one point 4 million cycles.

The WABCO product, the current product that was out there started exhibiting cracks somewhere between 0 and 50,000 cycles at 46 gs. That does not say it's failing, but it says that there is a problem. That's why we need to get those results back.

What I am really interested in is, was there a failure analysis done at any point prior to the time that the crack was discovered? Were there tests that were done by the OEM at the time of manufacturing? I have asked for the mil certs, I have asked for a casting analysis. This is a poured cast, it's not force fed. You know what happens in casting, when you put it in the sand, the way that it is cured. All those things kind of come into play.

The Amtrak metallurgist has informed me that he does not believe this is a casting problem. However, I would like to see the test results. I would like to see the metallurgy, I would like to see the yield and strength tests, all those things that go into steel. Steel is a great product. It is elastic. You generally design a safety factor of about 1.5 over the specification in anticipation of load, be-

38

cause it does have elasticity. There are ceratin things that you look at.

The new Knorr products, when you look at that diagram of the spokes, the biggest difference between that existing brake part and the new Knorr disc is you take the spoke and you turn it 90 degrees, so you have increased the section modulus and you have by definition strengthened it against the bending moment. That's what we would expect on a bench test that it would perform superiorly.

I would like to know when that was designed, why it was designed, get answers to all those questions. Because this time line is very important.

With respect to the procedures, I think there are some very good lessons to be brought over from aviation into the rail industry, and especially, especially with safety critical parts. If you don't have it anywhere else, at least have redundancy when you know you have a safety critical part.

Mr. OBERSTAR. I appreciate your answer and the depth to which you went in responding. All the issues about metallurgy are matters that I think we have to await the outcome of further investigation. The fact that, what I consider to be a fact, from reading the documents, the FRA inspector cut the spoke out of the rotor and then it fell apart in his hand.

Mr. WEIDERHOLD. At first, there was some concern about how deep the crack was, did the crack go through the entirety of the width of the spoke. The first one that looked like the worst one, there was a plasma cut that was done above and below the identified crack. When that piece was taken out, the two pieces fell apart, which confirmed that the crack was clean through the spoke.

Mr. OBERSTAR. Which raises questions about the standards, Mr. Chairman, set for the metallurgy itself. What are the standards and who crafted them? Those are questions that we should not pursue here, because I think we have to await the outcome of metallurgical testing. I hope there will also be some independent metallurgical lab testing of these parts, so we get a balanced kind of a consensus view and not just one viewpoint of this matter, which is, it is extremely important.

Again, in aviation, there are standards that are set, have to be followed. The parts that are cast, parts that are machined and parts that are composites have to be subjected to extraordinary testing and assure the continuity of quality.

Mr. WEIDERHOLD. If I could, you also made a point about the AMT and the certification that is required. There is, in this model, a certification that is required for a sign-off by a supervisor that includes slightly greater training than that of the person actually performing the work. But I think that it does not have the same panache that an AMT card has in the aviation industry.

The other thing I believe in the aviation industry is that if you miss things, there are penalties if you miss them. I am unsure as to what rules could be applied, barring a catastrophic event, which we I think we were lucky here. There can be incentives for people to do the right thing.

Mr. OBERSTAR. Mr. Chairman, you have been very generous with the time. I just have one more. At the end of all this process, we

may be making the case for hearings on safety procedures generally in railroading and the qualifications and status of rail maintenance providers. But Mr. Jamison, the IG's office staff seems to feel these cracked spokes and webs would not have been found on a typical FRA routine maintenance check. What is a routine maintenance check? How does that differ from the inspection that led to finding the cracks in the disc rotors? What is the difference there?

And again, I know in this specification sheet there are certain comments, at this level, such and such is inadmissible. Well, we know the catastrophic failure on the Aloha Airlines 737 when 18 feet of the roof of that aircraft bound for Honolulu ripped off, it was because of the propagation of a hairline crack that could be discovered only by eddy current technology inspection. That's the level of inspection that we need in aviation and on a safety critical part, it seems to me that that's also the level of attention to detail that is necessary.

