49

We do want to know what caused this. And on April 15th, I asked Fred Weiderhold, Amtrak's Inspector General, to investigate this matter for us. I believe he is asking all the right questions. The IG is independent, experienced and professional. And you have the benefit of his testimony today.

As I said earlier, Amtrak's focus is on seeing that the new parts are procured, satisfactorily tested and installed, the appropriate spares are in inventory, and that the trains are returned to service. Acela express is both popular with our passengers and is a very important part of our bottom line.

This concludes my testimony and I look forward to your questions.

Mr. LATOURETTE. Thank you very much, Mr. Crosbie.

Mr. Spurr, thank you for coming and we would like to hear from you.

Mr. SPURR. Mr. Chairman and members of the Subcommittee, good afternoon. My name is William Spurr. I am the President of Bombardier Transportation for North America.

Bombardier appreciates the opportunity to appear before the Subcommittee today and discuss issues related to the recent grounding of the Acela train sets. You have my written statement, it is part of the record.

The consortium of Bombardier and Alstom fully understands the importance of the issue and the impact it is having on rail transport along the northeast corridor. I am here today to reaffirm our commitment to finding a solution that brings the Acela equipment back into service as quickly as possible while at the same time ensuring public safety.

As is clear from the statements of the preceding panelists, the comprehensive analysis of the situation is underway. We expect to know more as analysis and testing winds down toward the end of May. We are pressing Knorr and their sub-suppliers to identify and correct the root cause of this issue. Knorr is currently subjecting the disc to a strenuous battery of testing at their labs in Munich, in Germany. There are some preliminary results but it would not be appropriate to discuss them until the conclusions are finalized.

We are also working with the parties to conduct field testing of the component using one Acela train set in operation on the NEC soon. Rather than speculate on what the test may show when completed, I will confine my oral comments to what we know to be facts and to the process now underway to return these cars safely to service.

With regard to the facts, I want to address certain misconceptions that have arisen in recent days. First, this is a fundamental component performance issue, not a maintenance issue. The brake disc spokes do not have hairline fissures because of the lack of maintenance. The problem arose due to design, manufacture or environmental factors. The root cause analysis will tell us whether the problem is design, manufacturing or the operating environment or a combination of these factors. But it is not a lack of maintenance. No maintenance as such is required for the disc spokes.

Second, the grounding of the Acela fleet is not due to a lack of spare parts. Amtrak and the consortium have on hand ample spares for all regular maintenance requirements. No railroad or

50

manufacturer can be expected to carry spares to cover a fundamental problem like this, in which virtually every component in the fleet has to be replaced all at once. That would be like requiring an auto manufacturer to equip every car with four spare tires. The level of inventory available to Amtrak was based on historical usage and is in line with standard industry practices.

This was indeed a completely unexpected development. Bombardier contracted with Knorr Brake Corporation to deliver a brake system and components in line with Amtrak's specifications. Knorr was well-known as a reputable supplier in the industry, used by many rail equipment manufacturers. Bombardier has worked with Knorr successfully on numerous projects. We had every reason to believe that the system would perform properly.

Now that I have spoken to what the issue is and is not, let me spend a few moments on our approach to resolving it. We are pursuing three options in parallel. The three options are each contingent, of course, on Amtrak and FRA approval. First, we are developing an approach to recertify the discs we have on hand for continued use. This would be an interim solution to get as many trains back in service as soon as possible. Trains, of course, would be closely inspected on a daily basis until a permanent solution was achieved.

Second, we are pressing Knorr and its sub-suppliers to secure new discs of the same design as quickly as possible. And again, this would be also a temporary solution. Finally, we are looking at the potential for using completely a different brake disc design produced by Knorr itself. The design has already been pre-qualified as a replacement part by Amtrak and would serve as an interim solution. Knorr has committed that it can produce brake discs of the new design and start delivering them in June 2005.

The objective behind these parallel approaches is to secure a solution that ensures public safety, gets as many train sets into service as soon as possible and ultimately arrives at a viable permanent solution to the issue.

In closing, let me once again stress Bombardier's commitment to resolving this issue quickly and safely. Since the fissures were discovered, Bombardier has been cooperating fully with the FRA, Amtrak and the Inspector General of Amtrak. Last week, for example, NEC-MSC, the Northeast Corridor Maintenance Services Company, held jointly by Bombardier and Alstom, met with the Inspector General of Amtrak. We supplied documents and the Inspector General's staff interviewed privately maintenance employees.

