109

To get Acela back on track, we must ensure that the Acela trainsets' brake discs are able to meet the intense demands of the Northeast Corridor. We must begin by figuring out what caused the cracks in the spokes. The design life of these brake disc rotors is one million miles, but reports indicate that these cracks have appeared much earlier – at 300,000 miles, 400,000 miles, and 650,000 miles on different trainsets.

I understand that Amtrak and the Bombardier-Alstom Consortium's brake manufacturer are conducting tests on the brake discs. It's unfortunate that we didn't get the result of these tests before having this hearing. These tests are crucial to ensure that the chemical composition, metallurgical processing during manufacture, and final internal structure of the brakes met the original design specifications. You must look at the shape of the casting, the metal specifications for the casting, and the chemical composition of the molten metal. You must investigate how the molten metal was poured into the molds in terms of gating and risering, and whether the metal was heated to a temperature of 3,000 degrees Fahrenheit. You have to look at the cooling rate. You have to ensure there were no shrinkage defects or imperfections. Sharp angle bends, notches, or dents in the surface of parts can initiate fatigue cracking. All of this must be examined to explore the possible causes of the fatigue cracks.

110

In addition, we must consider the design characteristics of this particular brake disc rotor and whether a replacement rotor of a different design is more suitable to the Acela trainsets and the Northeast Corridor. I know that Amtrak and the other parties are also exploring this option.

In the interim, I have asked Bombardier and the Amtrak Inspector General for the Original Equipment Manufacturer's technical manual on the brake disc rotors, and I'm looking forward to receiving that soon. I look forward to hearing more from the witnesses about the tests that are being conducted and the new designs that are being considered.

While the cause of the cracks is important, I am concerned that the Bombardier-Alstom Consortium, which was responsible for maintaining the Acela trainsets, did not find these cracks in earlier inspections.

One of the Consortium's subcontractors distributed a technical manual in March 1998 entitled "Axle-mounted brake disk W 700 S-N". The manual sets forth new inspection procedures for brake disc rotors. It states that maintenance personnel must check for cracks in the hubs, cracks in the connection spokes of the hubs and friction rings, penetrating cracks, and incipient cracks every 12,422 miles. If cracks are found, the manual requires replacement of the axle-mounted brake disc. This

111

manual was sent to the Consortium and the Consortium's brake manufacturer two years before the Acela came into service.

However, the Consortium's Inspection, Testing, and Maintenance plan, which was submitted and approved by the FRA sometime in 1999, never mentioned the new inspection requirements. The Consortium's maintenance procedures weren't even updated after Knorr (pronounced KUH-NOR), the Consortium's brake manufacturer, issued a service bulletin in 2003, which stated that failure of the brake discs could "result in considerable damage to equipment and extensive and possible fatal injury to both passengers and onboard personnel." In addition, the service bulletin referenced the subcontractor's technical manual requiring inspection and replacement of cracked spokes.

It is clear that the Consortium never updated their preventive maintenance work orders, the checklists that maintenance workers use to conduct train inspections, to reflect the new inspection requirements. In fact, I have reviewed some of the work orders and nowhere on the forms do I see a requirement to inspect the hubs or spokes. They require inspection of the friction rings for cracks, but not the spokes.

This lack of communication and lack of training was evident on April 15 when the FRA inspector found the cracks in the spokes. Amtrak was conducting test runs

112

from Washington to Boston with FRA assistance. As part of that test, the Consortium's maintenance personnel were required to conduct eight Level I inspections of the train. It wasn't until the end, after the eighth inspection, that the FRA, in conducting its own inspection, had found the cracks in the spokes of the brake discs. As I understand it, the FRA inspector cut the spoke out of the rotor and it actually fell apart in his hand.

So I'm trying to figure out where the disconnect was, and why these workers didn't know they were supposed to be inspecting the spokes for cracks.

I believe that this requires a complete examination of the role of all the parties involved – the FRA, Amtrak, the Consortium, and the Consortium's contractors and subcontractors – to ensure that each of them is doing everything possible to continue the Acela's exemplary safety record.

We need to make sure that the FRA is appropriately monitoring Amtrak and the Consortium to ensure that the trains are safe. I understand that the FRA is recommending the Consortium update their inspection requirements to include inspections for cracks in spokes and hubs. I hope the FRA intends to follow its own advice and update its own Class I, Class IA, and Class 2 inspection requirements for both passenger and freight railroads accordingly.

