

Pillsbury
Winthrop
Shaw
Pittman™

1540 Broadway
New York, NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

**CONFIDENTIAL INVESTIGATIVE COMMUNICATION
DISCLOSURE RESTRICTED TO HEAD OF DESIGNATED
FEDERAL ENTITY PURSUANT TO 5 U.S.C. APP. 3 § 8G(d)**

October 24, 2005

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

<u>Via Federal Express</u>

Colin C. Carriere, Esq.
Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

> Re:  Subpoena Issued by the Office of Inspector General to Bombardier Inc., dated May 4, 2005, No. 05-05 (the "Subpoena")

Dear Mr. Carriere:

On October 13, 2005, Bombardier Inc. produced certain Acela brake-related emails sorted chronologically from Sylvain Labbé's Microsoft Outlook application (Production Nos. BBD0166941 - BBD0206884).

Last Thursday, we learned that a small proportion of the electronic images in that production were corrupted due to a software glitch. Accordingly, we enclose a new set CDs bearing the same production numbers (BBD0166941 - BBD0206884), containing the identical documents and correcting the corrupted images.

Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

*/s/ Philip Le B. Douglas*

Philip Le B. Douglas

Enclosures

cc:   Marc-Andre Raymond (w/o attachments)

EXHIBIT 71



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman** LLP

1540 Broadway
New York,
NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

**Confidential Settlement and Investigative Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

October 28, 2005

**BY FAX**

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re: *Fred E. Weiderhold, Jr. v. Bombardier, Inc., Alstom Transportation, Inc. and Northeast Corridor Maintenance Services Company*

Dear Mr. Sadoff:

We have received a copy of the Inspector General's October 25, 2005 Status Report and Request for Temporary Stay of Proceedings. Inasmuch as Bombardier Inc. has not been served and has not appeared in the action, it will not be responding.

We appreciate, however, Mr. Weiderhold's offer for "discussions or correspondence with Respondents' counsel to discuss resolution of remaining disputes." The Inspector General can count on us to work in good faith towards a fair and practical outcome.

In the meantime, we suggest that there are compelling reasons why, rather than seeking a stay, Mr. Weiderhold should withdraw his Petition without prejudice. There can be no question that the Petition contains both errors and mooted claims and thus, sooner or later, will require substantial correction. The parties have been quite fortunate that the Petition's allegations have not yet become a matter of public discussion. In that event, however, Bombardier will of necessity have to respond with the evidence presented to you on October 20. This could have a negative impact on the parties' ability to resolve their differences confidentially and amicably. Accordingly, please consider withdrawing the Petition without prejudice. Alternatively, please advise the Court that, in the event it



EXHIBIT 72

500007530v2

October 28, 2005
Page 2

becomes necessary, Bombardier reserves the right to respond to the Petition prior to the expiration of any stay.

Please feel free to contact us with any questions you may have.

Sincerely,

Philip Le B. Douglas

500007530v2

**NATIONAL RAILROAD PASSENGER CORPORATION**
## Office of the Inspector General



APRIL 1, 2005 – SEPTEMBER 30, 2005

# Semiannual Report to Congress



EXHIBIT 73



AMTRAK

Amtrak Empire Builder | near Bison, Montana
Photo by Thomas Cerwin © 2006

**NATIONAL RAILROAD PASSENGER CORPORATION**

Office of the Inspector General

# Semiannual Report to Congress

**REPORT NO. 32**
**APRIL 1, 2005 – SEPTEMBER 30, 2005**



**NATIONAL RAILROAD PASSENGER CORPORATION**
Office of the Inspector General, 10 G Street, NE, 3W-300, Washington, DC 20002-4285



October 31, 2005

David L. Gunn
President and Chief Executive Office
Amtrak

Dear Mr. Gunn:

On behalf of the Amtrak Office of Inspector General, I am pleased to present this Semiannual Report to Congress. Our Report highlights some of the more significant audits, evaluations, and investigations for the six-month period ending September 30, 2005.

