billed by the vendor. We noted that there are no written procedures or guidance for approving airfare for agreement covered employees and inconvenienced passengers; while guidelines exist for management employees, pre-approval is not always obtained. In addition, airfares charged directly to Amtrak are not always matched to the direct order of an Amtrak approval record or adequately verified prior to payment. Internal control improvements are needed over the approval process for airfare procurements to ensure that procurements are necessary and required for business purposes.

The review also identified opportunities for cost savings by increasing Trip Manager's usage for booking lodging and by using the GSA employee travel program.

While management's initial response addressed most of the concerns, we are awaiting information from management on the timeframe for management to review certain recommendations. We will continue to monitor and report on the results.

### San Francisco Ticket Office Special Audit Uncovers Employee Theft
**Report #501-2005 – Issued 4/29/2005**
**Report #505-2005 – Issued 4/28/2005**

Amtrak's Station Accounting management reported possible irregularities in station accounting at Amtrak's San Francisco station and contacted the OIG. Service Vouchers are prepared by ticket office personnel as a form of service recovery. Corporate guidelines indicate that vouchers should not exceed $50 each.

The results of our audit and investigation revealed that the lead ticket clerk falsely reported service voucher claims in amounts ranging from $300 to, in some instances, more than $1,000 in order to improperly remove daily cash receipts for his personal use.

As a result of the audit/investigation, the lead ticket clerk was brought up on formal disciplinary charges and resigned from the Company. In addition, local management issued instructions that service vouchers would no longer be issued at ticket offices and customer problems would be referred to Amtrak's Customer Relations Department in Washington, DC. Similar instructions were subsequently issued to all stations in the Amtrak system.

Our second report resulting from this review was issued to Sales and Marketing regarding Gray Line Sightseeing (also known as Gray Line San Francisco), a tour operator. The tour operator would request and receive tickets from the San Francisco ticket office, however, payment would be made between 30 and 60 days later. Amtrak was essentially granting credit to the tour operator by allowing them to receive the tickets without immediate payment. The OIG recommended, and management agreed, that revisions are needed to future contracts to improve Amtrak's cash flow and its control over ticket issuance accountability. In addition, the tour operator has been notified that tickets are now to be issued from the Oakland ticket office and full payment is required upon collection of any issued tickets.

### Emergency Exchange Voucher Review – Management Employee Terminated
**Report #504-2005 – Issued 9/20/2005**

The OIG performed a review of selected Emergency Exchange Vouchers (EEV) transactions that were reported by the Albuquerque ticket office for the period October 2004 through March 2005 and identified internal control, compliance and transactional weaknesses. EEVs are used locally to assist passengers who are seriously inconvenienced due to a service disruption. The purpose of our review was to determine whether EEVs were processed in accordance with established company procedures and that EEV expenditures were appropriate and properly supported. The OIG determined that a local management employee failed to comply with governing procedural controls - transactions were missing proper supporting documentation and many records had been destroyed in violation of the company's record retention procedures. Other improper EEV transactions were subsequently identified and resulted in the termination of the management employee.

The OIG recommended, and division management concurred, that controls be strengthened. As a result, these transactions will be subject to a higher supervisory review at least twice annually. Also, record retention and destruction procedures will be reiterated to division ticket office personnel and instructions were issued to make clear that only original and complete receipts will be reimbursed.

## CONTRACTS
### Train Services Contracts – Weaknesses Noted in Contract Language, Administration and Monitoring of Contract Performance
**Report #304-2004 – Issued 08/25/2005**

The OIG completed an audit of Amtrak's contract administration of train service contracts. Train service contracts cover over $100 million in annual payments to freight railroads over which Amtrak operates. The purpose of our review was to determine whether Amtrak is receiving the level of services contracted for, and, to assess the adequacy of controls used to monitor performance and penalize contractors that are under performing.

Our audit identified inadequate contract administration with limited focus on monitoring contract performance. Many of the

service contracts were poorly written, lacked adequate statements of work and penalty clauses for failure to perform the level of service contracted; and did not include a contractual requirement for "background checks" for contractor personnel. Amtrak appears to be paying excessive prices for the limited services provided for run through trains.

Management agreed that service contracts need to be strengthened to include clear statements of work and penalty clauses and that increased contractor performance monitoring is needed to ensure that Amtrak is receiving the quality and quantity of services for which it contracted.

## PROCUREMENT AUDITS

**Genesis Coatings Inc. Procurement Procedures Not Followed Resulted in Termination of Employee**
**Report #404-2005 – Issued 6/20/2005**
**Report #506-2005 – Issued 6/22/2005**

The OIG performed two reviews of Genesis Coating, Inc. Genesis Coating provided interior coating services on specific passenger cars for Amtrak.

