format. For example, the production bearing Bates numbers BBD0166941 through BBD0198200 comprises more than 31,200 TIF images of individual pages or portions of pages of documents that are described as Brake-related emails sorted chronologically from Mr. Labbe's Microsoft Outlook application."[1]

None of these documents appear to have been produced in their original, searchable format notwithstanding that, presumably, the documents presently are maintained and available. To the extent that Respondents have not produced the documents in their native format, they have not complied with the terms of the Subpoenas. Moreover, not producing the documents in their searchable native format has made OIG's review, analysis and use of the produced documents needlessly and significantly more time-consuming and difficult. For example, where an electronic search of Mr. Labbe's email records might have required a morning, the review of the TIF image files required days of effort.

Two additional factors further contribute to the delay and inefficiency. Most of the documents produced are spreadsheets and reports of which only a portion of their contents appears on each separate, Bates-numbered, TIF-imaged, document page. Reading the documents requires assembling the TIF-image pages in a mosaic-like pattern. Second, as discussed in Part III, below, many of the spreadsheets and reports do not appear to be responsive to the text of the Subpoenas but, instead, appear to have been produced to support a negative inference.

Accordingly, OIG requests answers to the following questions:

1) Whether Bombardier will produce as part of its response to the Subpoenas, documents created and maintained in an electronic format, including:

    a.    the Contract Tracking System or responsive portions;

    b.    the EO database or responsive portions;

    c.    the ISC-ISL database or responsive portions;

    d.    the Open Technical Issues database or responsive portions;

    e.    the database of Failure Analysis Reports or responsive portions;

    f.    responsive emails, spreadsheets and reports?

---

[1] See "Index to Respondents' Productions" submitted as Exhibit 68 to Respondents' Memorandum on October 20, 2005 (the "Index).

3

2) Whether NeCMSC will produce as part of its response to the Subpoenas, documents created and maintained in an electronic format, including:

    a. the searchable and complete Technical Service Bulletins or responsive portions;

    b. the "Service Bulletins from Knorr" or responsive portions;

    c. the Inspection Records (since April 1, 2003)" or responsive portions;

    d. the SPEAR database or responsive portions;

    e. responsive emails, spreadsheets and reports?

3) Whether Alstom will produce as part of its response to the Subpoenas, documents created and maintained in an electronic format, including responsive emails, spreadsheets and reports?

### III. Production of Non-Responsive Documents

To date, Respondents' have produced more than 1 million Bates-numbered document pages in their responses to the Subpoenas. The size of the production is a burden not only to Respondents but to OIG. From our first meetings with you, it was precisely this manner of production that we sought to avoid by suggesting alternatives such as on-site document review <u>prior</u> to production. Not surprisingly, given the size of the production, it includes multiple copies of the identical documents and non-responsive documents.[2]

Respondents assert, based on their October 20, 2005 "Respondents' Declarations and Affidavits in Support of a Hearing" ("Respondents' Affidavits"), that they had no notice prior to April 15, 2005 of cracked disc brake rotors; OIG is reviewing those statements. However, it appears that to support their negative proposition, Respondents have misapplied the standard for responsive documents under the Subpoenas and produced many documents for which the claimed responsiveness is that they do <u>not</u> contain facts comprising such "notice".

> A file could be responsive, for example, because the absence of any reference to disc spoke problems demonstrates that Respondents did not have 'notice' of any such problem.

---

[2] For example, the materials described as "Brake-related emails sorted chronologically from Mr. Labbe's Microsoft Outlook application" (Index, at 4) contain timesheets, administrative correspondence, and personal messages -- none of which appear to be responsive to the Subpoenas. Also included in the production are multiple copies of the same document.

4

Index (Exhibit 68) at 1, n.1. Respondents' standard for production is improper, illogical and should be corrected.

The mischief resulting from Respondents' misapplication of "responsiveness" is demonstrated by their production of more than 31,000 document pages described as the Labbe "Brake-related emails" for the period mid-2004 until January, 2005.

The inflated and unwieldy aggregation of documents has slowed OIG's analysis and taxed its resources. Seemingly, similar considerations resulted in the production of the NeCMSC Daily Inspection Records. These were not the results Congress envisioned when it provided Inspectors General with subpoena power. See Agency for Int'l. Development. v. First Nat'l. Bank of Md., 866 F.Supp. 884, 887 (D.Md. 1994).

