# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703 | 1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 | 333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 |
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND | (202) 282-5000 | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193 |
| BUCKLERSBURY HOUSE<br>3 QUEEN VICTORIA STREET<br>LONDON, EC4N 8NH | FACSIMILE (202) 282-5100<br><br>www.winston.com | 21 AVENUE VICTOR HUGO<br>75116 PARIS, FRANCE |
| | | 101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |

TIMOTHY M. BROAS
(202) 282-5750
tbroas@winston.com

May 1, 2006

**Confidential Settlement and Investigative Communication
Disclosure Restricted to Head of Designated
<u>Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)</u>**

## <u>VIA HAND DELIVERY</u>

David Sadoff, Esquire
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

        **Re:**    Amtrak Office of Inspector General Subpoenas on Alstom Transport,
Inc. ("Alstom"), and Alstom's interest in Northeast Corridor
Maintenance Services Company ("NeCMSC") (the "Respondents")

Dear Mr. Sadoff:

      In response to your April 25, 2006 letter, and in agreement with the April 28, 2006
fax from Bombardier, Inc. ("Bombardier"), Respondents request a meeting to discuss all
outstanding issues and will be available to meet in the late afternoon/early evening of
Thursday, May 4, 2006, or another mutually convenient time. Should this meeting not
resolve all open issues between the parties, Respondents will request an appeal to the
Inspector General himself and, as necessary, to David Laney.

      Also in agreement with Bombardier's recent fax, Respondents seek clarification of
any "surviving issue[s]" related to items 1 and 2 of your letter that have heretofore
escaped resolution, as well as your "three understandings" regarding lost data.

DC:465922.1



EXHIBIT
118

Mr. David Sadoff
May 1, 2006
Page 2

      We look forward to meeting with you at a mutually convenient time this week.  If I can be of any assistance to you in the interim, please do not hesitate to let me or Frank Parker know.

Very truly yours,

Timothy M. Broas

cc:    Dana Wordes, Esquire
       Frank Parker, Esquire



**Pillsbury
Winthrop
Shaw
Pittman** LLP

1540 Broadway
New York, NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

**Confidential Investigative
& Settlement Communication
Disclosure Restricted to
Head of Designated Federal Entity
Pursuant to 5 U.S.C. App. 3 §8G(d)**

May 3, 2006

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

<u>VIA FEDERAL EXPRESS</u>

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

      Re:    Amtrak Office of Inspector General Subpoenas
             <u>05-05 and 05-17 on Bombardier Inc. ("Bombardier")</u>

Dear Mr. Sadoff:

We are enclosing Disk #BBD_043 as part of Bombardier's ongoing effort to settle the parties' dispute over the scope of the subpoenas served by OIG last spring (the "Subpoenas").

We are writing to advise you that during the "Electronic Search 1" review of the personal computers of certain employees[1], Bombardier was at first unable to open a few possibly responsive email files (the "Unreadable Files"). After receiving technical assistance, Bombardier has now opened and reviewed the Unreadable Files.

---

[1]  As described in my letter of April 13, 2006, Electronic Search 1 was run across the hard drives of the following Bombardier employees, *i.e.*, Suzanne El Zawi, Renaud Murray, Frank Duschinsky, Gaétan Slater, René Meuser, Mathieu Perrault, Mario Raymond, Virgilio Hilario, Jacques Desjardins, Michel Masse, André Coté, Catherine Morency, Denis Arvisais, Nicolas Lessard, Philippe Moslener, Sylvain Boily, Richard Drolet, Pierre Miclette, Jean-Pierre Noel-de-Tilly, Christian Auger, Raymond Dumoulin, Anick Tourigny, and Joe DeCrescenzo.

EXHIBIT

119

ALL-STATE LEGAL®

500083489v1

May 3, 2006
Page 2

Consultants working at the direction of Bombardier's in-house legal staff have eliminated from this group those files they could easily determine were obviously unrelated to problems in the Acela trailer car friction brakes.

As a result of this exercise, three emails and their attachments (a total of 14 files) are being produced by means of the enclosed Disk #BBD_043, which is labeled "Disk BBD0043 (BBD0391137-BBD0391379) 5/3/06". We believe that Bombardier's production from the Unreadable Files is complete.

There are three folders on Disk #BBD_043:

1. Formal Production Folder: This contains the formal production by Bombardier, in the form of 14 full-text searchable PDFs (production numbers BBD0391137 to BBD0391379). The name of each PDF file reflects the production number on the first page of the document.

2. Metadata Folder: This contains a searchable, read-only Excel file containing Metadata for the files in the Formal Production Folder, and is labeled "Metadata – Disk BBD-043.xls".

3. Native Format Excel Files Folder: Because large Excel files are not always readily usable in PDF format, this folder contains a searchable, read-only, "native format" version of 9 Excel files (attachments to emails) that are included in the Formal Production Folder. These files are labeled with the production number of the first page of each corresponding document in the formal production, and an "MD5hash signature" has been captured for each file.

The fact that, as part of ongoing settlement discussions, Bombardier agreed to conduct Electronic Search 1 and produce certain resulting documents is without waiver of any objections, including, but not limited to, those regarding Electronic Search 1 and the resulting production. Nor may that Electronic Search 1 or any resulting production be used in support of any request for additional production, including but not limited to, any by electronic search, or in native format, or any other method.

**Pillsbury Winthrop Shaw Pittman LLP**

May 3, 2006
Page 3

Please do not hesitate to contact me with any questions.

