UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.                    :
   AS INSPECTOR GENERAL                 :
NATIONAL RAILROAD PASSENGER                :
   CORPORATION                         :
                                  :

      Petitioner                        :
                                    :

       v.                                :     Civil No. 1:05 MS 367
                                    :     Judge Friedman
BOMBARDIER, INC.                           :
                                    :

ALSTOM TRANSPORTATION, INC.                :

NORTHEAST CORRIDOR MAINTENANCE             :
   SERVICES COMPANY                    :
                                    :

      Respondents.                      :

## PETITIONER'S REPLY TO "RESPONSE AND CROSS-PETITION OF BOMBARDIER, INC. AND NORTHEAST CORRIDOR MAINTENANCE SERVICES COMPANY" TO AMENDED PETITION FOR SUMMARY AND EXPEDITED ENFORCEMENT OF INSPECTOR GENERAL SUBPOENAS DUCES TECUM

### Introduction

Petitioner Fred E. Weiderhold, Jr., Inspector General ("IG") of the

National Railroad Passenger Corporation ("Amtrak"), through his undersigned

attorneys, respectfully submits this Reply in support of its Amended Petition, filed

August 8, 2006, for summary enforcement of four administrative subpoenas duces

tecum ("Subpoenas") that Petitioner issued to Respondents Bombardier, Inc.

("Bombardier") and Northeast Corridor Maintenance Services Company

("NeCMSC"). The Subpoenas were issued to Respondents Bombardier and

NeCMSC in May-June 2005 in compliance with section 6(a)(4) of the Inspector

General Act of 1978, as amended ("IG Act"), 5 U.S.C. App. 3 §§ 1-12. They

support an important investigation related to the discovery of cracks in the spokes of safety-critical disc brake rotors on the passenger cars of Amtrak's high-speed Acela trains.

Respondents Bombardier and NeCMSC failed to comply with the requirements of the Subpoenas served on them in May-June 2005 in five principal respects: 1) they failed to produce responsive electronic documents in their original or "native" format ("Amended Petition ..." ["Am. Pet." at __"] ¶¶21-23); 2) they failed to implement reasonable measures to preserve and protect responsive documents (Am. Pet. ¶¶24-31); 3) they failed to produce a) back-up tapes (Am. Pet. ¶33), and, b) potentially responsive documents subpoenaed from NeCMSC's data recovery vendor that were withheld at the direction of NeCMSC's counsel and without identification or claim of privilege (Am. Pet. ¶¶34-36); 4) they failed to describe responsive documents that no longer exist (Am. Pet ¶38); and, (5) they failed to certify that they had complied with the Subpoenas (Am. Pet.¶39).

Respondents' "Response and Cross-Petition..." ("Response"), filed October 6, 2006, argues, seemingly, 1) that enforcement of the Subpoenas is not warranted because Respondents have satisfactorily complied; and, 2) Petitioner's abusive and unreasonable conduct makes enforcement not appropriate. Also, Respondents cross-petition for unspecified costs based on the alleged conduct.[1]

---

[1]  Respondents claim that the Subpoenas have "imposed disproportionate costs ... which now exceed $1.5 million" (Resp. ¶174), but they neither document nor provide detail of the costs, e.g., amounts for reproduction, consultants' fees, or legal fees. Even assuming, arguendo, Respondents' allegations of unreasonable conduct, recovery of legal fees is not authorized. See Argument VI, infra.

2

In pertinent part the Response is exaggerated, and reliant on false allegations of unreasonable or abusive conduct by Petitioner and its counsel that not infrequently are not supported or even contradicted by the cited exhibits.[2]  At times Respondents' allegations become reckless.[3]

---

[2]  Petitioner offers just one example of exaggerated, non-factual statements, Resp. ¶¶5-10, and requests this Court's patience with the necessary exegesis.

> In Resp. ¶ 5, Respondents allege that the September 2005 Petition claimed: Respondents (a) may have precipitated a near calamity by suppressing prior knowledge that the brakes were likely to fail, and b) subsequently obstructed the investigation by, among other things, withholding "highly pertinent" evidence of such "notice."

Respondents introduce a "strawman". No such "claim[s]" are contained in the Petition or in the five pages of Petitioner's memorandum cited by Respondents. Respondents are also mistaken in Resp. ¶5 when they claim to have "affirmatively proved, through affidavits and by reference to the very records relied on in the Original Petition, that each and every one of those allegations was utterly false" (emphasis in original).  Actually, Petitioner's memorandum addressed Respondents' non-compliance with the Subpoenas' production requirements, and Respondents only "proved" that they had converted each page of each electronic or paper document exemplar described in the memorandum to single-page files in a TIFF or PDF format, copied the imaged pages to CD-ROMs along with hundreds of thousands of similarly converted document pages, and provided the CD-ROMs to Petitioner without an index and lacking the original file format that could have been used to more readily locate the document.  As discussed in Argument I.A, infra, the conduct Respondents' "proved" did not comply with the Subpoenas.

In Resp. ¶6, Respondents claim Petitioner "has long since abandoned" its purported "notice" and "obstruction" claims since they were not mentioned in the Amended Petition.  Actually, Am. Pet. ¶13 contains text similar to Pet. ¶12, that Respondents first misquote and then attack.  The text in Am. Pet. ¶13 is also consistent with paragraph 8 of the affidavit by OIG Special Agent Renee Jackson-Dixon submitted as Petition Ex. 8.  Petitioner adopts Pet. Ex. 8 as support for its Amended Petition.

In Resp. ¶7, Respondents claim that they first "informed" Petitioner that the purported "notice" theory was "demonstrably false" on September 30, 2005, citing Resp. Ex. 56 as support.  In truth, that letter from Respondents' counsel merely states in pertinent part that "[I]f Mr. Weiderhold had consulted with Respondents prior to filing suit, he would have learned that most of Petitioner's allegations are demonstrably false, others will soon be moot and several can and should be resolved on a consensual basis."  Id., at 1.

