UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.
  AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
  CORPORATION,

                              Petitioner,

            v.

BOMBARDIER, INC.,
ALSTOM TRANSPORTATION, INC.,
NORTHEAST CORRIDOR MAINTENANCE
  SERVICES COMPANY,

                              Respondents.

Civil No. 1:05-mc-00367
        (PLF/DAR)

**AFFIDAVIT OF PHILIP Le B.
DOUGLAS IN SUPPORT OF
CROSS-PETITION OF
BOMBARDIER INC.**

PHILIP Le B. DOUGLAS, being duly sworn, deposes and says:

1.      I am a member of the bar of this Court and Jones Day, counsel to Respondent

Bombardier Inc. ("Bombardier").  In addition to Bombardier itself, Jones Day represents

Bombardier's 50% interest in Respondent Northeast Corridor Maintenance Services Company

("NeCMSC").  I make this affidavit in support of Bombardier's October 6, 2006 Cross-Petition

for Compliance Costs (the "Cross-Petition") incurred in connection with the Inspector General's

investigation at issue in this case (the "Investigation').  Dkt. 21 ¶¶ 173-174.  Unless otherwise

indicated, this affidavit is based on either my personal knowledge or information provided to me

by persons working under my supervision.

2.      Petitioner's October 19, 2006 "Reply" to the Cross Petition (Dkt. 39) (the "Reply")

complains that the Cross-Petition is not accompanied by affidavits supporting the hours worked

and rates claimed.  Reply at 28-30.  Given (a) the absence of any such requirement in Judge

Friedman's August 22, 2006 Order (Dkt. 12) and (b) the Inspector General's own failure to

submit <u>any</u> evidence in support of his Amended Petition, Respondents were under no obligation

to submit evidence at the time they filed their Cross-Petition.[1]  Nevertheless, in order to moot

this issue, I demonstrate below that Bombardier has incurred more than $1.7 million in costs as a

result of the Petitioner's year-and-a-half Investigation of Bombardier and NeCMSC.[2]

    3.    In 1996, Alstom Transportation, Inc. ("Alstom") and Bombardier (collectively the

"Consortium") executed contracts with the National Passenger Railroad Passenger Corporation

("Amtrak") to, among other things, design, manufacture and maintain Acela high-speed trains

for use on the Northeast Corridor between Washington, D.C. and Boston, Massachusetts.  With

Amtrak's consent, the Consortium's maintenance obligations were delegated to NeCMSC, a

company in which Bombardier and Alstom each have a 50% interest.

    4.    On April 14, 2005, cracks were discovered in the spokes of a large number of

friction brake discs on Acela passenger cars (the "Brake Problem").  That day, all 20 Acela trains

were withdrawn from service.  In May and June 2005, Petitioner caused Alstom and

Respondents, Bombardier and NeCMSC, to be served with six subpoenas duces tecum (the

"Subpoenas") in connection with his Investigation.

---

[1]  In any event, the Cross-Petition was accompanied by affidavits regarding Bombardier's preliminary estimate of its costs through September 2005.  <u>E.g.</u>, 10/20/05 Douglas Dec. ¶¶ 20-21.  (Dkt. 22).

[2]  By this affidavit, Bombardier addresses only its own costs in connection with this Investigation and not those of Alstom Transportation, Inc.  In the event Petitioner ever makes a *prima facie* case in support of the Amended Petition, Bombardier reserves the right to provide responsive evidence regarding the merits of the Amended Petition and the Cross Petition.

5.      In early May 2005, Bombardier retained Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury Winthrop") to represent it and Bombardier's 50% interest in NeCMSC with regard to the Brake Problem.  Upon information and belief, Alstom retained Winston & Strawn LLP ("Winston & Strawn") to represent Alstom and Alstom's 50% interest in NeCMSC in connection with the  Brake Problem.

