UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR.<br>  AS INSPECTOR GENERAL<br>NATIONAL RAILROAD PASSENGER<br>  CORPORATION,<br><br>      Petitioner,<br><br>    v.<br><br>BOMBARDIER, INC.,<br>ALSTOM TRANSPORTATION, INC.,<br>NORTHEAST CORRIDOR MAINTENANCE<br>  SERVICES COMPANY,<br><br>      Respondents. | Civil No. 1:05-mc-00367<br>(PLF/DAR)<br><br>AFFIDAVIT OF<br>TIMOTHY M. BROAS |

  I, TIMOTHY M. BROAS, being duly sworn, deposes and says:

  1. I am a member of the bar of this Court and Winston & Strawn LLP ("W&S"), counsel for Alstom Transportation Inc. ("Alstom"), and Alstom's 50% interest in Respondent Northeast Corridor Maintenance Services Company ("NeCMSC"). I make this affidavit in support of Respondents' October 6, 2006 Cross-Petition for Compliance Costs (the "Cross-Petition") incurred in connection with the Inspector General's investigation at issue in this case (the "Investigation"). Dkt. 21 ¶¶ 173-174. Unless otherwise indicated, this affidavit is based on either my personal knowledge or information provided to me by persons working under my supervision.

  2. Petitioner's October 19, 2006 "Reply" to the Cross Petition (Dkt. 39) (the "Reply") complains that the Cross-Petition is not accompanied by affidavits supporting the hours worked and rates claimed. Reply at 28-30. Given (a) the absence of any such requirement in Judge

Friedman's August 22, 2006 Order (Dkt. 12) and (b) the Inspector General's own failure to submit any evidence in support of his Amended Petition, Respondents were under no obligation to submit evidence at the time they filed their Cross-Petition.[1] Nevertheless, in order to moot this issue, I demonstrate below, that Alstom has been billed, and has paid, a total of $703,749.25 in legal fees and related expenses in connection with Petitioner's year-and-a-half investigation of Alstom and NeCMSC.[2]

3. In 1996, Bombardier Inc. ("Bombardier") and Alstom (collectively the "Consortium") executed contracts with the National Passenger Railroad Passenger Corporation ("Amtrak") to, among other things, design, manufacture and maintain Acela high-speed trains for use on the Northeast Corridor between Washington, D.C. and Boston, Massachusetts. With Amtrak's consent, the Consortium's maintenance obligations were delegated to NeCMSC, a company in which Bombardier and Alstom each have a 50% interest.

4. On April 14, 2005, cracks were discovered in the spokes of friction brake discs on Acela passenger cars (the "Brake Problem"). That day, all 20 Acela trains were withdrawn from service. In May and June 2005, Petitioner caused Alstom and Respondents, Bombardier and NeCMSC, to be served with six subpoenas duces tecum (the "Subpoenas") in connection with his Investigation.

5. In early May 2005, Alstom retained W&S to represent it and Alstom's 50% interest in NeCMSC with regard to the Brake Problem. Upon information and belief, Bombardier

---

[1] In any event, the Cross-Petition was accompanied by affidavits regarding Alstom's estimated costs through September, 2005. This affidavit supplements my October 18, 2005 declaration (Dkt. 22).

[2] By this affidavit, Alstom addresses only its own costs in connection with this Investigation and not those of Bombardier Inc. In the event Petitioner makes a *prima facie* case in support of the Amended Petition, Alstom reserves the right to provide responsive evidence regarding the merits of the Amended Petition and the Cross-Petition.

retained Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury Winthrop") to represent Bombardier and its 50% interest in NeCMSC in connection with the Brake Problem.[3]

6. From early May 2005 to the present, I have been the partner in charge of W&S's representation of Alstom and its NeCMSC interest in connection with the Investigation. As a result, I have supervised the work of all timekeepers on this project, reviewed the timesheets and submitted bills to the client. All of W&S's work for both Alstom and NeCMSC in connection with the Investigation was paid for by Alstom.

7. In response to the Inspector General's demand for substantiation of Respondents' claim for reimbursement of Investigation-related fees and other charges paid to W&S, I have determined that Alstom was billed, and paid, approximately $360,238.66 in Investigation-related costs on behalf of Respondents. I made this determination by reviewing the W&S charges to Alstom since the inception of the investigation and estimating that from the period beginning May 10, 2005 (the date of the original NeCMSC subpoena) through May 19, 2006 (the date Alstom submitted its certificate of compliance to the Inspector General), 50% of these charges were directly attributable to Alstom's investigation-related efforts, with the remaining 50% relating to those costs of the investigation incurred on behalf of Alstom's interest in NeCMSC. As Alstom is not a party to the current proceedings, 100% of the investigation-related charges from May 20, 2006 through July, 2006 have been attributed to costs incurred on behalf of Alstom's interest in NeCMSC.