Mr. JAMISON. Congressman, first let me respond to the "routine inspection" question. It is my belief that the inspection requirements that are in place now would have picked this up if the proper training was done and the proper inspection techniques were conducted. So, for instance, we require a daily inspection of the undercarriage of the Amtrak trains for Tier I Class or Tier II Class I brake inspections.

But to your point, I by no means have your expertise on the aviation industry. But I also believe that they have learned greatly from where they have had equipment failures. That is what we are focused on, to try to make sure that we learn from this. The failure in the spoke has not been a common problem from FRA's experience in the railroad industry, even though there have been isolated instances. Now that there is a common problem specifically with this high-speed equipment, we need to go back, reevaluate the inspection, testing and maintenance plan that we approved, make sure it is appropriate, given the design, the loading and the possible cracks that may occur in this equipment.

Mr. OBERSTAR. Thank you.

Mr. Chairman, in conclusion, may I ask unanimous consent for Ms. Norton to ask questions at the appropriate time in the proceedings?

Mr. LATOURETTE. Absolutely.

Mr. Simmons.

Mr. SIMMONS. Thank you, Mr. Chairman, for having this hearing, and I have listened with great interest to my colleagues, Mr. Oberstar, Mr. Menendez in their discussions of this problem.

Mr. Chairman, we have more than a broken brake system here. We have a broken train system here. I think the whole system is broken and I think perhaps this problem with Acela is fortuitous, because it focuses our attention and the attention of everybody like me who is interested in providing good train service, passenger rail service in America on the fact that we need some major surgery and major overhauls here.

Let me just back up to some of the things Mr. Menendez was saying. The history of this project and decisions that have been made over the last 10 years, Amtrak has known about the prob-

40

lems of putting a high speed train on low speed tracks for years and years. I served on the Connecticut transportation committee, was ranking member back in the days when these decisions were being made. I remember when the ICE was running these lines and when the X-2000 was running these lines.

I also remember that Amtrak made a decision following a study, I believe, in 1988, that they could never run high speed along the shoreline of Connecticut. There were nine full turns of circles between Westerly and New Haven. It was impossible. So this study recommended an inland route where they could design a high speed track that would be straight. The decision was made not to pursue that because condemning land was considered to be so difficult.

So from the very, very inception of this project, it has been known that the shoreline between Westerly, Rhode Island, and New Haven, with nine full circles, was not congenial to true high speed.

Secondly, the train set that was decided upon was unanimously rejected by the Connecticut General Assembly Transportation Committee. They recommended test trials for a number of years using the turbo jets which would have avoided the tremendous cost of the catenaries and could have demonstrated whether there was a market for high speed. That recommendation, that unanimous recommendation of the State of Connecticut was rejected outright by Amtrak. They went ahead to develop their own tilt train.

Again, the fact that they were going with a tilt train shows that the knew there was a problem with winding tracks. They knew that winding tracks or more than three degrees of turn on a high speed track stresses the system. The systems are generally not designed for that. They designed the train to be crash-proof with freight trains, because freight trains run along the line, but that made it twice as heavy. So you are putting a substantial amount of more weight on these train sets.

Then if you look at the deployment schedule, where the wheels, since September of 1999, the wheels were wearing out too fast, they were hunting or oscillating, in 2000, bolts were broken and in December of 2000 the trains ran for a day then broke down, then there were cracked yaw dampers, etc., etc. My wife rode the Acela a month ago. When she got off in Boston and asked the train master what was the smell, and he said, it's the brakes, nothing wrong with that, they do that all the time.

Mr. Chairman, this project has been fraught with difficulties for a long period of time. And the problems of this project go way beyond the problems of a single piece of equipment failing. I think that we have systemic failures here that in fact led Mr. Gunn to say in 2002, or to question in 2002 whether Acela was worth its cost for Amtrak to operate, or whether they should go back to conventional trains and the Metroliner in fact can operate within 10 or 15, maybe 20 minutes of the time of the Acela.