We will continue to cooperate fully with all parties, including the Inspector General of Amtrak. It is also in our interest to go to the bottom of this and understand exactly what happened.

Thank you to the members of this panel for inviting us to participate today. I will respond to any questions you may have.

Mr. LATOURETTE. Mr. Spurr, we thank you very much.

Mr. Jelensperger, thank you for coming and we look forward to hearing from you.

Mr. JELENSPERGER. Mr. Chairman, members of the Subcommittee, thank you for the opportunity to appear before the Subcommittee to discuss issues related to the Acela train sets. We are pleased to be here this afternoon with our colleagues from Amtrak and

51

Bombardier, and together we are fully committed to ensuring a long-term, expeditious and most of all safe solution to the issue at hand.

Bombardier-Alstom, acting in a consortium, contracted with Amtrak in 1996 to provide 20 train sets and 15 high horsepower locomotives and for providing maintenance services for the Acela train sets in joint venture. Alstom was approximately 28 percent of the value of the consortium contract. Our scope of work was focused primarily on supplying the propulsion system.

Alstom, working together with Bombardier, is fully confident that our team will resolve the current situation by working with Amtrak, the Federal Railroad Administration and the consortium suppliers to get the equipment back into service as quickly as possible. As we do so, passenger safety continues to be our utmost priority for us all.

Alstom is committed to working closely with Bombardier and its subcontractor, Knorr Brake, to resolve the issue as Bombardier presented in its prepared statement. I have had an opportunity to review the statement of my colleague from Bombardier and can say that Alstom is in agreement with the substance of Bombardier's statement.

We understand and appreciate Congress' concern in this issue. Alstom will continue to work closely with Amtrak and Bombardier to rectify the situation quickly, effectively and most importantly, safely.

Attached to our prepared testimony are the responses to the questions raised by the Committee. I would be pleased to answer any additional questions the Committee may have.

Mr. LATOURETTE. I thank you very much, and I thank all of you for your testimony.

Mr. Crosbie, I think I want to start with you. When the FRA was here, we were talking about the instrumented tests, I guess we will call them. They are scheduled to start next week?

Mr. CROSBIE. We are working through the inspection, the test procedures. Once we get the final procedures finalized, and it is the responsibility of all parties, Amtrak included, and the FRA, if that goes through as planned, we hope to have a test through the weekend.

Mr. LATOURETTE. Okay. And Mr. Spurr was talking about perhaps, and I think the Inspector General also talked about, a redesigned or another disc that is being manufactured by Knorr. Is that currently being tested somewhere in the world as well?

Mr. CROSBIE. That is being tested. We are reviewing the design. There are items such as finite element analysis of the disc and Amtrak will be certainly engaged in testing it. We have done some laboratory tests in Munich, Germany, along with the existing disc.

The tests, I want to be clear, though, in terms of the tests in the corridor, we are really testing to see what the lateral forces underneath the train set. It is not a specific disc that we're testing.

Mr. LATOURETTE. Right. I asked you this the other day when you came to visit me, and while the Inspector General will complete his work and we will have some answers about how we got from here to there, I think what everybody, at least that we represent, want to know, aside from the money that it's costing, which you have al-

52

ready testified to, and not holding you to any certain date, but if things go swimmingly, when do you think the Acela trains are going to be back in operation?

Mr. CROSBIE. That is a very tough question to answer. I think the next two weeks are really going to tell us when they will come back. We need to complete the tests on the northeast corridor to understand those lateral forces underneath the train set. That will really tell us which disc we should be using.

A concern I have is that the existing disc, once we understand what's going on underneath the train set, may not be appropriately designed and we may need to move to the alternative disc that's been suggested. Each one has its own production rate. From that you would be able to determine when the train sets will be back in service.

I am sorry I can't give you a specific date. It will be summer, June, July, with the information I have right now.

Mr. LATOURETTE. Would you concur, I thought there was some good news today, and that is that the people that are supposed to be working together at least seem to be working together at this moment in time to solve the problem?

Mr. CROSBIE. Absolutely. For all the corporations involved, there has been one focus and that is getting the train sets back in service.