113

Page 6

Separately, I have asked the Department of Transportation's Inspector General to look into FRA's inspections of the Acela trainsets. I understand that FRA inspectors conduct routine maintenance checks on all Amtrak equipment, including the Acela. However, the Inspector General's office has informed me that these cracks would not have been found on a typical, routine maintenance check. The inspector who found the cracks in April was conducting a special inspection, which I am told is only done about two or three times a year. When I asked the Inspector General why these spot checks aren't conducted more often and why more stringent maintenance checks aren't required, the answer given was that the existing regulations predated the Acela and are not geared to call for these types of inspections. I have asked the Inspector General to look into this issue further. In the interim, I'd like the Acting Administrator, Robert Jamison, to tell me whether the FRA has enough inspectors, whether they are knowledgeable about high-speed rail and can do this type of work, and what additional resources, if any, are needed to ensure the continued safety of the Acela trains.

We also need to make sure that Amtrak is taking a leadership role in ensuring that the Consortium is adequately maintaining the Acela trainsets and following through with their commitments under the settlement agreement. A lot of work

114

needs to be done before the Consortium's contract is turned over to Amtrak in October 2006, and it's up to Amtrak to ensure that work is getting done.

Finally, we need to make sure that the Consortium and its contractors are abiding by industry standards and FRA safety regulations, and that the Consortium's maintenance records and inspection requirements are accurate.

I intend to explore these issues further with each of the witnesses. Thank you, Mr. Chairman.

115

Statement to the
Railroads Subcommittee of the
House Transportation and Infrastructure Committee
Wednesday, May 11, 2005


William Spurr, President
Bombardier Transportation – North America


Bombardier appreciates the opportunity to appear before the Subcommittee today and discuss issues related to the recent grounding of the Acela trainsets.

Let me open by stating that the Consortium of Bombardier and Alstom fully understands the importance of this issue and the impact it is having on rail transport along the Northeast Corridor. We have stated repeatedly our commitment to finding a solution that brings the Acela equipment back into service as quickly as possible while at the same time ensuring public safety. I am here today to reaffirm this commitment and to tell you that we continue to work closely with Amtrak, the FRA and our suppliers to resolve the issue to the satisfaction of everyone concerned.

In fact, I can say that we are appreciative of the constructive approach Amtrak is taking in this situation. From our perspective, we are working as a team, and we firmly believe that this co-operation will greatly facilitate movement toward a viable solution.

In that context, I will take a moment to discuss the challenge and the approach we are taking toward resolution. As discussed with staff prior to this hearing, a comprehensive analysis is underway, and we do not yet have definitive information on the reasons behind this issue. We expect to know more as analysis and testing winds down toward the end of May. In the meantime, I will provide an overview of the issue in my statement and be happy to respond to any questions you may have.

As many of you are aware, this issue surfaced when a visual inspection discovered hairline fissures in brake disc spokes on Acela Express coaches. Following this discovery, the entire fleet underwent a visual inspection, a process that identified approximately 300 discs having the issue from a total of 1,440 discs in the fleet. Locomotives, which utilize a different braking system, were not affected.

It is important to understand that the Acela trainsets undergo daily inspections by NeCMSC. This is part of a routine maintenance program in line with standard industry practices. Brake discs are included in this daily regimen. The 20 trainsets also undergo in-depth inspections and maintenance at 92-day and one-year intervals. To give you an idea of the rigor, the inspection at the 92-day interval is carried out over a week. The inspection at the one-year interval lasts two weeks. As a result, the brake discs had been

1

116

inspected by teams from our maintenance operation, the FRA and Amtrak multiple times prior to the first discovery of the hairline fissures in April.

It is unfortunate that the inspections did not detect the hairline fissures earlier. These defects are small and difficult to detect with the naked eye, particularly when the discs are cool and the metal is in a contracted state. Some of your committee staff actually visited the Acela maintenance facilities here in Washington last week to see the brake discs first hand. I think they can attest to what I am saying.

Most of the hairline fissures are not visible at all to the naked eye. Following the visual inspection process, our teams implemented a Magnetic Particle Inspection. The MPI process uses electro-magnetic equipment to detect surface and near-surface flaws in ferromagnetic material. In a nutshell, it helps us see anomalies not visible with the human eye. This is a detailed process, so we used it on a sample of the Acela brake discs in question. Based on the MPI results, we estimate that a large percentage of discs have some level of hairline fissures, indicating that the issue may be more prevalent than originally believed.

Having said this, let me be very clear on a few important points. First, the trainsets were grounded as a precautionary measure. These discs have operated for nearly five years without a failure and it is not yet clear how quickly the hairline fissures were propagating.

Second, contrary to assertions in some recent media reports, this is a component performance issue, not a maintenance issue. These discs were built to a specification provided by Amtrak that called for a minimum operating life equal to the lesser of five years or one million miles. Based on the average mileage traveled by the trainsets, the discs are at about the half-way point in that expected life cycle.