During the reporting period, the OIG became heavily involved in several critical matters that required considerable investment of OIG resources. In April 2005, Amtrak's Acela train sets were taken out of service because of disc brake cracks that were discovered by a Federal Railroad Administration Inspector. The OIG immediately began its own investigation of the part failure, and we presented testimony to the House Transportation and Infrastructure Committee in May 2005, detailing the possible causes of the failure and current efforts underway to remediate the disc failure. We have become very concerned about the processes used by the manufacturer(s) and equipment maintainers to inspect and qualify the safety critical part, and we will be following these issues very closely going into the new fiscal year.

In late August 2005, Hurricane Katrina devastated the City of New Orleans and much of the Gulf Coast of the United States. The OIG dispatched a number of its special agents and other staff to New Orleans and surrounding parishes within days of the catastrophic failures of the City's levees. Working through the Louisiana State Attorney General and the Federal Protective Service as Deputy U. S. Marshals, Amtrak OIG staff effected search and rescue operations, helped police and secure several areas in and around New Orleans, and generally provided critical support to federal, state, and local authorities. We continued these operations through October 2005, and we learned valuable lessons about our deployment capabilities should another major catastrophic event call into play OIG assets.

In addition to the unique events described above, the OIG continued to perform its more traditional duties as a statutory OIG. We issued 18 audit reports during the reporting period, and we have 60 audits underway as of September 30, 2005. As detailed in the Semiannual Report, we continue to conduct audits regarding grant compliance, internal controls, and major

David L. Gunn
October 31, 2005
Page 2



procurements. Our investigators and special agents opened 52 new cases in the past six months and closed 106 cases; we have 378 investigations that remain active as of September 30. We made 22 criminal referrals to federal prosecutors, and we have eleven cases pending prosecution. In addition, we are completing our review of revenue theft cases arising from food and beverage sales, with 42 employees being terminated or forced to resign for embezzlement of funds. We will continue to be aggressive in this area, and we will work closely with management to improve the internal controls associated with these operations.

The OIG Inspections and Evaluations team is supporting OIG legal staff in its review of Acela brake disc matters as well as following other contractual matters involving the Acela maintenance contract. The OIG also issued a major report regarding Amtrak's Mechanical Department, in which we make a number of recommendations for Amtrak management to shift from its current maintenance practices to a reliability-centered (condition-based) maintenance program. We also recommended that management consider rationalizing its facility operations to eliminate redundancy and reduce costs.

Finally, the OIG continues to conduct reviews of Amtrak's overall security preparedness, especially in the wake of the attacks on the London transit system in July 2005. The OIG dispatched one of its Special Agents to London shortly after the bombings to assist British Transport Police. In addition, the OIG has attended several 'lessons learned' briefings from international law enforcement to determine how these events can be used to better prepare the Amtrak system against a terrorist event. The Madrid and London bombings are very critical events from which the OIG, and all of Amtrak, should take into account in its security planning.

I appreciate your continued support of OIG operations and taking prompt action on our observations and recommendations.

Respectfully,

*Fred E. Weiderhold, Jr.*

Fred E. Weiderhold
Inspector General

# Table of Contents

## Inspector General Viewpoint

FY 2005 Year-End Financial Results ................... 1
Amtrak's Strategic Reform Plans – Challenges Ahead ..... 1
Safety & Security ................................... 2
The Bottom Line – Revenues and Cost Containment ...... 3
Conclusions ........................................ 3

## Amtrak Profile

Background ........................................ 4
OIG Profile ........................................ 4

## OIG Joint Department Efforts

Acela Brake Disc Cracking –
    OIG Investigates Brake Cracks .................... 5

## Office of Audits

Significant Audits .................................. 6
Unresolved Audit Issues ............................. 9
Management Responses Over Six Months Old for
    Which Corrective Action Has Not Been Completed ....... 9
Audit Statistics ................................... 10

## Office of Investigations

Investigations ..................................... 11
Case Handling ..................................... 11
Sources of Allegations ............................. 11
Hotline Statistics ................................. 11
Case Status of Investigations ...................... 11
Significant Investigations ......................... 12
Review Protection Efforts .......................... 12
Classification of Cases Opened During this Period ....... 12
Joint Investigations ............................... 13
Prosecutive Referrals .............................. 13
Hurricane Katrina – OIG Responds with Assistance ...... 13