The first review was to determine if a formal agreement existed with Genesis Coatings Inc. during the period December 1, 2003 through March 31, 2005, relating to coating services it provided to Amtrak, and to ascertain whether applicable procurement procedures were followed.

The results of the audit indicated that Amtrak did not have a signed agreement or other contractual documentation with Genesis, and the contract manager did not follow Amtrak procurement procedures. As a result, Amtrak expended significantly more monies than necessary for the services rendered. The OIG recommended that appropriate disciplinary action be taken and Amtrak terminated the employee.

Subsequent to the first report on the purchasing activities, Amtrak and Genesis Coating entered into a Memorandum of Understanding (MOU). At the request of Amtrak's Procurement department, the OIG completed a limited scope review of invoices submitted by Genesis Coatings, Inc. ("Genesis") for the work performed. The audit scope was restricted to those areas that were mutually agreed upon between the parties; and was limited to identifying duplicate costs, charges for services not performed, or invoices for work performed by subcontractors that exceeded Genesis' payment or obligation to pay the subcontractor. No questioned costs were noted during this review. Management subsequently awarded a contract to a different paint contractor for future services.

## RAILROAD AUDITS

**CSXT – Questioned Costs of $176,767**
**Report #207-2003 – Issued 5/18/2005**

We completed a review of CSXT billings to Amtrak for track usage and identified $176,767 in questioned costs of which $23,109 has been recovered. After protracted negotiations between the parties, it was agreed that the remaining $153,658 is due Amtrak. Management is pursuing recovery of the questioned costs from CSXT.

**BNSF – Special Trains & Authorization Notices Audit**
**$143,285 Excess Billings Recovered**
**Report #411-2003 – Issued 6/29/2005**

Amtrak and the Burlington Northern Santa Fe Railway (BNSF) entered into their most recent freight operating agreement effective September 1, 1996. Under the agreement provisions, the BNSF bills Amtrak each month for specific services and facilities for intercity rail passenger operations. The purpose of our audit was to determine the accuracy, reasonableness, and validity of the charges the BNSF billed Amtrak for the operation of special trains and authorization notices, and to develop an audit adjustment claim if appropriate.

The scope of our audit encompassed the period from August 1998 through September 2001. We audited 100% of the costs billed by the BNSF for special trains and authorization notices and found excessive and unsupported billings amounting to $143,285.

We recommended that management initiate a final settlement letter and that monies due Amtrak be collected as soon as possible. Management agreed with our recommendation and received full reimbursement.

**Connecticut Southern Railroad – Questioned Cost $55,000**
**Report #300-2005 – Issued 08/16/2005**

We completed an audit of Amtrak's Freight Operating Agreement with the Connecticut Southern Railroad Company (CTSO). Under this agreement CTSO, a freight railroad company, compensates Amtrak for the use of Amtrak owned tracks between New Haven, Connecticut and Springfield, Massachusetts. The objective of our audit was to determine whether management controls exist which ensure that Amtrak receives all of the revenue that it is entitled to under the Agreement.

The audit concluded that management controls are not adequate to reasonably ensure that Amtrak is receiving the total revenue to which it is entitled. Amtrak relies entirely on CTSO to submit accurate car counts and mileage for all train movements, and does not have any means of independently verifying CTSO data. We also determined that Amtrak is not billing CTSO in accordance with the agreement since the invoices are based on an incorrect car mileage rate and do not contain a one percent factor for reimbursement of liability costs as required by the Freight Operating Agreement. As a result, Amtrak under billed CTSO $55,000 for the period of May 2001 through December 2004.

We recommended that the Amtrak Contract Administration Department correct identified billing errors and strengthen management controls to ensure that Amtrak receives all revenue that it is entitled to under the Agreement. Management agreed with the OIG's findings and recommendations and billed CTSO $67,918 for previously unbilled liability costs together with an adjustment for the correct car mileage rate.

## UNRESOLVED AUDIT ISSUES

Appendices 1 and 2 show the status of management decision on audit recommendations and dollar values of questioned costs, unsupported costs, and funds to be put to better use.

Section 5(a)(10) of the Inspector General Act of 1978 as amended requires "a summary of each audit report issued before the commencement of the reporting period for which no management decision has been made by the end of the reporting period. . ." Such reports are shown in Appendix 1 and 2. Section 5(a)(11) requires "a decription and explanation of the reasons for any significant revised management decision made during the reporting period." There were none during this reporting period. Section 5(a)(12)requires "information concerning any significant management decision with which the Inspector General is in disagreement." Again, no such decisions were made during this reporting period.