Respondents are free to accumulate any documents they chose in the support of any negative inferences they wish to propound, and they can advise OIG of those inferences and make the selected documents available for review. However, Respondents cannot "water" their production specified in the Subpoenas with non-responsive documents that diminish the utility of the production.

We solicit your response to the following questions:

1) Whether Respondents' further production should abjure documents claimed as responsive only "because the absence of any reference to disc spoke problems demonstrates that Respondents did not have 'notice' of any such problem"?

2) What efficient and effective measures can be taken to identify and remove from Respondents' production to date those documents claimed as responsive only "because the absence of any reference to disc spoke problems demonstrates that Respondents did not have 'notice' of any such problem"?

IV.   Respondents' Proposals

In your September 30, 2005, letter you indicate that you have proposals to resolve disputes about compliance under the Subpoenas "on a consensual basis". If you presented them in subsequent correspondence, or in the "Respondents' Memorandum" I have not seen and considered them. If you have proposals to narrow or resolve the disputes, please present them for our consideration. If you have previously made proposals to which we have not responded, and you would still like them considered, please furnish a document and page reference for them.

5

Nov. 10. 2005  4:10PM                                               No. 7272   P. 7

Unless we hear from you to the contrary, we plan to telephone you during the afternoon of November 17 to discuss these matters and matters of concern to your clients.

Sincerely,

*David Sadoff* by (ET)

David Sadoff
Associate Counsel to the Inspector General
National Passenger Railroad Corporation

**Amtrak OIG**



| | |
|---|---|
| **To:** Philip Le B. Douglas, Esq. | **From:** D. Sadoff, Associate Counsel to the Inspector General |
| **Fax:** 212.858.1500 | **Date:** November 10, 2005 |
| **Phone:** 212.858.1704 | **Pages:** |
| **RE:** Letter dated November 10, 2005. | |

☐ Urgent　　☐ For Review　　☐ Please Comment　　☐ Please Reply　　☐ Please Recycle

•Comments:

　　Letter dated November 10, 2005.

05 NOV 10 PM3:19



Pillsbury
Winthrop
Shaw
Pittman

WINSTON & STRAWN LLP

**Confidential Investigative and Settlement Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

November 14, 2005

**BY FAX**

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:  *Fred E. Weiderhold, Jr. v. Bombardier, Inc., Alstom Transportation,*
     *Inc. and Northeast Corridor Maintenance Services Company*

Dear Mr. Sadoff:

As you know, part of Respondents' pending Request for a Hearing concerns their long-standing request for release for analysis of certain friction brake discs seized by the Inspector General shortly after Acela service was suspended in April 2005. (Resp. Mem. at 30). As we have noted, Mr. Weiderhold's failure to release any of these discs has delayed the completion of the parties' safety related and other investigations.

Although the Inspector General has yet to respond to the substance of the Request for a Hearing, we are enclosing a copy of the Consortium's November 9, 2005 letter to Amtrak (CATC 1248/CAMC-0484) soliciting authorization (i) to hire a specialized firm to perform a magnetic particle inspection in Wilmington on a particular Sab-Wabco disc referred to by Amtrak during meetings on October 18-19, 2005 (the "Zero-Mileage Disc"), and (ii) to hire an independent laboratory to perform detailed metallurgical analyses on the Zero-Mileage Disc, presumably at a facility outside of Wilmington. Because Amtrak asserts that it is not permitted to release the Zero-Mileage Disc without

EXHIBIT
75

November 14, 2005
Page 2

the Inspector General's authorization, we are hereby asking for Mr. Weiderhold's approval.

In order to expedite his consideration of this important matter, Respondents agree that the Inspector General's authorization to conduct the above analyses of the Zero-Mileage Disc will be without prejudice to any party's position in *Weiderhold v. Bombardier, Inc., et al.*, Civ. No. 1:05-MC-00367-PLF (D.D.C.). By this letter, Respondents do not waive any positions taken in their Request for a Hearing and hereby expressly reserve all rights in that regard.