Sincerely,

Philip Le B. Douglas

Enclosure

Pillsbury Winthrop Shaw Pittman LLP



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman**ₗₗₚ

1540 Broadway          Tel 212.858.1000
New York,              Fax 212.858.1500
NY  10036-4039         www.pillsburylaw.com

**Confidential Settlement and Investigative Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

May 9, 2006

**BY HAND**

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E. – Suite 3E-400
Washington, D.C. 20002

Re:    *Fred E. Weiderhold, Jr. v. Bombardier, Inc., Alstom Transportation,*
       *Inc. and Northeast Corridor Maintenance Services Company*

Dear Mr. Sadoff:

As you requested, Bombardier hereby provides its analysis of Sylvain Labbé's e-mails
and "loose" documents before and after the laptop theft.[1]

|  |  |  |
|---|---|---|
| 11/7/03-5/6/04 | 2,158 Documents |
| 5/6/04 | Laptop Stolen |
| 5/7/04-11/6/04 | 2,257 Documents |

Very truly yours,

Philip Le B. Douglas

EXHIBIT
120

---

[1]  Mr. Labbé recollects that at the time of the theft, it was his practice to back up his laptop data
approximately every six months. After the theft of his laptop on May 6, 2004, Mr. Labbé downloaded
the backed-up information into a new laptop.





**Pillsbury**
**Winthrop**
**Shaw**
**Pittman**LLP

1540 Broadway
New York,
NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

<u>Confidential Settlement and Investigative Communication</u>
<u>Disclosure Restricted to Head of Designated</u>
<u>Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)</u>

May 9, 2006

**BY FAX**

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E. – Suite 3E-400
Washington, D.C. 20002

     Re:   *Fred E. Weiderhold, Jr. v. Bombardier, Inc., Alstom Transportation,*
          *Inc. and Northeast Corridor Maintenance Services Company*

Dear Mr. Sadoff:

In anticipation of tomorrow's meeting, I am enclosing for your consideration a form of
Certificate of Compliance that Bombardier is prepared to sign. We will consider in good
faith any specific revisions proposed by the Office of the Inspector General.

Very truly yours,

Philip Le B. Douglas

Enclosure

EXHIBIT
121
ALL-STATE LEGAL®

May __, 2006

**Confidential Settlement and Investigative Communication
Disclosure Restricted to Head of Designated
Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

**VIA FACSIMILE**

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:    **OIG Subpoena Nos. 05-05, 05-09, 05-17 and 05-20**

Dear Mr. Sadoff:

This is to certify that Bombardier Inc. ("Bombardier") has, in accordance with settlement discussions between the parties and without prejudice to any previously-stated objections, complied with the requests of OIG Subpoena Nos. 05-05, 05-09, 05-17, and 05-20.

In addition, at my direction, Bombardier (i) has inquired of the persons with front-line responsibility for any significant brake problems, whether Bombardier was on notice of cracked friction brake spokes prior to April 14, 2005, and (ii) has undertaken a reasonable search for any documents evidencing such notice to Bombardier. We hereby certify that, based on the results of our inquiry and search, it appears that no knowledgeable person had any notice of broken spokes prior to April 14, 2005. *See* attached Declarations.

Mr. David Sadoff
May __, 2006
Page 2


Should you have any questions related to this certification or to past productions of documents or data related to this matter, please do not hesitate to contact me.

Very truly yours,


[Bombardier signatory]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRED E. WEIDERHOLD, JR.,<br> AS INSPECTOR GENERAL,<br> NATIONAL RAILROAD PASSENGER<br> CORPORATION | : | |
| | : | |
| | : | Misc. Civil No. 1:05-mc-00367-PLF |
| Petitioner | : | |
| | : | **DECLARATION OF** |
| v. | : | **SYLVAIN LABBÉ** |
| | : | |
| BOMBARDIER, INC. | : | |
| | : | |
| ALSTOM TRANSPORTATION, INC. | : | |
| | : | |
| NORTHEAST CORRIDOR MAINTENANCE<br> SERVICES COMPANY | : | |
| | : | |
| Respondents. | : | |

I, SYLVAIN LABBÉ, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am a Senior Mechanical Designer at Northeast Corridor Maintenance Services Company ("NeCMSC"), and am also an employee of Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation, Inc.'s ("Alstom"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

2.    I am a train brake specialist and a member of NeCMSC's reliability team. I have been responsible for designing interfaces to, trouble-shooting, testing and commissioning the brake system of trainsets for different transportation authorities, including the Acela trainsets.

3.    I have been employed by Bombardier since May 1980, and have been with

NeCMSC since May 2002. I have been involved with the Acela project from its inception. I am

therefore familiar with the facts and circumstances surrounding the events described in this

declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Bombardier's and NeCMSC's Lack of Notice**

4.    Because of my dual role as NeCMSC's lead brake specialist and the sole

Bombardier brake specialist to have been continuously involved in the Acela project, I am

routinely notified, through both formal and informal channels, of any problems with the brakes

(other than one-time problems such as those caused by improper handling). Accordingly, I

would have been notified of any issues relating to broken spokes.

5.    Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes

("Spoke Issues") on the Acela trains.

6.    After April 14, 2005, I reviewed my files to see if I had ever received any

documents that might have put me on notice of any Spoke Issues. I found no such documents.

7.    I am unaware of any documents that might have put NeCMSC or Bombardier on

notice of any Spoke Issues prior to April 14, 2005.

**Where Broken Spokes Might Be Identified**

8.    All periodic NeCMSC inspections are conducted by Amtrak employees. These

Amtrak employees are required to inspect the Acela trainsets thoroughly, including the brake

discs, every day while the trainset is in service and at other regular intervals. (For convenience, I

will refer to the various kinds of reports generated from routine inspection and maintenance as

"Daily Inspection Reports" or "DIRs".) Any Amtrak employee who identifies a problem with

2

the trainsets (including, for instance, any problems with the brake discs), is required to note those problems on certain forms as part of their DIR for that trainset.

9.    If a problem on a DIR requires corrective action, a Corrective Work Order ("CWO") is generated.

10.    Accordingly, if a cracked spoke had ever been identified by an Amtrak employee at NeCMSC, it would first be noted in writing on a DIR and CWO.