In Resp. ¶8, Respondents claim that, on October 31, 2005, "as a result of bureaucratic bungling or worse, Petitioner issued his Semiannual Report to Congress, making the investigation, this lawsuit and Respondents' 'possible prior

Since May 2005, Petitioner has sought prompt, reasonable and compliant

production under the Subpoenas, and to avoid the present enforcement

proceeding. While Petitioner's efforts were ultimately unsuccessful, additional

responsive documents were produced and issues were narrowed. At all times,

Petitioner's actions were proper and in good faith as evidenced by the

correspondence between counsel that Respondents include as exhibits to the

Response. See, e.g., Resp. Ex.74. The same record (including Resp. Ex. 74)

demonstrates that Respondents: 1) initially first delayed production of responsive

documents and then engaged in a "back-up-the-truck" production that lacked the

---

knowledge of the dangerous condition' the centerpiece of his office's efforts for
the next year" (emphasis by Respondents). Again, Respondents rely on selected
portions of the cited text. See Exhibit 73 to "Respondents' Exhibits in Support of
Response to Amended Petition and Cross-Petition" ("Resp. Ex.__"), at 5. The
complete text is similar to Petitioner's other descriptions of its investigation
described above. Id. Nowhere does Petitioner state or imply that the investigation
will be "the centerpiece of his Office's efforts for the next year."
    Based on the following non-factual predicate, Respondents allege that Petitioner
sought a stay of the enforcement proceeding filed September 2005, not to
negotiate compliance, but because Petitioner had "committed his office to this
lawsuit and to a theory Petitioner knew he could not sustain" (Resp. ¶9).
Respondents further allege that, during the stay, Petitioner's staff developed a
"new theory to justify the resources and political capital invested in the
investigation" -- the loss of two years of NeCMSC's e-mail during the May 30,
2005 network failure. Resp. ¶10. Neither "allegation" has any factual basis or
should divert this Court from the appropriate consideration -- Respondents'
failure to preserve two years of NeCMSC e-mail after receipt of the Subpoenas,
and its subsequent tardy and still incomplete production of electronic documents.
[3]  Response paragraph 17 suggests that, without notice to Respondents,
Petitioner submitted an ex parte Order to this Court seeking "a document
preservation order for all records that 'may be responsive' to a certain unspecified
subpoena." Respondents further claim that entry of this Order required their
filing the "Emergency Motion for Hearing to Modify Ex Parte Order" (DKT. 13).
    Petitioner filed only one Order with the Court and it was the same one served
on Respondents. (a review of the docket entries would indicate this fact).
Moreover, no Emergency Motion was ever required, and the dispute was
promptly negotiated, once Respondents concluded they could not use the transfer
of computers to Amtrak as a justification for deleting electronic documents on the
hard drives, and agreed to preserve the status quo ante.

requisite index or other reasonable organization and that was inflated by non-

responsive documents; 2) produced responsive electronic documents only after

converting the documents from their original, "native" format so that information

available on the original document was not reproduced, and, in the case of e-

mails, documents that could have been readily screened by their unique file

format and reviewed became indistinguishable from hundreds of thousands of less

pertinent and even non-responsive documents; and, 3) took advantage of

Petitioner's attempt to negotiate compliance by dragging out discussions for

months before stating they would not comply with Petitioner's clear and

unchanged positions.  It is past time for Respondents to fully, completely and

promptly comply with the Subpoenas.

### Argument[4]

I.     Respondents' Failure To Produce Responsive Electronic
       Documents In "Native" Format ( Resp. ¶¶ 63-77, 156-165)

       A.     Amended Petition and Summary

This Court should require that Respondents produce responsive, non-

privileged electronic documents in their original or "native" format as they exist

on Respondents' computer systems, unless an alternative production format can

provide comparable authenticity, content and usability.   Responsive documents

---

[4]   While this Reply, in <u>total</u> page count, exceeds the limitation of Local Civil
Rule 7(e), eight pages of the Reply is Argument VI that addresses Respondents'
Cross-Petition for costs.  That additional claim can properly be addressed in a
separate filing, but Petitioner does so now in order to speed resolution of this
matter.  If one subtracts the Argument VI page count, Rule 7(e) is satisfied.
    The Reply, Petitioner focuses on Respondents' claims most demonstrably
related to the five issues raised in the Amended Petition.  Petitioner believes its
discussion provides more than sufficient grounds to grant the relief sought and to
deny the Counter-Petition.  However, if this Court disagrees and desires
additional response, Petitioner will promptly prepare and file it.

can be readily copied by making a "mirror image" of those portions of their

computer systems containing potentially responsive documents. Am. Pet. ¶21.

This method of production simplifies authenticating the produced electronic

documents, and assures that their content and usability is identical to that of the

original documents. Id. Since a "mirror image" of an electronic document or

hard drive duplicates each bit and byte on the target drive -- including all files, the

slack space, Master File Table and metadata[5] as they appear on the original -- a

document that is a "mirror-image" is identical to the original, has the same

identifying "hash codes" as the original, and can be clearly authenticated.

Respondents produced no "mirror images" of responsive electronic

documents, even though NeCMSC's hard drives were "mirror imaged" during

data recovery efforts, and as part of their response to the Subpoenas. Had

---

[5]    Metadata includes "all of the contextual, processing, and use information
needed to identify and certify the scope, authenticity, and integrity of
active or archival electronic information or records." Some examples of
metadata for electronic documents include: a file's name, a file's location
(e.g., directory structure or pathname), file format or file type, file size,
file dates (e.g., creation date, date of last data modification, date of last
data access, and date of last metadata modification), and file permissions
(e.g., who can read the data, who can write to it, who can run it). Some
metadata, such as file dates and sizes, can easily be seen by users; other
metadata can be hidden or embedded and unavailable to computer users
who are not technically adept.

\*        \*        \*        \*

Metadata can assist in proving the authenticity of the content of electronic
documents, as well as establish the context of the content. Metadata can
also identify and exploit the structural relationships that exist between and
within electronic documents, such as versions and drafts. Metadata allows
organizations to track the many layers of rights and reproduction
information that exist for records and their multiple versions. Metadata
may also document other legal or security requirements that have been
imposed on records; for example, privacy concerns, privileged
communications or work product, or proprietary interests.

Williams v. Sprint/United Management Co., 230 F.R.D. 640, 646, 647 (D.Kan.
2005) (citations omitted).

Respondents used "mirror images" when they produced responsive documents,

they clearly would have complied with case law and the Subpoenas requirements.

Also, had they done so indicated their plan at the outset, many of the claimed

"innumerable meetings and telephone conferences" and much of the alleged

"hundreds of thousands of dollars in legal and consultant fees" (Resp. ¶52) they

complain about could have been avoided.

Respondents contend that Petitioner first demanded production of

electronic documents in their "native" format on November 10, 2005, after the

Petition had been filed and the parties had agreed to attempt to negotiate

compliance disputes. Respon. ¶¶156, 158. Respondents characterize Petitioner's

insistence on "native" format as one of Petitioner's three, "ever-changing" criteria

for production (Respon. ¶¶156, 63, 65) and state that it "refused to consider any

'comparable', 'alternative' productions that are not in 'native' format"(id., at ¶156

¶156). These contentions have no factual basis (see, e.g., Resp. Ex. 99 and 94).

Similar misstatements litter paragraphs 63-77 and 156-165 of the Response.