6.      From early May 2005 through June 5, 2006, when I left to become a member of Jones Day, I was the partner in charge of Pillsbury Winthrop's representation of Bombardier and its interest in NeCMSC in connection with the Investigation.  As a result, I supervised the work of all timekeepers on this project, reviewed the timesheets and submitted bills to the client.  All of Pillsbury Winthrop's work for both Bombardier and NeCMSC in connection with the Investigation was paid for by Bombardier.  Winston & Strawn also performed legal services for NeCMSC, which services were, upon information and belief, paid for by Alstom.

7.      On June 6, 2006, I became a partner of Jones Day.  At Bombardier's request, I continued to represent both Bombardier and its interests in NeCMSC in connection with the Investigation.  As I had at Pillsbury Winthrop, I supervised all of Jones Day's work for, and reviewed all bills submitted to, Bombardier.

8.      We have determined that Bombardier paid $1,622,397.44 to Pillsbury Winthrop and Jones Day in Investigation-related fees and costs by reviewing each of the monthly Pillsbury Winthrop and Jones Day invoices submitted to Bombardier for work performed from May 2005 through July 2006, including the daily time entries submitted by timekeepers who had worked on the Investigation during the month in question.  Any entries that were unrelated to the Investigation, such as the Brake Problem-related legal work performed in connection with

Bombardier's and NeCMSC's contractual dealings with subcontractors and Amtrak were excluded from the calculation. Where a particular amount of time was ascribed to both the Investigation and other Brake Problem matters, that time was divided in half, unless the Investigation-related work appeared to de minimis. In that event, none of that time was attributed to the Investigation. However, even if the non-Investigation-related work appeared to be only a small proportion of a particular time entry, only 50% of that entry's time was included in the calculation of Investigation-related costs. In addition, Pillsbury Winthrop's work with regard to the NeCMSC's May 30, 2005 loss of email server data (the "Memorial Day Incident") up through Pillsbury Winthrop's submission of a report on the subject on June 28, 2005 was excluded from that calculation. (A summary of these calculations appears as Respondents' Ex. 146 in the separately bound volume of exhibits filed with this affidavit).

9.     Bombardier's total fee payments to Pillsbury Winthrop and Jones Day for all Brake Problem-related work performed during the relevant period were $1,994,871.62. As a result of the review described above, a total of $400,437.96 was excluded from this amount. Thus, recoverable Investigation-related time charges were determined to be 76% of the total fees involved in the Brake Problem matter. In order to calculate the disbursements and other non-fee charges attributable to the Investigation, the total of all Brake Problem-related non-fee charges were multiplied by 76%. That percentage was then used to determine that the recoverable Investigation-related non-fee charges paid by Bombardier to Pillsbury Winthrop and Jones Day equaled $98,291.78. Because a higher percentage of these disbursements and other non-fee charges was in fact attributable to the costs of searching for and producing 1.3 million pages of records in connection with the Investigation, the calculation is conservative. As a result of this

review and calculation, it was determined that Bombardier paid Pillsbury Winthrop and Jones Day a total of $1,622,397.44 in recoverable Investigation-related fees and other charges.

10.     Bombardier is continuing to incur Investigation-related costs.  Respondent therefore reserves the right to update this calculation.  At an appropriate time, Bombardier will also calculate and submit to the Court its claim for prejudgment interest on all its Investigation-related costs.

11.     The Investigation may be divided into two phases.  "Phase I" occupied the period May-October 2005.  At the outset of Phase I, the Inspector General served on Respondents and Alstom six vague and broad Subpoenas.  Petitioner insisted that (a) the Subpoenas be satisfied on an expedited basis and (b) Respondents and Alstom immediately search for, isolate and produce all records that constituted pre-April 14, 2005 "notice" to Respondents of any brake "problem".  This latter demand is not found in any of the Subpoenas.  In a number of Phase I meetings and through correspondence involving at least 47 emails and letters, Respondents and, upon information and belief, Alstom informed the Inspector General's staff that, to the extent they could be understood, the Subpoenas would require a production of a very large volume of largely irrelevant paper and electronic records.  Respondents therefore asked Petitioner's staff to clarify and narrow the Subpoenas' demands.  In the hope of securing Petitioner's agreement to refine the document requests, Bombardier caused Pillsbury Winthrop to interview at least 20 Bombardier and NeCMSC employees, and, in June 2005, provide "lay-of-the-land" reports to Petitioner regarding the universe of potentially responsive Bombardier and NeCMSC files.