8. Although Alstom itself is not a party to these proceedings, Alstom is continuing to incur Investigation-related costs arising from its interest in NeCMSC. Alstom, therefore,

---

[3] On June 6, 2006, Philip Le B. Douglas, counsel for Bombardier, joined the law firm of Jones Day, which has since represented Bombardier, and its interest in NeCMSC, in this matter.

reserves the right to update this calculation. At an appropriate time, Respondents and Alstom will also calculate and submit to the Court their claim for prejudgment interest on all Investigation-related costs.

9.     The Investigation may be divided into two phases. "Phase I" occupied the period of May-October 2005. At the outset of Phase I, the Inspector General served on Respondents and Alstom six vague and broad Subpoenas. Petitioner insisted that (a) the Subpoenas be satisfied on an expedited basis and (b) Respondents and Alstom immediately search for, isolate and produce all records that constituted pre-April 14, 2005 "notice" to Respondents or Alstom of any brake "problem". This latter demand is not found in any of the Subpoenas. In a number of Phase I meetings and through correspondence involving at least 47 emails and letters, Respondents and Alstom informed the Inspector General's staff that, to the extent they could be understood, the Subpoenas would require the production of a very large volume of largely irrelevant paper and electronic records. Respondents and Alstom therefore asked Petitioner's staff to clarify and narrow the Subpoenas' demands.

10.    In the end, however, the Inspector General declined in Phase I to modify, or even define, any of the Subpoenas' demands. Therefore, after duly noting their objections to each of the demands, Respondents and Alstom proceeded to search for and produce numerous files in which any advance "notice" of a passenger car disc brake spoke failure would likely be found. As a result, more than one million pages of potentially responsive records were produced at the Inspector General's Washington, D.C. offices from May-October 2006.

11.    Upon information and belief, this extensive effort did not produce any evidence to support Petitioner's advance "notice" or any other misconduct theory. Based on the calculation

detailed in paragraph 7, W&S's legal fees and related charges to Alstom for this Phase I work on behalf of Respondents was $168,072.82.

12. On September 22, 2005, while Respondents' Phase I document production was still ongoing, the Inspector General, without any prior warning, filed the Petition of the National Railroad Passenger Corporation Inspector General for Summary and Expedited Enforcement of Administrative Subpoenas Duces Tecum (the "Original Petition") and a supporting memorandum ("Orig. Pet. Mem.") in this case. In substance, Petitioner alleged that Respondents and Alstom, (a) "appear" to have withheld "highly pertinent" records suggesting that they had advance "notice" of the Brake Problem (Orig. Pet. Mem. at 11, 21-22, n.28 & 23); (b) deliberately "disorganized" their document production (id. 5-6, 11, 17-18, 21, n.27 & 23-24); (c) "refused to produce any emails or electronic documents" (id. at 5; see id. at 10, 15, 17, Orig. Pet. ¶¶ 18, 21); (d) disaggregated electronic documents into their individual pages (Orig. Pet. ¶ 20); and (e) "inflated their production with [non-responsive] records." Orig. Pet. Mem. at 5; see id. at 5-6, 20, 23, Orig. Pet. ¶ 19. None of these claims had ever before been raised with Respondents or Alstom. Each, moreover, was false.

13. In an unsuccessful effort to have the Inspector General withdraw these inflammatory charges from the public record, Respondents and Alstom prepared and, on October 20, 2005 submitted to the Inspector General, a 36-page memorandum (the "Original Petition Response"), 12 declarations and affidavits and 68 exhibits demonstrating that the Original Petition's fundamental "notice" and suppression of evidence allegations were demonstrably wrong.[4] In order to disabuse Petitioner of his theory that Respondents and Alstom had advance

---

[4] These were all filed with the Court in support of Respondents October 6, 2006 Response and Cross-Petition (Dkt. 21).

"notice" of the Brake Problem, these parties submitted declarations and affidavits from five "key" (Amended Pet. ¶ 18) witnesses denying that they had any such advance knowledge. On October 25, 2005, only five days later, the Inspector General unilaterally sought a stay of all proceedings in this case. On November 10, 2005, moreover, Petitioner acknowledged that Respondents and Alstom had "demonstrate[d] that portions of the . . . petition require supplementation and revision." As a result of Petitioner's subsequent *ex parte* stay requests, no further proceedings occurred in this case for nine months. On August 8, 2006, after Judge Friedman indicated he would otherwise dismiss the Original Petition for failure to prosecute, the Inspector General filed his Amended Petition. None of the Original Petition's "notice" and suppression of "highly pertinent" evidence allegations are repeated in the Amended Petition.