We have a serious, serious set of problems here. And I am very concerned about it. I am concerned about the fact that the summer season for train passengers in Connecticut and New England generally is the season of tourism, you have high ridership and we're

41

not going to have these trains on the tracks. I am concerned that workers are transferred from one train set to another.

I just can't express to you my distress over what I have heard here this morning, over what I have observed over the last 10 years. I would hope, Mr. Chairman, that we could use this hearing and this situation as a springboard for a substantial and comprehensive review of every aspect of this system with some serious reorganizational recommendations to follow.

I don't know whether any of the panelists want to respond to my comments. I do have questions for the record, but I know we are short of time. But that is where this Amtrak supporter seems himself at this point in time, and it's not a happy situation that I see for myself.

I yield back.

[The information received follows:]

The Department agrees that part of the problem is organizational. Amtrak does not recognize its limitations and tries to do too many things and thus does not have the focus or resources to do many things well. The Acela procurement is an excellent example of how these shortcomings now hamstring the corporation's ability to meet its transportation mission in a cost effective and reliable manner. The Administration proposes to turn Amtrak into a pure operating company and thus remove from management the obligation to oversee maintenance of the most complex rail infrastructure in the Western Hemisphere. This in turn will permit the company to focus on serving customers and maintaining the necessary equipment for its service. Just meeting the complex challenges associated with that truncated mission would stretch the capabilities of most well run transportation companies.

Mr. LaTOURETTE. I thank the gentleman very much.

I have been advised that when the House goes back into session, they are going to reopen the vote on the previous question. But if you have already cast your vote on the previous question, there is no need to return. So it is my intention, unless someone has a big problem with it, to just plow ahead.

Ms. Norton.

Ms. NORTON. Thank you very much, Mr. Chairman. I appreciate the opportunity to ask a question or two.

First, on this hearing, I know that the witnesses feel as I do that the loss of the Acela could not have occurred at a worse time, when many of us are here on both sides of the aisle trying to save Amtrak, and have you only real money-maker go out on you this way. We will go a little further into how to keep that from happening in the future. I don't understand how the folks who built it, and I do understand, I do understand that we've got a custom built Acela here. Nevertheless, particularly sitting here where I am, where the Acela is not only good for you, it is good for the entire east coast, I can only say, what next.

I sat in on, because of the good graces of the Committee, I sat in on a hearing on rail safety that was held last year. At that time, I was very, very concerned, post-Madrid, sitting here with Union Station in our face, the Senate very close to Union Station, trains running under Union Station, my own Amtrak safety people had come to see me months before about their concerns, just to alert me.

I asked, I believe it was Chairman Quinn who was chairman at the time, that you have a plan, a cohesive plan by the end of the year. The chairman was adamant he wanted that plan by the end

42

of the year. So far as I have been able to tell, no plan was forth-coming for securing passenger rail. That's very concerning, considering that where the people are is really not in aviation, it's really on rail and subways and light rail. Huge numbers of people every day get on.

In my own questioning to the Administrator at the time, it was clear that a lot of work had been done with operators all across the country, a lot of work. Of course, there was nothing coherent for any of us to look at. And it looked like it was each man for himself, although people sat around and talked to each other and apparently something close to best practices was being developed, so it didn't seem like a big thing to get to Congress what it asked for, which was a plan for securing rail travel.

The Homeland Security Committee, on which I also serve, I am on this full committee as well, had a reauthorization markup just last week, ten days ago. I got an amendment in that bill, and I got some report language in the bill. The amendment should help you do what I think you can easily do, you haven't been just sitting there not talking to operators all around the country. It simply would have, it says the Department of Homeland Security, actually, the Homeland Security Committee is already talking with the staff of this Committee, because obviously the two are intertwined here.

But essentially it would have the Administration develop passenger security best practices to be used by operators on rail, light rail, etc., and a national plan for public outreach, an awareness, so that employees and the public alike can have a sense of what they ought to do on rail travel the way many of us understand what to do on air travel. That wouldn't cost anything, probably already going on, but again, there is nothing coherent that a member of Congress could look at and do oversight on. That's the first thing.