Mr. LATOURETTE. I was interested in this data flow schematic. I have to be honest with you, this does not look like something that I expected to see, as to how this will work. Why, if you can tell me, was this set up so that NEC-MSC is responsible for the maintenance, I understand originally until 2013? And I will want to talk to you about that in a minute. But it's Amtrak employees who are on the shop floor. Who designed this?

Mr. CROSBIE. I was not with Amtrak at the time when they made those decisions. But the people that were in place told me that they felt that at the time, they did not necessarily have the work force in place to take on the high speed train set. There were a number of other reasons, in terms of using the agreement employees, the unionized employees. That's around some labor agreements as well.

So it was a combination of things, from what I understand. Again, I was not there at the time, but it is not the way I would have put it together.

Mr. LATOURETTE. Right. That gets to my next question, and that is, you and Mr. Gunn are considered by many to be railroad experts. You have earned that, given your experience. Given that experience, how many times have you been in a position to contract with outside firms, such as NEC-MSC, to perform critical maintenance functions on various properties on which you have been involved?

Mr. CROSBIE. I have been in this situation many times. The one that I have seen that works the best is the operator needs to be the one that is responsible for the overall system. That includes the train set and all its subsystems as well as the infrastructure, everything from track, signals, catenary and the like. They need to be the one responsible for that. We like to call that a vertically integrated organization.

53

What seems to work is picking pieces that you, for various reason that you wish to outsource and contract out, but you need to retain the knowledge base and the understanding of those systems. You may do that because of costs, schedules and the like.

Mr. LaTourette. And the follow-up to that is, given the events surrounding the Acela express train sets, do you believe that Amtrak is not capable of managing such large and technically complex infrastructure projects, or are they?

Mr. Crosbie. I believe they are capable of managing this. And Mr. Weiderhold had mentioned, in terms of new projects, fire-life safety is a good example of one that is being managed properly. In terms of the Acela train set and taking over the maintenance, the reason, we are very comfortable taking over the maintenance of those train sets.

Mr. LaTourette. I think Mr. Spurr indicated that the alternative disc, the Knorr disc, I guess I can call it, it's my understanding from you and other testimony that the big difference is the spokes seem to be turned 90 degrees, which may give it better strength.

There was a June 2005 potential delivery date. Just for the purposes of the record, am I correct that the WABCO disc has a slower production rate than potentially the Knorr?

Mr. Crosbie. That's right.

Mr. LaTourette. Can you just for the record tell us, how many WABCO discs do you think you could get in a month if you would ask them to send some stuff over, and how many discs do you think Knorr can supply? Have they at least informed you of that?

Mr. Crosbie. They have informed me of that, and they can certainly correct me if I get this incorrect, and if there is new information. The WABCO disc, as I understand it, can have a production rate of between 18 and 25 per week. You have to remember there is three per axle. And you can do the math on that.

Mr. LaTourette. Well, I can't, maybe you can.

[Laughter.]

Mr. Crosbie. The Knorr disc, I think the initial commitment we had was mid-June of 50, then it ramps up to 100 per week at mid-July, I believe it is, and then on to 150 discs per week in early August. So the production rates are substantially better with the Knorr alternative.

Mr. LaTourette. I think the last question for each of you, again when the Inspector General was here, he may be developing information that ORX in Altoona, Pennsylvania has either documents or witnesses that indicate that the spokes were developing cracks between 12 and 36 months ago was the observation. I heard him say that that information was communicated to perhaps some on this schematic, but it certainly didn't get to the shop floor. So first to you, Mr. Crosbie, are you, until you heard that or were advised of that by the Inspector General, are you aware of Amtrak having any information about those findings prior to April 14th or 15th?

Mr. Crosbie. No.

Mr. LaTourette. Mr. Spurr and Mr. Jelensperger, the same for you on behalf of the consortium?

Mr. Jelensperger. We had no idea of the litigation before last night, in my case.

54

Mr. LaTOURETTE. And Mr. Spurr?

Mr. SPURR. Well, most of the information we got from the Wall Street Journal.

Mr. LaTOURETTE. Right. Welcome to Washington.

[Laughter.]

Mr. LaTOURETTE. One thing is bothering me, Mr. Crosbie, however, and then I will yield to the distinguished Ranking Member. The settlement agreement, I understand why there was litigation, I understand why parties would want to settle the case. But it has been described to me that the maintenance end of this thing, because of the difficulties, is not a money-maker. So I would understand while the consortium may want to get out of the maintenance end of things, my understanding is that in a settlement reached between the consortium and Amtrak that you moved up, we will see what happens based upon what's going on right now, but if everything had gone along fine, that you moved up the assumption by Amtrak of the maintenance of this fleet from 2013 to 2000, instead of fall of 2006.