Hairline fissures on the spokes are actually in an area of the disc assembly away from where you would expect to see normal wear. In fact, wear on the disc face (or friction ring) – where brake pads contact the disc when the brakes are applied – is as it should be at this point in the life cycle. The issue is in the spokes – an area where this sort of fissures should not be occurring. Let me underscore that these hairline fissures on the spokes are in an area unrelated to the disc face, and the disc face is really what determines the life-cycle of the disc.

This points to a fundamental fault in component performance, not excessive wear or lack of maintenance. In terms of normal wear on the brake disc face, these discs are performing exactly as they should. Let me repeat, the issue lies in component performance and the focus of our investigation is centering on the reason for that.

This is an important point because there has been some confusion about the five-year aspect of the specification for this part. The original specification assumed that five years would be the approximate timeframe for each trainset to travel one-million-miles. During their life, the discs would undergo routine inspections and be machined at their half-life point – about 500,000 miles. Machining is a process where the brake discs faces, which typically become misshapen as a result of normal wear, are returned to a flat state. The

117

discs are then expected to continue in operation until they are discarded at about one million miles in operation.

The five-year point on the most-used trainset will actually be reached this June, but even that trainset will have traveled only about half as far as originally anticipated by the negotiators of the original contract. As you can understand, wear on the trainsets and components is dictated by miles in use, not by time. For example, a steel disc sitting on a shelf for five years will incur virtually no wear unless it is put into operation. So, the real factor we need to be looking at here is mileage. In terms of mileage and based on the specification, none of the discs, even those on the most-used trainset, are near their expected life capacity, and that is the issue. In fact, at the time of the discovery, the maintenance operation was preparing to begin an overhaul process that included machining and potential replacement of the discs at their half life point. It is our understanding that one hundred and forty four new discs, two trainsets, were ordered or about to be ordered by Knorr in case replacements were needed during that overhaul process. NeCMSC has a life-cycle cost contract with Knorr by which Knorr must provide all the required material for the duration of the maintenance contract. So, the maintenance organization was doing exactly what it was supposed to be doing during this process. Assertions to the contrary are simply inaccurate.

Similarly, we have heard suggestions in the press that the Consortium overestimated the realistic wear on the brake discs and thus was caught with an inadequate parts inventory when the issue arose. That is not the case. As I have noted, disc surface wear, as such, has nothing to do with this problem. In any event, no rail operation in the world would carry enough spare parts in inventory to address a component performance issue of this magnitude.

Amtrak provided a minimum life requirement for the brake discs in their original specification for the Acela trainsets. Bombardier, in turn, contracted with Knorr Brake Corp. to deliver a brake system and components in line with those specifications. Knorr worked with sub-suppliers – Wabco, a division of Wabtec, and SAB Wabco, now owned by Faiveley Transport, a European supplier – to secure the brake discs for that system.

Knorr is a reputable supplier in the industry used by many rail equipment manufacturers. Bombardier has worked with Knorr successfully on numerous projects. Bombardier contracted with Knorr on the Acela coach braking system, and we had every reason to believe that the system would perform properly. For some reason, the brake discs are not doing so, and we need to find out why.

We are working closely with Knorr and their sub-suppliers to understand the root cause of this issue. Analysis is focusing on four general areas – component design, manufacturing process, casting process and environmental factors. Knorr is currently subjecting the discs to a strenuous battery of testing at their labs in Munich, Germany as we speak. Specifically, they are conducting metallurgical and stress testing on a new disc with no fissures and a used disc with hairline fissures to understand how and when the issue evolves. We are also working with the parties to conduct dynamic testing of the

118

component using one Acela trainset in operation on the NEC in coming days. This will use sensors on the trainset to monitor disc behavior in real-life operation. The dynamic testing process is subject to approval by the FRA.

The maintenance operation and the Consortium had no reason to anticipate the type or magnitude of this fault. There has been criticism of the maintenance operation in the media about the level of spare parts inventory on hand at the time the issue arose. I must underscore that the inventory level was determined based on four plus years of historical usage and was totally appropriate for carrying out normal maintenance on the Acela fleet. Again, no rail operation in the world would carry enough spare parts in inventory to address a component performance issue of this magnitude.

It has also been suggested that the discs should be changed sooner in the life cycle to alleviate the problem. That may be a possible interim solution, but it does not address the underlying problem. The issue at hand is that the hairline fissures in the spokes are not acceptable, and the problem that caused them must be identified and corrected. That is the bottom line.