## Inspections and Evaluations

Significant Inspections and Evaluations .............. 15

## Counter Terrorism and Intelligence

Significant Counter Terrorism and Intelligence Efforts .... 17

## Other OIG Activities

Coordination with Independent Public Accountants ...... 18
Automation of Audit Work Papers and
    Management Processes Initiated ................... 18
Inter-Agency Cooperative Efforts .................... 18

## Appendices

1. Audit Reports Issued with Questioned Costs ......... 20
2. Audit Reports Issued with Funds
   to be Put to Better Use .......................... 21
3. Detailed Listing of All Issued Audit Reports ......... 22
4. Summary of Reports to President of Amtrak
   Concerning Information or Assistance
   Unreasonably Refused or Not Provided ............. 23
5. Review of Legislation and Regulations ............. 24
6. Glossary of Audit Terms and Abbreviations ......... 25

## Reporting Requirements Index

Reporting Requirements Index ...................... 26

# Inspector General Viewpoint

## FY 2005 YEAR-END FINANCIAL RESULTS

Amtrak completed the fiscal year with $1.886 billion in total revenue ($1.436 billion in passenger revenues), slightly below budget, and total expenses were $2.940 billion (below budget). Amtrak's adjusted losses, before depreciation, were $1.054 billion.

These financial results were mostly consistent with Amtrak's revised projections in May 2005, following the discontinuance of Acela in April 2005. Total passenger-related revenues were down $66 million from budget, with Acela/Metroliner combined revenues down over $83.1 million. Stronger-than-expected ridership from the Northeast Corridor Regional trains and Pacific Surfliners helped the overall passenger revenue performance. Operating expenses were mixed with better-than-budget results from salaries and benefits (headcount controls) savings and worse-than-budget results from the increases in energy expenses.

## AMTRAK'S STRATEGIC REFORM PLANS – CHALLENGES AHEAD

In my last Semiannual Report, I commented upon the Board of Directors publication of its Strategic Reform Initiatives to Congress (April 2005). The full text of the plan is at www.amtrak.com under "Inside Amtrak" and other related reports can be found at this Amtrak web site.

The OIG commends the Board and management for setting strategic goals for the company, and we all realize there is considerable work ahead. From my perspective, here are some of the challenges.

**State Rail Corridors** – Amtrak has had considerable success in the past in working with its state rail partners. These successes arose from a legislated program (403(b) of the rail Passenger Service Act, since superseded) whereby the participating state agreed to fund various levels of avoidable operating losses of the contracted service. Over time, depending upon the willingness of the state to accept passenger rail service as a needed transportation mode, various states contributed both to the operating and capital needs for corridor development. California and Washington State, in particular, expanded passenger rail service, investing heavily in stations, equipment acquisition, and operations.

Shorter distance rail passenger services represent real growth opportunities for Amtrak, as an operator, maintainer, and supplier of various passenger rail services. The Strategic Reform Initiative calls for new legislation whereby states can apply for matching federal funds (programs similar to highways/transit) to grow passenger rail in their state. Until such



Empire Service | Fort Klock by the Mohawk River, NY

legislation is passed, Amtrak's Board has further directed that Amtrak management continue to contract for these services in a way that gradually increases state payments to more fully reflect all allocable expenses.

The challenge for Amtrak is to continue to offer services that current, and prospective, state partners perceive as 'value added' and worthwhile. Most states are willing to pay more for Amtrak in their state, but as their payments increase, they will want to see higher quality, more reliable service. Additionally, the participating states do not necessarily perceive a 'level playing field' in that some state corridor services evolved as part of Amtrak's base system. These corridor services were not covered by the former 403(b) program, or by any other state-supported contract, but rather the services were holdovers from the former designated national system prescribed by Congress.

Amtrak must press forward on the legislative front while simultaneously negotiate with its current state partners to satisfy the Board directive.

**Northeast Corridor: State of Good Repair** – Much of Amtrak's capital budget in recent years has been invested in restoring the 'state of good repair' to the Northeast Corridor. A major push by Amtrak President David Gunn has centered on operational reliability and continued safe operations for Amtrak's largest, and most important, asset.