## MANAGEMENT RESPONSES OVER 180 DAYS OLD FOR WHICH CORRECTIVE ACTION HAS NOT BEEN COMPLETED

*(Including Date of Management Response)*

**Capital Spare Parts for High Speed Trainsets and Locomotives – Questioned Costs Not Yet Resolved**
**Report #218-2001 – Response 5/21/2003**

As noted in the previous semiannual report, the OIG identified questioned costs of $1,223,897. Management allowed a 12 percent mark up to be consistent with each Consortium member associated with the subject audit, which reduced the questioned costs to $599,108. The funds were recovered except for $173,116 which will be withheld until all issues related to a global settlement are resolved. We will continue to monitor management's actions on this issue.

**Delaware Car ACSES Installation Bid Review – Corrective Action Not Yet Implemented**
**Report #225-2002 – Response 6/19/2003**

As noted in the previous semiannual report to Congress, Amtrak entered into an agreement with Delaware Car Company for the installation of ACSES on 18 NJT coaches for a total contract value of $410,400. Our review indicated costs were understated due to the incorrect calculation of overhead costs and the omission of equipment movement costs. Amtrak was also at risk because of the failure to place force account insurance on this project. Management has circulated draft procedures that, after approval, would ensure that force account insurance is included in future project cost bids. We will continue to monitor.

**Reimbursable Work Trains – Actions Still being Considered**
**Report #212-2003 – Response 10/28/2003**

We recommended that fueling of locomotives associated with work and transfer trains be fueled locally instead of being run to Philadelphia, Pennsylvania for fueling, with the expectation of reducing costs. Management is still considering our recommendation. We will continue to monitor.

**New York Tunnel Inspection Trains – Agreed to Actions in Progress**
**Report #211-2003 – Response 3/16/2004**

We previously identified $522,171 in unbilled costs associated with the New York East River tunnel inspection trains Management is in the process of implementing OIG's recommendations and we will continue to monitor corrective action taken.

**Blanket Purchase Order – Sole Source Compliance Review Corrective Actions in Progress**
**Report #206-2004 – Response 3/25/2004**

In OIG's previous review of non-competitively bid blanket purchase order, Management agreed to competitively bid two of the three exceptions noted. Management is in various stages of the competitive bid process for these requests. We will continue to monitor.

**Parsons – Jenny Joint Venture – Questioned Costs Not Yet Resolved**
**Report #201-2004 – Response 5/14/2004**

We performed a limited scope evaluation of costs associated with improvements to the railroad tunnel approaches to Pennsylvania Station, New York and identified questioned costs of $43,119. Management agreed with our findings and reached an agreement with the Contractor to recover the questioned costs from contract retainage and issue a contract modification. We are currently waiting for Management to issue the contract modification. We will continue to monitor.

**Audit Questioned $4 Million of Commissary Services Contract Costs**
**Corrective Actions Not Yet Completed**
**Report #218-2004 – Response 7/16/2004**

Based on the OIG review, we identified a total of $3,980,385 in questioned costs over the last five fiscal years. Management generally agreed with our findings and we are currently assisting management with the final negotiations of the agreement disputes and recovery of a portion of the questioned costs.

| AUDIT STATISTICS | |
|---|---|
| **Status of Audit Projects** | |
| Audits in progress at 4/1/05 | 54 |
| Audit projects postponed or cancelled | 2 |
| Audit projects started | 26 |
| Audit reports issued | 18 |
| Audit projects in progress 9/30/05 | 60 |
| **Audit Findings** | |
| Questioned costs | $1,244,716 |
| Unsupported costs | $0 |
| Funds to be put to better use | $0 |
| **Total** | **$1,244,716** |

**Southern Pacific Central Line – Questioned Costs Not Yet Resolved**
**Report #01-506 – Response 09/04/2001**
**Report #01-507 – Response 09/04/2001**
**Report #01-508 – Response 10/12/2001**
**Report #01-509 – Response 10/12/2001**

As noted in the previous Semiannual to Congress, settlement continued to be delayed until the questioned cost issues are resolved. No new developments to report during this reporting period.

# Office of Investigations

## INVESTIGATIONS

The OIG currently has 378 active investigations. During this most recent reporting period, we opened 52 new cases and closed 106.

Over the past six months, we made 22 criminal referrals to prosecutors, obtaining one conviction/plea, three indictments, two declinations, with eleven cases pending criminal prosecutorial review. We have two pending civil fraud referrals under review and several referrals to Amtrak management recommending civil action. We have worked with management on safety and security issues, employee discipline, accounting controls and collection policies regarding conductors and ticket agents, and issues related to worker productivity.

## CASE HANDLING

The OIG receives allegations from various sources, including employees, confidential informants, Congressional sources, federal agencies, and third parties. As set forth in the chart below, entitled "Sources of Allegations," employees, anonymous and confidential source referrals accounted for about 71 percent of the allegations during this reporting period, with employees being the predominate source (20 of the 52 allegations), or 38 percent. All allegations are reviewed, screened and resources are allocated based upon, among other things, the seriousness of the allegations and potential harm to Amtrak or the public.