Very truly yours,

Philip Le B. Douglas
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1704

Timothy M. Broas
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5750

Enclosure




CATC-1248   Closed
CAMC-0484   Closed
November 9, 2005
Spec/Contract:

Mr. John T. Prader
Contracting Officer's Representative
High Speed Trainset Program
Amtrak
30th Street Station, 5th Floor, SE
30th and Market Streets
Philadelphia, PA 19104

**Subject:** BRAKE DISC ISSUE - REQUEST FOR PERFORMING ANALYSES ON THE "ZERO-MILEAGE" SAB-WABCO DISC
Amtrak High-Speed Trainset Procurement

**Reference:**
**Doc. Ref.:**

Dear Mr. Prader:

As you might know, during the discussions held at Amtrak's Washington, D.C. Office on October 18-19, 2005, there has been a mention of a Sab-Wabco disc that is in the custody of Amtrak, which allegedly had not seen any mileage and was cracked ("zero-mileage disc").

The Consortium is hereby soliciting Amtrak's authorization to perform additional inspection and analyses on this zero-mileage disc that is currently held by Amtrak in Wilmington, Delaware.

With the intent of evaluating the present condition of this particular disc and of possibly further improving its understanding of the mechanisms that led to the issue currently at hand, the Consortium is proposing to:

1. Hire a specialized firm to perform a Magnetic Particle Inspection (MPI) on the above-referenced disc under our supervision in Wilmington;
2. Hire an independent 3rd party laboratory to perform detailed metallurgical analyses on the disc, presumably at a facility outside of Wilmington.

The Consortium is open to discussing with Amtrak and the Office of the Inspector General (OIG) the selection of the firm and laboratory to be retained to perform the task.

.../2

**BOMBARDIER ALSTOM CONSORTIUM**

1101 Parent Street, Saint-Bruno, Québec J3V 6E6   Phone (450) 441-2020   Facsimile (450) 441-3195

 

CATC-1248
CAMC-0484
Page 2

As we understand that the authorization of Amtrak's OIG is mandatory to be able to perform such work, the Consortium is also forwarding to the OIG, under separate cover, a copy of this letter.

The Consortium looks forward to receiving confirmation of Amtrak's authorization to perform the MPI in Wilmington and to promptly start discussing the selection of the laboratory to be retained to perform the metallurgical analyses.

Should you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

Suzanne El Zawi
Consortium Director
Program Management

SEZ/jb
File: N/A

c.c.    Ms. Jocelyne Boucher (Bombardier)        Mr. Frank Duschinsky (Bombardier)
        Mr. Don Cummings (Bombardier)             Mr. Renaud Murray (Bombardier)
        Mr. Sébastien Géraud (ALSTOM)             Ms. Stacey Panter (ALSTOM)
        Mr. John Robinson (ALSTOM)                Mr. Pierre Hébert (NeCMSC)

**BOMBARDIER ALSTOM CONSORTIUM**



Pillsbury
Winthrop
Shaw
Pittman LLP

WINSTON & STRAWN LLP

**Confidential Settlement and Investigative Communication
Disclosure Restricted to Head of Designated
Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

November 18, 2005

**BY FAX**

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

      Re:   *Fred E. Weiderhold, Jr. v. Bombardier, Inc., Alstom Transportation,
Inc. and Northeast Corridor Maintenance Services Company*

Dear Mr. Sadoff:

      Thank you for your November 10, 2005 letter, which we consider a positive response to our October 20, 2005 memorandum in support of Respondents' Request for a Hearing ("Respondents' Memorandum"). By continuing this settlement dialogue with the Inspector General's Office, Respondents do not waive any claims raised in that memorandum and expressly reserve all rights in that regard.

**I.    Respondents' Pending Requests**

      Before turning to the questions raised by your letter, Respondents respectfully inquire regarding the following open issues:



EXHIBIT 76

November 18, 2005
Page 2

1. **Voluntary Dismissal of Petition Without Prejudice**

On October 28, Bombardier faxed you a letter outlining the "compelling reasons why, rather than seeking a stay, Mr. Weiderhold should withdraw his Petition without prejudice." Your November 10 letter now acknowledges that "portions of the ... Petition require supplementation or revision." We have been fortunate so far, but it would be imprudent to allow concededly erroneous allegations to remain a matter of public record. Respondents, therefore, renew their request that the Petition be voluntarily dismissed. They are prepared to stipulate that the dismissal would be without prejudice and that all limitations periods and laches defenses would be tolled.

2. **Analysis of the Zero-Mileage Disc**

On November 14, 2005, Respondents asked Mr. Weiderhold to authorize the release of the so-called "Zero-Mileage Disc" for testing. We would appreciate Mr. Weiderhold's response as soon as possible.