11.    In November 2004, I searched the CWO titles in the SPEAR 2000 database for the word "CRACK" in order to provide information for a memorandum regarding cracked brake discs, which I understand is attached as Exhibit 12 to Mr. Weiderhold's Petition. I reviewed the search results; none of them involved a cracked or broken spoke.

12.    I am unaware of any DIR or CWO prior to April 14, 2005 noting any cracked spokes.

**Communications With Subcontractors Regarding Brakes**

13.    Although all formal communication between NeCMSC or Bombardier and Knorr Brake Corporation ("Knorr") goes through Bombardier's Supply Management department in St-Bruno, Canada, I am the primary contact for informal communications with Knorr. In early 2005, I was frequently on the telephone with Ted Lin, Ph.D., Lead Analytical Engineer of Knorr to discuss various brake-related issues (none of which related to brake spokes).

14.    Shortly before April 14, 2005, Dr. Lin called me to ask if Knorr and one of its subcontractors could visit NeCMSC's Ivy City facility. He stated that Knorr's subcontractor wanted to check the wear rate of its brake disc friction plates. Dr. Lin made no reference to brake disc spokes. In fact, our conversation did not appear unusual to me at the time. This

3

particular visit never took place, however, because on April 14, 2005, the Federal Railroad

Administration discovered cracks on the spokes of the Acela trailer car friction brakes, and took

the trains out of service.

15.     I do not ordinarily communicate directly with ORX or Knorr's subcontractors or

sub-subcontractors, including Faiveley Transport, Wabco, Wabtec, and Sab Wabco.

16.     Prior to April 14, 2005, neither ORX nor Dr. Lin nor anyone else at Knorr nor

Knorr's various subcontractors ever informed me of any cracked or broken spokes on the Acela

trailer car brake discs.

**March 16, 2005 Faiveley Memorandum**

17.     Prior to September 22, 2005, I had never seen the "Confidential!" March 16, 2005

Faiveley Transport memorandum, which I understand is attached as Exhibit 11 to Mr.

Weiderhold's Petition (the "Faiveley Memorandum").

18.     I was entirely unaware of the substance of the Faiveley Memorandum before Mr.

Weiderhold filed his Petition.

4

19.     I am not aware of anyone else at Bombardier or NeCMSC who had knowledge of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 19, 2005 in Washington, District of Columbia.

Sylvain Labbé

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR., AS INSPECTOR GENERAL, NATIONAL RAILROAD PASSENGER CORPORATION | : : : : : |
| Petitioner | : Misc. Civil No. 1:05-mc-00367-PLF : |
| v. | : **DECLARATION OF** : **DENIS OAKES** : |
| BOMBARDIER, INC. | : : |
| ALSTOM TRANSPORTATION, INC. | : : |
| NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY | : : : |
| Respondents. | : : |

I, DENIS OAKES, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am a Project Engineer at Bombardier Transportation, a group of Bombardier Inc.,

the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make

this declaration in support of Alstom Transportation's ("Alstom"), Bombardier's and Northeast

Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents")

Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General,

National Railroad Passenger Corporation ("Amtrak").

2.    I am a train systems and integration engineer, who has developed an expertise in the

brake system. I have been responsible for selecting, creating interfaces for, and testing the brake

system of many different vehicles, including the Acela trainsets.

3.    I have been employed by Bombardier since May 1982. From 1996 through October 2000, I was a Project Engineer on the Acela project. From November 2000 through December 2002, I was primarily working on a different project, but remained in close contact with my temporary replacement on the Acela project and continued to be kept informed on major issues relating to the Acela brakes. In January 2003, I formally resumed my role on the Acela project and continued my work in connection therewith through the end of January 2005. (Although my own involvement ended at that time, Acela brake issues continued to be reported to and handled by Pierre Miclette and Sylvain Labbé.) In April 2005, after the Acela service was suspended due to the broken spoke problem, I again resumed my role on the Acela project. I am therefore familiar with the facts and circumstances surrounding the events described in this declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Bombardier's Lack of Notice**

4.    Because of my role on the Acela project, I am routinely notified, through both formal and informal channels, of any problems with the brakes (other than one-time problems such as those caused by improper handling, for instance if a brake component is inadvertently dropped on the shop floor at NeCMSC). For instance, I am one of the core group of Bombardier employees responsible for making sure that Knorr addresses out-of-limit cracks on the friction surface of the brake discs. Accordingly, I would have been notified of any issues relating to broken spokes.

5.    Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes ("Spoke Issues") on the Acela trains.

2

6.  After April 14, 2005, I reviewed my files to see if I had ever received any documents that might have put me on notice of any Spoke Issues. I found no such documents.

7.  I am unaware of any documents that might have put Bombardier on notice of any Spoke Issues prior to April 14, 2004.

**Brake Discs and Spoke Cracks**

8.  The diagram below (a copy of which, I understand, appears in Exhibit 10 of Mr. Weiderhold's Petition) shows an axle-mounted friction brake disc. On the Acela trainsets, this type of brake disc is found only on the trailer car friction brakes. The other brakes on the Acela trainsets (*i.e.*, the electric brakes, which use electricity rather than friction, and the power car friction brakes, which are wheel-mounted rather than axle-mounted) do not have spokes.



1 - Friction ring
2 - Connection Spokes
3 - Hub

9.  Cracks in the "friction ring" (also known as the "friction surface" or the "friction plate") are due to the temperature gradient resulting from the heating, generated by the contact between the brake pads and the friction ring, and the cooling of the ring. They are not

considered to be a problem, unless their size exceeds the limits set by the brake manufacturer. (By contrast, the manufacturer has not set any specific size limits for spoke cracks.)