While Petitioner does not recollect using the exact phrase "'native'

format" in its communications with Respondents prior to its November 10, 2005

letter to Respondents' counsel (Respon. Ex. 73), Petitioner sought the functional

equivalent in the Subpoenas -- all responsive original documents, e-mails, and

hard drive materials. The Subpoenas required that in producing electronic data,

Respondents should produce computer disks or tapes, and should copy "all hard

drive materials onto a disk or tape and provide these copies" with an explanation

of how to access the materials. E.g., Subpoena 05-09, Instructions 1 and 7 (Resp.

Ex.4, at 4, 5). The Subpoenas did not require Respondents to convert any

electronic documents to TIFF, PDF or any format. Moreover, to the extent such

conversion did not duplicate all contents and attributes of the original electronic

document, the production would not comply with the terms of the Subpoenas.

One of the grounds for the Petition was that Respondents had not

produced responsive electronic documents in the functional equivalent of "native"

format. Paragraph 21 of the Petition asserts as a basis for relief that "Respondents

have failed to produce e-mails, spreadsheets and other electronic documents that

exist and are in a searchable format." The supporting memorandum references

an imaged copy of a computer-generated document stating:

> Even if Respondent Bombardier produced this or similar reports as
> part of more than 10,000 document pages it produced from its
> purchasing department, without an index or other organization, on
> four CDs, such production does not comply with its Subpoena
> obligations. Bombardier has not produced the documents, as they
> apparently exist -- in a searchable, electronic format.

Memorandum, at 21, n.27 (underlining supplied)[6]

Thus, Respondents have long been aware that Petitioner sought the electronic

documents "as they apparently exist[ed]" (i.e., in their "native" format.). Had

_____

[6]  Respondents pointed out in their previously unfiled, October 20, 2005
"Respondents' Memorandum In Support Of Request For Hearing", at 8-9, that
Exhibit 26 had been produced as BBD0062901-620. As of September 2005,
Respondents had produced hundreds of thousands of documents without any
index on CD-ROMs, and had converted documents from their original electronic
formats to TIFF and/or PDF, losing critical metadata in the process, and, in the
case of TIFF documents, leaving only an image of the face of the document. This
resulted in a fractured production of individual pages produced out of context.
Perhaps this prior "production" is what Respondents' rely on for their curious and
erroneous claim that the allegation "was completely false." Respon. ¶ 48.
  Whether or not the exemplar document described above was included among
the hundreds of thousands of one-page files comprising separate parts of a
computer-generated report -- rather than the entire report in its original or "native"
format with all its content and attributes, does not satisfy Respondents' statutory
obligation under the Subpoenas.

Respondents complied with the Subpoena instructions and the Federal Rules

requiring production "as they are kept in the usual course of business,"

Respondent would have produced responsive electronic records in their "native"

format, and would not now be raising dubious arguments.

> B.   Respondents' production of electronic documents is non-compliant

"The Federal Rules of Civil Procedure ["FRCP"] govern actions to

enforce administrative subpoenas. Fed.R.Civ.P. 81(a)(3)." United States v.

Wilfred American Education Corp., 1987 WL 10501 (D.D.C. 1987) at *fn* 3.

FRCP Rule 45(d)(1) sets the legal standard for what constitutes an adequate

response to a subpoena for documents:

> "A person responding to a subpoena to produce documents
> shall produce them as they are kept in the usual course of
> business or shall organize and label them to correspond
> with the categories in the demand."

In producing electronic data in this case, Respondents have done neither. "[A]

party who chooses the . . . option to produce documents as they are kept in the

ordinary course of business bears the burden of showing that the documents were

in fact produced in that manner. A mere assertion that they were so produced is

not sufficient to carry that burden." Bergersen v. Shelter Mutual Insurance Co.,

2006 WL 334675 (D.Kan. 2006) (hard copy documents scanned onto a CD for

production may not be sufficient unless it is clear to the requesting party which

specific images comprise a single document or attachment).

Respondents acknowledge they produced electronic documents only after

either scanning or converting them to a "TIFF", or in some cases, a "PDF"

format, and that this is not how the documents are kept in the usual course of

business (i.e., their "native" format).  Requiring Respondents to produce subpoenaed electronic documents in "native format" is not burdensome, and it relieves them of the cost of converting and producing documents in any additional format.  Production in the "native" format also insures that the entirety of the electronic document is produced, and it simplifies the sometimes difficult task of confirming that the produced document is identical to that subpoenaed.

Federal courts deciding disputes about production of electronic documents -- frequently in the context of civil discovery -- have required that production be in "native format."  Nova Measuring Instruments Ltd. v. Nanometrics, Inc., 417 F.Supp.2d 1121,1123 (N.D. Cal. 2006) (compelling production of documents "in their native file format, with original metadata"); In re NYSE Specialists Securities Litigation, 2006 WL 1704447 (SDNY 2006) (court ordered all electronic documents to be produced "in their native format" including "all metadata associated with the documents.")

The rationale supporting production in native format is even more compelling where, as here, enforcement is sought of an administrative subpoena issued in support of an investigation.  Courts liken Inspector General subpoenas to those issued by grand juries.  U.S. v. Westinghouse Electric Corporation, 788 F.2d 164, 170 n.1 (3d Cir. 1986).  In this case, the metadata and other features that are integral to the subpoenaed electronic documents are not reproduced in the "facsimiles" Respondents have typically produced.  The missing metadata provides information about the creation, use and distribution of the subpoenaed documents that is particularly important to the present investigation.

Two instructive decisions concerning production (during discovery) of electronic documents in their "native" formats are Hagenbuch v. 3B6 Sistemi Elettronici Industriali, S.R.L., 2006 WL 665005 (N.D. Ill. 2006) and In re Verisign, Inc. Securities Litigation, 2004 WL 2445243 (N.D. Cal. 2004). In Hagenbuch v. 3B6 Sistemi Elettronici Industriali, S.R.L., 2006 WL 665005 (N.D. Ill. 2006) the court ordered supplemental corrective production in "native" format because defendant had " altered the format and characteristics of the electronic media by converting it into TIFF format -- essentially creating new documents – and then turned the new documents over to Plaintiff."). Id., at *2.[7] Similar to the circumstances in Hagenbuch, in this case, the electronic documents responsive to the Subpoenas remain on Respondents computer systems in their various, original, "native" formats.