12.     In the end, however, the Inspector General declined in Phase I to modify any of the Subpoenas' demands.  After duly noting their objections to each of the demands, therefore,

Bombardier and NeCMSC proceeded to search for and produce paper and electronic files in which any advance "notice" of a Brake Problem would likely be found.  In order to accommodate Petitioner's repeated and insistent demands for expedition, teams of lawyers, paralegals and consultants conducted an additional 40 interviews and weeks of document reviews in Canada and the United States.  As a result, from April-October 2006, Bombardier and NeCMSC produced more than one million pages of potentially responsive records.  Pillsbury Winthrop's legal fees and related charges to Bombardier for this Phase I work on behalf of both Respondents was at least $925,188.17.  Resp. Ex. 146.

13.    On September 22, 2005, while Respondents' Phase I document production was still ongoing, the Inspector General, <u>without</u> <u>any</u> <u>prior</u> <u>warning</u>, filed the Petition of the National Railroad Passenger Corporation Inspector General for Summary and Expedited Enforcement of Administrative Subpoenas Duces Tecum (the "Original Petition") and a supporting memorandum ("Orig. Pet. Mem.") in this case.  In substance, Petitioner alleged that Respondents and Alstom, (a) "appear" to have withheld "highly pertinent" records suggesting that they had advance "notice" of the Brake Problem (Orig. Pet. Mem. at 11, 21-22, n.28 & 23); (b) deliberately "disorganized" their document production (*id.* 5-6, 11, 17-18, 21, n.27 & 23-24); (c) "refused to produce any emails or electronic documents" (*id.* at 5; *see id.* at 10, 15, 17, Orig. Pet. ¶¶ 18, 21); (d) disaggregated electronic documents into their individual pages (Orig. Pet. ¶ 20); and (e) "inflated their production with [non-responsive] records."  Orig. Pet. Mem. at 5; *see id.* at 5-6, 20, 23, Orig. Pet. ¶ 19.  <u>None</u> of these claims had ever before been raised with Respondents or, upon information and belief, with Alstom.  Each, moreover, was false.

14.    In an unsuccessful effort to have the Inspector General withdraw these inflammatory charges from the public record, Respondents and Alstom prepared and, on

October 20, 2005 submitted to the Inspector General, a 36-page memorandum, 12 declarations and 68 exhibits demonstrating that the Original Petition's fundamental "notice" and suppression of evidence allegations were demonstrably wrong.[3]  In order to disabuse Petitioner of his theory that Respondents and Alstom had advance "notice" of the Brake Problem, these parties submitted declarations from five "key" (Amended Pet. ¶ 18) witnesses denying that they had any such advance knowledge.  On October 25, 2005, only five days later, the Inspector General unilaterally sought a stay of all proceedings in this case.  On November 10, 2005, moreover, Petitioner acknowledged that Respondents had "demonstrate[d] that portions of the . . . petition require supplementation and revision."  As a result of Petitioner's subsequent *ex parte* stay requests, no significant proceedings occurred in this case for nine months.  On August 8, 2006, after Judge Friedman indicated he would otherwise dismiss the Original Petition for failure to prosecute, the Inspector General filed his Amended Petition.  None of the Original Petition's "notice" and suppression of "highly pertinent" evidence allegations are repeated in the Amended Petition.  Bombardier's legal fees and related costs in convincing the Inspector General to drop these baseless charges were at least $229,742.09.  Resp. Ex. 146.