14. "Phase II" of the Investigation extended from November 2005 until the end of July 2006. Even though, in Phase I, Respondents and Alstom had (a) searched for, and produced, numerous files in which records constituting "notice" of the Brake Problem might reasonably be found and (b) submitted declarations and affidavits from concededly "key" (Amended Pet. ¶ 18) officials categorically denying any pre-April 14, 2005 knowledge of the Brake Problem, Petitioner insisted that Respondents and Alstom conduct extensive new searches. In an effort to avoid litigation, Respondents and Alstom attempted to satisfy the Inspector General's demands by searching for, and producing, an additional 300,000 pages of records, subjecting their employees, consultants and counsel to lengthy interrogations by Petitioner's staff, preparing for, and participating in, numerous meetings and telephone conferences, providing various reports and analyses, and engaging in correspondence that exceeded an additional 76 letters and emails. Among other things, Respondents and Alstom attempted to address a series of shifting demands that were not in the Subpoenas and had not otherwise been raised during Phase I of the

6

Investigation, including (a) Petitioner's demand, first made on November 10, 2005, after Respondents and Alstom had produced 1,000,000 pages of records, that all previously produced electronic documents be resubmitted in their "native format"; (b) the Inspector General's insistence that Respondents and Alstom conduct still more electronic searches, none of which, in the end, produced any useful evidence; and (c) Petitioner's belated requests that Respondents and Alstom produce witnesses and records regarding the Inspector General's eleventh-hour interest in NeCMSC's May 2005 loss of email data.

15.     With regard to Phase II of the Investigation, based on the calculation detailed in paragraph 7, Alstom's pre-certification Phase II costs amounted to $173,843.76, with its costs from the date of certification to July 31 totaling $18,322.08. In all, W&S charged Alstom, and was paid, a total of $192,165.84 in legal fees and related costs for work performed on behalf of Respondents in connection with Phase II of the Investigation. Upon information and belief, Phase II did not produce any evidence in support of the Inspector General's theory that Respondents or Alstom had advance "notice" of the Brake Problem or anything else of relevance to the cause of the Brake Problem.

16.     Fair and accurate copies of the following W&S business records accompany this affidavit:

    a.     W&S invoices (exclusive of daily time entry materials for each of the months in the period May 2005 – July 2006 (Resp. Exh. A); and

    b.     W&S records of Alstom payments during the same period (Resp. Exh. B).

7

17.    These records contain the hourly rates charged to Alstom. Upon information and belief, these rates were competitive with those charged by peer law firms. As previously mentioned, in order to protect Respondents' and Alstom's attorney-client and work product privileges, I have redacted the substance of each daily time entry submitted to Alstom. Provided the Court rules that such a disclosure will not be deemed a waiver of any applicable privilege, Alstom is willing to submit the redacted time entries under seal for the Court's *in camera* review.

18.    Upon information and belief, Alstom directly paid Capital Legal Solutions, Inc. ("Capital Legal") in Washington, DC $1,594.00 for the copying, sorting and searching of electronic records produced to the Inspector General during the course of the Investigation.[5] Following the calculation from paragraph 7, $797.00 of this amount was related to work performed on behalf of Respondents in connection with the Investigation. A fair and accurate copy of this invoice appears as Resp. Exh. C.

19.    Based on the foregoing and on the record in this case, Alstom is entitled to reimbursement of at least (a) $360,238.66 of the amount it has paid to W&S in connection with this Investigation, and (b) the $797.00 paid to Capital Legal. In addition, Alstom is entitled to prejudgment interest. Alstom continues to incur substantial Investigation-related costs. These will be substantiated at an appropriate time.

---

[5] All additional amounts due to Capital Legal were charged to Alstom through W&S.

District of Columbia : SS
Subscribed and Sworn to before me, in my presence,
this 12 day of February, 2007

_____
Notary Public, D.C.
My commission expires 02/28/2011

_____
Timothy M. Broas

Sworn to before me this 12th day
of February, 2007

_____
Stephanie Riggs
Notary Public, District of Columbia
My Commission Expires 02/28/2011

Stephanie Riggs
Notary Public, District of Columbia
My Commission Expires 02/28/2011

9