The second thing is the embarrassment of the CSX litigation. Here we have a local jurisdiction trying to reroute trains that are in your jurisdiction, sir. The reason is, nobody could get your agency or the Department of Homeland Security to come up with a plan of any kind that they are willing to talk with the District about for making sure that trains which travel carrying toxic materials within four blocks of the Capitol were in fact properly secured.

There was unrebutted testimony at the hearing that if one of these trains, one car on this train was successfully attacked, you could have an explosion with gases emitted for as many as 14 miles in either direction, and if it was the right car at the right time with the wind blowing at the right time, as many as 100,000 people could die within a half hour. After South Carolina, I don't think anybody can doubt what a well-planned attack of that kind would do.

I was able to get report language in that really begins at the basics on the CSX type matter. All of the concern has gone off on rerouting. Everybody knows that you are not going to be able to reroute trains in the United States very much. Perhaps some rerouting can be done around the Capitol, I don't know. The National Capital Planning Commission is looking at whether or not the Federal Government could do something with some tracks in that regard.

43

But clearly, rerouting is probably an impractical way to deal with the situation nationwide. So what you need is a Federal agency to step up to the plate, so that we don't have what cities are now beginning to do all over the country. They are all saying, okay, let us do something like the District of Columbia did. And to show you just how compelling what the District of Columbia did was, it won at the trial court level on commerce grounds, it was overturned, at least at the preliminary injunction stage, at the court of appeals level.

But the court looked at what your agency said it had done. It must have said the equivalent of, is this it? Because it said, a local jurisdiction has the right to protect itself from such a deadly risk.

I give you that predicate to say first, do you have any objection to this language that I hope will remain in the bill. It was passed by the Committee concerning the development of a coherent set of written best practices to be used by operators of appropriate facilities and a plan for public outreach and awareness for employees on the one hand and passengers on the other. Is that something you think could be appropriately done by the agency so that for example, I was pressed to make it an amendment because no plan, so far as I could tell, had been received.

I would like first to have an answer on that, and then I would like to ask you a question on what to do about the CSX type problem.

Mr. JAMISON. Ms. Norton, I am not familiar with your amendment. But I can tell you this. I feel like what you are asking for, in the way you described it, has already been done.

Ms. NORTON. So where is it, sir?

Mr. JAMISON. Well, you can go to the—

Ms. NORTON. Why wasn't it submitted to this Committee as the Chairman asked last year?

Mr. JAMISON. I wasn't at the Committee hearing, first of all, and quite honestly, I don't even know if the agency that prepared it, which I am getting ready to tell you about, was at that hearing.

Ms. NORTON. The agency was at that hearing. The Railway Administration was at the hearing.

Mr. JAMISON. The Federal Transit Administration, of which I happen to be the Deputy Administrator, shortly after 9/11, established a comprehensive action plan for passenger rail security. As you mentioned, public awareness is a key issue. It is an issue that was brought up in Madrid, and one of the fundamental, basic things that you have to do to make sure that you protect passenger rail. The comprehensive national public awareness campaign was rolled out by the Federal Transit Administration, approved materials were disseminated to every public transit agency in the country. Technical assistance was provided to all those transit agencies to not only conduct vulnerability assessments, but to make sure that they had proper training in place to educate their employees on how to spot suspicious behavior and that they have public awareness messages across the country.

So a lot of that stuff has been done. I will reiterate, though, that DHS has the lead in security. Those "best practices", as you call it, were developed and comprehensively laid out in a top 20 action item list that is still posted on the Federal Transit Administration

44

Web site. I contend that every transit agency in the country is aware of that list.

Ms. NORTON. Could you submit to this Committee a copy of all the documents you have just described?

Mr. JAMISON. Absolutely.

Ms. NORTON. Thank you very much.

Ms. HECKER. Ms. Norton, I just wanted to add to actually after that hearing, Mr. Quinn, as well as several members of the Senate, asked GAO to do a global analysis of best practices in rail and transit security. That work is ongoing. As a successor, we briefed Mr. LaTourette's staff. That study is due out that summer. We basically covered eight European capitals and all of the rail manufacturers and operators and three Asian countries. We visited every transit organization in this country, as well as Amtrak. We will likely have comprehensive recommendations at that time. I know it is not speaking to your legislation that would direct that kind of leadership, but we will have some conclusions, and with the clearance of the other members, we would be happy to brief you on that.