First of all, am I correct that the maintenance does not appear to be a money-maker?

Mr. CROSBIE. I would let my esteemed colleagues answer that question. But in terms of, for Amtrak, it is part of our budget. It's built into the 2005 budget. Maintenance, I would let them answer.

Mr. LaTOURETTE. I'll ask them in a second. But my question to you is, I assume they are going to tell me it's not. But if I'm wrong, we'll double back.

Mr. CROSBIE. If you are asking in the industry, there are other examples where they have made money doing this. It is not a lot, though. It is not something that one would invest heavily in.

Mr. LaTOURETTE. Mr. Spurr, I have a follow-up question that I want to ask you, but just to confirm, Mr. Spurr, is it a money-maker? Have you made money on this contract? My understanding is NEC-MSC is a subsidiary of the consortium, is that right?

Mr. SPURR. That's correct.

Mr. LaTOURETTE. Is this a money-maker for you?

Mr. SPURR. This particular contract, no, but we have other contracts that make money in a similar kind of service environment.

Mr. LaTOURETTE. But not on this one?

Mr. SPURR. I would say it's just about break-even. You must realize that following the agreement, the settlement agreement that we had with Amtrak, that the relationship improved greatly, so better work could be done. We had a lot of modifications to be done, as the GAO explained earlier on. And these modifications were basically 80 percent complete right now on these modifications. Unfortunately, this new incident happened.

But that will be completed also, once we are done it will be a better brake system. But also the reliability of the trains was increasing. We are already months where we were hitting above the requirement. So things were getting better on the operational side.

Mr. LaTOURETTE. But my question goes to the settlement, and my last question to Mr. Crosbie is, if it was part of the settlement that Amtrak is going to assume or subsume the maintenance responsibilities seven years earlier, what did you get for that? That sounds like that isn't what you were bargaining for. What did you

55

get for taking over, slicing seven years off of a losing maintenance contract?

Mr. CROSBIE. One of the big things that Mr. Spurr had mentioned is, first we had extended the warranties with the train sets. That was part of the things that we got for it. There is a list of items. Obviously we settled the lawsuit. I think we did well, all parties did well, I think it was fair.

We also under the parts area, we reserved our rights on the number of options. We have at least two options we can exercise under the contract which are very important to us as well. And a commitment resolving a lot of down in the details, a lot of technical things that were under discussion or debate as to who is responsible for them. That is probably the most important thing for me as the operations person that got resolved, was a commitment to fix those items. We cleared the decks. I am very happy to hear that they are going to continue in that spirit.

Mr. LATOURETTE. Sure. And not to cast blame on somebody that was there before you got there, but again, the settlement cleaned up what maybe wasn't the best contract to begin with, is that fair?

Mr. CROSBIE. That is a fair assessment of it. What is not written in that settlement is, it rebuilt the relationship between the parties. I think evidence of that is the recent events and the cooperation. I couldn't imagine doing this in the middle of a lawsuit.

Mr. LATOURETTE. I agree with you, and I said at the outset I am impressed that all three of you are not only at the same table today but also seem to be working together to solve it. I thank you, and yield to the distinguished Ranking Member, Ms. Brown.

Ms. BROWN. Thank you. I want to start with Mr. Crosbie, too. As you know, I came to the press conference where you announced that you were replacing the Acela service with Metroliner and regional service to offset revenue losses. How has the brake problem impacted Amtrak's ridership level on the northeast corridor and what is the financial impact? Are all the costs recoverable?

Mr. CROSBIE. In terms of the ridership, it is down, slightly down. It is down by 5 to 10 percent. We are very early in this, and just for the systems we use internally, we like to do what's called a ticket lift and understand that better.

We are also seeing, though, that it is improving as people get used to a regular Metroliner schedule. So we think that at the end of this, as we move through the month of May and June that it will stay flat to where it was. The financial impact, as I mentioned, is roughly a net of expenses. We have taken action to lower the expenses where we could in the order of, in terms of positions, because we are not running as many trains. Total is just over 85 positions have been reduced within the organization.

We have also taken action on food and beverage in terms of what we are serving on the trains. That has resulted in 30 positions that are external to Amtrak, but is a savings to us.