As the supplier of record for the Acela trainsets and a customer of Knorr, the Consortium wants nothing less than a permanent solution and we want it as soon as possible because we understand the situation that Amtrak is facing. Let's be clear. The Consortium is committed to working with Amtrak, the FRA and with our suppliers to find a solution to this problem. We expect the same commitment from Knorr and assume Knorr expects the same from its own sub-suppliers. The last point, however, is a line of inquiry best addressed by Knorr.

Now that I've spoken to what the issue is and isn't, let me spend a few moments on our approach to resolving it. At this point, we are pursuing three potential avenues of action in parallel. First, we are developing an approach to "recertify" the discs we have on hand for continued use. This would be an interim solution using the existing brake disc design supplied by Sabwabco (now owned by Faiveley Transport) and Wabco to get as many trains back in service as soon as possible. Trains would be closely inspected on a daily basis until a permanent solution was achieved.

Recertification of each disc under this plan would involve close inspection using the MPI process, followed by a qualifying process that would identify which discs are in appropriate condition for use in operation. The qualifying process would be based on criteria approved by Amtrak and the FRA with public safety as the primary objective. The Consortium and Knorr are currently working with these organizations to finalize that criteria, so we can move forward with the assessment of discs.

Second, we are working with Knorr and its sub-suppliers to secure new discs of the same design as quickly as possible. These discs would also be subject to the certification process. To date, Knorr's sub-suppliers have tentatively committed to deliver brake discs of the same design starting in June 2005. We have expressed to Knorr that we are not

4

119

satisfied with the timeline on this proposal and have asked them to push their sub-suppliers for faster production and delivery.

Finally, we are looking at the potential for using a completely different brake disc design. This is a design produced by Knorr itself. The design has already been prequalified as a replacement part by Amtrak and would serve as an interim solution, so some of the work has been completed already. It is of course contingent upon FRA approval. Preliminary review indicates that the new design may have some advantages over the SAB Wabco (now Faiveley Transport) and Wabco version. Knorr has committed that it can produce brake discs of a new design and start delivering them also in June 2005.

The objective behind these parallel approaches is to secure a solution that ensures public safety, gets as many trainsets into service as soon as possible, and ultimately arrives at a viable permanent solution to the issue. As we move down these parallel paths, we will compare the merits and drawbacks of each of these approaches. In the end, we will select the proposal that best meets the target for getting some trains back in service in June and the rest of the fleet in following months.

I should note again that each of these plans is subject to review and approval by Amtrak and the FRA, and we will rely on them to provide the go ahead before moving forward.

In closing, let me once again stress Bombardier's commitment to resolving this issue quickly and safely. Thank you to the members of this panel for inviting us to participate today. I will respond to any questions you may have.

5

120

**Addendum to Statement**
*Response to specific questions asked by the Railroads Subcommittee of the
Committee of Transportation and Infrastructure,
US House of Representatives
in its May 4, 2005 letter*

**What is the Northeast Corridor Maintenance Services Co. (NeCMSC) role in maintaining the Acela fleet?**
**What is Bombardier's relationship to NeCMSC?**

The Northeast Corridor Maintenance Service Company (NeCMSC), jointly owned and operated by Bombardier and Alstom (50-50), is in charge of maintenance for the Acela trains until October 1, 2006 (started in 2000). A NeCMSC management team oversees maintenance operations carried out by Amtrak's labour force.

As part of the settlement between Bombardier-Alstom and Amtrak in March 2004, it was agreed that maintenance services be transitioned to Amtrak's own in-house resources by October 1, 2006. The Bombardier-Alstom Consortium is in the process of transitioning maintenance operations back to Amtrak. For example, the Consortium will offer training to employees to secure a seamless transition. The Consortium will also continue to support Amtrak after October 1, 2006 as a supplier of parts and of technical services, if needed.

**When did NeCMSC first become aware that 20-30% of the brakes on the Acela fleet had cracks?**
**What procedures did NeCMSC have in place that could have detected the problem before such a large percentage of the Acela fleet was affected?**

This issue surfaced when a visual inspection discovered hairline fissures in brake disc spokes on Acela Express coaches during a FRA inspection on the evening of April 14. Following this discovery, the entire fleet underwent a visual inspection during the next day, a process that identified approximately 300 discs having the issue from a total of 1,440 discs in the fleet.

It is important to understand that the Acela trainsets undergo daily inspections by NeCMSC as part of a routine maintenance program that is in line with standard industry practices. Disc brakes are included in this daily regimen. The 20 trainsets also undergo in-depth inspections and maintenance at 92-day and one-year intervals. To give you an idea of the rigor, the inspection at the 92-day interval is carried out over a week. The inspection at the one-year interval lasts two weeks. As a result, the brake discs had been inspected by teams from our maintenance operation, the FRA and Amtrak multiple times prior to the first discovery of the hairline fissures in April.