The OIG is in strong support of this initiative, but we believe more work is required to bound the effort and lay out a more rigorous analysis of return on capital invested. First, there is not enough clarity to the state of good repair goal. Amtrak needs to

delineate specifically the results of these programs. For example, Amtrak can prescribe a level of utility (class of track to permit high-speed operations) for all sections of the Northeast Corridor track infrastructure. Amtrak can categorize the incremental costs for maintaining track at Class 7 (MPH) or Class 8 (MPH), and can tie revenue projections to scheduled performance. Other efforts can be oriented to major bridge and tunnel work, e.g. to keep the useful life of an asset within 90 percent of its expected useful life before replacement. Additionally, a more complete inventory of major programs and projects, by asset type, should be maintained and shared with Congress and rail partners.

The Board also expects that the actual costs for maintaining the Northeast Corridor infrastructure should be re-examined, and, as necessary, be re-apportioned among the Corridor users. While there are a number of joint benefit funding agreements in place with the major users of the Corridor, not all users participate in these agreements, and there are disagreements as to what capital and operating expenses are incremental and should be shared. The existing agreements must be honored through their contract terms, and more studies around cost sharing must be conducted. Additionally, new contractual arrangements will have to be negotiated with those states and regional authorities as directed by the Board.

**National Long Distance Operations** – Perhaps the most contested area of Amtrak's operations is the continued operation of its long distance train services. There have been many studies conducted since Amtrak's inception that attempt to describe, rank order, and make recommendations to restructure the national route structure. Until 1997, Congress had mandated specific performance guidelines that attempted to set a 'threshold' by which determinations could be made to continue, or discontinue, any given route. Today, Amtrak has the ability to re-structure its national route system, but there is no consensus among Amtrak's various stakeholders as to how this may be accomplished.

The challenge for the Board, and Amtrak management, is to build the necessary consensus for examination of the route structure, select the appropriate performance criteria (financial/ ridership), and then to establish a timetable by which routes would achieve those criteria, or be subject to elimination. A major review of the national route structure is underway, and final recommendations for these services will most likely be made in late FY 2006. Once again, there is an expectation that certain states will be allowed, through appropriate legislation establishing matching funds, to weigh in on such route determinations.

**Ancillary Businesses** – The Board has directed that management closely examine its 'non-core' businesses, that is, its operation of commuter services, real estate, commercial activities, and reimbursable work. These businesses provide a net profit to Amtrak, and the Board desires that Amtrak manage these business lines more closely to ensure these activities complement, rather than detract, from core activities.

The OIG agrees with the general directive of the Board, but the OIG also believes there is more opportunity for Amtrak to leverage its assets, both physical and human capital assets. Amtrak has made several decisions in recent years to remove itself from some business lines, including some commuter operations and the mail and express business. We agree with some of those decisions, but we also believe there has not been sufficient analysis to remove Amtrak from all parts of such businesses. For example, prior to Amtrak's foray into the express business, Amtrak's handling of U. S. mail was a profitable business line.

The OIG will be re-examining several ancillary business elimination decisions in FY 2006. We recommend that the company move carefully in this area to ensure that any competitive advantages Amtrak enjoys are not lost.

## SAFETY & SECURITY

### SAFETY

We have previously reported on the need for Amtrak management to make improvements in restoring its System Safety program to be a more integrated and visible company program. We repeat our recommendation now to the company that more effort and attention must be paid to this vital performance area.

The System Safety program has been re-established within Amtrak, but the OIG has observed that this program has not become widely visible and well known to all areas of the company. As reported previously, we have seen some improvements in the area of safety auditing and environmental controls. We are encouraged by the reintroduction of 'block training' within the Transportation Department, and we know there have been selective areas for additional 'hands-on' safety training, but more needs to be done. We are advised that Amtrak management has begun reviewing this area in detail with one of its insurers, Liberty Mutual, and we will monitor these efforts into the next fiscal year.

Because of the OIG's Acela brake disc investigation, we began examining the supply chain and maintainers' processes for inspecting, disclosing, and mitigating potential defects for safety critical parts and safety systems affecting train operations.

These reviews have been very helpful in pinpointing the deficiencies that led to the catastrophic part failures affecting the Acela train sets. Additionally, the OIG has recommended that the company review the entirety of its contractual relationships with suppliers and adopt a best practices approach to failure mode analyses.