The fraud OIG HOTLINE program has continued to provide employees or third parties an opportunity to report allegations of fraud, waste, abuse, and other wrongdoing. Employees can access the HOTLINE twenty-four hours a day by calling Amtrak Telephone System number 728-3065 in Philadelphia and the toll free number (800) 468-5469 if outside Philadelphia. During working hours from 9:00 a.m. to 4:30 p.m., OIG staff answer the callers on the HOTLINE system. During other hours or during those occasions when staff are away from the office, callers can leave a message on the HOTLINE answering machine. In addition, people can write in confidentially to P.O. Box 76654, Washington, DC 20013. The OIG received seven telephonic HOTLINE complaints during this reporting period, which was

### HOTLINE STATISTICS
| 4/1/05 – 9/30/05 | Total |
|---|---|
| Hotline Complaints Received | 7 |
| **Sources of Hotline Complaints** | |
| Amtrak Employee | 2 |
| Anonymous Source | 2 |
| Private Citizen | 2 |
| Former Amtrak Employee | 1 |
| **Classification of Complaints** | |
| Other | 2 |
| False Claims | 1 |
| Theft/Embezzlement | 2 |
| Kickbacks | 1 |
| Non-criminal – Other | 1 |
| **Complaints Referred To:** | |
| OI Field Offices | 6 |
| Office of Diversity | 1 |



### SOURCES OF ALLEGATIONS
4/1/05 – 9/30/05

- Referred by Federal/Local Law Enforcement 5
- Private Citizen 2
- Referred by Audit 1
- Referred by Other Amtrak Dept. 3
- Referred by Other OIG 2
- Hotline 1
- Amtrak Employee 20
- Former Amtrak Employee 1

### CASE STATUS OF INVESTIGATIONS
| 4/1/05 – 9/30/05 | |
|---|---|
| Total Open Cases as of 3/31/05 | 432 |
| Closed Cases | 106 |
| Opened Cases | 52 |
| **Total Ongoing Cases as of 3/31/05** | **378** |

an increase from the prior reporting period. The HOTLINE complaints received during this reporting period were from Amtrak employees, anonymous sources, private citizens and a former Amtrak employee.

## SIGNIFICANT INVESTIGATIONS

**Train Operating Crew Embezzlement**

Embezzlement has ranked as one of this country's leading financial crimes that affects many organizations including Amtrak. The OIG has spent considerable time and effort towards identifying and addressing issues of embezzlement, theft and fraud within the corporation. Examples of some of those efforts are set forth below.

A former Amtrak Assistant Conductor pled guilty to the theft of more than $9,000 in Amtrak funds, and is scheduled for sentencing in November 2005 in the United States District Court, Southern District of Florida.

An engineer in the State of Washington submitted fraudulent time claims on more than eighty (80) occasions. Amtrak denied thirty-five (35) of these claims, but paid the Engineer for the remaining forty-eight (48). The Engineer was terminated and Amtrak recovered the money from the Engineer.

## REVIEW PROTECTION EFFORTS

The Revenue Protection Unit (RPU) provides pivotal support in detecting fraud waste and abuse in on-board services. These efforts are illustrated by the following examples.

**Food & Beverage Sales Reviews**

The sale of food and beverage products on-board Amtrak trains generates approximately $79 million. This revenue and the stock used to supplement the sales generating this revenue, render it an area at risk for revenue abuse.

To detect wrongdoing or questionable activity by Amtrak food service employees, the OIG continues to conduct observations, evaluations, and follow-up of the remittance documentation. Our analysis contributed to 82 cases being closed with 50% resulting in administrative referrals forwarded to management for further handling.

Also, during this period, 45 administrative referrals sent by RPU, in this period as well as previous periods, were addressed by management and resulted in various levels of employee discipline.

To date, 42 on-board service employees have either been terminated or resigned, and two employees have administrative hearings pending. The monetary loss to Amtrak, as a result of these 44 employees' actions is $103,728.32. During this reporting period, six additional Lead Service Attendants (LSAs), based out of Chicago, were charged for failing to remit all on-board sales monies to Amtrak that resulted in a loss of $4,749.75. Four of these LSAs have been terminated, and two (2) have hearings pending. In a previously reported case, a former Passenger Conductor from the Jacksonville Crew Base pled guilty to theft charges and accepted a pre-trial diversion. On April 25, 2005, the former employee paid full restitution to Amtrak in the amount of $17,176.25

**Conductor Remittance Reviews – Improvements Noted**

As a result of the OIG's earlier efforts and involvement in identifying and addressing conductors and assistant conductors guilty of embezzlement or other financial transgressions, strengthened internal controls have been instituted and are being enforced. During this reporting period no new conductor cases warranted OIG review by the Revenue Protection Unit, and we identified only three instances of questionable revenue remittance totaling just over $8,000 where two employees resigned from the corpo-