II. **The Inspector General's Questions**

We address below the four topics raised in your November 10 letter.

A. **Completion of Production**

You have asked a series of questions regarding Respondents' expected completion of their document production. These inquiries are addressed in the order you have raised them.

**Question 1:   Documents Responsive to Any Subpoena**

Due to Respondents' unresolved objections to various instructions and subpoena requests, they do not contemplate a production responsive to all subpoena requests.

**Question 2:   Documents Responsive to "Notice" Request**

You have asked when Respondents will have produced "all documents that contain or pertain to notice received by any of them, prior to April 14, 2005, of any defect related to Acela disc brake rotors" (the "Notice Documents"). Respondents believe that they have produced all files in which Notice Documents, to the extent they exist, would

November 18, 2005
Page 3

likely be found.[1] It should be noted, however, that in order to avoid the substantial delay involved in a document-by-document review of files from Mr. Oakes' own hard drive (the "Oakes Files") and address the Inspector General's concern that Respondents' prior productions have been over inclusive, Bombardier streamlined its electronic document review procedure. Previously, Bombardier manually reviewed potentially responsive Labbé electronic files for privileged communications and for any document that constituted pre-April 14, 2005 "notice" of a spoke problem. That exercise involved well over 168,000 pages of Labbé records and took 13 weeks. The Oakes Files contain over 38,000 potentially responsive documents, some of which are 3,000 pages long. If Bombardier were today to initiate the same manual document-by-document privilege and "notice" review, document production would not be complete until March 2006, at the earliest.

In order to expedite production of the Oakes Files, Bombardier conducted an electronic, rather than manual, search of those electronic records to determine whether any constituted "notice" of a spoke problem.[2] Bombardier's review of the results of that search has determined that none of the 4,505 records so identified constitutes pre-April 14, 2005 notice of a spoke problem. As a consequence, none of the Oakes Files will be produced.

### Question 3:   Other Documents

*See* Responses to Questions 1 and 2.

---

[1] In the absence of any agreement with the Inspector General's Office, Alstom has not conducted any electronic searches. Because two of its employees have sworn they did not receive advance notice of a broken spoke and, in any event, would have learned of such a brake problem only from the same sources as Labbé and Oakes (whose files, including hard drives, apparently do not contain broken spoke documents), Alstom does not believe that a search of electronic files would be productive. Behety Aff. ¶¶ 3-4; Wochele Aff. ¶¶ 3-4. Alstom, however, has produced all responsive paper files, and, as part of any settlement, would conduct an electronic search of Behety's hard drive similar to that performed by Bombardier with regard to Oakes' electronic records.

[2] Bombardier used the following search protocol: (acela* or nec* or 041* or trainset*) and (disk* or disc or discs or disque* or crack* or fissure* or hairline* or "hair line*" or capillaire* or hub* or pad* or thermal* or mono*).

November 18, 2005
Page 4

### Question 4:  Certificate of Compliance

As you know, Respondents have objected to certain instructions and document requests made in the Inspector General's seven subpoenas. Thus, even if there were legal authority for such a "Certificate of Compliance", Respondents could not possibly certify "full compliance" with each and every instruction and document request. Nevertheless, without prejudice to our position that such a certificate is not required, Respondents are willing to execute a certificate that accurately describes their actual document production.

### Question 5:  Estimate of Remaining Production

At present, no further records remain to be produced. *See* Response to Question 2.

### Question 6:  Privilege Log

Within a month after the completion of all document production, Respondents will provide a log of documents, if any, withheld on privilege grounds.

**B.   Production of Electronic Documents
       in Native, Searchable Format**

You are correct that Mr. Weiderhold's staff has not had access to some of the databases identified at pages 3-4 of your letter.[3] However, when Respondents informed you of the existence of these databases in their May 31 and June 7, 2005 "lay-of-the land" surveys, they asked for a meeting to discuss how, in light of these surveys, document production should proceed. Resp. Exs. 10 & 12. Despite Respondents' repeated efforts to engage the Inspector General in a dialogue regarding the substance of these surveys, no such meeting ever occurred. Douglas Dec. ¶ 14; Resp. Exs. 13 at 6 & 23 at 2. We, therefore, welcome your November 10, 2005 inquiry regarding these databases.

---

[3]  As we will demonstrate below, Amtrak (and presumably the Inspector General) has long had independent access to most of these databases.