10.     Thermal cracks on the friction surface are known and expected by the Amtrak employees inspecting and maintaining the Acela cars under the supervision of NeCMSC. In fact, prior to April 2005, when Amtrak personnel maintaining the Acela referred to a "cracked disc," it was understood that they were referring to cracks in the friction surface. By contrast, if there were a crack in any other part of the brake disc, such as the spoke, the hub, or the cooling fins, the crack would have been described by reference to that part of the disc (*e.g.*, a "spoke crack" or "crack in the hub" or a "cracked fin").

### Communications With Knorr Regarding Cracked Brake Discs

11.     I drafted the document 041-ISL-2420, dated November 15, 2004 (the "Cracked Brake Discs Memorandum"), which I understand is attached as Exhibit 12 to Mr. Weiderhold's Petition.

12.     None of the cracks that I identified or referred to in the Cracked Brake Discs memorandum or its attachment, "Cracked Disc List Rev_02", involved cracks on the spokes. They were all reported to me as cracks on the friction surface.

13.     This is apparent from a reading of most of the individual line items of Cracked Disc List Rev_02. It is clear on the face of the document, without even looking up the applicable Failure Analysis Reports or Corrective Work Orders, that at least 36 of the 46 cracks cannot possibly be spoke cracks:

a.     Many entries refer to whether or not the dimensions of the crack are within permissible limits. Because there are permissible limits for surface

4

cracks, but not for spoke cracks, there is no reason to mention the size of a spoke crack; all such cracks are impermissible.

      b.      The <u>power car</u> brake discs (*e.g.,* items where the "Equipment Code" starts with the number "2", or items referencing "bolt holes" or the "bolt countersink") do not have spokes.

      c.      The terms "heat crack" and "thermal crack" describe cracks in the friction surface, not spoke cracks.

      d.      Similarly, the terms "incipient crack" and "penetrating crack" are defined and used in the maintenance and inspection manuals to refer to cracks in the friction surface.

14.      In my experience, it is unlikely that engineers or maintenance personnel on the Acela project would describe a spoke crack as appearing on the "side"; "left side"; "inner side"; "1/4" from edge"; "on edge"; "surface"; or "on surface" without <u>specifically</u> stating that the crack is related to the spoke. Ordinarily, they would likely describe the location of a spoke crack as on the "spoke surface" or the "spoke web". By contrast, they would utilize words such as "surface" (without additional qualifiers) to describe the friction surface.

15.      Bombardier has repeatedly expressed its concern to Knorr Brake Corporation ("Knorr") about out-of-limit friction surface cracks through both formal and informal channels. Knorr addressed some, but not all of the issues raised in the Cracked Brake Discs Memorandum, by providing Failure Analysis Reports. None of Knorr's communications in response to the Cracked Brake Discs Memorandum ever made any mention of cracked or broken spokes.

**Communications With Faiveley, ORX, Wabco, Wabtec, and Sab Wabco**

16.    I do not ordinarily communicate directly with Respondents' subcontractors, including Knorr and ORX, or with any of Knorr's subcontractors or sub-subcontractors, including Faiveley Transport, Wabco, Wabtec, and Sab Wabco.

17.    Prior to April 14, 2005, I did not have any communications with ORX, Knorr, Faiveley Transport, Wabco, Wabtec, or Sab Wabco with respect to cracked spokes on the Acela project.

18.    Prior to September 22, 2005, I had never seen the "Confidential!" March 16, 2005 Faiveley Transport memorandum, which I understand is attached as Exhibit 11 to Mr. Weiderhold's Petition (the "Faiveley Memorandum").

19.    I was entirely unaware of the substance of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

20.    I am not aware of anyone else at Bombardier who had knowledge of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October __, 2005 at St-Bruno, Québec, Canada.

Denis Oakes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,
    AS INSPECTOR GENERAL,
    NATIONAL RAILROAD PASSENGER
    CORPORATION

           Petitioner

           v.

BOMBARDIER, INC.

ALSTOM TRANSPORTATION, INC.

NORTHEAST CORRIDOR MAINTENANCE
    SERVICES COMPANY

           Respondents.

Misc. Civil No. 1:05-mc-00367-PLF

**DECLARATION OF
PIERRE MICLETTE**

I, PIERRE MICLETTE, pursuant to 28 U.S.C. § 1746, declare that:

1.     I am an engineer with the Reliability, Availability, Maintainability, and Safety ("RAMS") group of Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation's ("Alstom"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

2.     I have been employed by Bombardier since 1996, and have been involved with the Acela project since that time. I am therefore familiar with the facts and circumstances

*PM*
October 18, 2005

surrounding the events described in this declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Respondents' Problem Reporting Process**

    3.    When a problem with the Acela trainsets is found during inspections at NeCMSC, it is first described in the appropriate inspection report (*e.g.*, on a daily or 90-day inspection report), and if corrective action is required, a Corrective Work Order ("CWO") is issued. Each CWO is reviewed at NeCMSC by NeCMSC, Alstom and Bombardier customer service, and by Amtrak field representatives to determine whether the problem should be considered as a reliability failure or not. In addition to the CWO review, any brake problem which is safety related, appears to be recurrent, or has caused service failures is reported by NeCMSC on a Failure Analysis Report ("FAR") for the Bombardier RAMS group attention.

    4.    The Bombardier RAMS group extracts information about reliability failures (*i.e.*, CWOs) from the SPEAR 2000 database (Amtrak has read-only access), and then transfers that information into the Bombardier Failure Reporting, Analysis, and Corrective Action System ("FRACAS") reliability database. I then review and analyze the relevant information. Then, this information is reported to the Consortium, NeCMSC, and Supplier organizations.

    5.    When we receive a request from NeCMSC for a FAR, my group alerts the appropriate engineering personnel responsible for whichever system is implicated by the problem. The problem is reviewed by the appropriate engineering personnel and a decision is taken whether to proceed with a further request for a formal FAR. Ultimately, the problem will be analyzed (by Alstom, Bombardier or the appropriate supplier), and an answer to the requested FAR will be issued when the analysis is completed.