The district court in In re Verisign, Inc. Securities Litigation, 2004 WL 2445243 (N.D. Cal. 2004) upheld a magistrate's order findings that "[p]roduction of TIFF version alone is not sufficient" and that "[t]he electronic version must include metadata as well as be searchable." Id., at *1. The court required production of responsive e-mails produced "in their native .pst format if that is how they were stored in Defendants' usual course of business" and rejected defendants' argument that it would be too burdensome to convert the documents back to .pst format after defendants had "been preparing to produce the responsive documents in TIFF format." Id., at *3. Similarly, Respondents should have produced e-mail in its original .pst format, as well as other electronic data in

---

[7]   The court recognized that "TIFF documents do not contain all of the relevant, non-privileged information contained in electronic media . . . such as the creation and modification dates of a document, e-mail attachments and recipients, and metadata." Id., at *3.

original electronic format. To satisfy their obligations under the Subpoenas, they should produce those electronic documents in their "native" format. This makes the e-mails readily identifiable, provides Petitioner with the full metadata and attributes of the original documents, and does not increase the effort required to review and authenticate the documents.

The Response fails to demonstrate 1) any basis for its production of electronic documents by imaging only some of their contents into TIFF or PDF formats that omits metadata and other attributes of the documents; and, 2) any support for its production of non-identical "facsimile" documents that require authentication and additional effort to use.

While Respondents will incur additional costs complying with the Subpoenas, it is the result of their choices to convert their responsive electronic documents into a format that reproduces only a part of the electronic document and omits metadata and other attributes of the original documents that reside on their computer systems. Notwithstanding Respondents' allegations, Petitioner had no role in cause of any additional cost of compliance-- Respondents' disregard of the Subpoenas text, and the plain language of the Federal Rules and pertinent case law require, under the present circumstances, production of responsive electronic documents in their "native" formats.

II.    NeCMSC's Repeated Failures To Implement Reasonable
       Procedures To Preserve Responsive Electronic Documents

       A.    Amended Petition and Summary

On May 30, 2005 -- twenty days after NeCMSC received Subpoena 05-09 its computer network system overheated and shut down. As a result, more than two years of NeCMSC e-mail messages and attached documents stored on the e-

mail server apparently became irretrievable. The affected documents were e-mails and attachments that had been sent or received during the two year period immediately prior to the April 2005 discovery of the cracked spokes on the Acela disc brake rotors. The e-mails and attachment comprised the best evidence of contemporaneous, candid communications concerning possible problems with passenger car disc brake rotors (or the absence of such communication) by NeCMSC personnel. Petitioner understands that the only e-mail messages at NeCMSC that survived the May 30 server failure were those that 1) had been specifically "saved" by a sender or recipient to their files on the shared "U" drive on the NeCMSC system and, 2) that existed on laptop computers used by certain NeCMSC management, and that, for some period after the failure, had not been synchronized with the network system.[8] Although many questions remain unanswered about the e-mail server failure and subsequent events, it appears that the apparent loss of two years of e-mail messages in the server failure was avoidable through reasonable measures.

Paragraphs 24-32 of the Amended Petition describe multiple failures by Respondents to ensure that NeCMSC documents responsive to the subpoenas were adequately preserved. The first failure occurred during the twenty days between May 10, 2005, when NeCMSC received Subpoena 05-09 (Resp. ¶27) and May 30, 2005 when its computer system overheated and shut down. See Am. Pet. ¶¶24, 31. Respondents acknowledge that, on an unspecified date, NeCMSC's network administrator, Jeremy Edwards, was informed that

---

[8]   Apparently, e-mail messages on some of those laptops were lost following the May 30 failure when users connected with the re-booted NeCMSC network system and the e-mail files on the laptops were "synchronized" with the NeCMSC e-mail server that no longer contained the two years of e-mail messages.

NeCMSC's electronic documents including e-mail had been subpoenaed, and, "[a]s a precaution, Mr. Edwards was ... to make back-up tapes of all data on NeCMSC's sixteen server hard drives." Resp. ¶91.  However, as of May 30, 2005, NeCMSC still had not secured its e-mail and other computer systems that contained documents responsive to the subpoenas, even though Mr. Edwards recalled three system failures in the prior five years, including at least one resulting from overheating.   Am. Pet. ¶¶ 24, 31.

Another failure occurred at least once between May 10 and May 30 when NeCMSC erased and then re-used 16 data tapes during a weekly back up of its computer system.  The erasure was inconsistent with NeCMSC's duty to preserve documents responsive to the Subpoena, and with measures its counsel would later claim NeCMSC had implemented in the period.[9]

Still another failure occurred during October-November 2005 when NeCMSC overwrote data on several hard drives that had been on the e-mail server on May 30, 2005 by transferring them to other servers on their network. See Am. Pet. ¶30.  One of the transferred drives was one of the two that failed on the e-mail server on May 30.  NeCMSC's transfer and re-use of these drives may well have overwritten and destroyed the prior contents.[10]  From June 2005,

---

[9]   A document titled "Preliminary Overview of NeCMSC Documents" ("Preliminary Overview"), provided Petitioner by NeCMSC's counsel on June 7, 2005 but prepared earlier, stated that NeCMSC servers were "backed up to tape once per week, and the backup tapes are reused each month (i.e., data older than one month is overwritten)," and that following receipt of the Subpoenas, "scheduled over-writing has now been suspended. See Am. Pet. ¶¶26-28; Amended Petition Exhibit 2 ("Am. Pet. Ex.___") and Resp. Ex. 12, at 3.

[10]   Data recovery consultants not infrequently employ proprietary software with differing capabilities.  In light of the apparent loss of two years of NeCMSC e-mail, whether the former e-mail server hard drives (or certain of the boxed and May 30, 2005 back-up tapes) contain recoverable documents and data either

Respondents' counsel had indicated to Petitioner's counsel that the hardware affected by the May 30 failure had been preserved.

        B.      <u>Respondents' Claims (¶¶ 88-132)</u>

              1.     "Good Faith" (¶¶ 88-100)

Respondents' discussion of the e-mail server is remarkable in several respects. First, Respondents do not dispute that there were three system failures at NeCMSC -- including at least one due to overheating -- over the prior five years. A network failure of the sort that occurred on May 30 was hardly unexpected, based on NeCMSC's experience.

Second, Respondents offer no satisfactory explanation for the failure to copy or to back up the NeCMSC servers believed to contain responsive documents, or for the failure to implement <u>in fact</u> the document preservation procedures their counsel represented had previously been implemented in the "Preliminary Overview" provided to Petitioner on June 7. Back-up tapes were certainly available and the servers believed to contain responsive documents could have been "mirror imaged" without difficulty.

Third, with uncharacteristic and (in this case unwarranted) understatement, the Response states that the e-mail loss was attributable to "perhaps human error" (Respon. ¶100) although it introduces another "straw man" -- "the loss of data

---

directly responsive to the Subpoenas, or contain electronic data that allows the recovery of other responsive electronic data and documents, is of sufficient importance that there should be additional analysis by a consultant using proprietary recovery software not available to Kroll. Petitioner's counsel understands that the hard drives transferred in October-November 2005 were removed and placed into storage in February 2006.