15.    "Phase II" of the Investigation extended from November 2005 until the end of July 2006.  Even though, in Phase I, Bombardier and NeCMSC had (a) searched for, and produced, any files in which records constituting "notice" of the Brake Problem might reasonably be found <u>and</u> (b) submitted declarations from concededly "key" (Amended Pet. ¶ 18) officials categorically denying any pre-April 14, 2005 knowledge of the Brake Problem, Petitioner insisted that Respondents and Alstom conduct extensive new searches.  Respondents and Alstom

---

[3]    These were all filed with the Court in support of Respondent's October 6, 2006 Response and Cross-Petition (Dkt. 21).

attempted to satisfy the Inspector General's demands by searching for, and producing, an additional 300,000 pages of records, subjecting their employees, consultants and counsel to lengthy interrogations by Petitioner's staff, preparing for, and participating in, numerous meetings and telephone conferences, providing various reports and analyses, and engaging in correspondence that exceeded an additional 70 letters and emails.  Among other things, Respondents attempted to address a series of shifting demands that were not in the Subpoenas and had not otherwise been raised during Phase I of the Investigation, including (a) Petitioner's demand, first made on November 10, 2005, after Respondents had produced 1,000,000 pages of records, that all previously produced electronic documents be resubmitted in their "native format"; (b) the Inspector General's insistence that Respondents conduct still more electronic searches, none of which, in the end, appear to have produced any significant evidence; and (c) Petitioner's belated requests that Respondents and Alstom produce witnesses and records regarding the Inspector General's eleventh-hour interest in NeCMSC's May 2005 loss of email data.  With regard to Phase II of the Investigation, Pillsbury Winthrop and Jones Day charged Bombardier, and were paid, a total of $467,467.17 in legal fees and related costs.  Resp. Ex. 146.

16.    Fair and accurate copies of the following Pillsbury Winthrop and Jones Day business records accompany this affidavit:

a.    Pillsbury Winthrop and Jones Day invoices (exclusive of daily time entry materials withheld on privilege grounds) for each of the months in the period May 2005 – July 2006 (Resp. Ex. 147); and

b.    Pillsbury Winthrop and Jones Day records of Bombardier payments during the same period (Resp. Ex. 148).

17.     These records contain the hourly rates charged to Bombardier.  Upon information and belief, these rates were competitive with those charged by peer law firms.  As previously mentioned, in order to protect Respondents' attorney-client and work product privileges, I have redacted the substance of each daily time entry submitted to Bombardier.  Provided the Court rules that such a disclosure will not be deemed a waiver of any applicable privilege, Bombardier is willing to submit the redacted time entries under seal for the Court's *in camera* review.

18.     Upon information and belief, Bombardier paid Commonwealth Legal ("Commonwealth Legal") in Montreal, Quebec $60,000 in Canadian dollars for the copying of records produced to the Inspector General.

19.     Upon information and belief, NeCMSC has paid $215,795.73 to Alpha Systems ("Alpha") for the copying of NeCMSC records produced to Petitioner.  Bombardier has reimbursed NeCMSC for 50% of these costs ($107,897.86).  I understand further that Bombardier will shortly pay Alpha directly an additional $38,562.94 (Invoice Nos. IVC027702 and IVC027703) in NeCMSC copying costs.  Accordingly, Bombardier will pay Alpha a total of $146,460.80 in NeCMSC copying costs.  Fair and accurate copies of Alpha's invoices to NeCMSC appear as Resp. Ex. 149.

20.     Based on the foregoing and on the record in this case, Bombardier is entitled to reimbursement of at least (a) $1,622,397.44 of the amount it has paid to Pillsbury Winthrop and Jones Day in connection with this Investigation; (b) $60,000 in Canadian dollars paid to Commonwealth Legal; and (c) $146,460.80, which represents its share of payments that have been made or are owed to Alpha for copying records NeCMSC produced to the Inspector General.  In addition, Bombardier is entitled to prejudgment interest on all these amounts.

Bombardier continues to incur substantial Investigation-related costs.  These will be

substantiated at an appropriate time.


                                          /s  Philip Le B. Douglas
                                              Philip Le B. Douglas

Sworn to before me this 7th day
of February, 2007


_____
        Notary Public