Ms. NORTON. That does speak directly to it, and I am glad that you are looking at it, as other countries have also engaged in it. Finally, on the report language, the first responders, the fire chief, for example, in D.C. said he had no idea when these substances were coming through. At the very least, apparently the League of Cities the mayors said they wanted that kind of notification. So this language goes to prenotification of shipments to local law enforcement agencies, protocols on effective communication between shippers and local authorities, training of employees in handling hazardous materials. Really the basics.

Do you have any problem with that, or are you going to tell me that's already been done? Because the litigation came precisely because the District of Columbia did not have any information on what to do. And here you have a local jurisdiction that moved out on its own and now has a whole bunch of local jurisdictions moving out on its own, showing that there is a void, a gap in leadership here.

Mr. JAMISON. I just want to clarify. The comments I was making before were strictly related to passenger rail, and a lot of the work that I headed personally at the Federal Transit Administration. So I'm intimately aware of that, would be happy to share that with the Committee.

As far as prenotification goes, Graniteville taught us a lesson about not only security but also safety around hazardous materials and the impact that TIH can have, particularly chlorine can have, in a situation. However, I have concerns about prenotification. As a result, we are accelerating the use of our research resources, with those of the Department of Homeland Security, the Office of Domestic Preparedness, to come up with a Railinc demonstration project that actually would allow us to have consist information available in a push-pull type of system. So, for instance, if there is an accident in the vicinity of five emergency responders, automatically they would be in a database, and the information of what's on that train would be pushed out to them, as well as giving them the opportunity via Internet or other opportunity to go in and pull that information to them.

45

However, I do have a lot of concerns about prenotification. There were 1.7 million hazardous material shipments by rail in the United States in a year, and I don't want to overburden or take away the importance of key data with a constant stream of information that would keep coming to emergency responders who have a lot of other critical work to do. More importantly, I think it's critical that we give them the access to information when they need it most.

Ms. NORTON. If there are appropriate guidelines or regulations, do you know what you would get? You would get responses back from agencies and you would be able to work that out. In the absence of that, you have a local jurisdiction out on its own. I must tell you that their notion of rerouting was not my idea of the only available option. But when people who are sitting where they are sitting, without any leadership, think about what to do, they can only think about move the train away from where it is.

So I would simply ask you, I am very pleased that you responded as you did on prenotification. What it does is to show the importance of publishing something, so that local jurisdictions can speak back to you and we can iron out this problem before you get this proliferation of concerns already developing, surely you must know that, already developing in cities and towns around the United States. I am confident this language will remain, because it is report language, and I want to assure you that I am personally going to make it my business to follow up on both of these issues I have raised at this hearing.

Thank you very much, and thank you, Mr. Chairman.

Mr. LATOURETTE. I thank the gentlelady. We are going to bring this panel to a close. I want to thank each of you, and Ms. Hecker, we look forward to your continued work and appreciate the work you have done already. Mr. Weiderhold, I speak for members on both sides of the aisle, that your investigation to this point has been very impressive and we look forward to your further work.

And Mr. Jamison, I know that your role as Acting Administrator is about to come to an end with the confirmation of the Administrator. You go with our thanks and my thanks for your service to the country to this moment in time in filling that role on an acting basis, and good luck with the addition to your family. Thank you for being so patient. Thank you all.

While we wait for the second panel, the House has notified those who do not have access to the outside communications, it indicates an apparent air space violation by an unidentified aircraft over Washington today prompted the evacuations that we just encountered. F-16 fighter jets scrambled to intercept the aircraft, it was a small, single-engine plane forced to land in Frederick, Maryland. There are two subjects now in custody and being interviewed by the Secret Service. That's what happened to us a little bit ago.