So net of expenses, it is $1 million a week in terms of the net loss.

Ms. BROWN. What is the time frame? For example, on the other trains it took how long to come from Washington to New York and vice versa. What is the time frame now?

56

Mr. CROSBIE. On paper it is 12 minutes between Washington and New York, the difference. The Metroliner is off the Acela schedule by 12 minutes. In all reality, it is typically only eight minutes.

Ms. BROWN. Another question. Would you tell me how Amtrak and the other organizations involved with the maintenance of the train set communicate with one another as problems arise? I am most interested in how this work operationally. I understand that the maintenance function is the responsibility of the consortium, but why didn't someone tell Amtrak about the problems if they knew months ago?

Mr. CROSBIE. The last part I obviously can't answer.

Ms. BROWN. We are going to ask the other parties there on the last part. Answer what you can please.

Mr. CROSBIE. Obviously we wait, I await the Inspector General's final report on this. That is the question I am asking as well, how did this happen, how did we not know, who knew and why did we get this end result. On an operating basis, we have under my direction, we have a regular meeting once a month with all the parties. It is referred to as the Acela oversight committee meeting. We go through in great detail, these meetings last typically a half a day or more. We go through all the open technical items, operational items, we go through on-time performance.

So we cover both, to put it in some buckets, if you will, the contractual part of this as well as the operational part. We have all parties at the table for that meeting. I chair the meeting. We have minutes. I have what is typically a month's worth of work that we go through.

It also covers the transition plan. We have submitted this this week to the GAO for their review in answer to the request for a comprehensive transition plan. They now have that document. It details with Gant charts, organization charts, and in great detail as to how we are going to get from where we are today to taking over the maintenance of these train sets.

So the communication, what is really frustrating me at this point is the communication was certainly there since the settlement agreement. It is very unfortunate that this one pie e did not find its way into the right hands. I was very happy to see, though, that my people, my master mechanic, my engineers that night, the night of April 14th into the 15th, once they got it, they knew what to do with it.

I want to be clear on that point. I authorized the train sets being taken out of service. It was the engineers, my engineers and our maintenance personnel that made a clear recommendation. They knew what to do.

Ms. BROWN. Mr. Spurr, can you answer that question? Let me just say that just recently, you all run the set from London to Paris, don't you?

Mr. SPURR. Yes, we do.

Ms. BROWN. We just completed it, less than a month ago. It was very interesting, because I think it usually takes about four hours, and it took us about six. But it was a demonstration on the French side, human error, that kept, that delayed the train. So there are many factors that trains to not run on time.

But would you tell us a little bit about the consortium, your responsibility? I understand it is like subcontracted out to you, your company?

Mr. SPURR. Yes. We maintain the 20 train sets for Amtrak under contract with Alstom. We have a joint company to do that. We share in that company 50-50. The work in that, under the contract, is just in simple terms, we have what we call preventive maintenance and regular maintenance, inspections that we do on a daily basis for every train set that goes out into service. We have 92 day inspections which are regulatory and that take a week, actually, it is a very thorough checking of the train, every 92 days, all the safety elements. And we have annual inspections that take actually around two weeks to perform.

In response to the other part of your question, if anything, what's happened is actually extraordinary. So when problems like that arise, it is our duty to inform our client immediately of the situation. We would, if we knew exactly what was happening.

Ms. BROWN. Mr. Spurr, I know that you would not intentionally not inform them. But why do you think the system broke down? Because from everything that I've heard this morning, it was lucky, our luck that we found out about it. So it wasn't, even though you are inspecting the train, evidently the brakes were not being inspected?

Mr. SPURR. If you look at the report of the Inspector General, the person who actually found what he thought was a little rust spot on the disc, on the spoke, actually mentioned himself in the report that he has been under those trains hundreds of times to do his routine inspections, and he is never able to detect anything. Actually, I think these hairlines fissures were so hard to see that it's, I think we're very happy that they were detected, like everybody else. Because it could have been a calamity if we hadn't, that it hadn't been checked.

Nonetheless, these discs have been operating for four years actually without one single failure. There are 1,440 of them in the system. So statistically, it is a good number to work on. But it doesn't mean, I think we were lucky to have found it and we are grateful to the inspector for finding the crack.