It is unfortunate that the inspections did not detect the hairline fissures earlier. These defects are small and difficult to detect with the naked eye, particularly when the discs are cool and the metal is in a contracted state.

Most of the hairline fissures are not visible at all to the naked eye. Following the visual inspection process, our teams implemented a Magnetic Particle Inspection. The

6

121

MPI process uses electro-magnetic equipment to detect surface and near-surface flaws in ferromagnetic material. In a nutshell, it helps us see anomalies not visible with the human eye. This is a detailed process, so we used it on a sample of the Acela brake discs in question. Based on the MPI results, we estimate that a large percentage of the discs have some level of hairline fissures, indicating that the issue may be more prevalent that was originally believed.

NeCMSC was following industry's maintenance practices with visual inspection performed on the brake discs on a daily basis. Standard industry practice does not include performing MPI as part of the normal daily inspection procedure.

Having said this, the trainsets were grounded as a precautionary measure. These discs have operated for nearly five years without a failure and it is not yet clear how quickly the hairline fissures were propagating.

Contrary to assertions in some recent media reports, this is a component performance issue, not a maintenance issue. These discs were built to a specification provided by Amtrak that called for a minimum operating life equal to the lesser of five years or one million miles. Based on the average mileage travelled by the trainsets, the discs are at about the half-way point in that expected life cycle.

Hairline fissures on the spokes are actually in an area of the disc assembly away from where you would expect to see normal wear. In fact, wear on the disc face (or friction ring) – where the brake pads contact the disc when the brakes are applied – is as it should be at this point in the life cycle. The issue is in the spokes – an area where this should not be occurring. It needs to be emphasized that fissures on the spokes are in an area unrelated to the disc face, and the disc face is really what determines the life-cycle of the disc.

That points to a fundamental fault in the component performance, not excessive wear or lack of maintenance. In terms of normal wear on the brake disc face, these discs are performing exactly as they should.

The point is that the maintenance operation and the Consortium had no reason to anticipate the type or magnitude of this fault. There has been criticism of the maintenance operation in the media about the level of spare parts inventory on hand at the time the issue arose. The inventory level was determined based on four plus years of historical usage and was totally appropriate for carrying out normal maintenance on the Acela fleet. No rail operation in the world would carry enough spare parts in inventory to address a component performance issue of this magnitude.

122



123

Statement of
Fred E. Weiderhold, Jr.
Inspector General, Amtrak
Before the
Subcommittee on Railroads
Committee on Transportation & Infrastructure
U. S. House of Representatives
May 11, 2005

Chairman LaTourette:

Good morning, Mr. Chairman. Thank you for the opportunity to appear today to discuss the circumstances and issues surrounding the recent termination of Amtrak's high-speed Acela service.

This morning I would like to provide you with answers to the three questions included in your May 4 letter to me, as well as to explain the Amtrak Office of Inspector General (OIG) ongoing investigation of the brake disc failures.

At the onset, I would like to make several key points:

First, following discovery of the cracked spokes in the Acela brake discs, the FRA and Amtrak Mechanical forces conducted a fleet-wide inspection of all non-Acela cars. These inspections revealed no systemic problem with the other brake discs. There were, however, a very small number of brake discs that were found to be out of tolerance and exhibiting cracks, probably thermal cracks not cracks in spokes, and those discs were immediately removed from service. My Office has received and reviewed the FRA inspection reports from this effort, and we will follow-up on the problems reported.

Second, there is considerable effort being expended by all affected parties to find a fix to the Acela brake disc problem. It is in everyone's best interest to get the trainsets back into service quickly, but more importantly, safely. The existing brake disc unit is being extensively tested by the brake disc supplier/manufacturer (Knorr, Faively Transport, SAB WABCO). There is concurrent testing of a "new" brake disc design and manufactured product. There will soon be live testing of an Acela trainset outfitted with instrumentation to measure the actual loads and forces being applied to the brake discs. There is ongoing analysis of finite element models of both the "new" and existing discs. Early indications are that the brake disc is failing as a result of fatigue loading, but not all the results are in. Amtrak, the FRA, and the Amtrak OIG are monitoring all of this testing, inspection, and related work.

Third, while it is necessary and appropriate to focus on the "fix," the OIG is concentrating on the entirety of the root causes for the failures. In our review, we are going beyond simply wanting to know the mode of failure, or physical causation. For