## SECURITY

The July bombings in London have again reinforced for the OIG the need to strengthen its security preparedness toward similar events in the United States. The Amtrak OIG and new Security Department sponsored a law enforcement-only training conference with its Spanish counter-parts in February 2005. Since that time, we have maintained our contacts with international authorities, and we have strengthened our relationship with the New York Police Department anti-terrorism units. Following the London bombings, we also supplied a Special Agent from the investigations team to assist the British police.

The OIG reiterates its concern that more federal funds should be available for passenger rail security counter-measures. Last year Amtrak finally became eligible to receive a portion of new security-related appropriations for rail and transit operations. The $7.1 million from last year's appropriations, and a similar amount for FY 2006, are welcome, but these funds fall far short of the mark. Congress must do more to address the shortfall, particularly in the area of adding canine units, improving pay/retirement benefits for Amtrak Police, and acting on recommendations included in Amtrak's security funding plans.

## THE BOTTOM LINE – REVENUES AND COST CONTAINMENT

Making its revenue targets and controlling expenses must be ongoing priorities for Amtrak if the company expects to receive Congressional support.

While Amtrak continues to perform close to its budget projections for revenue performance, in spite of the large revenue loss caused by the Acela cancellations, more can and must be done to increase Amtrak's revenue streams. The OIG recommends that more company resources be applied to increasing the availability and reliability of the Acela fleet. In FY 2006, Amtrak plans to operate only fourteen of the twenty train sets that comprise the Acela fleet, far below the original expectations for these high-speed trains. Too much attention has been paid to the contractual and legal issues affecting the train sets, rather than to the operational and utilization of this premium product. Amtrak should be operating a service that consistently meets high on-time performance (above ninety percent) goals, and operates close to capacity – Amtrak is not there.

Amtrak recently formed an Acela Executive Oversight Committee to serve as a senior leadership forum for Acela issues; we strongly endorse that decision. We recommend the company use that forum to have the company rally around on-time performance, improve ridership (especially on the north-end), and leverage this product to its maximum. Last year, Acela's expected revenue performance was $330 million, but the actual performance was $205 million. The company cannot afford a failure of this magnitude in the future.

The OIG has also encouraged the company to examine its load factors and to show greater flexibility in consisting (making up) its trains. Amtrak's overall peak and average load factors have always been consistently low, with a few exceptions, and there has not been sufficient analysis as to the true cost-benefit of managing to higher load factors. We expect this to be a company priority in FY 2006.

On the expense side, as noted above, the company finished the fiscal year ahead of budget. This result is mostly due to the restoration of budget discipline around the headcount and closer management of larger expense areas, such as fuel. In conjunction with pending re-negotiation of labor contracts, the company has submitted proposals to revise some labor work rules that should result in productivity savings, but these savings will most likely be offset by wage increases. Still, Amtrak must move ahead with these negotiations to ensure overall workforce stability and productivity.

The OIG has several cost containment program reviews underway, and we will be reporting on these efforts during the next fiscal year.

## CONCLUSIONS

The OIG is hopeful that the next round of authorizations, statutory review, and appropriations will help set the guidelines by which there can be positive change for Amtrak and our nation's passenger rail services.

Amtrak needs to find its place as part of a more integrated and rationalized national transportation plan.

# Amtrak Profile

## BACKGROUND

Amtrak is incorporated under the District of Columbia Business Corporation Act in accordance with the provisions of the Rail Passenger Service Act of 1970 (Public Law 91-518). Amtrak is governed by a seven-member Board of Directors appointed under the Amtrak Reform and Accountability Act (December 2, 1997). The company operates as a for-profit corporation providing inter-city rail passenger service as its principal business.

Amtrak operates more than 260 daily inter-city trains over 23,000 route miles serving over 500 communities in every state but two in the contiguous United States. Of this route system, Amtrak owns the right-of-way of more than 2,600 track miles in the Northeast Corridor. This includes Washington, DC-New York City-Boston, Philadelphia-Harrisburg, New Haven-Springfield, CT and short segments in Michigan and New York. Amtrak also operates rail services in several areas around the country under contract with state and regional commuter authorities.