### CLASSIFICATION OF CASES OPENED DURING THIS PERIOD
4/1/05 – 9/30/05

| Type | Number |
|---|---|
| Fraud | 6 |
| Theft/Embezzlement | 9 |
| Bribery | 1 |
| False Claims | 6 |
| False T&A Issues | 3 |
| Drug Violations | 1 |
| Criminal – (other) | 6 |
| Waste | 3 |
| Abuse of Position | 1 |
| Mismanagement | 1 |
| Conflict of Interest | 4 |
| Administrative Inquiries | 5 |
| Non-criminal – (other) | 6 |
| **TOTAL** | **52** |

ration and the third accepted a waiver for ten days suspension served and thirty days suspension held in abeyance.

Given that more than 200 employees have been removed from service for remittance irregularities and theft, these results demonstrate the effectiveness of a strong control environment and a cultural change in fare collection practices.

## JOINT INVESTIGATIONS

From time to time, the OIG relies on support from, or works in cooperation with, other law enforcement and investigative teams. The cases detailed below, are examples of some of the joint efforts.

### US Postal Service Inspectors Assist in Mail Fraud Guilty Plea by Contractor

The OIG and the Amtrak Police Department with assistance from the United States Postal Inspection Service uncovered a scheme in which an Amtrak contractor overcharged Amtrak for maintenance activities that were never performed. During a four-year period, the contractor's scheme defrauded Amtrak of $65,000. All invoices were transmitted for payment through the United States mails. On August 19, 2005, the former contractor was charged with mail fraud and pled guilty in the United States District Court for the Northern District of New York. The plea agreement requires the defendant to pay full restitution to Amtrak.

### US Postal Service Inspectors – Identity Theft Prosecuted

The OIG previously reported that they assisted the United States Postal Inspection Service in identifying an Amtrak employee who, among other victims, was a victim of identity theft by a Real Estate Broker in Georgia. The personal information was used in a mortgage scam to purchase millions of dollars in properties. As a result of the investigation, the defendant was found guilty and on August 26, 2005, was sentenced to over five (5) years in prison; and was required to pay restitution to the victims.

### Unauthorized Railroad Retirement Board Benefits Recovered

The Railroad Retirement Board (RRB) is an independent agency whose primary function is to administer comprehensive retirement-survivor and unemployment-sickness benefit programs for the nation's railroad workers and their families.

**PROSECUTIVE REFERRALS**
4/1/05 – 9/30/05

| Referrals | U.S. Attorney | Local/State | Total |
|---|---|---|---|
| **Criminal Cases** | | | |
| Indictments | 3 | 0 | 3 |
| Convictions/Pleas | 1 | 0 | 1 |
| Pending* | 11 | 0 | 11 |
| Declinations | 2 | 0 | 2 |
| TOTAL | | | 17 |
| **Civil Cases** | | | |
| Suits Filed | 0 | 0 | 0 |
| Settled | 3 | 0 | 3 |
| Pending | 2 | 0 | 2 |
| TOTAL | | | 5 |
| **Total Civil and Criminal** | | | 22 |

*Some of these will be reflected under pending civil cases because these matters are being handled by the United States Attorney's office in parallel proceedings. In cases where there have been convictions or pleas, we may be awaiting sentencing, restitution, or other resolutions.

We previously reported on a joint investigation between the OIG and agents from RRB's OIG office regarding an Amtrak employee who received RRB benefits while participating in the Amtrak Transitional Work Program / Right Care Day One. A civil action was filed with the U. S. Attorney's office in Philadelphia, Pennsylvania. The employee has since resigned, pled guilty of violating United States False Claims Act, and agreed to pay double restitution of over $22,000.

## HURRICANE KATRINA – OIG RESPONDS WITH ASSISTANCE

The tragedies resulting from back-to-back Hurricanes Katrina and Rita were monumental and overwhelming for our country. Amtrak had approximately 390 employees assigned to its New Orleans facilities who were directly affected by these disasters. Within days of the devastation brought about by Hurricane Katrina, the OIG provided assistance in law enforcement and emergency response. All qualified OIG personnel, serving as

Special Deputy United States Marshals, upon arrival in Louisiana worked with the Louisiana State Police, and State Office of Attorney General.

The OIG provided around-the-clock police support for the depleted law enforcement agencies in Louisiana. They also provided security to both the United States Army Mortuary Affairs Unit and Kenyon International Emergency Services, during the body recovery process, assisted with and made numerous apprehensions/arrests, provided Amtrak passenger protection and assisted the Amtrak Police Department with protection for a convoy of Amtrak railroad workers and equipment sent to New Orleans Yard to prepare for continuation of Amtrak services.