November 18, 2005
Page 5

As you know, the vast majority of the documents produced to date are not maintained in searchable format. Insofar as Bombardier is concerned, only the Labbé hard drive files produced to date are text searchable. Those files have been searched and do not appear to contain pre-April 14, 2005 references to broken spokes. Resp. Mem. at 27. As noted in footnote 1 above, in the absence of any agreement with Mr. Weiderhold's staff on search terms, Alstom has not produced records from electronic files. Insofar as NeCMSC is concerned, most of the documents it produced are not maintained in a searchable format.[4]

In addition, none of the other databases referenced in your letter are likely to contain a Notice Document. As you know, Bombardier and NeCMSC have already conducted searches of the SPEAR, FRACAS, FAR and Technical Service databases. Those electronic searches did not produce any information that would have put Respondents on notice of any problems with spokes prior to April 14, 2005. Miclette Dec. ¶ 7; DeMarco Dec. ¶ 4.

In any event, Amtrak (and thus presumably its Inspector General) already has full access to each and every of the NeCMSC databases listed in your letter, namely, the "Technical Service Bulletins," "Service Bulletins from Knorr," "Inspection Records" and SPEAR databases. In addition, Amtrak (and again presumably Mr. Weiderhold) has direct access from Amtrak's own offices to Respondents' Contract Tracking System ("CTS").

It is true that the Inspector General has not had access to Bombardier's EO Letter (a list of official correspondence and meeting minutes with Knorr), the ISC-ISL (engineering letters forwarded to suppliers), Open Technical Issues (an Excel spreadsheet listing open engineering items), "Technical Service Bulletins" and "Service Bulletins from Knorr" databases. Bombardier, however, has produced the contents of those databases as part of the Knorr Correspondence, Labbé and Oakes files, none of which appear to contain any pre-April 14, 2005 "notice" of a broken spoke problem. Resp. Mem. at 27.

---

[4] Only post-March 2003 DIRs are maintained by NeCMSC as electronic documents. Only 2,501 of these are text-searchable. The text searchable DIRs have already been searched to weed out, where practicable, non-responsive files. Broas Dec. ¶¶ 6-9. In any event, Amtrak engineers (and through them presumably Mr. Weiderhold) have direct access to the DIR server from their own terminals.

November 18, 2005
Page 6

     Respondents' production of database material in "pdf" or "tiff" form was entirely consistent with accepted electronic document production practice. Hansen Dec. ¶ 3; Drury Dec. ¶¶ 3-6.[5] Nevertheless, in order to avoid litigation and to settle this dispute, Respondents propose to provide the Inspector General's staff with the additional database access described below:[6]

1. Respondents have no objection to the Inspector General's use strictly for investigative purposes of Amtrak's existing access to the "Technical Service Bulletins", "Service Bulletins from Knorr", "Inspection Records", SPEAR and CTS databases.

2. With regard to the remaining Bombardier databases identified in your letter, namely, the "EO Letters", "ISC-ISL", "Open Technical Issues" and FAR databases, and the hard drive of Alstom's principal brake-related witness, Norbert Behety (collectively the "Bombardier and Alstom Databases"), Respondents will provide access to the Inspector General in the manner specified below:

---

[5] There are a variety of good reasons why Bombardier did not produce the Labbé documents in their native, searchable format:
- All of Labbé's responsive electronic records have been manually searched and none appear to relate to pre-April 14, 2005 broken spokes. Resp. Mem. at 27.
- Production of text-searchable databases would present difficult chain-of-custody problems. By their very nature, Respondents' text-searchable databases do not and cannot contain serial document page production numbers and, in any event, can be altered by anyone with access to them. Thus, if during its use of such a database, the Inspector General's staff were inadvertently to alter or delete a record, it would be difficult to reconcile any differences between the database produced by Respondents and that used by the Inspector General.
- The chain-of-custody issues discussed above would be greatly exacerbated if the Inspector General were to disclose portions of Respondents' databases to third parties, such as Amtrak, Congress, future litigants or, as a result of a Freedom of Information Act ("FOIA") request, random members of the public.
- If Amtrak or other potential litigants obtain these databases from OIG by subpoena or FOIA request, they will secure great litigation advantages, without necessarily being required to provide equivalent discovery to Respondents.

[6] This proposal, like the rest of this letter, is a confidential settlement communication and may not be used or referred to outside of the settlement context by Mr. Weiderhold or any third party.