2

*PM*

October 18, 2005

6.    I would have been informed if there had been any reports of cracked or broken spokes in the trailer car friction brake discs by either the FRACAS database information or directly by NeCMSC which would have initiated an FAR on a cracked or broken disc spoke. Prior to April 14, 2005, I had never been notified of any problems with the spokes.

7.    After April 14, 2005, I checked the FRACAS and FAR databases for any spoke-related problems. There were none in the database prior to April 14, 2005. I am unaware of any information that might have put Bombardier on notice of any problems with the spokes prior to April 14, 2005.

**Supplier Reliability Reports**

8.    Bombardier issues Supplier Reliability Reports to its vendors, which summarize performance issues for that particular vendor, on an as-needed basis. These reports are addressed to Supply Management and are then transmitted to Knorr as part of the formal project correspondence.

9.    I have routinely been involved in preparing such Supplier Reliability Reports for the brake systems on the Acela trainsets.

10.    I drafted the document 041-FMS-0714, dated September 23, 2003, which I understand was attached as Exhibit 26 to a Petition recently filed by Amtrak's Inspector General. This Supplier Reliability Report does not show any spoke cracks, and there was nothing about this report that would alert a knowledgeable technical person that there might be cracks in the spokes.

*PM*

October 18, 2005

3

11.    To the best of my knowledge and recollection, none of the Supplier Reliability Reports prior to April 14, 2005 ever concerned or referred to spoke cracks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on October 18, 2005 in St-Bruno, Québec, Canada.

Pierre Miclette

4

| JOB STATUS REPORT |
| --- |

```
TIME  : 05/09/2006 18:43
NAME  :
FAX#  : 2128581713
TEL#  :
SER.# : 000004057725
```

```
DATE,TIME           05/09  18:41
FAX NO./NAME        912029064695
DURATION            00:02:10
PAGE(S)             19
RESULT              OK
MODE                STANDARD
                    ECM
```



**Pillsbury
Winthrop
Shaw
Pittman** LLP

1540 Broadway
New York, NY 10036-4039
Tel 212.858.1000 | Fax 212.858.1500
www.pillsburylaw.com

## FACSIMILE

Century City
Houston
London
Los Angeles
New York
Northern Virginia
Orange County
Palo Alto
Sacramento
San Diego
San Diego-North County
San Francisco
Silicon Valley
Stamford
Sydney
Tokyo
Washington DC

Total Pages: (including cover): 19

| | | | |
| --- | --- | --- | --- |
| Date: | May 9, 2006 | User No: | |
| From: | **Philip Douglas** | Phone No: | **212-858-1704** |
| | | C/M No: | |
| To: | **David Sadoff** | Phone No: | 202-906-4355 |
| Company: | | **Fax No:** | **202-906-4695** |
| Confirm? | | Confirmed by: | |

Comments:



May 9, 2006

**Confidential Settlement and Investigative
Communication
Disclosure Restricted to Head of Designated
Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

**via FACSIMILE**

David Sadoff, Esquire
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

**Re:   OIG Subpoena Nos. 05-07, 05-09, 05-18 and 05-02**

Dear Mr. Sadoff:

    This is to certify that Alstom Transportation, Inc. ("Alstom") has, in accordance with settlement discussions between the parties and without prejudice to any previously-stated objections, complied with the requests of OIG Subpoena Nos. 05-07, 05-09, 05-18 and 05-20.  In addition, at my direction, Alstom has (i) inquired of its key engineering and customer service managers, who would be among the first to learn of any significant brake problem, whether any knew of cracked friction brake spokes prior to April 14, 2005, and (ii) undertaken a reasonable search for any documents showing knowledge of broken spokes on Acela car trailer friction brakes prior to April 14, 2005.  We hereby certify that, based on the results of our inquiry and search, it appears that no knowledgeable person had any notice of broken spokes prior to April 14, 2005.

ALSTOM Transportation Inc.
353 Lexington Avenue, Suite 1100
New York, NY 10016
Tel: (212) 557-7260
Fax: (212) 972-4404



Mr. David Sadoff
May 9, 2006
Page 2

Should you have any questions related to this certification or to past productions of documents or data related to this matter, please do not hesitate to contact me.

Very truly yours,

Dana Wordes
Associate General Counsel
Alstom Transportation, Inc.

cc:     Timothy M. Broas, Esquire
        Franklin R. Parker, Esquire

*Referred to D. Sadoff on 5/10/06*



**CAPITOL** LLC
Digital Document Solutions
805 THIRD AVENUE 15TH FLOOR
NEW YORK, NY 10022

TEL (212) 871-0585
FAX (212) 871-0586
WWW.CAPITOL-LLC.COM

May 9, 2006

Re:    Capitol's Involvement on the Bombardier/Knorr Matter

        Capitol was called upon to assist Pillsbury Winthrop Shaw Pittman (PWSP) in the processing of electronic data for the purposes of converting it to image-based format for production. In doing so, Capitol undertook the following steps:

- Capitol logs incoming client data and maintains that log for chain-of-custody purposes. The original data is copied to the Capitol processing system, and the original media is then put aside or returned to the client.

- The Capitol processing system then extracts metadata and loads it into a database structure; in doing so, the metadata is preserved as originally encountered.

- The files and e-mail messages are then converted to image format using a processor that renders the documents in complete form.

- Once processed, the resulting images are production-numbered, formatted into text-searchable PDF files, and delivered to PWSP, along with a metadata index.

Throughout this processing, Capitol takes care to preserve the original metadata of the files.

*Gary Swenson*

Gary Swenson
Managing Director

**EXHIBIT**
**123**
ALL-STATE LEGAL®

SACRAMENTO • CENTURY CITY • LOS ANGELES • SAN FRANCISCO • PALO ALTO • PHOENIX • SCOTTSDALE • HOUSTON • NEW YORK • WASHINGTON, D.C.