   Previous efforts by Petitioner's counsel to negotiate access to the e-mail server hard drives and back-up tapes by Petitioner's data recovery consultant in order to perform such analysis have not been successful.

from NeCMSC's email server was not the product of some dark NeCMSC conspiracy...." Id.

Fourth, the Response misdescribes the e-mail server and its component hard drives that failed in the incident, the hard drives that survived without data loss, and the nature of the data loss.[11] As of May 30, 2005, NeCMSC's computer network used several servers each with multiple, removable hard drives with capacities ranging from 18 to 72 gigabytes. The combined contents of NeCMSC's networked servers were backed up, weekly, by a Quantum tape drive containing 16 DLT tapes each with a capacity of 40-80 gigabytes. The e-mail server alone required two of the 16 back-up tapes.

NeCMSC's e-mail server that failed on May 30, 2005 had nine separate hard drives -- not the two described in Resp. ¶ 92. The server used these drives to maintain data redundancy -- duplicate versions of message and program files to protect the files from a system failure. The e-mails were distributed in segments and in duplicate among four of the nine hard drives on the e-mail server. The "exchange data base" (or "edb") file for Microsoft Exchange was also distributed redundantly among the four hard drives. The "edb" file located and re-assembled the two years of distributed e-mail when it  was accessed.

Based on Petitioner's discussion with Kroll representatives, it appears that the May 30 server failure damaged the "edb" files used to re-assemble the e-mail messages stored on the four hard drives but did not damage the data comprising

---

[11] Petitioner's understanding is based on a January 24, 2006 conversation with Mr. Edwards, and a February 13, 2006 site visit to the NeCMSC computer facility and conversations with Mr. Edwards and Mr. Frank Christello, a NeCMSC Vice President in charge of information technology. (NeCMSC's counsel attended the site visit and all conversations.)

those e-mails.  While damage to one of the e-mail server hard drives that failed

on May 30 was so great that it could not be re-used, the other e-mail server hard

drive that failed was moved to and used in another NeCMSC network server in

October-November, 2005. This raises questions including whether data survived

the May 30 server failure, and whether that data might have been recoverable by

other methods than those used by Kroll.  Petitioner has sought to obtain answers

to these questions by seeking records of the data recovery effort from NeCMSC,

and by issuing a separate subpoena to Kroll for its records and reports of its

efforts to restore the NeCMSC e-mail system.  Petitioner's efforts have been

thwarted.  See Argument III.  Petitioner has also attempted, without success, to

negotiate with Respondents for access by its data recovery consultant to the hard-

drives and back-up tapes to determine whether data is recoverable and, if so,

whether it could be responsive to the Subpoenas.

>      2.      "Accuracy of Pillsbury Winthrop Report" (¶¶101-
>              110)

In asserting the "accuracy" of the report of the May 30 network failure

prepared by NeCMSC's counsel (Pet. Ex.2, Resp. Ex.26), Respondents introduce

another "straw man": "this Court should reject the Inspector General's suggestion

that there was something improper about Pillsbury Winthrop's report to his office

regarding the Memorial Day Incident" (Resp. ¶110).

First, what the Amended Petition states is self-evident -- "that either the

'E-Mail Server Failure 'report (Exhibit 3) or the 'Preliminary Overview' is

materially inaccurate"  (Am. Pet. ¶28, emphasis supplied).  In the "Preliminary

Overview", described as based on interviews with NeCMSC personnel conducted

after May 18, NeCMSC counsel state unequivocally that 1) NeCMSC's prior

17

practice had been to retain back-up tapes for one-month before re-use "(i.e., data older than one month is overwritten)", and 2) "[t]his scheduled over-writing has now been suspended." Pet. Ex. 3 (Resp. Ex. 12), at 3. The Report of the May 30 network failure was prepared and reviewed by at least some of the same counsel for NeCMSC who prepared or reviewed the "Preliminary Overview," and it describes NeCMSC actions that are inconsistent with the above-quoted statements about the back up of NeCMSC servers and the implementation of measures to preserve responsive electronic documents.

Second, Respondents disregard prior, unambiguous statements by their counsel in the "Preliminary Overview" when they argue that any distinction between "whether NeCMSC's tapes were overwritten weekly or monthly is of no importance to the investigation" because the May 30 failure "occurred at the end of both the week and the month so that "whether NeCMSC's overwriting practice was weekly or monthly, there is no doubt that the tapes were in fact being overwritten over that weekend." Resp. ¶105, emphasis in original. Even consistent with the prior procedure described in the Preliminary Report, the back-up tapes should not have been overwritten over Memorial Day weekend because the tapes had not been "retain[ed] ... for one month before re-use." Pet. Ex. 2 (Resp.Ex.12) at 3. The overwriting Respondents describe in ¶105 is wholly inconsistent with any reasonable reading of the description of NeCMSC's prior practice described in the Preliminary Overview that NeCMSC 's counsel provided late on June 7, 2005.

Third, Respondents' statements that Petitioner's only asked "a few perfunctory questions" about the May 30 failure and made "no request ... that

Respondents take any further action with regard to either the servers or back-up tapes" (Resp. ¶101) is incomplete. The narrative description by NeCMSC's counsel at the June 8 meeting about the loss of two years of e-mail was shocking and unexpected. At no time prior to the June 8 meeting had NeCMSC's counsel indicated that the topic of the meeting would be other than the NeCMSC documents described in the Preliminary Overview provided late the prior day.[12] During the June 8 meeting Petitioner's counsel asked for a report of the May 30 failure, and either requested and/or was provided assurances by NeCMSC's counsel that Petitioner would have access to the reports, personnel and hardware necessary to understand the event and substantiate Respondents' claims.

Notwithstanding the lengthy discussion of the May 30 network failure, Respondents have failed to resolve legitimate issues raised as a result of the May 30 server failure and the conduct of NeCMSC and its consultants. These include: 1) why the procedures described in the NeCMSC "Preliminary Overview" were not implemented as represented; 2) what was done to restore the e-mail system; 3) whether e-mails or key files for the e-mail system were recoverable following the May 30 network failure; 4) whether subsequent re-use of the e-mail server hard drives -- including one that failed on May 30 -- overwrote otherwise recoverable data; and, 5) whether certain back-up tapes[13] and the hard drives transferred from

---

[12]   Respondent Bombardier had previously provided its narrative on May 30, and Petitioner had expected NeCMSC's description since the parties had discussed on May 18 ways to promote cooperative, expedited and focused compliance with the Subpoenas.
[13]   During Petitioner's February 2006 visit to the NeCMSC computer facility, its representatives observed a box containing more than 40 back-up tapes, some bearing dates from 2002 to 2005 (others were undated) and 16 neither Respondents nor their consultants had reviewed any of the back-up tapes in the box, and only certain of the 16 tapes.

the e-mail server currently contain retrievable, responsive electronic documents. Petitioner submits that these issues, related to an apparent loss of important electronic documents that occurred twenty days after NeCMSC received Subpoena 05-09, merit this Court's exercise of its discretion to direct the additional, limited inquiry and substantiation Petitioner seeks.