It is now my pleasure to welcome the second panel today. The second panel will be comprised of William Crosbie, who is the Director of Operations at Amtrak; William A. Spurr, who is the President of Bombardier Transport of North America; and Francis Jelensperger, who is the President of Alstom Transportation, Inc., of America. I want to thank all of you for coming here today. I apologize for the deadline.

46

I just notified the members of the Subcommittee, there was a Highway Subcommittee meeting that was supposed to start at 2:00 o'clock. They are now going to wait for us. If we can sort of shoot for a 3:00 o'clock out time from this, I don't want to short anybody the opportunity to ask any questions, but if we can sort of aim towards 3:00 o'clock, I think we can facilitate our brethren on the Committee.

I would say to the panel, this is a pretty funny place, Washington, as most of you know. While we were outside in the parking lot, some of the wags were suggesting after the second panel was sitting in the audience and saw Mr. Mica's questions of the first panel, perhaps we should check your fingerprints on the smoke detectors and fire alarms in the building.

[Laughter.]

Mr. LaTourette. I'm sure that that was not right. But I again thank you very much for coming. I want to say, as an editorial comment, that when the Inspector General was here, I am personally impressed that all three of your organizations are cooperating fully with the IG and what he is attempting to do. I think you are to be commended for it. He made the observation that one entity not represented here today may be lawyering up, and while I understand business concerns, I think it is commendable that all three of your organizations have stepped up to the plate and are helping us try to find a solution.

So with that, welcome, and Mr. Crosbie, we look forward to hearing from you.

**TESTIMONY OF WILLIAM CROSBIE, SENIOR VICE PRESIDENT OF OPERATIONS, AMTRAK; WILLIAM A. SPURR, PRESIDENT, BOMBARDIER TRANSPORT OF NORTH AMERICA; AND FRANCIS JELENSPERGER, PRESIDENT, ALSTOM TRANSPORTATION, INC. OF AMERICA**

Mr. Crosbie. I am just going to walk through a series of slides for the record, we would like to submit them for the record, which has some photographs that you might be interested in. I will do that quickly and then I would like to move on to my testimony if that's okay.

The first slide there, photograph, gives you a sense of the shop environment. It is a modern facility and the train set over a pit. This area here is the undercarriage of the train, the wheel axle set, there are three rotors or discs on an axle. That is something you may not have heard until now.

When we talk about the friction surface, Mr. Weiderhold mentioned that, there is a good photograph of it there. This is what is referred to as the web, and you can see the spokes in here.

This is a good example of the type of crack that you would see. You can see that one we have submitted, it is barely visible to the naked eye. Now we know where to look, so your mind and eye can play some tricks on you as to is it there or isn't it there. That is the same spoke a little bit closer in.

Then this is a different spoke. You can see that that crack is clearly visible. So what I wanted to give you today is a sense of the degree of variation in visibility.

47

Mr. Chairman and members of the Committee, I appreciate the opportunity to come before you for an update on the status of Amtrak's Acela service. This afternoon, I am going to address what happened last month regarding our decision to pull the Acelas, what is being done to return the trains to service and what the financial impact has been to date. I am Williams Crosbie, Senior Vice President of Operations for Amtrak. I joined Amtrak in January 2003.

I am a professional electrical engineer with over 20 years' experience in railroad operations, maintenance and engineering. Let me begin by saying that this incident has not affected our resolve to return Acela to service. Acela was introduced nearly five years ago. The train is popular among our passengers and ridership has grown from just under a half million in its first year of operation, 2001, to more than two and a half million in fiscal year 2004.

Last year, it accounted for nearly $295 million in ticket revenue, or approximately 25 percent of all Amtrak ticket revenue. Its popularity among passengers was continuing this year until the trains were sidelined in April, with revenue up 10 million and ridership up 7 percent through March against the same period last year.

In the early morning hours of Friday, April 15th, I was contacted by Amtrak's high speed rail master mechanic and told that cracks in the spokes of the brake rotor had been found. The first crack was found following a post-run inspection of one train set. The initial Amtrak high speed rail mechanical engineering assessment was that the defect existed on every train set inspected to that point, and that it likely existed across the fleet.