Ms. BROWN. Yes, Mr. Spurr, but I'm not a mechanic, so believe me, I don't know anything about cars or trains as far as how they operate. But I have this car. And when something goes wrong, it just stops. That's a part of the system. It just will not go over five miles an hour if something is wrong with the brakes.

So I guess I'm trying to find out, is that safety mechanism, can it be built into the system? Because even though you were doing the inspections as you are telling us, it was just luck that we found the flaw.

Mr. SPURR. No, I think the reason we found it was that there was an inspector under the car looking at it. So—

Ms. BROWN. But you have already told me that he looked several times.

Mr. SPURR. No, it's just that—

Ms. BROWN. It's something that you couldn't find with the naked eye. But I'm just telling you, the computer in my car, it just shuts my car down if something is wrong with the brakes.

Mr. SPURR. The inspections that we do are standard practice. It is the same inspections, not in detail, but in terms of checking the brakes, the spokes and so on, that we do in Europe. We are the largest maintainer of railway equipment in Europe ourselves. And it is the same, we checked it, it is the same kind of visual inspection that we do for the spokes. This component should not be failing. It is a problem of component failure.

It's like if the rims, when you go out and check your tires for winter driving, you don't check the rims of the tire, you assume that the rim is solid and is built properly. Every now and then you send it in, and yes, there is an inspection. There is an overhaul coming up on all the trucks, for instance, the wheel sets. And at that time, there is an opportunity to do a more detailed inspection of the discs.

Ms. BROWN. Right. My understanding is that you are supposed to have been operating, doing a certain level three maintenance requirement that you do a check so often. You had only completed 70 or so of the brakes. That percentage should have been much higher.

Mr. SPURR. Are you talking about spare parts? I didn't understand.

Ms. BROWN. Yes, it says, why did the consortium only have 70 or so brakes, discs in reserve, spare parts, yes.

Mr. SPURR. No, we had around 40 in reserve, plus we had around 14 wheel sets also in reserve. But the wheel sets, unfortunately, unbeknownst to us, had the same disc on them as the ones that were found to be faulty. So unbeknownst to us, the wheel sets that were in reserve were not necessarily all adequate directly for usage. And we had also under order an additional 40 discs with WABCO.

So that in actual fact we believe was sufficient to do what we call normal maintenance on wear and tear of the discs.

Ms. BROWN. Would you like to add something to that, sir?

Mr. JELENSPERGER. Well, I would have answered exactly the same way, maybe just a little piece of additional information. In the life of these trains, I think we changed 15 discs altogether. They were damaged by ice, damaged by other things, but only 15 were changed. We had basically enough wheel sets to change two train sets. And we had new discs that would have been used also. I think we had an adequate supply to respond to normal wear and tear.

Ms. BROWN. Well, are you saying that the problems that existed were not normal problems, is that correct?

Mr. JELENSPERGER. That's exactly right, that's what we think. It had nothing to do with maintenance, it had to do the quality of the component. And we discovered, thank God early enough, that that component was flawed. I guess all we are doing together with FRA is trying to find out what has happened, what was the cause, and once we knew, once we made the tests, we can basically reinstall the discs on these brakes, the brakes on the trucks and finally have the train in service.

Ms. BROWN. I am just hoping that we can come up with a system that just doesn't operate on luck. I yield back the balance of my time.

59

Mr. LaTourette. I thank the gentlelady. I just have a couple more questions, and I will be happy to yield to the gentlelady if she has additional questions as well, and I thank you for your patience.

But two things that I wanted to clear up. One I asked the FRA, and I just want to get back to you, Mr. Crosbie, as my last one. On this disc we're talking about, my understanding is that when the contracts were let out, Knorr was the winning bidder on the brake assembly but not on the disc? The disc comes from WABCO to Knorr and Knorr does the rest of the brake, Mr. Spurr, is that right or not?

Mr. Spurr. No, let me explain it a little bit. We gave a contract to Knorr for the total braking system. It was their responsibility to select the appropriate disc for the system. Of course, they had to go through a qualification process and they have to go through a design review process for all the components for the whole system. But that's the way it works.

Mr. LaTourette. I had thought Amtrak did not find the—so it's Knorr that didn't even take its own disc, they decided to take the WABCO disc? Amtrak, FRA had nothing to do with that, Mr. Crosbie?

Mr. Crosbie. No, they did not.