Amtrak owns many of its passenger stations and also leases other stations from the freight railroads. It owns most of the maintenance and repair facilities for its fleet of about 2,000 cars and locomotives. Amtrak employs 20,000 persons, of which about 18,000 are agreement-covered employees. These employees work in on-board services, maintenance of way, station and reservations services, and other support areas. Outside the Northeast Corridor (NEC), Amtrak contracts with freight railroads for the right to operate over their tracks. On their property, the host freight railroads are responsible for the condition of their tracks and for the coordination of all railroad traffic.

## OIG PROFILE

**Amtrak's OIG** was formed under the provisions of the Inspector General Act Amendment of 1988. The OIG is an independent entity within Amtrak whose mission is to detect fraud, waste, and misconduct involving Amtrak's programs and personnel and to promote economy and efficiency in Amtrak operations. The OIG investigates allegations of violations of criminal and civil law, regulations, and ethical standards arising from the conduct of Amtrak employees in performing their work. The OIG also audits and evaluates Amtrak operations and assists management in promoting integrity, economy, efficiency, and effectiveness. The OIG consists of the following units with specific responsibilities:

The **Audit Unit** is responsible for conducting independent reviews of Amtrak's internal controls; overseeing and assisting audits of Amtrak's financial statements; reviewing information technology programs and information security; providing accounting counsel to, and oversight of, Finance Department operations; reviewing certain procurements and material acquisitions for appropriateness of cost and pricing and compliance with applicable grant and/or contract terms and conditions; and, monitoring compliance with laws and regulations.

The **Investigations Unit** is responsible for investigating various types of fraud and abuse particularly allegations of financial wrongdoings, kickbacks, construction irregularities, bribery, and false claims; performing reviews of Amtrak's safety and security programs; recommending to the company better internal controls to prevent fraud and abuse; and, reporting violations of law to the Attorney General and prosecutors. The Unit is also charged with reviewing and safeguarding Amtrak's cash and credit card purchases for transportation and food services on board Amtrak trains.

The **Inspections and Evaluations Unit** is a hybrid unit within the OIG whose staff have specialized skills in engineering, safety, labor/employee relations, mechanical maintenance operations, strategic planning, and finance. This group conducts targeted inspections of Amtrak programs, providing assistance to managers in their efforts to determine the feasibility of new initiatives and the effectiveness of existing operating methodologies. The evaluative process they utilize, whether requested or mandated, consists of independent studies and analytical reviews that often serve as the cornerstone for strategies to improve program cost efficiency and effectiveness, management, and the overall quality of service delivery throughout Amtrak.

The **Intelligence and Counter-Terrorism Unit** is responsible for facilitating, and overseeing projects and tasks pertaining to rail security, counter-terrorism and intelligence related to the country's war on terrorism. The unit is involved in working with external agencies to provide focus on the importance of rail security and the need for an integrated approach for addressing the many challenges in securing an open-architecture rail passenger system.

**OIG Legal Counsel** is responsible for providing legal advice, counsel and training to all of the aforementioned units. Moreover, Legal Counsel represents the Inspector General and his employees in litigation or legal matters, specifically related to OIG responsibilities, or coordinates such representation on behalf of the IG and his employees.

OIG personnel are located in seven offices in Washington, DC (Headquarters), Baltimore, Wilmington, Philadelphia, New York, Boston, Chicago, and Los Angeles.

# OIG Joint Department Efforts

As set forth below, during this period, the OIG – Investigations, Inspections and Evaluations and Audit – completed a joint investigation project and initiated another project. Highlights are discussed below:

## ACELA BRAKE DISC CRACKING – OIG INVESTIGATES BRAKE CRACKS

On the evening of April 14, 2005, during an inspection of an Acela trainset that had just completed a high-speed run, a Federal Railroad Administration Inspector discovered hairline cracks in the connection spoke between one of the Acela brake discs and the axle hub. Subsequent inspections found additional discs with cracked connection spokes, eventually resulting in the discovery of cracks in other discs in the fleet.



Auto Train Station | Lorton, VA

As a result of these discoveries, Amtrak immediately took the entire fleet of 20 Acela high-speed trainsets out of service pending evaluation of the severity, scope and cause of problem. The Amtrak OIG became involved from the outset in evaluating the maintenance and inspection requirements for the discs. OIG investigators and evaluators jointly interviewed contractor personnel involved with both the maintenance and supply of the parts, to identify breakdowns in the quality assurance process.