Additional OIG staff manned phone lines, at the National Center for Missing and Exploited Children in Alexandria, Virginia, to help victims be reunited with missing relatives, and researched the status of approximately 390 Amtrak employees, affected by these disasters.

# Inspections and Evaluations

## SIGNIFICANT INSPECTIONS AND EVALUATIONS

### Acela Maintenance Service Contract – OIG Continuing Involvement

The Acela high-speed trains are extremely popular with the public and generate approximately one quarter of Amtrak's total revenue. Due to the significant impact of the Acela program on Amtrak's financial goals and objectives, the OIG continues to examine different aspects of the program and remains involved in this critical area of the company.

With the responsibility for maintenance of the trainsets transitioning from the manufacturer's consortium, NEC MSC, to Amtrak in October 2006, the OIG is closely monitoring this transition to highlight potential problem areas and make recommendations to help achieve a smooth and safe transition of trainset maintenance from the manufacturers to Amtrak. We continue to participate in the Acela Executive Oversight Committee and are providing periodic feedback to the Senior Vice President of Operations on areas we feel are at risk so that actions can be taken by management now to help prevent problems in the future.

### Amtrak Mechanical Maintenance Operations – System-wide Review Recommends New Maintenance Approach
### Report E-05-04 – Issued September 6, 2005

In conjunction with the on-going review of the Acela Maintenance Service contract, in the fall of 2004 the OIG initiated a system-wide review of the rest of Amtrak's mechanical maintenance operation. The maintenance of the fleet is accomplished by Amtrak's Mechanical Department, primarily through the efforts of over 4,000 agreement-covered employees and 280 management employees. In FY04, Amtrak spent over $500 million (both operating and capital) for inspection, maintenance, repair, cleaning, and overhaul of its mechanical fleet.

Our evaluation found that Amtrak's current maintenance operation consists mainly of preventive maintenance inspections and services, conducted at mostly time-based intervals, augmented by a high number of reactionary, unscheduled, repair actions. This is similar to the way the other major railroads in North America did maintenance over 20 years ago. The other Class I railroads have since progressed to more sophisticated approaches to maintenance to improve reliability and reduce costs. Most Class I railroads currently use, or are moving towards, a maintenance philosophy that is based on "Reliability-Centered Maintenance" (RCM). RCM requires that maintenance actions be supported by sound technical and economic justification.

After evaluating the way Amtrak currently performs maintenance, we estimate that Amtrak could potentially save in excess of $100 million a year in mechanical maintenance costs by adopting an RCM philosophy, similar to the other major railroads. Our report discusses specific actions that Amtrak should take to transition to a Reliability-Centered Maintenance operation.

Moving to an RCM philosophy will require a change in culture within the Mechanical Department and will therefore take time. Our recommendations include ways to accelerate the process, but the full benefit to adopting an RCM philosophy will not be realized for several years. Even considering the inability to establish clear timetables, the long-term benefits are significant and we feel justify the actions required for Amtrak to embrace fully the modern advances in equipment maintenance which other railroads utilize.

Our report was well received by Amtrak Management. We are currently working with the Mechanical Department to help them implement our recommendations.

### Harassment and Intimidation Complaint – Amtrak Policies Violated

Amtrak's Statement of Policy Against Harassment and Intimidation states, in part, "Amtrak will, under no circumstances, tolerate harassing or intimidating conduct by any employee that is calculated to discourage or prevent any individual from receiving proper medical treatment or from reporting an accident, incident, injury or illness."

The OIG conducted an inquiry into a complaint of Harassment and Intimidation by an On-Board Services employee regarding management's handling of her on-duty injury and the subsequent Drug and Alcohol (D&A) test. Although we could not confirm that a violation of Amtrak's Statement of Policy Against Harassment and Intimidation had occurred, we did find that the Train Manager failed to properly handle the employee's injury at the time of her injury and failed to conduct an effective Accident Investigation of the injury. Also, we found that Crew Base management inappropriately D&A tested the employee under Amtrak's Drug and Alcohol Policy Guidelines. These violations of Amtrak's policies and procedures were referred to Amtrak Management for action.

### Conductor and LSA Non-Remittance – OIG Continuing Involvement

Amtrak employees handle approximately $100 million annually in on-board ticket and food and beverage sales. The OIG previously issued two evaluation reports where we noted substantial evidence of employee theft and made recommendations to



Acela | Hell Gate Bridge, East River, NY

improve the oversight and control of cash generated from on-board sales.

The Inspections and Evaluations staff works closely with the OIG Revenue Protection Unit, whose work is highlighted earlier in this report. OIG staff continues to remain engaged in determining additional process improvements for safeguarding these revenues.