Dale Drury
Alpha Systems
458 Pike Road
Huntingdon Valley, Pa. 19006

May 9, 2006

Re:    Alpha Systems' Production Processing on the Bombardier/Knorr Matter

         In its role to support production activity on behalf of Pillsbury Winthrop Shaw Pittman (PWSP), Alpha was responsible for receiving original data in native format, making it available over the internet for review, and, finally, converting that data into producible form. Outlined below is the process used by Alpha:

- Upon receipt of the electronic media from our clients, the evidence is immediately profiled and logged into our database to maintain tracking for chain-of-custody. Forensically sound clones of the data are then created for processing. The original media is then immediately secured for purposes of preservation.

- Metadata is extracted and utilized for de-duplication, internet-based review, searching and production.

- When alerted by PWSP that review is complete, Alpha runs a proprietary formatting process that renders each file or e-mail message to image format. This formatting process renders documents in complete form.

- Once processed, the resulting images are production-numbered, formatted into text-searchable PDF files, and, combined with a metadata index and native-format versions of Excel spreadsheets, burned to disk.

Throughout this processing, Alpha takes care to preserve the original metadata of the files. Alpha has maintained in a safe location both the original and working form of the data it has received from PWSP.


Dale Drury
Vice President

*[signature: Dale A. Drury]*



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman** LLP

1540 Broadway
New York, NY 10036-4039
Tel 212.858.1000 | Fax 212.858.1500
www.pillsburylaw.com

## FACSIMILE

Century City

Houston

London

Los Angeles

New York

Northern Virginia

Orange County

Palo Alto

Sacramento

San Diego

San Diego-North County

San Francisco

Silicon Valley

Stamford

Sydney

Tokyo

Washington DC

Total Pages: (Including cover):  2

| | | |
|---|---|---|
| Date: | May 12, 2006 | User No: |
| From: | **Philip Douglas** | Phone No: **212-858-1704** |
| | | C/M No: |
| To: | **David Sadoff** | Phone No: 202-906-4355 |
| Company: | | Fax No: **202-906-4695** |
| Confirm? | | Confirmed by: |

Comments:

Attached is a List of NeCMSC Backup Tapes with Emails

CONFIDENTIALITY NOTE:
The documents accompanying
this facsimile transmission may
contain confidential information
which is legally privileged.
The information is intended
only for the use of the individual
or entity named above. If you are
not the intended recipient, or the
person responsible for delivering
it to the intended recipient, you
are hereby notified that any
disclosure, copying, distribution
or use of any of the information
contained in this transmission is
strictly PROHIBITED. If you have
received this trans-mission in error,
please immediately notify us by
telephone and mail the original
transmission to us. Thank you.

EXHIBIT
124
ALL-STATE LEGAL®

**Confidential Investigative
& Settlement Communication
Disclosure Restricted to
Head of Designated Federal Entity
Pursuant to 5 U.S.C. App. 3 §8G(d)**

## LIST OF NeCMSC BACKUP TAPES WITH EMAILS
### 5/12/06

Information received from eMag regarding the 13 backup tapes that contain at least some emails that were not destroyed or overwritten on Memorial Day weekend 2005. We understand that these are all Lotus Notes emails (*i.e.*, from NeCMSC's prior email system, before the changeover at the end of 2003). We do not currently know the volume of data on each tape, or the condition of the data.

| Notes or Markings on Outside of Tape | Backup Date |
|---|---|
| Data Archive 9/29/02 1 | 29-Sep-02 07:09:32 |
| B5 | 15-Oct-03 03:45:22 |
| B7 | 19-Oct-03 6:47 |
| B6 | 26-Oct-03 07:47:40 |
| B3 | 26-Oct-03 08:46:44 |
| 5C | 04-Nov-03 08:44:20 |
| 7C | 09-Nov-03 23:47:24 |
| 10C | 16-Nov-03 02:46:52 |
| 6C | 16-Nov-03 23:47:22 |
| 7D | 14-Dec-03 23:30:50 |
| 3D | 21-Dec-03 12:32:16 |
| 8D | 21-Dec-03 23:32:12 |
| 4D | 23-Dec-03 12:31:56 |

---

JOB STATUS REPORT

```
TIME   : 05/12/2006 16:04
NAME   :
FAX#   : 2128581713
TEL#   :
SER. # : 000004057725
```

| | |
|---|---|
| DATE,TIME | 05/12  16:03 |
| FAX NO./NAME | 912029064695 |
| DURATION | 00:00:30 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |



**Pillsbury
Winthrop
Shaw
Pittman** LLP

1540 Broadway
New York, NY 10036-4039
Tel 212.858.1000 | Fax 212.858.1500
www.pillsburylaw.com

## FACSIMILE

Century City

Houston

London

Los Angeles

New York

Northern Virginia

Orange County

Palo Alto

Sacramento

San Diego

San Diego-North County

San Francisco

Silicon Valley

Stamford

Sydney

Tokyo

Washington DC

Total Pages: (including cover): 2

| | | | |
|---|---|---|---|
| Date: | May 12, 2006 | User No: | |
| From: | **Philip Douglas** | Phone No: | **212-858-1704** |
| | | C/M No: | |
| To: | **David Sadoff** | Phone No: | 202-906-4355 |
| Company: | | Fax No: | **202-906-4695** |
| Confirm? | | Confirmed by: | |

Comments:

Attached is a List of NeCMSC Backup Tapes with Emails

NATIONAL RAILROAD PASSENGER CORPORATION
Office of Inspector General, Investigations, 10 G Street, NE, Third Floor, Washington, DC 20002



May 18, 2006


VIA FACSIMILE AND FIRST-CLASS MAIL


Philip Le B. Douglas, Esquire
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036-4039

> Re:    "List of Back-Up Tapes with E-
> Mails" and Compliance by
> Bombardier, Alstom and/or
> NeCMSC with Inspector General
> Subpoenas Nos. <u>05-05, 05-07, 05-09,</u>
> <u>05-17, 05-18 and 05-20</u>

Dear Mr. Douglas:

Thank you for the "List of Back-Up Tapes with E-Mails" ("List") that you transmitted by facsimile on May 12, 2006. However, it is unclear from the List whether it presents the results of the review of <u>every</u> back-up tape[1] for documents responsive to the above referenced Subpoenas and <u>all</u> back-up tapes with any e-mail document(s), or, alternatively, if it presents the results or a review of some of the back-up and/or lists <u>some</u> of those back-up tapes that contain one or more e-mail(s).