         3.     NeCMSC's Re-Use of the Server Hard Drives (Resp. ¶¶ 111-115)

Respondents' brief discussion of its third failure to secure important electronic documents presents a factual misstatement and an erroneous implication requiring correction, and introduces another "straw man".

Respondents claim in Resp. ¶113 that the transfer of the e-mail server drives to other servers in October-November2005 had no effect since Kroll "confirmed that any original data had been lost when Mr. Edwards mistakenly caused the 'Chkdsk' program to overwrite the email server drives." Based on conversations with Kroll representatives and Mr. Edwards (attended by NeCMSC's counsel) Petitioner understands that the "Chkdsk" only ran on the two server hard drives that had failed on May 30, and not on the hard drives that did not fail.[14] Two of the e-mail server hard drives that did not fail on May 30 contained e-mail messages. Petitioner understood from Kroll that the system failure did not affect that data.[15]

---

[14]   Petitioner notes that computer experts and other computer-knowledgeable individuals it has consulted have all advised it that "Chkdsk" does not overwrite or otherwise destroy data. The impact "Chkdsk" could or did have on the May 30 e-mail loss merits further inquiry and analysis.

[15]   Perhaps the facts can be determined from among the five "documents" and 94 e-mails that Kroll has stated it withheld from its subpoena production at the "direction" of NeCMSC's former counsel. Am. Pet Ex. 6; see Argument III, infra.

Respondents are in error to the extent they imply that that Petitioners had no interest in the hardware related to the May 30 network failure and/or the recovery of e-mails. See Resp. ¶ 112. Since June 8, 2005 when Respondents first alerted Petitioner of the Mazy 30 e-mail loss, Respondents have represented that the hardware would be maintained and never advised otherwise. The Report of he server failure provided Petitioner on June 28 states that "NeCMSC believes that much of the e-mail responsive to the Subpoena is available on the hard drives of personal computers of NeCMSC personnel which was not lost as a result of the server failure." Am. Pet. Ex. 3 (Resp. Ex.26), at 3. Additionally, during the summer and fall of 2005  Respondents repeatedly refused to produce any electronic documents and records other than after conversion to TIFF or PDF formats where the electronic document was subdivided into single-page files. None of these altered documents could be searched, or be located for review and analysis by type format. Petitioner's concerns about the non-compliant production of electronic documents took precedence over its concerns about the server failure, particularly where the affected hardware, apparently, was being preserved, and where, apparently, "much" of the affected e-mail could be obtained on other media or systems. Petitioner's efforts to prioritize and address these concerns actions cannot legitimately be described as either "indifference" or lack of interest in the e-mail server failure, or in data recovery from the surviving e-mail hard drives. It certainly cannot justify the apparent destruction of e-mail data on those drives in October-November 2005.

4.    "No Significant Records Were Lost" (Resp. ¶¶116-126)

In the there is no dispute that two years of NeCMSC e-mails were "lost" during a computer network failure on May 30, 2005 (see Am. Pet. ¶24) although . the Report of the May 30 e-mail server describes a more limited result: "NeCMSC has been unable to restore-mail from the e-mail server drive." Am. Pet. Ex. 3 (Resp. Ex. 26), at 1. Several arguments are advanced for the proposition that the loss of NeCMSC e-mail for the two-year period immediately prior to discovery of cracks on the disc brake rotors on Acela passenger cars -- the contents of which Respondents have, apparently, made little effort to determine -- did not result in the loss of any "significant records. Repeatedly Respondents' arguments seek to shift onto Petitioner the requirement to demonstrate, as pre-condition for relief, the importance of the missing NeCMSC e-mails and electronic documents to its investigation – e-mails and electronic documents that . Respondents failed to preserve after receipt of the Subpoenas.

Respondents make the unsupported claim in Resp.¶117 that there is no reason to believe that the lost e-mail do not exist as separately "saved" documents in personal files of the sender or recipient, and, that there is "no reason to believe that any [of the lost e-mails] were of importance to the this investigation." The statement is conjectural at best and seemingly unrealistic. It begs the question why Respondents, with access to the "saved" versions of the "lost" e-mails and to most of the persons who sent or received the e-mails, rely on conjecture rather than analysis to determine the scope of the loss.

In Resp. ¶¶120, 126 Respondents seemingly disclaim any responsibility for not preserving the NeCMSC e-mail prior to May 30 and, instead, advance the

remarkable argument that Petitioner has the burden of demonstrating that it was deprived of "responsive" (¶120) or "relevent e-mail data" (¶126) as a result of the e-mail server failure.

In Resp. ¶¶ 121-123 Respondents appear to argue that because of their efforts to interview Bombardier and NeCMSC personnel, and because, arguendo, they produced the described documents, there is no reason to believe that any e-mails about a significant brake problem ever existed.[16]  Obviously these records are no dissimilar from and no substitute for the candor and broad ranging communication of e-mails.

Second, Respondents' search for responsive documents has not been thorough and provides no substitute for the "lost" e-mail documents.  For example, by December 8, 2005, Respondents still had not interviewed or reviewed the hard drive or paper files of Mr. David Stillman, the NeCMSC employee in charge of Quality Assurance at the New York Maintenance Facility, notwithstanding Mr. Stillman's job responsibilities, and that he had created an inspection spread sheet reporting (thermal) brake disc cracks.  See Resp. Ex.86.

---

[16]  Respondents' statements in Resp. ¶122 are both thinly supported and troubling.  The text accurately describes that Bombardier and NeCMSC personnel such as Denis Oakes and Sylvain Labbe filed Declarations supporting the Original Petition Response stating that they were not aware of issues relating to the "Brake Problem" and that they had never received "advance notice of the Brake Problem."  However, Respondents then state that "[b]ecause none of the people who would have been informed of the Brake Problem lost any data or have any records of a significant brake problem [capitalization in original], there is no reason to believe that any such evidence ever existed, much less was lost ion connection with the Memorial Day Incident."  The implies similar substantiation for the lost data when, in fact, none exists.  Neither the Labbe or Oakes Declaration mentions e-mail, lost data or documents, or the May 30 network failure.  Of course, even adding the missing facts the argument would be highly dubious.