Amtrak's high speed rail maintenance and engineering staff recommended to me that the train sets be taken out of service because based on their assessment, it could be unsafe to operate the train sets. After reviewing their findings in detail, I concurred with their recommendation and ordered the entire fleet of Acela train sets out of service.

Simultaneously, I also ordered an immediate fleet-wide inspection of all train sets to detail and document the cracked spokes by train set, by car number, axle number and rotor number. Each of the 6 coaches of the 20 train sets has 12 broken brake rotors. That means the full fleet has 1,440 rotors. Of those 1,440 rotors, approximately 300 cracks were found on 250 of the rotors. These cracked spokes, many of which were not visible to the naked eye, were found on every train set. At a meeting on Friday, April 15th, all parties agreed that taking the Acelas out of service was the right decision.

These train sets were assembled in the United States for Amtrak by a consortium of Bombardier Transportation of Canada and Alstom of France. In addition to the 20 train sets, the consortium provided 15 other high horsepower locomotives, 3 new maintenance facilities, and through its subsidiary, the Northeast Corridor Maintenance Service Company, better known as NEC-MSC, a contract to maintain the equipment. Under this service contract, NEC-MSC is obligated to inspect, service and maintain the equipment with NEC-MSC management supervising Amtrak employees.

The brake systems used on the Acela were supplied by Knorr, a subcontractor of the consortium, and the discs or rotors at issue

48

were supplied by Knorr and SAB WABCO. Under our management services agreement, NEC-MSC is responsible for inspecting and maintaining the train sets and managing the inventory of spare parts. When this incident occurred, we discovered that there were only 64 spare rotors on hand and none on order.

Consequently, this required Amtrak to deliver the news on April 20th that the train sets would in all likelihood not return to service until some time this summer, and then only gradually. We then moved on parallel paths to determine the cause of the problem and the solution, and to quickly begin a service recovery plan. The absence of Acela initially left a substantial hole in our northeast corridor service. On weekdays we had been running 15 round trips between Washington and New York, 11 between New York and Boston. These trips accounted for average weekday revenue of $1 million a day.

Moving quickly with replacement Metroliner service, we reduced the daily revenue loss by more than 50 percent. Starting the week of April 25th, we were able to offer nearly hourly service from 6:00 a.m. to 6:00 p.m. in both directions between New York and Washington with Metroliners. Starting last week, we expanded that to 7:00 p.m. in both directions, and added two Metroliner round trips between New York and Boston. So we now have 14 Metroliner round trips south of New York and 2 round trips north of New York. We did all this by a combination of actions, including the redeployment of equipment from throughout the country, reducing the shop count of our other service cars and borrowing equipment from third parties.

The Metroliners have performed well. Since starting their full schedule on April 25th, on-time performance as of May 9th was 83 percent. A good day for us is typically between 85 and 90 percent with the Metroliners. This is equivalent to the Acela's on-time performance in March, which was 83 percent. The trip time also compares favorably with the run time that is within 10 minutes of the Acela express.

However, despite quick action to redeploy equipment and construct a Metroliner schedule that meets our passengers expectations, the loss of revenue has been and will continue to be substantial until the train sets are returned to service. Our estimate is that net of expenses, we will lose somewhat more than a $1 million a week that the Acela express trains are out of service.

This has the potential to seriously jeopardize our end of fiscal year 2005 cash balance. Right now the projection stands at $32 million before considering the impact of Acela service disruption. This incident may well exhaust our cash by the end of the fiscal year. We are taking every opportunity to mitigate the financial consequences of this incident. Also the FRA and U.S. DOT, who are on our board of directors, are up to date with daily cash on hand reports as well as monthly cash flow projections.

The Subcommittee may also be interested in knowing that under the maintenance agreement, NEC-MSC may be assessed liquidated damages of $10,000 per missed trip, although typically liquidated damages are subtracted from the regular monthly payments that we make to NEC-MSC for its services. As of April 15th, Amtrak has not made any payments to NEC-MSC.