Mr. LaTourette. They did not. Okay. The last question on the disc is, this new disc that is being tested in Germany with the spoke turned 90 degrees, do you know if that was in existence at the time of this original contract? Did Knorr have such a product or is it a new product?

Mr. Crosbie. My understanding is it existed some time in 2002 and 2003, in that time frame. At least there was a design and possibly at least two discs on hand.

Mr. LaTourette. Which is after the construction of Acela?

Mr. Crosbie. Yes.

Mr. LaTourette. And the last question I have, and I asked the FRA this, but there was a local news report here last night about the tunnel that goes near the Cannon Building. I made a series of declarative statements and I will ask you to either agree with them or tell me that I'm wrong. It's my understanding that that tunnel that was pictured on the news is patrolled by the Amtrak police, that only trains that carry passengers go through and there is no freight, no tank cars, no hazardous materials, only passengers trains, that the rail access is controlled at the CSX dispatch control center, and that both CSX and Amtrak, in cooperation with the FRA and the Department of Homeland Security, have developed an extensive security plan relative to that tunnel, that for obviously security reasons we don't discuss in open session.

And lastly, I understand that the camera crew was met by a police officer when they attempted to begin their filming. Are those things all right or are some of them right and some of them wrong?

Mr. Crosbie. That is a correct assessment. Amtrak is responsible for that tunnel. We are working with the local and Federal authorities, Homeland Security, DHS, and we have a program in place for security for the tunnel which we are not going to discuss here.

Mr. LaTourette. I really appreciate all three of you coming. I appreciate the first panel as well. If there are follow-up questions—

Mr. CROSBIE. Sir, if you wouldn't mind. I just want for the record to note that we have submitted a comprehensive transition plan to the GAO for their comments. We gave it to them this week. They have that, and we look forward to their comments.

Mr. LATOURETTE. Maybe you and Ms. Hecker can make friends after the hearing and get everything all squared away. Thank you, Mr. Crosbie.

Ms. BROWN. Maybe they can answer my time about how much time does it take the GAO studies. You have done nine since 2000. I'm just wondering how much—we mandated it, so I just wanted to know how much time it takes, what's the cost. You don't have to tell me at this point.

Mr. CROSBIE. I couldn't tell you at this point, but it is a lot of work. Amtrak has a number of oversight agencies and GAO is one of them. It is a lot of work to put it together, a lot of time, especially given that Amtrak has gone to great extents to try and reduce its work force in the last few years, so that the people that might have been there that were able to just be at the beck and call of these oversight agencies are no longer there. The people that answer these reports are individuals like myself, my staff, people that are running the railroad. It is an enormous task for us at times with the requests.

Ms. BROWN. Thank you.

Mr. LATOURETTE. Thank you very much for coming. Mr. Oberstar had asked earlier to potentially submit additional questions that may come up. We would appreciate your continued courtesy in answering those if we send them to you.

Thank you all again, and we are adjourned.

[Whereupon, at 2:42 p.m., the Subcommittee was adjourned.]

61

**STATEMENT OF
THE HONORABLE CORRINE BROWN
SUBCOMMITTEE ON RAILROADS
HEARING ON
"GETTING ACELA BACK ON TRACK"
MAY 11, 2005 – 10:00 AM**

I want to begin by thanking Chairman LaTourette (La-ter-et) for holding this hearing to Get Acela Back on Track.

On April 15, during a routine inspection of an Acela Express train, the Federal Railroad Administration (FRA) discovered cracks in the spokes of the train's brake discs. This led to an investigation of brake discs on the entire Acela fleet. Among the 1,440 brake discs, about half of

62

the rotors have failed. As a result, Amtrak has been forced to suspend Acela Express service.

Let me first congratulate Amtrak for being cautious and erring on the safe side. I understand that while the FRA recommended that Amtrak ground the fleet, it was Amtrak's discretion to do so. Too often, this Subcommittee has investigated mechanical failures after an accident has occurred and lives are taken. In this case, Amtrak did the right thing and grounded the fleet before a catastrophe struck.

2

63

A few weeks ago, I attended a press conference on the Acela crisis, and I just want to once again state how much I appreciate Amtrak and Amtrak workers for stepping-up to the plate, working hard to minimize service disruptions, and address the needs of Amtrak passengers.

Amtrak has a lot to deal with. Since its inception in 2000, Amtrak's Acela has been plagued with a host of problems. First there were problems with construction of the trainsets. Then