Since April, 2005, when cracked spokes on disc brake rotors on Acela passenger cars were fortuitously discovered, OIG has been investigating 1) the causation of the cracks, 2) possible prior knowledge of the dangerous condition by the prime contractors who designed, built and maintained the Acela trains, and/or their sub-contractors and vendors, and, 3) whether, and if so why, daily and periodic inspection and maintenance by the main contractors failed to discover and remedy the dangerous condition. OIG has issued several subpoenas in its investigation, and has received production and begun to evaluate more than 1 million document pages. In addition, the OIG has filed suit in the District Court for the District of Columbia to compel compliance with subpoenas issued to three entities.

# Office of Audits

## SIGNIFICANT AUDITS

### INTERNAL OPERATIONS REVIEWS

**Amtrak Accident and Incident Reporting –
Instances of Non-Compliance May Subject Amtrak to
Potential Penalties
Report #102-2004 – Issued 4/16/2005**

The Federal Railroad Administration (FRA) has regulatory responsibility for safety, inspection, and enforcement under Title 49, Part 225 of the Code of Federal Regulations (CFR). This regulation requires the railroads to adopt internal control plans to ensure accurate capturing and reporting of information concerning the hazards and risks that exist on the railroads. Part 225 prescribes civil penalties of $500 to $11,000 per violation for non-compliance with the promulgated requirements. Amtrak established and implemented an Internal Control Plan (ICP) on January 1, 1997 to bring Amtrak's Safety Department into compliance with Title 49, Part 225 of the CFR.

The objective of this audit was to review Amtrak's ICP and determine if the plan is developed as prescribed by the FRA under Title 49 - Part 225.33, and if Amtrak is complying with the established policies and procedures. We concluded that Amtrak was in compliance with the FRA regulation. The audit, however, detected instances of late submissions of reports by the field offices, inaccurate reporting of lost time days from injuries and illnesses, and non-compliance with the FRA guidelines regarding updating original estimates of equipment damages. Management reviewed the OIG's findings and recommendations and provided an action plan to address our recommendations.



Acela | Boston, MA

**Engineering Department's Capital Projects Labor Charges –
Adjustments of $280,838 Noted Due to Inadequate
Controls and Inappropriate Timecard Adjustments
Report #102-2005 – Issued 9/2/2005**

The OIG reviewed FY 04 timecard adjustments made by Engineering and identified $280,838 of inappropriate timecard adjustments that was transferred from operating expense to capital expense. Our review of the journal entry adjustments also indicated a significant number of journal entries that lacked evidence to validate that the expenditures being charged to capital projects were capital expenses. We also noted that journal entry approval and attestation forms were not properly signed off in accordance with the established procedures.

We recommended that management reverse the $280,838 plus associated fringe benefit and overhead costs transferred to capital projects, require adequate documentation and approval for all timecard and journal entry adjustments, and enforce the proper attestation of journal entries by the approvers. Furthermore, we recommended that management review and improve the current controls over the issuance of work elements to enable Engineering to correctly charge the labor to the proper work elements at the time the original timecards are prepared. Management reviewed the findings and recommendations and provided a written response including corrective actions planned to address our recommendations. Our audit findings were also shared and discussed with Amtrak's external auditor, KPMG.

**Grant Agreement for New York Tunnels Fire and Life
Safety Improvements – Non-compliance with
Administering and Maintaining the Working Capital
Advance Fund and Weakness in Internal Controls
Identified
Report #104-2005 – Issued 6/22/2005**

Amtrak made withdrawals from the Working Capital Advance fund that was not in accordance with specific procedures contained in the Grant Agreement. Amtrak also failed to file required forms as prescribed in the Grant Agreement. In addition, for a period of time, we noted an internal control weakness due to lack of segregation of duties between reconciling the fund account and making deposits and withdrawals to the fund. Management agreed to correct the noted deficiencies.

**ETrax Trip Manager System and Worldspan Call Center –
Internal Control Weaknesses Noted Opportunities for
Additional Cost Savings May Exist
Report #215-2005 – Issued 8/5/2005**

The OIG performed a review of airfares procured through Trip Manager and the Worldspan Call Center to determine whether airfares were properly authorized, approved and accurately