Since October 2002, more than 150 conductors and 125 On-Board Service (OBS) employees have either resigned or been terminated from the company for misappropriation of revenues, as a result of OIG's efforts.

### Employee Leave of Absence Initiative – OIG Inter-Department Team Working with Amtrak Human Resources

In September 2004, the OIG issued an evaluation report on Employee Leaves of Absence (E-04-04). The report found that Amtrak was not adequately tracking employees on leave of absence and therefore Amtrak could not ensure that benefits were only being paid to eligible personnel.

In August 2005, after realizing that the situation had not improved significantly, the CEO directed that the Human Resources department create an Employee Leave of Absence Initiative and take necessary actions to ensure employees on leave of absence are tracked and their benefit eligibility is properly managed. An OIG inter-department team of Inspections and Evaluations (I&E) and Audit personnel has been monitoring and advising the Human Resources team tasked with this initiative.

### Project Management – OIG Partners with Engineering to Develop and Implement Improved Procedures

In our last report, we described the OIG's partnership with the Engineering Department to develop a more disciplined approach to the management of projects. As a result, an initiative is now under way to improve how Engineering estimates, plans, tracks, reports, and controls its projects. This initiative will encompass (1) the setup and configuration of information systems to support Engineering's project management direction, (2) the re-engineering of the corresponding management and control processes, and (3) the setup of organizational structures within Engineering to support the initiative. The intent is to build a culture of disciplined project management practices that will, over time, yield significant improvements in productivity and control.

The long-term goal is to establish a set of project management practices and procedures that will eventually be used throughout the company. We will continue to report on the progress of this initiative in future reports.

# Counter Terrorism and Intelligence

This unit is responsible for facilitating strategic initiatives and providing oversight for projects and tasks, as it pertains to Amtrak's rail security, emergency preparedness, intelligence and counter terrorism efforts related to this country's war on terrorism.

In conjunction with Amtrak's Vice President for Security and OIG's security oversight, we continue to raise awareness of the importance of rail and infrastructure security in the post 9-11 environment. The significant efforts during this reporting period include:

**Critical Vulnerability in Homeland Security Pertaining to Rail Security – Update**

As reported in previous semiannual reports, the OIG continues to emphasize the need to correct a critical vulnerability in rail security. Amtrak officials met with personnel from the Department of Homeland Security (DHS) to forge a strategy to address this vulnerability. There is no quick solution to the problem, but considerable progress has been made in bringing the two sides together, and building a framework to resolve this issue.

There is now focus on this vulnerability, and the OIG is playing a key role in facilitating a solution. Given the complexity of the issue, we will continue to facilitate the institution of timely and appropriate counter-measures.

**Proposed Pilot-Program to Counter Terrorist Activity**

More needs to be done to raise the security awareness of those who both ride the railroads, and those who operate them. The OIG produced a concept paper that proposed the creation of a pilot program to increase Amtrak's capability to anticipate, deter, and prevent whenever possible terrorist threat, or attack.

Briefings about the OIG proposal were held with DHS, the Transportation Security Administration (TSA), the Federal Bureau of Investigation (FBI), the Department of Defense (DOD) and the National Guard Bureau (NGB). The OIG strongly believes this undertaking should be given serious consideration and continue discussions and negotiations about partnering with Amtrak on this effort.

**Additional Red Team Exercise**

In November 2004, the OIG sponsored a "Red Team" exercise which underscored critical vulnerabilities in rail security. During this reporting period, preliminary work was done to plan an additional red team exercise pertaining to management of threat information and intelligence. One of the objectives of the exercise is to assure that threat information is handled in a timely and professional way.

**Additional Networking with Security and Counterterrorism – New Law Enforcement Initiatives**

The OIG continues to develop a network of contacts in the Federal Government, State Governments and Homeland Security who deal with security and counter terrorism issues.

The OIG arranged, at the request of the New York Police Commissioner, to have Amtrak senior officials meet in New York City to discuss what more could be done with other State and railroad officials to improve security against terrorist attacks.

As a result of this meeting, the Amtrak Vice President of Security and Amtrak Chief of Police established closer working relationships with NYPD personnel assigned to Amtrak assets as well as establishing new patrol agreements with numerous state and local police authorities.

**OIG Special Agent Assigned to British Transport Police**

On July 7, 2005, a series of four bomb attacks struck London's public transport system during the morning rush hour. Fifty-six people were killed in the attacks, including the four suspected bombers, with 700 injured. The OIG immediately dispatched a supervisory special agent to work with the British Transport Police in the aftermath of the bombings on London's public transit system. In conjunction with this effort, the OIG representative met with representatives from Scotland Yard in an information gathering session to reinforce and improve on knowledge needed to strengthen Amtrak's counter-terrorism efforts.