We believe it would be useful and prudent to clarify the record of the search effort. We request the following:

---

[1] "Back-up tapes" refers to the electronic media NeCMSC used to back-up its computer servers and that we observed in a box in NeCMSC's computer room during our February 2006 visit, <u>and</u> 2) any similar, additional electronic media not part of the box contents but otherwise used to back up the NeCMSC computer system during any part of the time period referenced in the Subpoenas.

I understood you to state during our May 10 meeting that there were 70-80 back-up tapes in the box in the NeCMSC computer room.



EXHIBIT
125

NATIONAL RAILROAD PASSENGER CORPORATION



1) A list by label, serial number or other unique marking for each of the back-up tapes described in note 1, and, separately for each listed tape, a statement:

   a) whether it has been reviewed as part of the search for documents responsive to the Subpoenas;

   b) whether it contains one or more e-mails responsive to any request in the Subpoenas, and, if so, the date range in which the e-mail(s) were transmitted or received;

   c) whether it contains one or more documents responsive to any request in the Subpoenas, and, if so, the date range in which the document(s) were created and last modified.

2) For each listed back-up tape that was not been reviewed for documents responsive to the Subpoenas, the reason(s) therefor.

Thank you for your assistance.

Sincerely,

David Sadoff

David Sadoff
Associate Counsel to the Inspector General
National Passenger Railroad Corporation



**NATIONAL RAILROAD PASSENGER CORPORATION**
Inspector General, Legal Counsel's Office, 10 G Street, NE, Suite 3E-400
Washington, DC 20002

Philip Le B. Douglas, Esquire
Pillsbury Winthrop Shaw Pittman
1540 Broadway
New York, NY 10036-4039

REC'D.
5/18/06

# WINSTON & STRAWN LLP

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

BUCKLERSBURY HOUSE
3 QUEEN VICTORIA STREET
LONDON EC4N 8NH

WRITER'S DIRECT DIAL NUMBER

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

(202) 282-5000

FACSIMILE (202) 282-5100

www.winston.com

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

May 18, 2006

**Confidential Settlement and Investigative Communication
Disclosure Restricted to Head of Designated
Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

## VIA HAND DELIVERY

David Sadoff, Esquire
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Re:    **OIG Subpoena Nos. 05-07, 05-09, 05-18 and 05-20**

Dear Mr. Sadoff:

It has recently come to my attention that certain production letters that were recently provided to you inadvertently misstated the subpoenas to which the underlying documents and data were responsive. As a result, please note the following corrections to those earlier letters:

The production letters dated March 10, April 7, April 18, April 19 and April 26, 2006 were associated with documents responsive to subpoenas 05-07, 05-09, 05-18 and 05-20, and not subpoenas "05-05 and 05-20" as referenced in the letters.

Please do not hesitate to contact me with any questions you may have.



EXHIBIT
126

DC:467176.1

Mr. David Sadoff
May 18, 2006
Page 2

Very truly yours,

Timothy M. Broas

cc:    Dana Wordes, Esquire
       Franklin R. Parker, Esquire

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| **35 WEST WACKER DRIVE**<br>**CHICAGO, ILLINOIS 60601-9703** | **1700 K STREET, N.W.**<br>WASHINGTON, D.C. 20006-3817 | **333 SOUTH GRAND AVENUE**<br>LOS ANGELES, CALIFORNIA 90071-1543 |
| **43 RUE DU RHONE**<br>**1204 GENEVA, SWITZERLAND** | (202) 282-5000 | **200 PARK AVENUE**<br>NEW YORK, NEW YORK 10166-4193 |
| **BUCKLERSBURY HOUSE**<br>**3 QUEEN VICTORIA STREET**<br>**LONDON EC4N 8NH** | FACSIMILE (202) 282-5100<br><br>www.winston.com | **21 AVENUE VICTOR HUGO**<br>**75116 PARIS, FRANCE** |
| | | **101 CALIFORNIA STREET**<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |

WRITER'S DIRECT DIAL NUMBER

May 18, 2006

**Confidential Settlement and Investigative Communication**
**Disclosure Restricted to Head of Designated**
**Federal Entity Pursuant to 5 U.S.C. App. 3 § 8G(d)**

## VIA HAND DELIVERY

David Sadoff, Esquire
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

        Re:    OIG Subpoena No. 05-07

Dear Mr. Sadoff:

        Enclosed, please find Alstom's document retention policy (Production Nos. ATIWS_000001 - ATIWS_000003). As this document is confidential in nature, we ask that it be treated as such and used only for the purposes of your investigation.

        Please do not hesitate to contact me with any questions you may have.