Respondents suggest in Resp. ¶¶ 118-119, that negotiated search protocol to be used in searching computer hard drives of selected persons for responsive electronic documents applies to and/or resolves issues concerning the "lost" e-mails. This not the case. The agreement did not cover those documents, and, moreover, was an agreed first analysis rather than a restriction on production of otherwise responsive documents. See Resp. Ex. 86, at 2.

III.    Incomplete Production

While Respondents characterize the withholding of Kroll's production as merely a demand for a privilege index, and offer to provide one, they are wrong. The facts reflect a one-sided game of "hide-the-ball" discovered only inadvertently. See Am. Pet. Ex. 5, 6.

It seems dubious that the documents ever qualified for privilege. Rather, it seems likely that they reflect non-privileged communications concerning the performance of what is primarily a business function -- emergency data recovery to re-start NeCMSC's e-mail system -- under the umbrella of an attorney. Additionally, any claim of privilege would be vitiated by the delay in its assertion, and the indicated conduct of Respondents' counsel.

The loss of two years of e-mail during the May 30, 2005 network failure cries out for further analysis of the back-up tapes and the server hard drives.

IV.    Respondents Should Be Directed To Certify Their Compliance
       With The Subpoenas

If counsels' lengthy, respective narratives suggest anything it is that requiring each Respondent to certify its compliance with the subpoenas served on it should help bring this matter to an end.

V.    The Court Should Reject Respondents' Counter-Petition For
Petitioner To Reimburse Their Costs Of Subpoena Compliance

Respondents contend that the Inspector General "has conducted this

investigation in an inconsistent and fundamentally unreasonable manner" leading

Respondents to expend more than $1.5 million in costs and fees. Mem. at 20.

Respondents' position is legally and factually unsupportable. Respondents have

not met the applicable legal burden and the facts do not warrant the granting of

Respondents requests for costs. Instead, Respondents use the claim to justify their

exaggerated, unwarranted allegations against Petitioner and divert attention from

their own conduct, which has thwarted the investigation.

Courts have repeatedly held that the subpoenaed party bears the costs of

compliance with an administrative subpoena. This was articulated in U.S. v.

Firestone Tire & Rubber Co., 455 F.Supp. 1072, 1083 (D.D.C. 1978), where the

court held that, "[s]ome burden on subpoenaed parties is to be expected and is

necessary in furtherance of the agency's legitimate inquiry and the public

interest." See also, EEOC v. Maryland Cup Corp., 785 F.2d 471, 477 (4th Cir.

1986); Hurt v. Dime Savings Bank, 151 F.R.D. 30, 31 (EDNY 1993)("In general,

the cost to business of complying with governmental subpoenas are normal costs

of doing business which should be borne by the [subpoenaed] company"); In re

Tropicana Casino & Resort, 9 OCAHO 1060, 2000 WL 33113961, ***1

(O.C.A.H.O. 2000); and, FTC v. Rockefeller, 591 F.2d 182 (2nd Cir. 1979).

Requests for reimbursements in connection with subpoenas issued in the

course of an investigation are rarely granted. Unless Respondents clearly

demonstrate, as a pre-condition, that the Subpoenas are oppressive or

unreasonable, the Court will not consider invoking its power to direct

reimbursement. See, e.g., Stern v. Commissioner of Internal Revenue, 74 T.C. 1075, 1087 (Tax Court 1980).

Even when granted, the order is entered prior to the provision of records and documents, thus conditioning enforcement on the obligation to reimburse. See, e.g., SEC v. Arthur Young & Co., 584 F.2d at 1032-1033. On this basis alone, this Court should also reject Respondents' claims for reimbursement as being untimely. See, e.g., In the Matter of ITT, 97 F.T.C. 202, 1981 WL 389458 (1981) ("requests for compliance costs already incurred are untimely and inconsistent with the Commission's rules, because they deprive the ALJ and the proponent of the subpoena of the choice of means by which to ameliorate unreasonable burdens"); Warshay v. United States, 1999 WL 250777 (E.D.N.Y.,1999).

The cases upon which Respondents rely do not support recovery. All but two of the cases upon which Respondents rely concern costs of subpoena compliance incurred by third parties, not to the party subject of investigation. See SEC v. Arthur Young, (Rule 45 and third party not subject of investigation); FTC v. Winters Nat. Bank and Trust Co., 509 F.Supp. 1228 (S.D. Ohio, 1981) (FTC subpoena to third party bank); U.S. v. Friedman, 532 F.2d 928 (3d Cir. 1976) (enforcement proceedings against banks and an accountant to enforce summonses issued in connection with an examination into the tax liabilities of two taxpayers); FTC v. Rockefeller, 591 F.2d 182 (2nd Cir. 1979) (subpoena enforcement against bank holding companies and their executives regarding energy companies and financial institutions and their affiliates); Linder v. Calero-Portocarrero, 251 F.3d 178 (D.C.Cir.2001) (subpoena to third party in civil suit). The case law draws a

26

clear distinction between third parties' requests for costs and the respondents who are the recipient of an investigative or administrative subpoena. See, e.g., FTC v. Texaco, Inc., 555 F.2d 862, 88, n. 59 (D.C.Cir. 1977) ("This is not a case in which the subpoena is directed to a third party not under investigation").

In United States v. Friedman, 532 F.2d 928 (3d Cir. 1976), the court concluded that a trial court has discretion to award costs for compliance with an IRS subpoena issued to third party banks, but that costs should be imposed "only after individualized determination by court that cost involved in complying with summonses exceeded that which banks might reasonably be expected to bear as cost of doing business." The court noted that there was no statute or rule that which authorized the reimbursement of costs of compliance. Id., 532 F.2d at 936.

This case is readily distinguishable from Freidman. In Friedman, a subpoena was issued to a third party -- not, as here, to a party subject to an investigation related to safety matters, and the subpoena recipient sought relief prior to production of records rather than after it incurred alleged significant funds. Moreover, in Friedman the responding party apparently sought reproduction costs, not attorney's fees.

The two cases cited by Respondents that do not concern subpoenas to third parties, SEC v. OKC Corp., 474 F.Supp. 1031 (N.D.Tex., 1979) and U.S. v. Tivian Laboratories, Inc., 589 F.2d 49 (1st Cir. 1978), also provide no support.

In OKC the respondent argued that the subpoena imposed an unreasonable burden and that the production would be excessively expensive. In addressing OKC's claim, the court made various findings related to this issue: (a) "The general rules are well established that expense alone does not render a subpoena

unreasonable and that the recipient of a subpoena duces tecum is required to bear the costs of compliance", (b) "in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence", (c)"Where, as here, the agency inquiry is Congressionally authorized and the documents sought are relevant to the investigation, that burden is not easily satisfied, " and (d) "The court does not find in light of the facts of this case that the expense of complying with the subpoena will exceed that which OKC reasonably ought to bear." Id. 474 F.Supp at 1036-1037. OKC is furthermore distinguishable in that OKC sought costs prior to expenditure not subsequent thereto.