**Additional Emergency Response Training Provided**

During this reporting period, several Special Agents were trained in various aspects of responding to terrorism, including certifications in Incident Command and responding to bomb threats. The training emphasized incident command in train derailments and a vast array of Emergency Response issues.

# Other OIG Activities

## COORDINATION WITH INDEPENDENT PUBLIC ACCOUNTANTS

Section 805 of the Rail Passenger Service Act of 1970 requires Amtrak to have its financial statements audited annually in accordance with the generally accepted auditing standards, and to report the audit findings to Congress in Amtrak's annual report. Amtrak has been audited annually since 1971.

The OIG is continuing to follow-up on progress being made by management to implement corrective actions in response to Management Letters issued by the external auditor (KPMG LLP), in connection with the annual audits of Amtrak's financial statements. We issued a draft status report in August 2005 that summarized management progress on the significant internal control issues identified by KPMG in their FY 01 Management Letter issued in July 2002. During the next semiannual period, we plan to work with the external auditors and Amtrak management on issues related to prior audits and the financial statement audit for FY 05.

## AUTOMATION OF AUDIT WORK PAPERS AND MANAGEMENT PROCESS

**Automation of Audit Work Papers and Management Processes Continued**

In November 2004, our office launched a major initiative to implement an automated solution to manage audit assignments and audit work papers. We selected TeamMate application from PricewaterhouseCoopers, which is the de facto standard in the IG community. TeamMate improves audit efficiency and effectiveness by automating various audit processes such as risk assessment, planning and scheduling, electronic work paper documentation, time and expense tracking, and report writing. It enables auditors located at different offices or working remotely to collaborate, and audit managers to review and approve work papers electronically.

As part of this implementation, we had to build a secure IT infrastructure to host the TeamMate application. We worked with Amtrak's IT department to complete the business requirements, and developed a technical architecture consisting of a Secure Subnet protected by internal firewalls and two-factor authentication. Our Secure Subnet solution aims to leverage Amtrak's existing technical support resources, and includes technologies such as VPN, Active Directory, and Citrix.



California Zephyr | Ruby Canyon, CO

Our auditors received the initial TeamMate training from PricewaterhouseCoopers and Inspector General Auditor Training Institute (IGATI). In FY2006, we plan to complete the testing and implementation of Secure Subnet and TeamMate Release 8. We will be creating a new security policy, updating the departmental policies and procedures, and developing the TeamMate library and protocol according to the best practices.

## INTER-AGENCY COOPERATIVE EFFORTS

**Legal Services Corporation OIG Peer Review Report #105-2005 – Issued 8/5/05**

Amtrak OIG performed a Peer Review of the audit function of the Legal Services Corporation (LSC)– Office of Inspector General (OIG), in conformity with the standards and guidelines established by the President's Council on Integrity and Efficiency. The purpose of our review was to determine if the quality control policies and procedures were appropriately designed to ensure that applicable auditing standards have been adopted, and established policies and procedures were being followed. The LSC OIG reviewed our draft report, concurred with our recommendations, and provided details on actions that would be taken to address our recommendations.

**NATIONAL RAILROAD PASSENGER CORPORATION**

Office of the Inspector General

# Appendices



# Appendix 1

## INSPECTOR GENERAL AUDIT REPORTS ISSUED WITH QUESTIONED COST
4/1/05 – 9/30/05

|  | Number | Questioned Costs | Unsupported Costs |
|---|---|---|---|
| A. For which no management decision has been made by the commencement of the reporting period. | 3 | $902,509 | $277,348 |
| B. Reports issued during the reporting period. | 6 | $1,244,716 | $0 |
| Subtotals (A + B) | 9 | $2,147,225 | $277,348 |
| **LESS** | | | |
| C. For which a management decision was made during the reporting period. | 7 | | |
| (i) dollar value of recommendations that were agreed to by management. | | $387,533 | $0 |
| (ii) dollar value of recommendations that were not agreed to by management. | | $856,309 | $0 |
| D. For which no management decision has been made by the end of the reporting period. | 2 | $903,383 | $277,348 |

# Appendix 2

## INSPECTOR GENERAL AUDIT REPORTS ISSUED WITH FUNDS TO BE PUT TO BETTER USE
4/1/05 – 9/30/05

|  | Number | Dollar Value |
|---|---|---|
| A. For which no management decision has been made by the commencement of the reporting period. | 2 | $621,200 |
| B. Reports issued during the reporting period. | 0 | $0 |
| Subtotals (A+B) | 2 | $621,200 |
| **LESS** | | |
| C. For which a management decision was made during the reporting period. | 1 | |
|   (i) dollar value of recommendations that were agreed to by management. | | $600,000 |
|   (ii) dollar value of recommendations that were not agreed to by management. | | $0 |
| D. For which no management decision has been made by the end of the reporting period. | 1 | $21,200 |