DC:467738.1

**EXHIBIT**

**127**

ALL-STATE LEGAL

Mr. David Sadoff
May 18, 2006
Page 2

Very truly yours,

Timothy M. Broas

cc:    Dana Wordes, Esquire
       Franklin R. Parker, Esquire

DC:467738.1

 **ALSTOM**

## 6.5  Retention of original documents

|1| Background |2| Principles |3| Corporate Documents |4| Contract Agreements, Consortia and subcontracts |5| Real Property Agreements |6| License Agreements and IPR related Agreements |7| Employment Contracts |8| Litigation documents |9| Financial and tax documents |10| Insurance policies

| | | |
|---|---|---|
| Section : Legal | Subject : Retention of original documents | Publication Date : 15 Feb 2001 |
| Responsibility : General Counsel | Number : 6.5 | Update : 08 Apr 2002 |

|1| Background

Corporate documents including, but not limited to, certificates of incorporation, by-laws, minutes of shareholders meetings and minutes of board of directors meetings) related to any ALSTOM company's business  (including, but not limited, to correspondence, technical documents, tender documents, contracts, subcontracts and consortium agreements) must be retained by each ALSTOM company and/or Unit (a) in strict compliance with the respective applicable legislation, which is different from country to country and (b) as may be necessary or desirable, taking into account the business requirements of the relevant ALSTOM business (e.g., a period of retention at least as long as the design life of a product or for the period of decennial liability may be appropriate in certain businesses).

For the purposes of this Corporate Instruction, "documents" shall include all information in whatever media it may be stored (e.g. computer disk etc).

|2| Principles

The following general principles shall apply to all ALSTOM companies and/or Units:

(a) each ALSTOM company or Unit is required to establish a formal procedure for document retention and destruction in accordance with this Instruction and the applicable business requirements of such company or Unit;

(b) original documents shall be retained in the archives of each company, at a minimum, for the period of time set out below, except as otherwise required by the related contract and/or applicable legislation; and

(c) no original document shall be destroyed except in accordance with the applicable policy of a company or Unit. Any variation from such policy must be approved by the relevant in-house Legal Counsel.

|3| Corporate Documents

Certificates of incorporation, by-laws, minutes of shareholders meetings, minutes of board of directors meetings, statutory books, share certificates and all other documents related to the administration of an ALSTOM company ( "Corporate Documents" ) must be retained by company secretaries or the equivalent person responsible for corporate documents in such ALSTOM company.

Corporate Documents must not be destroyed at any time for any reason whatsoever, except if an exemption is obtained from the relevant in-house Legal Counsel. Normally such documents should be retained in a fire-proof safe.

The same applies to original and formative merger and acquisition agreements, or joint venture agreements not related to a specific project.

CONFIDENTIAL

ATIWS_000001

**|9| Financial and tax documents**

The CFO or Finance Director of each ALSTOM company shall retain all financial and tax documents, including without limitation tax returns, accounting books and records and all related certificates and documents, invoices, letters of credit, guarantees (i.e. bid bonds, advance payment bonds and performance bonds).
These documents shall be kept and filed for ten years from, whichever is the latest, (i) the end of the financial year of issuance or (ii) the date of the final decision rendered by the competent authority (e.g. ordinary courts, arbitral tribunals, adjudicator and mediator) relating thereto.

**|10| Insurance policies**

As a general rule, original insurance policies should be retained indefinitely.
The Group Programme insurance policies are retained by the ALSTOM Insurance Risk Manager.

For internal purposes only. Any use, such as copying, reproduction, publication, downloading, posting, transmission or distribution outside the context of your professional activity within ALSTOM is prohibited.

CONFIDENTIAL

ATIWS_000003

**Pillsbury
Winthrop
Shaw
Pittman**LLP

1540 Broadway
New York, NY 10036-4039

Tel 212.858.1000
Fax 212.858.1500
www.pillsburylaw.com

**Confidential Investigative
& Settlement Communication
Disclosure Restricted to
Head of Designated Federal Entity
Pursuant to 5 U.S.C. App. 3 §8G(d)**

May 19, 2006

**BY FAX**

David Sadoff, Esq.
Associate Counsel to the Inspector General
Office of the Inspector General
Legal Counsel's Office
10 "G" Street, N.E.
Suite 3E-400
Washington, D.C. 20002

Philip Le B. Douglas
Phone: 212.858.1704
philip.douglas@pillsburylaw.com

> Re:    Amtrak Office of Inspector General Subpoenas
> 05-09 and 05-20 on Northeast Corridor
> <u>Maintenance Services Company ("NeCMSC")</u>

Dear Mr. Sadoff:

In response to your May 18, 2006 letter, please be advised as follows:

1. There were forty-eight NeCMSC back-up tapes in the box you observed in NeCMSC's computer room in February 2006.

2. We asked eMag to look at only thirty-one of the forty-eight back-up tapes because there was reason to believe from external markings that the remaining seventeen tapes did not involve e-mails, but were instead backups of Oracle database or non-email file servers.

3. According to eMag, only thirteen of the thirty-one tapes they reviewed appear to contain e-mails prepared prior to Memorial Day 2005. None of these thirteen tapes have been restored and thus the substance of any e-mails has not been reviewed by anyone.

EXHIBIT
ALL-STATE LEGAL®
128



David Sadoff, Esq.
May 19, 2006
Page 2

4.  I did not say that there were "70-80 back-up tapes in the box".

5.  All forty-eight tapes are available for visual inspection upon reasonable
    notice.

I understand that in your May 10, 2006 conversation with Frank Parker, you
indicated that RenewData has estimated that it would cost only $200 per back-up tape to
cover the extraction, sampling and running of searches on the thirteen back-up tapes that
appear to contain e-mails.  We believe this estimate is in error.  Please inform RenewData
of the following facts and secure a new estimate:

a.  The anticipated data volume on the back-up tapes is potentially 250-500
    gigabytes;

b.  The e-mail files on the back-up tapes belong to hundreds of custodians; and

c.  Electronic Search 1 needs to be conducted, followed by the extraction of
    responsive messages into smaller "hit results only" mailboxes.  For every e-
    mail file that has at least one hit, there must be a corresponding NSF results
    file.

If you have any questions, please feel free to contact the undersigned.

Very truly yours,

Philip Le B. Douglas

cc:     Timothy M. Broas, Esq.
        Franklin Parker, Esq.

bcc:    Marc-André Raymond, Esq.
        Dana Wordes



Pillsbury Winthrop Shaw Pittman LLP