In Tivian the First Circuit remanded proceedings for a determination if compliance was so burdensome as to entitle respondent to reimbursement for the costs of compliance. In doing so, the Court cautioned that [I]t is only, however, in very extreme circumstances that it is appropriate for a court to impose conditions of this nature and we do not mean to suggest that such circumstances necessarily or indeed are likely to exist here." 589 F.2d at 55.

Nor have or met the extraordinary high burden of proof which these cases articulate. Indeed, none of the cases on which Respondents rely are comparable or even similar to the investigation here.

Not only do Respondents fail to demonstrated the "extreme" circumstances required to recover under their claim, they fail to adequately describe those costs. Instead, in Resp. ¶¶173-174 Respondents provide a conclusory statement that "the Inspector General's investigation has imposed disproportionate costs on Respondents, which now exceed $1.5 million" and reference the remainder of the Response and their "Original Petition Response."

and their current "Response and Cross-Petition." Respondents leave to the Petitioner and this Court the task of finding support for the amount claimed and its reasonableness.

Petitioner's review has located two declarations by Respondents' counsel, appended as exhibits to the October 2005 "Original Petition Response" that describe legal fees approximately one half of total amount claimed in the Response.[17] Neither declaration is accompanied by a breakdown of the costs or documents supporting the stated amounts. It appears from the declarations that Respondents' claim for costs seeks attorneys' fees for their compliance with an investigative subpoena. They provide no authority supporting their claim.

Even in areas of the law where, unlike here, there is statutory or other authority for recovering legal fees, it is settled law that the requesting party bears the burden of proof showing its entitlement. See, U.S. for Varco Pruden Bldgs. v. Reid & Gary Strickland Co., 161 F.3d 915, 919 (5th Cir. 1998) ("A party requesting attorneys' fees carries the burden of proof and the duty to segregate fees.")(citation omitted). In order to satisfy this burden of proof, the requesting party must present sufficient evidence to the district court that supports the request for attorneys' fees. See generally, Hensley v. Eckerhart, 103 S.Ct. 1933, 1939 (1983) ("The party seeking an award of [attorneys'] fees should submit evidence supporting the hours worked and rates claimed"). In National Ass'n. of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1327 (D.C.Cir.

---

[17]   Mr. Broas asserted that his firm had amassed 570 hours totaling approximately $114,000 in attorney's fees for "reviewing and preparing documents for production on behalf of NeCMSC and Alstom." Broas Decl.,at 4.   Mr. Douglas stated that, as of August 31, 2005, his firm had billed over 3,200 hours at a total cost to Bombardier "in excess of $600,000" for costs "directly related to production of [subpoenaed] documents." Douglas Decl., at 9.

1982), the Court of Appeals held that, "[c]asual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees. Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." See also Perotti v. Seiter, 935 F.2d 761, 764 (6th Cir. 1991) (party seeking attorneys' fees "has the burden of providing for the court's perusal a particularized billing record"). Respondents have not demonstrated a legal or factual basis for the claimed "costs."

More importantly, Respondents' conduct -- not their claims or support provided -- is the more reliable indicator that they are not entitled to costs. The unnecessary or increased costs of subpoena compliance Respondents allege, if it exists, is likely attributable to their delaying actions and sharp tactics, or what appears to be exorbitant time charges. Respondents' conversion of their electronic documents to TIFF and PDF images, and its "back-up-the-truck" and "needle-in-the-haystack" methods of production have been addressed previously. Respondents also delayed production over several months by initially refusing to identify, segregate and produce documents indicating whether, and, if so, when they learned of cracks in the disc brake rotors on Acela passenger cars. They argued that the effort comprised work product, and that it would compromise potential litigation with sub-contractors. While the claim has no support in case law, it did delay the investigation and it does indicate that the costs they now allege may have been incurred for reasons separate from compliance with the Subpoenas. Yet another example is Respondents' repeated threat, from early discussions about compliance, that they would seek costs if Petitioner did not

substantially and unreasonably restrict the Subpoenas or sought to enforce their provisions. Although Respondents could have sought judicial protection for claimed abuses it did not do so, and this inaction is the best indicator of the merits of Respondents' claim.

This Court should reject the "Cross-Petition" for its failure to provide the support required even in the cases it cites, such as a detailed breakdown of the costs, their reasonableness, the goods and services for which they were incurred, Respondents' financial condition, and whether claimed amounts include attorneys fees.[18] To rule otherwise would not only chill Petitioner's investigation and further investigative efforts, but would also chill the functions of other Inspectors General. It would also reward non-compliant, delaying behavior by these Respondents, and by recipients of investigative subpoenas in other important investigations.

---

[18] The cases which Respondents cite pertain to copying and reproduction costs and not attorney's fees. See, e.g., Resolution Trust Corp. v. Thornton, 798 F.Supp. at 8 ("Arthur Young merely established that the district court *may* order reimbursement for photocopying where the cost of compliance would be unreasonable.")

## Conclusion

Accordingly, Petitioner respectfully requests that this Court summarily enforce the Subpoenas and grant the relief described in the Amended Petition, and that it deny Respondents' Cross-Petition for costs.

Respectfully submitted,

COLIN C. CARRIERE (# 375016)
Counsel to the Inspector General
Office of the Inspector General
National Railroad Passenger Corporation
10 G Street, Northeast
Room 3E-404
Washington, DC 20002
Tele: (202) 906-4355

DAVID SADOFF (#204974)
Associate Counsel to the Inspector General
Office of the Inspector General
National Railroad Passenger Corporation
10 G Street, Northeast
Room 3E-406
Washington, DC 20002
Tele: (202) 906-4882

Dated: October 19, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2006, I caused to be served copies of "Petitioner's Reply to 'Response And Cross-Petition Of Bombardier, Inc. And Northeast Corridor Maintenance Services Company' To Amended Petition For Summary And Expedited Enforcement of Inspector General Subpoena Duces Tecum," on the below-listed counsel, by United States mail, first-class postage prepaid.

Philip Le B. Douglas, Esquire
Jones Day
222 East 41st Street
New York, New York 10017
  Counsel for Bombardier and NeCMSC

Timothy M. Broas, Esquire
Winston & Strawn, LLP
1700 K Street, N.W.
Washington, D.C.  20006-3817
  Counsel for Alstom and NeCMSC


                
David Sadoff